UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| BAE SYSTEMS INFORMATION AND ELECTRONICS SYSTEMS INTEGRATION, INC., | ) ) ) ) |
| Plaintiff, | ) ) ) Case No. 10-cv-370-LM |
| vs. | ) ) |
| SPACEKEY COMPONENTS, INC. | ) ) |
| Defendant, | ) ) ) |

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS OF SPACEKEY COMPONENTS, INC.

For its answer to the Amended Complaint filed by BAE Systems Information and
Electronic Systems Integration, Inc. ("BAE"), SpaceKey Components, Inc. ("SpaceKey")
answers and alleges as follows:

1.      SpaceKey admits that BAE has an office in New Hampshire.  SpaceKey
further alleges that it entered its Domestic Business Development Consultant Agreement
with BAE Systems Information and Electronic Warfare Systems, which has an office in
Manassas, VA, and that SpaceKey's communications pursuant to that agreement were
with personnel in the Manassas office.  SpaceKey denies the remaining allegations of
paragraph 1 of the Amended Complaint.

2.      While SpaceKey admits that it has an office in Virginia Beach, VA, it
denies that it has an office at 1239 Lawson Cove Circle.  SpaceKey denies the remaining
allegations of paragraph 2 of the Amended Complaint.

3.      SpaceKey lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of paragraph 3 of the Amended Complaint, and therefore denies the same.

4.      SpaceKey denies the allegations of paragraph 4 of the Amended Complaint.

5.      SpaceKey admits the allegations of paragraph 5 of the Amended Complaint.

6.      SpaceKey admits that BAE provides a copy of a boilerplate Terms of Sale in connection with orders for its products.  SpaceKey denies the remaining allegations of paragraph 6 of the Amended Complaint.

7.      SpaceKey admits that it was a buyer of certain of BAE's products. SpaceKey admits that in connection with its purchases from BAE, BAE provided a copy of its boilerplate Terms of Sale.  SpaceKey denies the remaining allegations of paragraph 7 of the Amended Complaint.

8.      SpaceKey admits that the Terms of Sale speaks for itself.  SpaceKey denies the remaining allegations of paragraph 8 of the Amended Complaint.

9.      SpaceKey admits that it submitted orders SKC122309, SKC1610, and SKC12508 to BAE.  SpaceKey denies the remaining allegations of paragraph 9 of the Amended Complaint.

10.     SpaceKey admits that BAE has delivered certain goods under orders SKC122309, SKC1610, and SKC12508.  SpaceKey denies the remaining allegations of paragraph 10 of the Amended Complaint.

11.     SpaceKey denies the allegations of paragraph 11 of the Amended Complaint.

12.     SpaceKey admits submitting orders SKC61808, SKC127309, SKC17210, SKC71510, SKC71610, SKC12010(B), and SKC11310.  SpaceKey denies the remaining allegations of paragraph 12 of the Amended Complaint.

13.     SpaceKey admits that BAE agreed to accept the orders received prior to January 31, 2010.  SpaceKey denies the remaining allegations of paragraph 13 of the Amended Complaint.

14.     SpaceKey denies the allegations of paragraph 14 of the Amended Complaint.

15.     SpaceKey admits that its claims are stated in its counterclaims.  SpaceKey denies the remaining allegations of paragraph 15 of the Amended Complaint.

16.     SpaceKey admits that it entered a Domestic Business Development Consultant Agreement with BAE Systems Information and Electronic Warfare Systems that has an effective date of July 8, 2004 and a termination date of January 31, 2007 (the "Agreement").

17.     SpaceKey admits that the Agreement assigned a territory to SpaceKey comprising Connecticut, Maryland, and Virginia.  SpaceKey further admits that it was to act as a consultant for certain of BAE's products targeted to use in space programs, and that it was to receive a 5% commission on sales to qualified buyers within its territory. SpaceKey alleges that the Agreement specifically provides that SpaceKey's primary contact at BAE was to be with Timothy Scott in the Manassas office, and that throughout the life of the Agreement, SpaceKey communicated, with very rare exceptions,

exclusively with the Manassas office for all product and billing related issues.  SpaceKey admits that the Agreement's terms speak for themselves.  SpaceKey denies the remaining allegations of paragraph 17 of the Amended Complaint.

18.     SpaceKey admits that the Agreement was for a specific term of July 8, 2004 to January 31, 2007.  Paragraph 2 of the Agreement states that it "shall be renewed for an additional term commencing February 1, 2007, and annually therafter, unless either Party gives the other notice of its intention not to renew the Agreement, no later than ninety (90) days prior to commencement of the renewal term."  SpaceKey further admits the Agreement was annually renewed under these terms in 2007, 2008, 2009 and 2010.  SpaceKey denies the remaining allegations of paragraph 18 of the Amended Complaint.

19.     SpaceKey admits that throughout its consultancy relationship with BAE, it routinely and regularly acted as a "qualified buyer" of BAE products, which it then resold to various international customers.  Such purchases and resales were approved and acknowledged by BAE's offices in Manassas, and BAE regularly and routinely paid SpaceKey commissions on all such transactions.  Indeed, in a June 20, 2008 memo regarding BAE's resumption in production of RH1280 and RH1020 FGPAs, Don Francis stated that "Space Key Components, Inc. is a marketing representative for the BAE Systems manufactured parts for all sales in the domestic U.S. marketplace.  For international sales Space Components, Inc. [*sic*] is a reseller of the RH1280B and the RH1020B product line.  Mr. Will Key, president, is experienced in all aspect of international sales and has provided excellent service to our customer base for over ten

years." SpaceKey denies the remaining allegations of paragraph 19 of the Amended
Complaint.

20.   SpaceKey admits that BAE sent a letter on December 10, 2009, but denies
that it had the effect alleged in paragraph 20 of the Amended Complaint. By way of
further answer, SpaceKey alleges that the original term of the Agreement was from July
2004 to January 2007, unless earlier terminated pursuant to paragraph 12, which allows
either party to terminate on 60 days' notice. But paragraph 2B specifically provides that
if "the Agreement has not been terminated prior its expiration, it shall be renewed for an
additional term commencing February 1, 2007, and annually thereafter, unless either
Party gives the other notice of its intention not to renew the Agreement, no later than
ninety (90) days prior to commencement of the renewal term." Thus, once renewal terms
began, the parties could only end the Agreement by giving timely written notice of intent
not to renew. In December 2009, the parties were in the second "renewal term," and yet
BAE did not provide timely notice of intent not to renew. Accordingly, the Agreement
renewed for another year on February 1, 2010. SpaceKey denies the remaining
allegations of paragraph 20 of the Amended Complaint.

21.   SpaceKey admits that BAE's December 10, 2009 letter purported to
terminate the Agreement as of January 31, 2010, but denies that it had this effect.
SpaceKey denies the remaining allegations of paragraph 21 of the Amended Complaint.

22.   SpaceKey denies the allegations of paragraph 22 of the Amended
Complaint.

23.     SpaceKey admits that it submitted purchase orders as the Qualified Buyer both before and after January 31, 2010. SpaceKey denies the remaining allegations of paragraph 23 of the Amended Complaint.

24.     SpaceKey admits the allegations of paragraph 24 of the Amended Complaint.

25.     SpaceKey admits that during discussions about the parties' relationship during the Spring and Summer of 2010, it and/or its counsel stated to BAE a belief that the December 10, 2009 was ambiguous, and that the Agreement had renewed by its plain terms.  SpaceKey denies that it or its counsel ever threatened legal action to pursue such claims.  SpaceKey denies the remaining allegations of paragraph 25 of the Amended Complaint.

26.     SpaceKey admits that BAE owes more than $75,000 under the terms of the Agreement.  SpaceKey denies the remaining allegations of paragraph 26 of the Amended Complaint.

27.     SpaceKey incorporates herein its answers to paragraphs 1 through 26.

28.     SpaceKey denies the allegations of paragraph 28 of the Amended Complaint.

29.     SpaceKey admits that its affirmative claims are stated in its counterclaims. SpaceKey denies the remaining allegations of paragraph 29 of the Amended Complaint.

30.     SpaceKey admits that its counterclaims create an actual controversy between the parties.  SpaceKey denies the remaining allegations of paragraph 30 of the Amended Complaint.

31.     SpaceKey denies the allegations of paragraph 31 of the Amended Complaint.

32.     SpaceKey denies the allegations of paragraph 32 of the Amended Complaint.

33.     SpaceKey incorporates herein its answers to paragraphs 1 through 32 of the Amended Complaint.

34.     SpaceKey admits that its counterclaims create an actual controversy between the parties.  SpaceKey denies the remaining allegations of paragraph 34 of the Amended Complaint.

35.     SpaceKey denies the allegations of paragraph 35 of the Amended Complaint.

36.     SpaceKey incorporates herein its answers to paragraphs 1 through 35 of the Amended Complaint.

37.     SpaceKey denies the allegations of paragraph 37 of the Amended Complaint.

38.     SpaceKey denies the allegations of paragraph 38 of the Amended Complaint.

39.     SpaceKey incorporates herein its answers to paragraphs 1 through 38 of the Amended Complaint.

40.     SpaceKey admits that the parties entered a contractual arrangement regarding the purchase of items covered by purchase orders SKC122309, SKC1610, and SKC12508.  SpaceKey denies the remaining allegations of paragraph 40 of the Amended Complaint.

41.     SpaceKey denies the allegations of paragraph 41 of the Amended Complaint.

42.     SpaceKey denies the allegations of paragraph 42 of the Amended Complaint.

43.     SpaceKey denies the allegations of paragraph 43 of the Amended Complaint.

44.     SpaceKey denies the allegations of paragraph 44 of the Amended Complaint.

45.     SpaceKey incorporates herein its answers to paragraphs 1 through 44 of the Amended Complaint.

46.     SpaceKey denies the allegations of paragraph 46 of the Amended Complaint.

47.     SpaceKey denies the allegations of paragraph 47 of the Amended Complaint.

48.     SpaceKey denies the allegations of paragraph 48 of the Amended Complaint.

49.     SpaceKey incorporates herein its answers to paragraphs 1 through 48 of the Amended Complaint.

50.     SpaceKey denies the allegations of paragraph 50 of the Amended Complaint.

51.     SpaceKey denies the allegations of paragraph 51 of the Amended Complaint.

52.     SpaceKey denies the allegations of paragraph 52 of the Amended Complaint.

53.     SpaceKey denies the allegations of paragraph 53 of the Amended Complaint.

### Affirmative Defenses

For its affirmative defenses in this case, SpaceKey alleges as follows:

### First Affirmative Defense

BAE has failed to state a claim upon which relief can be granted.

### Second Affirmative Defense

BAE is precluded from obtaining equitable relief because of the doctrine of unclean hands.

### Counterclaims

For its counterclaims in this case, SpaceKey alleges as follows:

### Count One – Breach of Contract

1.     SpaceKey and BAE are parties to a Domestic Business Development Consultant Agreement (the "Agreement") with an effective date of July 8, 2004.  The Agreement's term ran until January 31, 2007, "or until such earlier termination of the consultant services as hereinafter provided."

2.     The Agreement was drafted wholly and entirely by BAE.  SpaceKey had no input on the language or terms of the Agreement.

3.     The Agreement expressly provides that SpaceKey's contact and communication was to be with BAE's office in Manassas, Virginia.  And that is how it

worked in practice.  Throughout the life of the Agreement, SpaceKey dealt almost exclusively with the Manassas office regarding its sales and its commissions.

4.      Paragraph 12 of the Agreement "hereinafter provided" that the parties could terminate prior to the January 31, 2007 expiration date on 60 days' notice.

5.      Paragraph 2B of the Agreement states, in its entirety, that:

> If the Agreement has not been terminated prior to its expiration, it shall be renewed for an additional term commencing February 1, 2007, and annually thereafter, unless either Party gives the other notice of its intention not to renew the Agreement, no later than ninety (90) days prior to commencement of the renewal term.

6.      The Agreement was not terminated prior to its expiration date of January 31, 2007.  Accordingly, paragraph 2B came into effect, and the Agreement renewed for an additional year in 2008.

7.      Neither party sent notices of intention not to renew in 2008, and the Agreement thus renewed for an additional year in January 2009.

8.      Paragraph 2B makes annual renewals mandatory, unless an intention not to renew for an additional year is given "no later" than 90 days before the renewal date of February 1 – i.e., November 3 of the preceding year.

9.      SpaceKey gave no notice of an intention not to renew prior to November 3, 2009.

10.     Neither did BAE.  BAE alleges in its Amended Complaint that it sent a letter on December 10, 2009, which letter stated in relevant part that BAE had "determined that your current Consultant Agreement will not be renewed in the coming year."

11.     Notice of nonrenewal on December 10, 2009 could not and did not prevent the Agreement from renewing for another year, as it was not given 90 days prior to the renewal date of February 1, 2010.

12.     Nevertheless, BAE has, since February 2010, acted as though the Agreement failed to renew.  It has refused to accept orders from SpaceKey for parts and products it has and is able to sell.

13.     SpaceKey does business with very sophisticated international buyers.  The BAE products it buys and sells are intended, after all, for use in space-going vehicles and equipment, and space programs are typically the exclusively province of governmental entities.

14.     During 2009 (and for delivery in 2010), SpaceKey arranged buyers for at least $5 million in sales of BAE products.  During 2010, SpaceKey has arranged for another $4 million in sales.

15.     Under the Agreement, SpaceKey is entitled to a 5% commission on all sales to qualified buyers in its territory.

16.     Since 2002, SpaceKey has, itself, repeatedly been a "qualified buyer" of BAE products, which it then resells to its international customers.

17.     BAE's Manassas office had full knowledge of SpaceKey's relationship with its international customers.  Indeed, in a June 20, 2008 memo regarding BAE's decision to resume manufacture of RH1280 and RH1020 FGPAs, Don Francis of the Manassas office stated that "Space Key Components, Inc. is a marketing representative for the BAE Systems manufactured parts for all sales in the domestic U.S. marketplace. For international sales Space Components, Inc. [*sic*] is a reseller of the RH1280B and the

RH1020B product line.  Mr. Will Key, president, is experienced in all aspect of international sales and has provided excellent service to our customer base for over ten years."   SpaceKey and BAE used this memorandum as part of their sales efforts. Additionally, and in accordance with accepted practices, SpaceKey would provide a copy of the export license for BAE prior to delivery of components to international customers.

18.     With knowledge of this arrangement, BAE paid SpaceKey its 5% commission on all sales for which SpaceKey was the "qualified buyer," and which resulted in a resale to an international buyer.  This arrangement was very beneficial for BAE, because it was enjoying sales at List Prices without the hassle and expense of export administration.

19.     BAE's refusal to accept or process orders and sales that SpaceKey has generated during 2009 and 2010 is a breach of the Agreement.

20.     BAE's breach of the Agreement has caused damage to SpaceKey in an amount to be proven at trial.  Given the volume of business SpaceKey was unable to conclude in 2010, those damages will be in the neighborhood of $2 million.

**Count Two – Breach of Contract**

21.     SpaceKey incorporates herein the preceding allegations of these counterclaims.

22.     SpaceKey was the qualified buyer for a purchase order (SKC12508) for 800 RH1280B parts totaling $5,915,000.  All of these parts were intended for resale to sophisticated international buyers, a fact that was well known to BAE.

23.     SpaceKey has paid $4,115,000 to BAE for products delivered pursuant to this purchase order.

24.     SpaceKey is, accordingly, entitled to its 5% commission on those payments.  BAE has refused to pay such commissions.

25.     SpaceKey was also a qualified buyer on the following purchase orders: SKC53007; SKC122206; SKC12305; SKC8307; SKC12607; SKC11107; SKC102907; SKC82707; SKC3508; SKC31308; SKC32408; SKC4708; SKC41508; SKC8508(A); BAE109678; BAE111426; SKC71008; BAE112645; SKC4708; SKC100609; SKC61808(B); SKC1909(A); SKC3509; SKC3909; SKC6109; SKC100709; BAE141146.

26.     BAE has refused, despite demand, to pay SpaceKey its 5% commission on these sales.

27.     SpaceKey has been damaged by BAE's breach of contract in an amount in excess of $250,000.

### Count Three - Misrepresentation

28.     SpaceKey incorporates herein the preceding allegations of these counterclaims.

29.     An important component of SpaceKey's business is sales of suitable parts and products to customers with space programs.  In connection with its activities in that market, SpaceKey's reputation depends on quality of delivered products and adherence to fixed (and promised) schedules.  A typical 'burn rate' for an average satellite project is $20,000 per day.

30.     Any product or part intended for use in space must satisfy more stringent performance and reliability requirements than a part intended for normal use within the on-ground atmosphere.  One particularly critical performance component is the ability of

the part to withstand radiation effects. Once beyond the near-earth atmosphere, radiation levels increase dramatically, and parts must be able to withstand those levels while still serving a useful life.  Parts designed and manufactured to withstand radiation are known as "radiation-hardened," or "RAD-Hard."  It is generally understood by the international Space community that the TID threshold for RAD Hard components, when tested IAW MIL Std 883, Method 1019, Condition A, is 300KRAD TID (Total Ionizing Dose). Parts testing $\leq$ 200KRAD are generally referred to as "RAD Tolerant" rather than RAD Hard.

31.     Many of SpaceKey's customers use field programmable gate arrays, or FPGAs, in their satellites, rockets, and other equipment.  FPGAs are small integrated circuits that can be programmed by the customer to meet unique requirements.  They have an appearance similar to home computer processing chips and perform logic functions in spacecraft.

32.  For many years, Actel Corporation offered a RAD-Hard FPGA known as the RH1280.  Although designed and marketed by Actel, the RH1280 was actually manufactured by BAE under contract to Actel.  The RH1280 was in high demand during the 1990s and early 2000s by the major aerospace companies of the world.  There were two major advantages to use of the FPGA: a) the ability for the customer to program the device with their unique requirements; and b) the RH1280 FPGA's ability to withstand the radiation effects of space, specifically, TID $\geq$ 300KRads.  (The "RH" in the product name stands for "Radiation Hardened," or "RAD-Hard".)

33.     In addition to its programmability and $\geq$300 KRad radiation hardening, the Actel RH1280 also met important specification parameters for Single Event Latchup (SEL) and "Single Event Upset" (SEU).  (An SEU is a change of state or transient

induced by an energetic particle such as a cosmic ray or proton in a device.  An SEL is a condition which causes loss of device functionality due to a single event induced high current state.  Just as with radiation hardening, it is critical for reliable use in space that SEU and SEL parameters be satisfied.)   The Actel RH1280 also had a Single Event Dielectric Rupture point of 60.

34.     When Actel stopped selling the RH1280 in 2006, BAE began efforts to acquire the rights to manufacture and sell the technology directly.  In July 2007, BAE issued a press release stating that it had acquired the rights to manufacture and sell the RH1280.  The press release stated, in relevant part, that:

> "BAE Systems can now produce mature FPGA products to support older government and commercial satellite designs," said Tim Scott, national sales manager of space components for BAE Systems in Manassas, Virginia. . . .

> The RH 1280B will be offered, as before, in the same 172-pin ceramic quad flat pack or in die form.  The RH1280B offers a total dose radiation-hardness in excess of 300K rads (Si), the standard for a majority of applications, and guaranteed latch-up immunity.

35.     In addition to the promise of an exact replacement made in its product announcements, the product specifications that BAE released to SpaceKey and other consultants, sales agents, and customers – BAE's Top Level Drawing (TLD) 197A806G – specified the following parameters: TID $\geq$ 300KRad; SEL of 177; an SEU (C Mod) of 17, an SEU (S Mod) of 4, and a Single Event Dielectric (antifuse) Rupture of 60.  These parameters were identical to what the Actel RH1280 part provided.  Indeed, the RH1280B was specifically intended to replace the Actel RH1280.

36.     Preliminarily, and as part of the purchase orders, BAE delivered in July 2008 Engineering RH1280 FPGAs to enable customers to integrate, verify and

electrically qualify the remanufactured RH1280 FPGA.  At the time of delivery of these Engineering parts, BAE communicated, and SpaceKey and its international clientele understood, that the Flight parts, to be delivered, would be interchangeable in form, fit, and function with the original Actel RH1280 FPGA.

37.     In reliance on BAE's repeated representations and technical documents stating that the RH1280B part would meet all original RH1280 performance specifications, SpaceKey initiated customer presentations and searches to find buyers for the product.

38.     Through its expertise and longstanding contacts in the industry, SpaceKey found buyers for 800 RH1280B FPGAs.   These buyers relied on BAE's announcements, specifications and presented production plans to move forward with their own design, verification, integration and qualification of their space systems incorporating the RH1280B.  It was critical to these customers that the RH1280B meet the specifications provided by BAE, and be delivered within the promised timeframe.

39.     One reason why it was so important that the Flight parts match the TLD and Engineering specifications is that the initial coding necessary to make an FPGA function properly is very expensive, and is not necessarily transferable to other devices. Accordingly, once a space program commits to using a particular FPGA, it quickly generates commitments and investments that will work only with that product.

40.     BAE had originally stated that the RH1280B Flight FPGA would be available for delivery in the second quarter of 2008.  That promised date was extended no less than three times.  First, from 2008 Q2 until November 2008, then until March 2009,

and finally until June 2009.  Although the first shipments did occur in June 2009 (albeit without meeting specifications), they were not completed until January 2010.

41.     In June 2009, contemporaneously with the first delivery of the RH1280B parts, BAE informed SpaceKey that the Flight components would not meet the 300KRads specification.  But BAE was unable or unwilling to state *what* the final TID would be.   Instead, BAE stated that it would develop a plan (through a second production) to improve TID.  As late as September 2009, BAE issued a formal announcement reemphasizing that the RH1280B would be "100% form/fit/functional with the legacy design."

42.     The delivered Flight RH1280Bs did not meet the 300KRad specification. Instead, TID measured at 50KRad.  And even this rating was achieved only after BAE derated the "Over test" parameter to 1X as opposed to 1.5X minimum test specification.

43.     The delivered Flight RH1280Bs also failed to meet the TLD specifications in other respects as well.  BAE had promised a SEL of 177.  The delivered parts measured at 80.  BAE had promised an SEU(C Mod) of 17.  The delivered parts measured 14.  BAE had promised an SEU(S Mod) of 4.  The delivered parts measured 3.5.  BAE had promised a Single Event Dieletric (antifuse) Rupture point of 60.  The delivered parts measured 37.

44.     BAE was well aware that SpaceKey and its customers had already invested heavily in pre flight system integration, verification, and qualification of spacecraft, relying on BAE's released RH1280 specifications.  After all, SpaceKey's customers had been working with the Engineering units, delivered July 2008, for nearly a year.  By June 2009, SpaceKey and its customers were at a point of no return.  It was

simply too late to embark on a new design, or to recalibrate or reconfigure equipment to employ a different FPGA.  Doing so would have resulted in years of delay and significant additional funding (on the order of hundreds of millions of dollars) to design a new system.  SpaceKey and its customers had no choice but to take the deficiently specified RH1280Bs, and to accept the 2/3 loss of value in "time-on-order" and/or increased reliability risks.

45.     BAE made its representations regarding the performance characteristics of the RH1280B FPGA, as well as its delivery schedule, knowing that SpaceKey and its customers would rely on them.  After all, BAE was a recognized world expert in the field of RAD-Hard devices.  SpaceKey and its customers did, in fact, rely on those representations, both in ordering the parts based on their published specifications, in making significant capital investments paired to use of the in-spec RH1280B, and in anticipating a particular delivery schedule.

46.     BAE knew or should have known that its representations regarding the specifications of the RH1290B FPGA were false or misleading.

47.     BAE's misrepresentations have harmed SpaceKey in several respects. First, the Flight RH1280Bs have deficient specifications, which will significantly reduce the usable lifetime of the spacecraft that employ them.  Second, SpaceKey incurred additional travel expenses and time in meeting with customers following BAE's disclosure of the substandard TID.  Third, because of the substandard specifications, SpaceKey lost the opportunity to sell approximately 20 RH1280B Flight FPGAs. Finally, SpaceKey and its customers were harmed by BAE's delays in delivery.

## Count Four – Breach of Express Warranty

48.     SpaceKey incorporates herein the preceding allegations of these counterclaims.

49.     BAE made an express warranty that the Flight RH1280B FPGA would satisfy its own TLD and other published specifications, and would otherwise be a 100% form/fit/function replacement for the Actel RH1280 part.

50.     BAE breached this express warranty by delivering a Flight RH1280B FPGA that failed to meet the TLD specifications for TID/KRad, SEL, SEU, and Single Event Dielectric Rupture.

51.     BAE was fully aware that the Flight RH1280B FPGAs failed to meet these specifications, and SpaceKey gave notice to BAE of these failures.  Indeed, BAE made attempts to rectify the shortcomings of the first batch of Flight RH1280B FPGAs in later production runs, but was unable to do so.  BAE was equally unable to repair the RH1280B FPGAs to bring them into compliance with the promised specifications.

52.     BAE's breach of its express warranties has harmed SpaceKey in an amount to be proven at trial, but which will be no less than the difference in value between the RH1280B parts as warranted by BAE, and the Flight RH1280B parts it ultimately delivered.

## Count Five

53.     SpaceKey incorporates herein the preceding allegations of these counterclaims.

54.     BAE is engaged in trade or commerce as that term is defined in RSA 358-A:1, II.

55.    BAE represented that its RH1280B FPGAs had certain characteristics and met certain specifications that they did not.  In doing so, BAE violated RSA 358-A:2, V and RSA 358-A:2, VII.

56.    SpaceKey is entitled, pursuant to RSA 358-A:10, I, to its actual damages or $1,000, whichever is greater.

57.    BAE's acts were willful or knowing.  Accordingly, SpaceKey is also entitled to as much as 3 times, but not less than 2 times, its damages.

58.    SpaceKey is also entitled to its costs and reasonable attorneys' fees.

WHEREFORE, SpaceKey respectfully requests that the Court:

A.    Grant relief on SpaceKey's counterclaims;

B.    Award SpaceKey its costs and reasonable attorneys' fees; and

C.    Grant such other and further relief as justice requires.

SpaceKey Components, Inc.

By its Attorneys,

ORR & RENO, P.A.
One Eagle Square
P.O. Box 3550
Concord, NH  03302-3550
603-224-2381

Date:   December 14, 2010        /s/ Jeffrey C. Spear
                                 Martha Van Oot (NHB #963)
                                 mvanoot@orr-reno.com
                                 Jeffrey C. Spear (NHB #14938)
                                 jspear@orr-reno.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of December 2010, the foregoing Answer, Affirmative Defenses, and Counterclaims has been sent via the Court's ECF system to counsel for BAE Systems.

/s/ Jeffrey C. Spear_____
Jeffrey C. Spear