UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| BAE SYSTEMS INFORMATION AND ELECTRONICS SYSTEMS INTEGRATION INC.<br><br>                Plaintiff,<br><br>v.<br><br>SPACEKEY COMPONENTS, INC.<br><br>                Defendant. | Civil Action No.  10-CV-370-LM |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S COUNTERCLAIMS AT COUNTS THREE AND FOUR

Plaintiff BAE Systems Information and Electronics Systems Integration Inc. ("BAE Systems"), respectfully submits this following memorandum in support of it motion for summary judgment on defendant's counterclaims at counts three and four.

## I.     INTRODUCTION

SpaceKey ordered specialized semiconductor integrated circuits from BAE Systems, pursuant to detailed purchase orders and very specific terms and conditions, and based on contracts SpaceKey had in place with its customers.  SpaceKey sold all of the semiconductors to its customers at a substantial profit above what it agreed to pay BAE Systems, and SpaceKey received full payment from its customers.  SpaceKey, however, has not paid BAE Systems $1.8 million it owes for the semiconductors.  Why?  According to SpaceKey, the semiconductors did not meet the specifications BAE Systems said they would meet, even though SpaceKey's

knowledge of the specifications was recorded in the purchase order SpaceKey issued after BAE Systems notified it of specification changes.

SpaceKey, in counts three and four of its counterclaims, asserts claims for misrepresentation and breach of warranty, even though SpaceKey sold at substantial profit and received payment for all of the semiconductors, without complaint, rejection or return from its customers. Spacekey admits and has provided proof that it sold all of the semiconductors to its customers and that it received payment in full. Though these facts would show at trial that the semiconductors are not defective, they show at summary judgment that SpaceKey has no damages to claim even if the predicate allegation – that the semiconductors fell short of promised specification in some meaningful way – is assumed true.

Not only did SpaceKey suffer no damages, SpaceKey expressly agreed in its contract with BAE Systems that its remedies would be limited to return the goods within one year of the date of delivery for repair or replacement or for a return of the purchase price (to the extent previously collected by BAE Systems). SpaceKey also agreed that it would pay for the parts unconditionally, without recourse, setoff or discount. SpaceKey, in other words, could either return the semiconductors or pay for them. At no point did Spacekey request return of the semiconductors and, in discovery, Spacekey has confirmed that its customers did not request return or refuse to accept the semiconductors. SpaceKey cannot now return the semiconductors because SpaceKey delivered all of them to its customers (and received payment in full). Now, SpaceKey needs to pay for them.

As explained more fully below, BAE Systems is entitled to summary judgment on SpaceKey's counterclaims at Counts Three and Four.

## II.  STATEMENT OF UNDISPUTED MATERIAL FACT PURSUANT TO LOCAL RULE 7.2(b)(1)

### A.  BAE Systems' Term of Sale

1.  BAE Systems sells specialized goods and services to buyers in the defense, security and aerospace industries.  (Declaration of David A. Rea ¶ 2 ["Rea Decl."].)

2.  BAE Systems sells its goods and services pursuant to Terms of Sale that it enters into with its buyers.  (*Id.* ¶ 3.)

3.  The Terms of Sale entered into between BAE Systems and buyers provide, among other things, that buyers are required to pay for goods delivered by BAE Systems the earlier of net thirty (30) days from the date of BAE Systems' invoices or upon delivery of the goods. (Terms of Sale ¶ 6, Exhibit A to Rea Decl.)  The Terms of Sale state that "[p]ayments are unconditional and shall be made as specified in the Order without recourse, setoff or discount." (*Id.*)

4.  Should the buyer fail to make timely payment, BAE Systems is entitled to (i) defer shipment of goods under the contract or any other contract with the buyer, (ii) require payment before delivery of the goods, and/or (iii) terminate the order.  (*Id.* ¶ 7.)  In addition, the buyer is liable for all damages and losses to BAE Systems resulting from the buyer's payment default, including loss of reasonable profits, and for costs and expenses, including attorneys' fees sustained by BAE Systems.  (*Id.*)

### B.  The Warranty

5.  Paragraph 8 of the Terms of Sale set forth BAE Systems' warranty.  The warranty provides, in part:

(b)  Defects in Hardware:  BAE SYSTEMS warrants that, at the time of delivery, any hardware Deliverables, shall be free from defects in material and workmanship under normal usage for a period of one (1) year after delivery, but

3

BAE Systems' sole liability under this warranty shall be limited to the repair or replacement of the Deliverables returned to BAE Systems or the refund of its price, at BAE SYSTEMS' option. Notice of any defects shall be given to BAE SYSTEMS in writing and Buyer shall prepare transportation to and from BAE SYSTEMS' plant. BAE Systems shall have no liability under Warranty for (i) Altered Goods; (ii) as to Deliverables which Buyer has not maintained in accordance with BAE SYSTEMS' maintenance manuals or (iii) Deliverables that have been abused, repaired, or misused by Buyers or third parties. This warranty shall not apply to expendables or consumable parts.

******

(e)  EXCLUSION/LIMITATIONS:  THE FOREGOING CONSTITUTES BAE SYSTEMS' ENTIRE WARRANTY AND BUYER'S SOLE REMEDY WITH RESPECT TO ANY DEFECT OR NONCONFORMANCE IN DELIVERABLES PROVIDED BY BAE SYSTEMS.  THESE WARRANTIES AND REMEDIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING THE IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OR THOSE ARISING FROM COUSE OF DEALING OR USAGE IN TRADE.

(*Id*. ¶ 8.)

6.  Paragraph 13 of the Terms of Sale set forth a limitation of BAE Systems' liability, as follows:

Limitation of Liability:  BAE SYSTEMS shall not be liable to Buyer for consequential (to include lost profits and business interruption), incidental, special, punitive/exemplary damages alleged to arise from, or relate to Deliverables and/or this Order however or whenever caused.  BAE SYSTEMS' cumulative liability (if any) to Buyer for all claims of direct damage of any kind resulting from BAE SYSTEMS performance or breach of this Order or from the Deliverables furnished hereunder shall not exceed, to the extent collected by BAE Systems, the equivalent of a refund of the Price of the Deliverable(s) which is (are) the subject of a claim.

(*Id*. ¶ 13.)

7.  Finally, paragraph 17 of the Terms of Sale states that the buyer's order "shall be interpreted, construed and governed under the laws of the State of New Hampshire, excluding its choice of law rules, as applied to contracts between New Hampshire corporations entered into and fully performed in New Hampshire."  (*Id*. ¶ 17.)

### C.     SpaceKey Components, Inc.

8.     In 2004, BAE Systems entered into an agreement with SpaceKey Components, Inc. entitled "Domestic Business Development Consultant Agreement" ("Agreement").  (Rea Decl. ¶ 4 and Exhibit B to Rea Decl.)

9.     Pursuant to the Agreement, SpaceKey agreed to advise and assist BAE Systems in identifying suitable, financially qualified buyers of BAE Systems' products in the States of Connecticut and Maryland and in the Commonwealth of Virginia.  (Rea Decl. ¶ 5.)  In exchange, BAE Systems agreed to pay SpaceKey a fee equal to five per cent (5%) of the Net Sales Prices of Products sold to buyers in the Territory identified by SpaceKey.  (*Id.*)  BAE Systems retained sole discretion to accept the purchase orders submitted by the buyers identified by SpaceKey and SpaceKey's fee only became due once BAE Systems accepted the purchase orders and received full payment from the buyers.  (*Id.*)

10.     In performing the Agreement, SpaceKey fell into a practice of delivering purchase orders to BAE Systems in which it identified itself as the "financially qualified buyer" for BAE Systems products.  (*Id.* ¶ 6.)  SpaceKey would take delivery of the products from BAE Systems pursuant to BAE Systems' Terms of Sale and resell the products to end users at a mark-up.  (*Id.*)  In addition to the profit it realized by acting as a distributor of BAE Systems' products SpaceKey also charged its fee of 5% of the Net Sales Price of each contract as stipulated in the Agreement.  (*Id.*)

11.     In this way SpaceKey played two roles in the transaction with BAE Systems: one as BAE Systems' consultant and one as BAE System's customer.  (*Id.* ¶ 7.)

D.      **BAE Systems' Field Programmable Gate Array Semiconductors**

12.      Field programmable gate arrays ("FPGAs") are semiconductor integrated circuits (often called chips) that perform certain user-specified logic functions.  (Rea Decl. ¶ 8.)  FPGAs are often used in satellites and other space equipment.  (*Id*.)  Some FPGAs are designed and manufactured to withstand the rigors of space travel, including the increased radiation exposure that occurs beyond the near-earth atmosphere.  (*Id*.)

13.      At one time BAE Systems manufactured two FPGA models under agreement for Actel Corporation, which Actel Corporation marketed and sold as the RH1280 and the RH1020. (*Id*. ¶ 9.)

14.      Actel Corporation stopped offering the RH1280 and RH1020 for sale in 2006 as it had exhausted the available inventory.  (*Id*. ¶ 10.)

15.      Despite Actel Corporation's decision to stop offering the FPGAs, a demand still remained for the RH1280 and RH1020.  (*Id*. ¶ 11.)  This was because a number of government and commercial satellite programs still used legacy satellite designs that incorporated the RH1280 and RH1020 FPGAs.  (*Id*.)

16.      In response to this demand, BAE Systems licensed from Actel Corporation the right to manufacture and sell its own version of the RH1280 and RH1020 FPGAs.  (*Id*. ¶ 12.)

17.      In 2007, BAE Systems announced that it would begin manufacturing new FPGAs to replace the Actel Corporation RH1280 and RH1020.  (*Id*. ¶ 13.)  BAE Systems designated its new FPGAs as the RH1280<u>B</u> and RH1020<u>B</u>.  (*Id*.)  BAE Systems added the "B" to indicate that its FPGAs were distinct from the Actel Corporation FPGAs once sold.  (*Id*.)

18.      BAE Systems sells several versions of the RH1280B and RH1020B FPGAs.  (*Id*. ¶ 14.)  For example, BAE Systems offers an engineering version of the FPGAs that allows end

users to integrate, verify, and electrically qualify the FPGA for the particular use intended. (*Id*.) The engineering FPGAs do not necessarily withstand radiation effects or meet other performance standards as they are not intended for actual use in a deployed system. (*Id*.) The "flight" version of the FPGAs, by contrast, meet performance specifications for use in space. (*Id*.) Flight FPGAs are the actual parts deployed. (*Id*.)

19. BAE Systems representatives made presentations concerning the RH1280B FPGAs to several prospective international end users, including the Indian Research Satellite Organization ("ISRO") and the Space Application Center ("SAC"). (Def.'s Answer to Interrog. 10, Exhibit A to Declaration of Jonathan M. Shirley.) ISRO and SAC are divisions of the Government of India Department of Space. (*Id*.) A presentation was also made to Actel.ru JSC ("Actel.ru") a sales consultant for the Russian Federation. (*Id*.) William Key, the owner of SpaceKey, accompanied the BAE Systems representatives during these presentations. (*Id*.)

**E.      SpaceKey Purchase Order SKC12508(C)**

20. Between July 2008 and January 2010, BAE Systems delivered to SpaceKey a total of 800 RH1280B FPGAs. (Rea Decl. ¶ 15.) The invoice dates, quantity, description and selling price for the FPGAs BAE Systems delivered to SpaceKey are summarized in Table A:

**TABLE A**

| Invoice Date | Quantity | Description | Price |
|---|---|---|---|
| July 24, 2008 | 165 | Engineering RH1280B Part No. 197A806-23 | $247,500.00 |
| June 26, 2009 | 50 | Flight RH1280B Part No. 197A806-24 | $425,000.00 |
|  | 1 | Final Test Data | $2,500.00 |
| August 19, 2009 | 50 | Flight RH1280B Part No. 197A806-24 | $425,000.00 |

| | | | |
|---|---|---|---|
| December 3, 2009 | 335 | Flight RH1280B<br>Part No. 197A806-24 | $3,015,000.00 |
| December 16, 2009 | 100 | Flight RH1280B<br>Part No. 197A806-24 | $900,000.00 |
| January 12, 2010 | 100 | Flight RH1280B<br>Part No. 197A806-24 | $900,000.00 |
| March 4, 2010 | 1 | Quality Conformance<br>Inspection ("QCI") report[1] | $2,500.00 |
| **Total FPGAs** | 800 | **Total Price** | **$5,917,500.00** |

21.     True copies of the invoices BAE Systems furnished to SpaceKey with the deliveries identified in Table A are submitted as Exhibit C to the Rea Declaration.

22.     BAE Systems completed the deliveries identified in Table A pursuant to purchase order SKC12508(C) submitted by SpaceKey.[2]  (Rea Decl. ¶¶ 21-23.)  A true copy of purchase order SKC12508(C) is submitted as Exhibit G to the Rea Declaration.

23.     In the purchase order, SpaceKey expressly agreed that "BAE Systems Terms and Conditions apply."   (Ex. G to Rea Decl.)

**F.     SpaceKey Resells The FPGAs**

24.     SpaceKey resold to its customers all of the flight FPGAs and all but 15 of the engineering FPGAs that BAE Systems delivered under SKC12508(C).[3]   (Def.'s Answers to Interrog. 3 and 4, Ex. A to Shirley Decl.)

---

[1]  The QCI report was furnished at SpaceKey's request to confirm that all delivered FPGAs met certain manufacturing and performance specifications.

[2]  BAE Systems' records include a purchase order identified as SKC12508(D) dated June 9, 2009, which appears to be the final version of the purchase order SpaceKey submitted.  (Ex. H to Rea Decl.)  SpaceKey has not produced SKC12508(D) in discovery and it appears to take the position in its interrogatory answers that SKC12508(C) was the final, governing purchase order.  Because there are only modest differences between SKC12508(C) and SKC12508(D), it is assumed for purposes of this motion that SKC12508(C) is the governing purchase order.

25.     The shipping dates, quantity, description, and customers to whom SpaceKey resold the FPGAs are summarized in Table B:

**TABLE B**

| Shipping Date | Quantity | Description | Customer |
|---|---|---|---|
| August 4, 2008 | 150 | Engineering RH1280B Part No. 197A806-23 | ISRO |
| June 25, 2009 | 50 | Flight RH1280B Part No. 197A806-24 | Actel.ru |
| September 24, 2009 | 50 | Flight RH1280B Part No. 197A806-24 | Actel.ru |
| December 3, 2009 | 300 | Flight RH1280B Part No. 197A806-24 | ISRO |
| December 10, 2009 | 35 | Flight RH1280B Part No. 197A806-24 | ISRO |
| December 28, 2009 | 100 | Flight RH1280B Part No. 197A806-24 | SAC |
| April 8, 2010 | 10 | Flight RH1280B Part No. 197A806-24 | Actel.ru |
| April 8, 2010 | 70 | Flight RH1280B Part No. 197A806-24 | Actel.ru |
| March 31, 2011 | 20 | Flight RH1280B Part No. 197A806-24 | Actel.ru |
| **Total FPGAs** | **785** | | |

26.     SpaceKey generated shipping receipts for all of the deliveries identified in Table B.  True copies of the shipping receipts are submitted as Exhibit B to the Shirley Declaration.

---

[3] This dispute only concerns the flight RH1280B FPGAs.  Thus, while SpaceKey apparently still possesses 15 engineering RH1280B FPGAs, SpaceKey does not contend the engineering FPGAs are non-conforming and it has already paid BAE Systems for the engineering FPGAs.

27.     Each of the deliveries to ISRO, SAC and Actel.ru identified in Table B were made pursuant to written agreements and/or purchase orders that SpaceKey had secured from its customers prior to submitting purchase order SKC12508(C) to BAE Systems.

28.     The agreements between SpaceKey and its customers included:

    a.   ISRO purchase order 20070082180101 dated December 18, 2007 for delivery of 150 engineering RH1280B FPGAs (part number 197A806-23) in exchange for payment to SpaceKey of $375,000.00.  A copy of the purchase order is submitted as Exhibit C to the Shirley Declaration.

    b.   ISRO purchase order 20070085520101 dated December 20, 2007 for delivery of 300 flight RH1280B FPGAs (part number 197A806-24) in exchange for payment to SpaceKey of $3,255,000.00.  A copy of the purchase order is submitted as Exhibit D to the Shirley Declaration.

    c.   ISRO purchase order 20080022620101 for delivery of 35 flight RH1280B FPGAs (part number 197A806-24) in exchange for payment to SpaceKey of $379,750.00.  A copy of the purchase order is submitted as Exhibit E to the Shirley Declaration.

    d.   SAC agreement AHSE 2007003188-01 for delivery of 100 flight RH1280B FPGAs (part number 197A806-24) in exchange for payment to SpaceKey of $1,085,000.00.  A copy of the agreement is submitted as Exhibit F to the Shirley Declaration.

    e.   Actel.ru purchase orders BA001 and BA002 dated November 11, 2008.  Taken together, the purchase orders called for delivery of 200 flight RH1280B FPGAs in exchange for payment to SpaceKey of $2,825,000.00.  Copies of the purchase orders are submitted as Exhibit G to the Shirley Declaration.

29.     The amount due SpaceKey from ISRO and SAC for delivery of the FPGAs under all purchase orders and agreements totaled $5,094,750.00.  (Exhibits C, D, E, and F to Shirley Decl.)  SpaceKey admits that it delivered invoices to ISRO and SAC totaling this amount and that it has been paid in full on the invoices, i.e., it has received full payment of $5,094,750.00.  (Def.'s Answer to Interrog. 4, Ex. A to Shirley Decl.; SpaceKey Invoices to ISRO and SAC, Ex. H to Shirley Decl.)

30.     Likewise, SpaceKey has produced in discovery an account ledger showing that it received payment of at least $2,824,990.00 from Actel.ru for the FPGAs it delivered.  (SpaceKey Ledger, Ex. I to Shirley Decl.)  This amount is within $10.00 of the total amount owed under the Actel.ru purchase orders.  (*Cf*. SpaceKey Ledger to Actel.ru purchase orders, Exhibits I and G to Shirley Decl.)

31.     In short, SpaceKey has received a total of $7,919,740.00 – full payment for all of the FPGAs it purchased from BAE Systems under SKC12508(C) and resold to its customers.  (*See* Exhibits A, H, and I to Shirley Decl.)  These payments represent a gross profit to SpaceKey in excess of $2 million.  (*Cf*. Rea Decl. ¶ 25 to Exhibits H and I to Shirley Decl.)

**G.     The Payment Dispute**

32.     BAE Systems' Terms of Sale require customers pay for goods no later than 30 days from the date of delivery of the goods or receipt of a BAE Systems invoice.  (Terms of Sale ¶ 6, Ex. 1 to Rea Decl.)  The payment obligation is unconditional, without recourse, setoff or discount.  (*Id*.)

33.     BAE Systems completed all of its obligations under SKC12508(C) no later than March 4, 2010, the date it furnished the QCI report to SpaceKey.  (Rea Decl. ¶ 24.)

34.     The total amount owed to BAE Systems under SKC12508(C) is $5,917,500.00.  (*Id*. ¶ 25.)  To date, BAE Systems has received payments from SpaceKey totaling only $4,117,500.00.  (*Id*.)  An outstanding balance of $1,800,000.00 remains due and owing under SKC12508(C).  (*Id*.)

35.     Despite having been fully paid by its customers for delivering the RH1280B FPGAs it ordered from BAE Systems, SpaceKey has refused to pay BAE Systems the outstanding balance of $1,800,000.00 due under SKC12508(C).  (Rea Decl. ¶ 25.)

36. Instead, SpaceKey asserts by way of counterclaim in this action that the flight RH1280B FPGAs BAE Systems delivered to SpaceKey did not meet certain specifications. (Def.'s Counterclaims ¶¶ 28-52, Docket Entry 10.)  In particular, SpaceKey alleges that BAE Systems promised the flight RH1280B FPGA would withstand a radiation exposure of 300 Kilorad ("KRAD") total ionizing dose ("TID") (a measure of radiation exposure), which had been the radiation exposure tolerance for the flight FPGAs sold by Actel Corporation.  (*Id*. ¶ 34.) Instead, the flight RH1280B FPGAs BAE Systems delivered only met lower KRAD TID exposures.  (*Id*. ¶ 42.)

37. When BAE Systems first launched the RH1280B program, BAE Systems believed that it would be able to manufacture the FPGAs with a TID of 300 KRAD.  (Rea Decl. ¶ 26.)

38. BAE Systems was not able to manufacture the flight RH1280B FPGAs with a TID of 300 KRAD.  (*Id*. ¶ 27.)

39. BAE Systems kept its customers, including Spacekey, apprised of its manufacturing process for the FPGAs and the radiation tolerance issue as it developed.  (*Id*. ¶ 28.)  In May 2009, for example, and prior to delivering any flight RH1280B FPGAs, BAE Systems notified SpaceKey that the flight RH1280B FPGAs that it had manufactured in its first production run met a specification of 50 KRAD TID.  (*Id*.)  BAE Systems further notified SpaceKey that it planned to acquire equipment that would allow it to improve the TID tolerance for flight RH1280B FPGAs in a second production run.  (*Id*.)

40. Following BAE System's notice, SpaceKey asked its customers whether they would accept the flight RH1280B FPGAs with a TID of 50 KRAD.  (Def.'s Answer to Interrog. 11, Ex. A to Shirley Decl.)  Actel.RU. agreed to accept 100 units of the flight RH1280B FPGAs

with a TID of 50 KRAD, but required that the remaining balance of 100 flight RH1280B FPGAs meet a TID of 100 KRAD.  (*Id*.)  SpaceKey's other customers (i.e., ISRO and SAC) indicated that they would only accept delivery of flight RH1280B FPGAs that met a TID of 100 KRAD. (*Id*.)[4]

41.   SpaceKey submitted purchase order SKC12508(C) to BAE Systems on or around May 28, 2009, after it confirmed that ISRO, SAC and Actel.ru would accept the flight RH1280B FPGAs with TID lower than 300 KRAD.  (Ex. G to Rea Decl.)

42.   SKC12508(C) expressly memorialized the lower TID specifications required for the flight RH1280B FPGAs as accepted by ISRO, SAC and Actel.ru.  (*Id*.)  Indeed, the description SpaceKey provided for all parts numbered 197A806-24 (which is the flight RH1280B FPGA) specify either "TID $\geq$ 50 KRAD" or "TID $\geq$ 100 KRAD", meaning the TID will meet or exceed either 50 KRAD or 100 KRAD.  (*Id*.)

43.   All of the flight RH1280B FPGAs BAE Systems delivered to SpaceKey met the TID specifications which were contractually agreed to between BAE Systems and SpaceKey. (Rea Decl. ¶ 29.)

---

[4]   SpaceKey's Answer to Interrogatory 11 is lengthy.  The specific passage from SpaceKey's interrogatory answer upon which this statement of fact relies reads:

> Mr. Key asked his customers whether they would accept TID = 50KRAD.  SpaceKey's Indian customers outright rejected the delivery of 50 KRAD devices (435 pieces).  SpaceKey's Russian customers had more critical issues; they needed to replace failed satellites in their strategic GPS (GLONASS) constellation.  So, they agreed to receive 100 of 200 pieces at the 50KRAD level to advance their prototyping/qualification effort . . . Additionally, as a result of customer inquiries and responses SpaceKey further identified to BAE that a TID non-conformance < 100KRAD for the 535 remaining Flight FPGAs would not be considered.

(Ex. A to Shirley Decl.)

44.    SpaceKey has produced no evidence that its customers – ISRO, SAC, or Actel.ru – rejected any of the flight RH1280B FPGAs for failing to meet radiation hardened specifications or any other specifications.[5]

45.    SpaceKey's customers paid SpaceKey the price agreed upon when the projection was that the FPGAs would have a TID of 300 KRAD.  In other words, SpaceKey was not paid a lesser amount by its customers because the flight RH1280B FPGAs did not meet radiation hardened specifications of 300 KRAD.  (*Cf*. Exhibits C through I of the Shirley Decl.)

## III.    STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).  A material fact is one "that might affect the outcome of the suit."  Id. at 248.

In ruling on a motion for summary judgment, the party moving for summary judgment "bears the initial responsibility of . . . identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  While the Court construes the evidence in the light most favorable to the non-movant, *see Navarro v. Pfizer Corp.,* 261 F.3d 90, 94 (1st Cir. 2001), once the moving party has met its burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the non-movant to "produce evidence on which a reasonable finder of fact, under the

---

[5]  BAE Systems learned in 2010 that four of the flight RH1280B FPGAs sold to Actel.ru failed during programming.  (Rea Decl. ¶ 31.)   Programming failures are not related to radiation hardening specifications and BAE Systems is processing the warranty claim of Actel.ru to replace the four FPGAs.  (*Id*.)

appropriate burden of proof, could base a verdict for it; if that party cannot produce such

evidence, the motion must be granted." *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86,

94 (1st Cir. 1996) (citing *Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 249).  Neither

conclusory allegations, improbable inference, nor unsupported speculation are sufficient to

defeat summary judgment.  *Carroll v. Xerox Corp.,* 294 F.3d 231, 236-37 (1st Cir. 2002).

## IV.   ARGUMENT

### A.   The Terms Of Sale Preclude SpaceKey's Breach Of Warranty Counterclaim At Count Four

#### 1.   <u>SpaceKey Agreed to Limited Remedies That Do Not Encompass Counterclaim Count Four</u>

BAE Systems is entitled to summary judgment on Court Four of SpaceKey's

counterclaims, for breach of warranty, because the Terms of Sale provide the exclusive remedies,

and SpaceKey failed to satisfy the conditions under the Terms of Sale to trigger warranty

obligations of BAE Systems.  The sale of goods in New Hampshire is governed by RSA 382-

A:2-101 *et seq.*, New Hampshire's codification of the Uniform Commercial Code for sales.[6]

Although RSA 382-A sets forth baseline rights and remedies of sellers and buyers of goods, the

statute permits parties to modify their statutory rights and remedies by agreement.  For example,

express and implied warranties may be excluded or modified in writing by the parties.  RSA 382-

A:2-316; *Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc.*, 40 F.3d 492,

501 (1st Cir. 1994).  Likewise, the measure of damages and remedies may be limited by

agreement, as by limiting a buyer's remedies to the return of goods and repayment of the price or

to repair and replacement of the non-conforming goods.  RSA 382-A:2-719(1)(a); *Xerox Corp. v.

Hawkes*, 124 N.H. 610, 618 (1984).

---

[6]   The Terms of Sale expressly state that disputes will be governed by New Hampshire law.  (Terms of Sale ¶ 17, Ex. A to Rea Decl.)

SpaceKey accepted BAE Systems' Terms of Sale when it purchased the RH1280B FPGAs and, indeed, SpaceKey expressly incorporated the Terms of Sale by reference into the SKC12508(C) purchase order.  (Ex. G to Rea Decl.)  Through the Terms of Sale, SpaceKey agreed that its exclusive remedy for defective parts was limited to their repair or replacement, or a refund of the purchase price, at BAE Systems' sole option, upon written notice and return of the goods within one (1) year of the date of delivery.  (Terms of Sale ¶ 8, Ex. A to Rea Decl.)  In addition, also through the Terms of Sale, SpaceKey waived all "consequential (to include lost profits and business interruption), incidental, special, punitive/exemplary damages alleged to arise from, or relate to" goods purchased from BAE Systems, and further agreed that the total amount of its damages, if any, shall not exceed, "to the extent collected by BAE Systems, the equivalent of a refund of the Price of the [goods] which is (are) the subject of a claim."  (*Id*. ¶ 13.)

The Terms of Sale foreclose SpaceKey's breach of warranty counterclaim.  New Hampshire's Uniform Commercial Code expressly states that parties may limit remedies by contract, "as by limiting the buyer's remedies to return of the goods and payment of the price or to repair and replacement of non-conforming goods or parts . . . ."  RSA 382-A:2-719(a).  The remedies to which BAE Systems and SpaceKey agreed in the terms and conditions are the exact remedies that the statute identifies as legally permissible limitations, namely, return in exchange for repair or replacement, or refund of the purchase price.

In keeping with the express statutory language, the New Hampshire Supreme Court has approved similar, if not nearly identical remedy limitations.  *Xerox Corp. v. Hayes*, 124 N.H. 610 (1984).  In *Xerox*, the Court observed that such remedies limitations are commonly upheld, particularly "when, as here, the transaction was between commercial entities and the disclaimer

was not prima facie unconscionable." *Id.* at 617 (citation omitted).  Similar disclaimer language

extends also to tort claims when the thrust of the complaint is breach of contract and warranty.

*Id.*

SpaceKey's exclusive remedy for the alleged non-conforming flight RH1280B FPGAs

was to provide written notice of the defects and to return the parts to BAE Systems within one

(1) year from the date of delivery.  SpaceKey has never returned any of the parts that BAE

Systems delivered in performance of purchase order SKC12508(C) and the one year period for

such returns has now long since passed.  And, it comes as no surprise that SpaceKey never

returned the parts, since SpaceKey sold the parts to ISRO, SAC and Actel.ru in exchange for

payment of the *full and original sales price* (a 20%-50% markup from SpaceKey's purchase

price) that SpaceKey negotiated with its customers.  (Exhibits A, H, and I to Shirley Decl.)

Falling in line with New Hampshire's UCC as they do, the terms and conditions preclude

counterclaim count four because they bind SpaceKey to a very clear remedy limitation that does

not allow for SpaceKey's statutory claims for breach of warranty.

## 2.   The Remedies To Which The Parties Agreed Do Not Fail Their Essential Purpose

SpaceKey will presumably argue that repair (one of the remedies to which the parties

agreed) of the FPGAs was not possible, so the remedy (repair) fails its essential purpose.

Through this argument, SpaceKey seeks to take advantage of remedies the statute provides in the

event contractual remedies "fail their essential purpose."  RSA 382-A:2-719(2).  The New

Hampshire Supreme Court, however, faced with the virtually identical situation, has rejected

SpaceKey's argument and held that a buyer's limited remedies of repair of the goods or return of

the purchase price do not fail their essential purpose even if one of the remedies – repair of the

goods – is unavailable. *Xerox*, 124 N.H. 610.  In *Xerox*, a lessee sought to recover consequential

damages from the lessor resulting from the malfunction of a leased copy machine.  *Id*. at 614.

The lease agreement, however, limited the lessee's remedies to repair of the copy machine or

return of the lease price.  *Id*. at 614-15.  The lessee argued that the exclusive remedies provided

in the lease agreement denied him the benefit of his bargain – and thus failed their essential

purpose – because the lessor was unable to repair the machine.  *Id*. at 619.

 The New Hampshire Supreme Court rejected the lessee's argument.  The Court, relying

on Seventh Circuit authority, reasoned that RSA 381-A:2-719 expressly permits limitation of a

buyer's remedies to return of the goods and repayment of the purchase price, and observed "[i]t

is obvious that this remedy deprives the buyer of his benefit of the bargain . . . but it is

nonetheless deemed permissible."  *Id*. (quoting *Dow Corning Corp. v. Capital Aviation, Inc.*, 411

F.2d 622, 626 (7th Cir. 1969)) (internal quotations omitted).  The Court also reviewed precedent

refusing to invalidate remedies limitations because repair of nonconforming goods was not

possible, approving the survival of such provisions even if repair was not an option.  *Id*.  at 619-

20.  The Court construed New Hampshire's Uniform Commercial Code to permit buyers and

sellers to craft exclusive remedies governing the sale of goods even if some of those remedies

(like repair of the goods) are unavailable and other remedies (such as return of the purchase

price) effectively deprive the buyer of the benefit of the bargain.  *Id*. at 619.

 The *Xerox* decision rests on facts highly analogous to this action and forecloses any

attempt by SpaceKey to skirt the exclusive remedies under the Terms of Sale.  Irrespective of

whether or not the RH1280B FPGAs were "non-conforming," the fact remains that SpaceKey

was entitled to the repair of the parts or, if that was not possible, to return them and obtain a

return of its purchase price (to the extent collected by BAE Systems).  (Terms of Sale ¶¶ 6, 8, 13,

Ex. A to Rea Decl.)  Accepting as true, for purposes of this motion, SpaceKey's likely contention

– that BAE Systems could not "repair" the parts – does not change the outcome: *Xerox* makes clear that the inability to repair does not constitute a failure of essential purpose pursuant to RSA 382:2-719.

It is undisputed that SpaceKey never elected to pursue either of the remedies to which it agreed to be limited.  Instead, SpaceKey resold the FPGAs for the full price that it negotiated with ISRO, SAC and Actel.ru – a price that had been agreed upon *before* SpaceKey, ISRO, SAC and Actel.ru learned that the flight RH1280B FPGAs would have a radiation exposure tolerance less than 300 KRAD TID.  SpaceKey cannot plausibly argue that it was deprived the benefit of its bargain or that the remedies under the Terms of Sale fail their essential purpose, when the undisputed facts demonstrate that it profited (handsomely without discount) on the resale of  the RH1280B FPGAs.  Moreover, SpaceKey has adduced no evidence whatsoever that either ISRO, SAC or Actel.ru have sought any remedies against SpaceKey arising from their purchase of the flight RH1280B FPGAs.

BAE Systems is entitled to summary judgment on SpaceKey's breach of warranty counterclaim at Count Four because SpaceKey's remedies for the alleged non-conforming flight RH1280B FPGAs are limited by the Terms of Sale.  Having determined to sell (at profit) rather than return the alleged defective goods as required by the Terms of Sale, SpaceKey failed to trigger any warranty obligation on the part of BAE Systems.

**B.  SpaceKey's Counterclaims At Count Three and Four For Misrepresentation And Breach Of Warranty Fail For Lack Of Damages**

BAE Systems is entitled to summary judgment on Counts Three and Four of SpaceKey's counterclaims because SpaceKey cannot prove that it has suffered damages.  It is settled law that a plaintiff may only proceed on a claim for breach of warranty if it can establish that it incurred damages as a result of the alleged breach.  *Medigroup, Inc. v. Schildknecht*, 463 F.2d 525, 528

(7th Cir. 1972) (upholding dismissal of breach of warranty claim where plaintiff failed to adduce damages); *Shuniak v. AAA Well Drilling & Boring Company*, 247 S.E.2d 601 (Ga. App. 1978) (upholding directed verdict dismissing breach of warranty claim where plaintiff introduced evidence of defects in a well drilling machine thus indicating a warranty breach, but failed to produce evidence to show damages). To prove misrepresentation, moreover, a plaintiff must establish as an essential element of its claim that it suffered damages as a result of the alleged misrepresentation. *Hair Excitement, Inc. v. L'Oreal U.S.A., Inc.*, 158 N.H. 363, 369 (2009) (fraudulent misrepresentation); *Plourde Sand & Gravel Co. v. JGI Eastern, Inc.*, 154 N.H. 791, 799 (2007) (negligent misrepresentation).

Between June 2009 and January 2010, BAE Systems delivered the flight RH1280B FPGAs to SpaceKey pursuant to purchase order SKC12508(C) and, in turn, SpaceKey delivered the FPGAs to ISRO, SAC and Actel.ru. (Rea Decl. ¶ 15; Ex. B to Shirley Decl.) SpaceKey's customers accepted the FPGAs as delivered and paid SpaceKey the full amount of the sales price they had agreed to under their purchase orders. (Exhibits A to I of Shirley Decl.) SpaceKey has produced no evidence that ISRO, SAC or Actel.ru rejected the parts for failing to meet TID specifications or for failing to meet any other specifications. (*See also* Rea Decl. ¶¶ 30-31.) In short, having resold the flight RH1280B FPGAs at the original prices and pursuant to the original terms of its agreement with ISRO, SAC and Actel.ru, SpaceKey cannot claim to have suffered any damages. Indeed, far from suffering damages, SpaceKey realized the full benefit of its bargain – in the form of handsome profits – when it resold the flight RH1280B FPGAs.

For SpaceKey to recover damages in these circumstances, moreover, would amount to an impermissible windfall. Despite having profited (per original contracts with its customers) from the sale of the FPGAs, SpaceKey alleges that BAE Systems' delivery of non-conforming flight

RH1280B FPGAs entitles it to an award of damages equal to the difference between the value of the goods delivered and the value of the goods as promised.  (Counterclaim ¶ 52.)  Even assuming the Terms of Sale permitted such a remedy, the law does not contemplate that a party recovering for breach of warranty should be better off because of the breach than it would have been had the contract been carried out according to its terms.  For this reason, courts confronted with buyers who have resold alleged non-conforming goods to third parties for the full value of third party contracts have not been entitled to damages.  *Cincinnati Siemens-Lungren Gas Illuminating Co. v. Wester Siemens-Lungren Co.*, 152 U.S. 200 (1894); *Ed S. Michelson, Inc., v. Nebraska Tire & Rubber Co.*, 63 F.2d 597 (1933).

In *Cincinnati*, for example, the plaintiff sold the defendant lamps fitted with solid metal burners and brought an action to recover the price of the lamps.  152 U.S. 200, 210.  The defendant counterclaimed that the lamps were deficient as delivered; specifically, that the plaintiff should have equipped the lamps with tube burners.  *Id*.  The defendant showed that it would have cost $3 each to make this change.  *Id*.  In upholding judgment against the defendant on its counterclaim, the United State Supreme Court observed:

> It does not appear that the burners had ever been exchanged, or that the defendant had paid any money for the purpose of making an exchange, nor was there any testimony showing how much less in value a lamp with the solid burner was than one with the tube burner.  If the defendant never made an exchange of burners, and so never expended any money therefor, and sold the lamp with a solid burner for the same price as the one with a tube burner, *it is difficult to see how it was damaged*, even if it be conceded that the tube burner is a better appliance than the solid burner.

*Id*. at 211 (emphasis added).

The *Michelson* decision resulted in similar conclusion on similar facts.  In *Michelson* the plaintiff sold a supply of tires to the defendant and the defendant in turn resold the tires to a third party.  63 F.2d 597, 598-99.  Similar to SpaceKey, the defendant entered into a contract for

resale of the tires *before* the plaintiff delivered the tires. *Id.* The plaintiff delivered the tires, the defendant sold them for a profit, and the defendant did not pay for them. *Id.* In an action by the plaintiff to recover the price of the tires, the defendant counterclaimed that the tires failed to meet certain specifications. *Id.* In upholding a judgment for the plaintiff, the Eight Circuit stated:

> defendant received the substantial profit which it contracted for on the resale of these tires, and if it were awarded damages in this case it would receive two profits out of a contract that guaranteed it but one, and it would be very substantially better off because of the breach of the contract than it would have been had the contract been literally carried out. Rules for the measure of damages must not be considered in the abstract, without reference to the facts and circumstances to the case, and it must always be borne in mind that the purpose of the law is to compensate, indemnify, or make reparation for the injury or loss actually suffered. Defendant's market on resale was not dependent upon the market price, but was a price fixed by contract, and it would be against all justice to permit it to make a profit by the breach of this contract, to be compensated for a loss it never suffered, and to be placed, not in the same position in which it would have been if the contract had been performed, but in a much better position.

*Id.* at 601.

The reasoning in *Cincinnati* and *Michelson* apply with equal force to SpaceKey's claims. Given that SpaceKey resold the RH1280B parts for the full amount of its contracts with ISRO, SAC and Actel.ru, it should not be permitted to also obtain as a remedy under RSA 382-A:2-714(2) the purported "difference in value" between the FPGAs BAE Systems allegedly promised and the FPGAs it delivered. As observed in *Michelson*, such a result would bestow on SpaceKey two profits on contracts that guaranteed it but one, and SpaceKey would be very substantially better off because of the alleged breach by BAE Systems than if no breach had occurred. Such a result would fundamentally contravene the purpose of compensatory damages and provide an unfair windfall to SpaceKey.

SpaceKey cannot prevail on its counterclaims for breach of warranty or misrepresentation because it was paid the full amount under the contracts with its customers for the resale of the

flight RH1208B FPGAs.  Having obtained the full benefit of its bargain in reselling the goods,
and with no evidence its customers rejected the goods, SpaceKey has no basis to claim damages
for breach of warranty or misrepresentation.  BAE Systems is therefore entitled to summary
judgment on Counts Three and Four of SpaceKey's counterclaims.

### C.  SpaceKey Can Demonstrate No Reliance To Support Its Misrepresentation Counterclaim

Separate and apart from its inability to prove damages, SpaceKey is also unable to prove
another essential element of its misrepresentation counterclaim:  reliance.  To prevail on a claim
of misrepresentation under New Hampshire law, a plaintiff must prove that it relied on a material
statement by the defendant that the defendant knew or should have known was false.  *Hair
Excitement*, 158 N.H. at 369; *Plourde Sand & Gravel*, 154 N.H. at 799.

SpaceKey's theory of misrepresentation in this case is that it purchased the flight
RH1280B FPGAs in reliance on BAE Systems' statements that the FPGAs would meet certain
radiation tolerances and other specifications and that BAE Systems knew or should have known
that such statements were untrue.  (Counterclaim ¶¶ 28-47.)  The undisputed facts establish,
however, that SpaceKey can claim no reliance on any statements of BAE Systems because it was
nothing more than a middleman for purchase order SKC12508(C).  All decisions relating to the
purchase of the flight RH1280B FPGAs were made by ISRO, SAC and Actel.ru. – the customers
that actually used the FPGAs in their satellites.  SpaceKey's role in the transaction, by contrast,
was limited to accepting purchase orders from its customers for the FPGAs, submitting its own
purchase order to BAE Systems to obtain the FPGAs, and arranging for the sale and shipment of
the FPGAs in compliance with the appropriate regulations.  SpaceKey's role, in other words, was
to fill the orders of its customers; it was not in the business of selecting, testing or deciding on
what goods to buy from BAE Systems, nor using those goods in SpaceKey products.

Moreover, the alleged "misrepresentations" by BAE Systems were not even directed at SpaceKey. By SpaceKey's own admission, all presentations to ISRO, SAC and Actel.ru concerning the RH1280B FPGAs were conducted by BAE Systems representatives who traveled to India and international trade shows to meet with the customers. (Def.'s Answer to Interrog. 10, Ex. A to Shirley Decl.) It was at these presentations, according to SpaceKey, that the BAE Systems representatives assured ISRO, SAC, and Actel.ru that the specifications of the RH1280B FPGA would match the specifications of the Actel Corporation FPGA, including the radiation tolerances. (*Id*.) Thus, to the extent "misrepresentations" were made by BAE Systems (an allegation BAE Systems vigorously denies), they were made directly to the customers that placed the orders and that used the FPGAs in their satellites. For its part, SpaceKey stood to the side at these presentations and simply processed the orders that that the customers placed. (*See Id*.)

That SpaceKey made no decisions concerning the purchase of the flight RH1280B FPGAs is confirmed by its handling of the radiation tolerance issues. After BAE Systems notified it of the problem in May 2009, SpaceKey contacted its customers to obtain permission to accept the FPGAs with lower radiation tolerance specifications. (Def.'s Answer to Interrog. 11, Ex. A to Shirley Decl.) It was only after SpaceKey obtained such permission that it submitted SKC12508(C) and proceeded with accepting delivery of the goods. (Rea Decl. ¶¶ 27-28.) Again, SpaceKey could not have "relied" on anything stated by BAE Systems because it was never in a position to decide whether to purchase the FPGAs or to accept the FPGAs with the revised radiation tolerances. SpaceKey left those decisions entirely to its customers.

The heart of SpaceKey's misrepresentation counterclaim, therefore, rests on the statements BAE Systems made directly to ISRO, SAC and Actel.ru upon which those customers

allegedly then relied.  SpaceKey can demonstrate no reliance of its own on such statements because it was never in a position to decide whether to purchase the flight RH1280B FPGAs. Those decisions were made by ISRO, SAC and Actel.ru alone.  As set forth in BAE Systems' motion to dismiss (Docket Entry 15), SpaceKey's counterclaims surrounding the FPGAs are really claims of third parties – ISRO, SAC and Actel.ru – that SpaceKey has no standing in this action to assert.  SpaceKey's reliance theory is an example of that problem:  it has impermissibly asserted the alleged reliance of its customers on BAE Systems' statements to mount a misrepresentation counterclaim on its own behalf.

Accordingly, BAE Systems is entitled to summary judgment on SpaceKey's counterclaim at Count Three because SpaceKey cannot adduce evidence of its own reliance on a material statement by BAE Systems.

## V.   CONCLUSION

For the reasons set forth above, BAE Systems respectfully requests that summary judgment be entered in its favor on Counts Three and Four of SpaceKey's counterclaims.

Respectfully submitted,

**BAE SYSTEMS INFORMATION AND
ELECTRONICS SYSTEMS
INTEGRATION INC.**

By its attorneys,

**DEVINE, MILLIMET & BRANCH, P.A.**

Dated: July 1, 2011                /s/ Jonathan M. Shirley
                                   Daniel E. Will, Esq. (Bar No. 12176)
                                   Jonathan M. Shirley, Esq. (Bar No. 16494)
                                   111 Amherst Street
                                   Manchester, NH 03101
                                   (603) 669-1000

### CERTIFICATE OF SERVICE

I, Jonathan M. Shirley, hereby certify that a copy of the foregoing Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment on Defendant's Counterclaims at Counts Three and Four was this day served via the Court's Electronic Filing System on counsel for the defendant.

                                   /s/ Jonathan M. Shirley
                                   Jonathan M. Shirley