UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| BAE SYSTEMS INFORMATION AND ELECTRONICS SYSTEMS INTEGRATION, INC., | ) ) ) | |
| | ) | |
| Pl aintiff, | ) | |
| | ) | Case No. 10-cv-370-LM |
| vs. | ) | |
| | ) | |
| SPACEKEY COMPONENTS, INC. | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| | ) | |

## SPACEKEY COMPONENTS, INC.'S OBJECTION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant Space Key Components, Inc. ("Space Key") respectfully submits this objection to plaintiff BAE Systems Information and Electronics Systems Integration, Inc.'s ("BAE") motion for summary judgment.

### Introduction

SpaceKey's counterclaims arise from a number of express warranties and representations BAE made about the performance of its RH1280B field programmable gate arrays ("FPGAs") that it was never able to satisfy. BAE warranted to SpaceKey, in particular, that the RH1280B would have the same radiation-hardened characteristics as the legacy Actel RH1280, a part BAE had made under license for years. These "Rad-Hard" specifications are critical to reliable and long-lived performance in space, where satellites and their components are bombarded with radiation on a daily basis, and they were critical to SpaceKey's decision to purchase the product from BAE.

There is no dispute that the RH1280B failed to conform to those express warranties. David Rea admits it in his declaration, and BAE's own materials document the

nonconformance in detail. Yet BAE argues that it should be granted summary judgment on SpaceKey's claims – that its failures to comply with its express warranties should never even reach the finder of fact.

The Court should deny BAE's motion for several fundamental reasons. First, BAE has misread its own agreement. SpaceKey does not dispute that BAE's Terms of Sale contain a remedy limitation for defective parts. But SpaceKey does not claim that the RH12780B FGPAs are *defective*. To the contrary, the RH1280Bs are functional. SpaceKey's claim is that the RH1280Bs do not conform to the express performance warranties that BAE made. Because the remedy limitation BAE relies on applies by its terms only to claims for defective parts, it has no application to SpaceKey's claims for breach of warranty.

Even if the limitation *did* apply to SpaceKey's claims, it must be disregarded because it failed of its essential purpose. BAE's argument on this issue is flawed, because the case law it cites addresses a question that is not before the Court – whether failure of purpose of a limited remedy for direct damages also invalidates a limit on consequential damages. This authority is irrelevant because SpaceKey has no claims for consequential or incidental damages.

The purpose of the limited remedy in the Terms of Sale is to provide the buyer with a conforming product. But BAE cannot make or provide an FPGA that conforms to its warranties. It has tried and failed to do so. BAE cannot repair the RH1280B to bring it into compliance, and replacement would merely swap one nonconforming part for another. Accordingly, the limited remedies fail of their essential purpose, and SpaceKey is entitled to seek damages for the difference in value between the products as BAE warranted, and the products that it actually delivered.

BAE argues that there are no such damages, because SpaceKey resold the parts at a profit.  BAE contends, in essence, that the fact of resale at profit bars a claim for warranty damages. BAE is mistaken. The case law, both before and after adoption of the UCC (and including the case law BAE itself cites), underscores that the fact of resale does *not* preclude a claim for warranty damages, even when the resale yields a profit. At most, the resale price is one of many factors for a jury to consider in assessing warranty damages, and net profits on resale are typically deducted from warranty damages. But no adjustments to a warranty damage figure can be made without first determining those damages. Both components of the equation are necessary – the difference in value between the product as warranted and as delivered, and the impact, if any, of a profit on resale. Because BAE is asking the Court to bypass and ignore an entire half of the equation, its motion for summary judgment should be denied.

The Court should also deny BAE's motion for summary judgment on SpaceKey's misrepresentation claim. BAE cites no authority for its novel proposition that a reseller cannot reasonably rely on a misrepresentation. No such authority exists. To the contrary, the law of misrepresentation recognizes that liability arises when false information is supplied "for the guidance of others in their business transactions," and it is "enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it." Here, BAE made numerous representations *to* SpaceKey, its direct customer, and SpaceKey relied on those representations in agreeing to purchase product from BAE. BAE's motion for summary judgment should be denied.

### Concise Statement of Material Facts[1]

1.  BAE issued a press release in July 2007 that stated the following:

-that it had signed a licensing deal with Actel to permit BAE to manufacture the RH1280 FPGA that had been discontinued in 2006;
-that it was the manufacturer of the discontinued Actel RH1280, and would be the only source for the new RH1280B;
-that a "critical customer need" existed for the RH1280 part;
-that the reintroduction of the RH1280B would solve "a major obsolescence problem for many legacy satellite programs, enabling producers of satellite payloads and instruments to avoid time-consuming and costly redesigns."
-that the RH1280B would offer "a dose radiation-hardness in excess of 300K rads (Si), the standard for a majority of applications, and guaranteed latch-up immunity."
-that the "RH1280B will have the same Standard Microcircuit Drawing number (5962F92156) to Qualified Manufacturers List Q and V levels as the originals"; and
-that the "Flight units will be delivered in the second quarter of 2008."

SpaceKey Answer to Interrogatory 11 (¶1) (attached as Ex. A to the Declaration of Jonathan

Shirley) ("Shirley Decl., Ex. A"); Declaration of Jeffrey C. Spear ("Spear Decl."), Ex. A.

2.  The "F" letter in the Standard Microcircuit Drawing ("SMD") is a designation

under Defense Supply Center Columbus ("DSCC") nomenclature that the part will have a

Radiation Hardness Assurance ("RHA") of at least 300 KRads. Int. 11 (¶1).

3.  In August 2007, BAE issued Top Level Drawing ("TLD") 197A806G. Spear

Decl., Ex. B. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

4.  ██████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████

5.  These characteristics, while set forth in BAE's own TLD, are drawn from, and required by, SMD 5962-92156. Spear Decl., Ex. C (sheets 3 and 6).

6.  This specific TLD established the contractual baseline technical performance of the BAE RH1280B in SpaceKey's sales efforts to its customers. Int. 11 (¶2). It was the basis of SpaceKey's marketing and sales to Space Key customers, and was specifically incorporated into the purchase orders submitted by SpaceKey's customers. *Id.*

7.  In September 2007, BAE prepared and released to SpaceKey and other prospective customers and sales agents its "Rad Hard Field Programmable Gate Array (RH1280B, RH1020B) Product Plan." Spear Decl., Ex. D. ███████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████        *Id.*

8. In January 2008, BAE informed Space Key telephonically that the RH1280 delivery schedule needed to be modified; the parts would be available in the fourth quarter of 2008 instead of the second. Int. 11 (¶4). That same month, having entered its own purchase orders with its customers in India and Russian, Space Key delivered purchase order SKC12508 to BAE. This purchase order was baselined on BAE's TLD 197A806G, the September 2007 Product Plan, SMD 5962F9215603, and delivery in Q4 2008, as was SpaceKey's own orders with its customers. *Id.*

9.  Contrary to BAE's claim that SpaceKey "fell into a practice" of reselling BAE products (BAE CS ¶ 10), BAE specifically included SpaceKey in its plans to market the RH1280B to international customers. Don Francis at BAE issued a press release on June 20, 2008 stating that "Space Key Components, Inc. is a marketing representative for the BAE Systems manufactured parts for all sales in the domestic U.S. marketplace. For international sales, Space [Key] Components, Inc. is a reseller of the RH1280B and RH1020B product lines. Mr. Will Key, president, is experienced in all aspects of international sales and has provided excellent service to our customer base for over ten years." Spear Decl., Ex. E.

10.  During July 2008, BAE delivered RH1280B "Engineering" parts to SpaceKey, and SpaceKey sent those parts to its customers in India. Int. 11 (¶7). Using the Engineering parts, Space Key's customers initiated prototyping, software verification, FPGA programming, and other efforts to integrate the RH1280B FPGAs into their satellite systems. *Id.* (¶9).

11.  Because BAE delivered engineering units near schedule and compliant to BAE TLD 197A806G, SpaceKey and its customers reasonably presumed that BAE would deliver compliant Flight Units on or near schedule. Int. 11 (¶7). Later that month, however, BAE notified Space Key by letter of a further schedule slip for Flight units from November 2008 to March 2009. *Id* (¶5).

12.  In September 2008, Don Francis from BAE accompanied Mr. Key to give presentations about BAE products – including the RH1280B – to the Government of India, Department of Space, and Indian Research Satellite Organization – both SpaceKey customers. Int. 10 (Shirley Decl., Ex. A). In September 2009, at the Radecs conference in Bruges, Tim Scott assisted Mr. Key in giving a similar presentation to Actel.ru JCS, SpaceKey's sales consultant in the Russian Federation. In both instances, Mr. Scott and Mr.

Francis reiterated BAE's position that the RH1280B would be compliant with SMD

5962F92156, would have a TID of 300 KRads, and would otherwise be equivalent to the

legacy Actel part. *Id;* Spear Decl., Ex. F.

    13.  BAE repeated its warranties regarding the performance specifications of the

RH1280B FGPAs in numerous contexts and materials. *See e.g.* ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████.

    14.  In November 2008, Don Francis at BAE informed Space Key of yet another

schedule slip in the availability of RH1280B Flight parts, from March 2009 to June 2009.

Int. 11 (¶10).

    15.  The first mention BAE ever made to Space Key that the RH1280B Flight parts

would not meet the warranted specifications of the original Actel part was in May 2009,

when Don Francis verbally informed Mr. Key that the Flight parts would not meet the 300

KRad TID that had been promised. Int. 11 (¶11). Mr. Francis mentioned no other

shortcomings, and the issue he did raise was done informally only – no testing or other

documentation was provided. *Id.* (¶12).

    16.  As of May 2009, SpaceKey and its customers had already entered purchase

orders for RH1280B FPGAs compliant with the SMD and baseline TLD – in other words, for

parts equivalent to the legacy Actel product. SpaceKey's customers had been working with the Engineering parts for just shy of a year. Int. 11 (¶7). More importantly, BAE's RH1280B was the only available product to fill the void left by the departed Actel original. As BAE itself touted in its marketing materials, the RH1280B was specifically intended to avoid "a major obsolescence problem for many legacy satellite programs, enabling producers of satellite payloads and instruments to avoid time-consuming and costly redesigns." Spear Decl., Ex. A.

17.  When Mr. Key passed along Mr. Francis' informal notification that the RH1280B Flight parts would have only a 50 KRad TID, he asked his customers whether they could make use of such parts. Int. 11 (¶12). SpaceKey's Indian customers could not. But his Russian customers had more critical issues; they needed to replace failed satellites in their strategic GPS (GLONASS) constellation. *Id.* So, they agreed to receive 100 of 200 pieces at the 50KRAD level to advance their prototyping and qualification efforts. Additionally, as a result of customer inquiries and responses Space Key further identified to BAE that a TID non-conformance < 100KRAD for the 535 remaining Flight FPGAs would not be considered. *Id.*

18.  Although BAE revealed that a second production run was planned to attempt a solution to the poor TID performance, they refused to predict the TID performance they would attain. Int. 11 (¶12).

19.  Despite the absence of any technical, compliance, or qualification documentation, SpaceKey took delivery in November and December 2009 and January 2010 of RH1280B products that BAE represented as meeting a minimum TID of 100 KRad, and sent them to its own customers. Int. 11 (¶17). Other than the reduction in TID from 300 to 100 KRad, it was Space Key's expectation and understanding that the other warranties

regarding radiation performance – addressing single events – would be met. BAE made no representations to the contrary. *Id.*

20.  For shipments in June and August 2009 (100 total pieces), November 2009 (335 pieces), and its first shipment in January 2010 (100 pieces), BAE provided neither a TCI report nor a QML qualification. Int. 11 (¶¶12, 15, 17, 18, 19). BAE did not provide a TCI report for any of these parts until later in January 2010. BAE has never sent (and SpaceKey has never received) QML certification documentation for any of the RH1280B parts. Int. 5 (Spear Decl., Ex. K).

21.  Space Key gave notice to BAE that the delivered RH280B FPGAs had the following departures from warranty:  TID < 300KRAD; SEL <  177; SEU(c) < 17; SEU(S) < 4; SEDR < 60. Int. 12, Int. 13 (Spear Decl. Ex. K).

22.  SpaceKey was also notified by its own customers about these failures to comply with warranted specifications. Int. 13. In addition to express warranties extended to its customers (Shirley Decl., Ex. F at ¶ 20), SpaceKey considers it a practical obligation to make good on performance or specification warranties for products it sells to customers – particularly those with whom it has an ongoing business relationship (as is the case with its Russian and Indian customers). *Id.*

23.  The delivered RH1280B Flight parts did not, in fact, meet these specifications. BAE's TLD 197A806K (March 1, 2010) ██████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████
███████████████████████████

███████████████████████████████

███████████████████████████████

████████████

### Argument

**I.      BAE Made Express Warranties regarding the Performance and Specifications of the RH1280B FPGAs that it Cannot and Did not Disclaim.**

NHRSA 382-A:2-313 states in relevant part:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
(c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

BAE made express warranties in this case as measured by each of these methods. It specifically made affirmations of fact regarding RH1280B FPGAs as contemplated by subsection 1(a) of the statute. From the very outset of its efforts to reintroduce the RH1280 FPGA, it repeatedly stated that it would provide a part that was a form, fit, and function replacement for the legacy Actel part. CS ¶1. More specifically, BAE repeatedly warranted that the RH1280B would meet a number of critical performance specifications, including TID, SEU, SEL, and SEDR, which the original Actel part had. CS ¶¶1, 3, 4, 7, 13. These descriptions of the RH1280B FPGAs' specifications were an express warranty, and they became part of the basis of BAE's bargain with Space Key, and SpaceKey's bargain with its customers.

 BAE           cites *Eastern Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc.*, 40 F.3d 492, 501 (1st Cir. 1994) for the proposition that express warranties can be disclaimed.

That case makes no such holding. This is not surprising, as the law is to the contrary. RSA 382-A:2-316(1) provides that disclaimers that are inconsistent with an express warranty must be disregarded.

*H.G. Fischer X-Ray Co., Inc. v. Meredith,* 121 N.H. 707, 711 (1981) involved an analogous set of facts. In that case, the plaintiff sold an x-ray machine to the defendant, and its sales contract contained text purporting to disclaim all express and implied warranties. The Court agreed that "[b]y using this language, the plaintiff effectively disclaimed the implied warranties of merchantability and fitness for a particular purpose." *Id.* at 711. But the disclaimer had no effect on the plaintiff's *express* warranties.

> In its description of the goods, however, the plaintiff expressly warranted that the machine would be capable of producing up to 300 milli-amps at 125 kilovolts. This fact was confirmed by the plaintiff's only witness at trial, who testified that the machine was designed to "put out a maximum . . . of 300 milli-amps at 125 KVP." Thus, notwithstanding the disclaimer, the defendant still had the benefit of this warranty.

*Id.*

The same is true in this case. Although BAE's disclaimer would be effective against implied warranties (either of merchantability or suitability for a particular purpose), SpaceKey has made no claim for breach of implied warranties in this case. SpaceKey is seeking relief for BAE's breach of its *express* warranties regarding the performance specifications of the RH1280B FPGAs, and BAE has not disclaimed them.

**II.     SpaceKey Was Expressly Permitted by Law to Accept the Nonconforming Goods and Seek Recovery for the Difference in Value Between the Goods as Warranted and the Goods as Delivered.**

BAE's motion implies that SpaceKey should have rejected the RH1280B FPGAs once it learned that the 300 KRad specification would not be met, and that having accepted them it has no cause for complaint. That is not the state of the law. The Uniform Commercial Code, NH RSA 382-A *et seq.* ("UCC") expressly allows a buyer like SpaceKey to accept

goods, despite a known lack of conformance,[2] and then sue for warranty damages. RSA 382-A:2-607(2); RSA 382-A:2-714(1). Specifically, SpaceKey is entitled to "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted." RSA 382-A:2-714(2).

BAE was well aware of the nonconformities in the RH1280B FPGAs. CS ¶¶ 15, 21, 23. It was aware of the failure to comply with the >300 KRad specification from the outset – a failure it conveyed to Space Key. And Mr. Key informed Don Francis at BAE of the other nonconforming elements as he became aware of them. CS ¶ 21.

Accordingly, the remedy and relief SpaceKey seeks in this case is expressly permitted by the UCC.

### III.    The Remedy Limitations on Which BAE Relies in its Motion Are Inapplicable to Space Key's Claims.

BAE's primary argument is that SpaceKey's warranty claim is barred by a remedy limitation in the Terms of Sale. SpaceKey acknowledges that parties may limit the remedies otherwise available under the UCC. RSA 382-A:2-719. But certain requirements must be met in formulating such limitations. "A limitation of the buyer's remedies to that of repair must be clearly stated. In determining whether there is a limitation of remedies, the contract of sale will be construed strictly against the party preparing it." 4B Anderson U.C.C. § 2-719:24 (2011). These principles compel rejection of BAE's argument, because the specific remedy limitation on which it relies, paragraph 8(b) of its Terms of Sale, is inapplicable to the claims SpaceKey makes in this case.

---

[2] It is critical to stress that although BAE confirmed in its TLD that the first batch of RH1280Bs achieved a TID of only 50 KRad, SpaceKey was given no such documents regarding the later batches of RH1280Bs until well after the shipments and purchases were complete. And no TLD ever documented the RH1280B's failures to meet warranted single-event specifications until March 2010, well after delivery of the parts to SpaceKey.

This is plain from the language of the paragraph itself. Paragraph 8 contains a variety of different warranties, each set forth in a separate subparagraph. Declaration of David Rea, Ex. A ("Rea Decl."). In subparagraph (a), for example, BAE warrants that its products will have clear title and be free from liens. No remedy limitation accompanies this warranty. In subparagraph (c), BAE "warrants that, from the date of delivery, its Software media delivered hereunder shall be free from defects in material and workmanship for a period of 90 days." This warranty *is* accompanied by a specific limitation. BAE's "sole liability under *this warranty* shall be to replace the defective media." *Id.* (emphasis added.) In paragraph (d), BAE warrants that it will (on certain conditions) defend its buyer from claims of patent infringement. This paragraph also contains a warranty-specific limitation: "BAE SYSTEMS will, at its option and expense, either procure for Buyer the right to continue using the Deliverables, replace or modify them so they become noninfringing, or grant Buyer credit for the then current value of the Deliverables."

Subparagraph 8(b) follows this same pattern. It sets forth a specific warranty against "defects in material and workmanship under normal usage," and provides that BAE's "sole liability under this warranty shall be limited to the repair or replacement of the Deliverables returned to BAE SYSTEMS or the refund of its price, at BAE SYSTEMS' option."

Neither this warranty, nor its accompanying limitation, has any application to this case. SpaceKey has not claimed that the RH1280Bs contain defects in material or workmanship.[3] SpaceKey claims that the RH1280B FPGAs, even when fully functional, do not meet the specifications that BAE warranted they would have. BAE's reliance on the limitation in paragraph 8(b) is therefore misplaced.

---

[3] Indeed, as BAE itself acknowledges, several of the FPGAs sent to Space Key's Russian customer have failed to program. Rea Decl., ¶ 30. That is a defect in material or workmanship. And, as BAE states, it is addressing those defects with the Russians under the provisions of subparagraph 8(b).

*Community Television Services, Inc. v. Dresser Industries, Inc.*, 586 F.2d 637 (8th Cir.

1978), involved a similar set of circumstances. In that case, Dresser supplied a broadcasting

tower to the plaintiff that collapsed after an ice storm. The plaintiff sued for breach of

warranty. Prior to the sale, Dresser had supplied the plaintiff with certain advertising material

that created "a warranty that Dresser's tower would be properly designed so as to safely

withstand the maximum wind velocities and ice loads to which it would likely be subjected."

*Id.* at 640. As here, Dresser's contract contained a paragraph – "Item 9" – that both created a

warranty against "defects in material and workmanship," and limited a buyer's remedy to

repair, replacement, or refund. *Id.* at 641. Dresser contended that this clause barred the

plaintiff's claims.

The Eighth Circuit rejected Dresser's position because "the limitation clauses apply

only to the limited and purportedly exclusive warranty set forth in item nine, and not to the

broader warranty created by the affirmation made in Dresser's advertising materials." *Id.* at

642.

> Dresser's affirmation in its advertising catalog went beyond the limited warranty
> in the written contract and created a promise concerning the tower's durability
> much broader than mere compliance with the 60 psf specification. Dresser
> promised Community that a nondefective, properly designed tower would
> "safely withstand the maximum wind velocity and ice storms to which (it is)
> likely to be subjected." This broad warranty of performance clearly falls outside
> the limited warranty provided in item nine. Thus, the jury could reasonably have
> found that the tower was not defective in materials or workmanship and met the
> technical specifications, but did not live up to its promised performance
> capacity.

*Id.* at 643 (internal citations omitted). *See also*, *Jutta's Inc. v. Fireco Equipment Co.* 150

N.J.Super. 301, 306 (N.J.Super. A.D. 1977) ("since the limitation of damages clause is

contained in the paragraph providing for the express guarantee, it can only be read to apply to

claims made on the basis of that express guarantee").

The same is true here. The express warranties BAE made regarding the performance specifications of the RH1280Bs went far beyond a pledge that they would not be defective. Indeed, just as in *Dresser*, SpaceKey's claims remain valid even though the material and workmanship of the RH1280Bs are *not* defective. Accordingly, the remedy limitations for repair, replacement, or refund in paragraph 8 of the Terms of Sale are inapplicable in this case.

SpaceKey recognizes and acknowledges that the Terms of Sale contain two other limitations clauses. But neither has any role to play in this case. Paragraph 8(e) contains a limitation on claims for consequential and incidental damages. This provision is immaterial because SpaceKey has not brought any claims for consequential or incidental damages. It only seeks *direct* warranty damages under §2-714(2). Paragraph 13 limits claims for direct damages to the total contract price. This limitation is applicable on its face, but it is irrelevant as a practical matter because SpaceKey's direct damages will not, by definition, exceed the contract price. [4]

The Court should deny BAE's motion because its primary argument relies on a contractual limitation that is inapplicable to the claims SpaceKey raises in this case.

## IV.   Even if they Did Apply, the Remedy Limitations BAE Cites Do not Control Because they Fail of their Essential Purpose.

As demonstrated in the preceding section, the remedy limitations BAE relies upon in its motion are inapplicable to SpaceKey's claims for breach of express warranty. But even if

---

[4] SpaceKey is seeking the difference in value between the RH1280Bs as promised and delivered. Even if the RH1280Bs had no value whatsoever – a claim SpaceKey does not make – the damage calculation would be the contract price minus 0 – or, the contract price. A far more likely outcome of SpaceKey's claims is that the RH1280s have a value greater than $0 but considerably less than the contract price. This outcome likewise yields a figure less than the contract price. Because the contract price thus already forms the outer bounds of SpaceKey's direct damage claim, the limitation in paragraph 13 has no practical force.

those limitations were applicable to SpaceKey's claims, they should be disregarded pursuant

to RSA 382-A:2-719(2), because the limited remedies fail of their essential purpose.

> **A.** **BAE's Discussion of Failure of Essential Purpose is Premised on a Fundamental Confusion Between Consequential and Incidental Damage Claims (which SpaceKey Does not Assert) and Claims for Direct Damages.**

BAE        relies on *Xerox Corp. v. Hayes*, 124 N.H. 610 (1984) to argue that the limited

remedies of paragraph 8(b) of the Terms of Sale do not fail of their essential purpose. BAE

has misread *Xerox*. More importantly, BAE misunderstands the different standards applicable

under the UCC to limitations on direct damages and limitations on consequential or

incidental damages. The first category is governed by Section 2-719(2), which provides that

"where circumstances cause an exclusive or limited remedy to fail of its essential purpose,

remedy may be had as provided in this chapter." The second category – the limitation of

consequential and incidental damages – is governed by Section 2-719(3), which provides

that: "[c]onsequential damages may be limited or excluded unless the limitation or exclusion

is unconscionable."

    *Xerox* is irrelevant because the NH Supreme Court was solely concerned with an

issue not presented in this case: whether the failure of a limited remedy under 2-719(2)

should automatically invalidate a limit on consequential damages (the minority rule) or

whether those limits should remain unless shown to be unconscionable (the majority rule). In

adopting the majority position, the court stated:

> Other courts, interpreting the effect of the 'failure of essential purpose' Code provision in cases where there is proof of an inability to repair nonconforming goods, have not invalidated contractual limitations on incidental and consequential damages. Those portions of a contract disallowing incidental and consequential damages are considered separate and distinct from the language dealing with repair and replacement. Such damage limitations survive even if the contractual provision limiting the buyer's remedies to repair or replacement is judicially stricken.

*Id.* at 619-20.

This Court addressed the very same issue in *The Colonial Life Insurance Co. of America v. Electronic Data Systems Corp.*, 817 F.Supp. 235 (D.N.H. 1993). There, "Chubb argue[d] that consequential damages are automatically available to a grieving buyer under § 2-719(3), if an exclusive or limited remedy fails of its essential purpose under §2-719(2), notwithstanding an express contractual exclusion of consequential damages." *Id.* at 240. Noting a "split of authority on the issue of whether §2-719(2) and (3) are interdependent," the Court determined that *Xerox* had adopted the majority view "according independent status to the subsections." *Id.*

While interesting, the issues addressed in *Xerox* and *Colonial Life* are entirely irrelevant in this case,[5] because Space Key has not stated a claim for consequential or incidental damages under the UCC. Its claim is only for direct warranty damages under RSA 382-A:2-714(2). Accordingly, the Court should disregard BAE's arguments about failure of essential purpose.

**B.      The Remedy Limitations in Paragraph 8(b) of the Terms of Sale Fail of their Essential Purpose.**

Section 2-719(2) of the UCC expressly provides that a limited remedy is disregarded if it fails of its essential purpose. As Comment 1 explains, this subsection applies to "an apparently fair and reasonable clause," which "because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain."

---

[5] In any event, it is not at all clear that *Xerox* reflects the current state of New Hampshire law. In *Hydraform Products Corp. v. American Steel & Aluminum Corp.*, 127 N.H. 187, 197 (1985), a case decided more recently, the NH Supreme Court held that the failure of a primary remedy did invalidate a limit on consequential damages.

The essential purpose of the limited remedies in BAE's Terms of Sale[6] is to ensure that Space Key obtained the FPGAs that were promised. *See Hydraform Products Corp. v. American Steel & Aluminum Corp.*, 127 N.H. 187, 196-7 (1985) (purpose of limited remedy of replacement is to ensure that buyer receives goods as warranted; if it does not, "the clause would fail of its essential purpose to provide some effective remedy for breach"); *Hartzell v. Justus Co., Inc.*, 693 F.2d 770, 774 (8th Cir. 1982) ("The purpose of a remedy is to give to a buyer what the seller promised him-that is, a house that did not leak. If repairs alone do not achieve that end, then to limit the buyer's remedy to repair would cause that remedy to fail of its essential purpose.").

Here, Space Key contracted to obtain radiation hardened FPGAs that met certain critical specifications – specifications that BAE expressly warranted the RH1280B would satisfy. But it is undisputed that BAE cannot repair the RH1280Bs to make them compliant with the express warranties. As the latest TLD reveals, and as Mr. Rea admits in his declaration, BAE is only able to make RH1280B FPGAs that fall well short of conformance with the express warranties it made. Replacement fails as a remedy for this same reason. Sending an RH1280B back to BAE would be senseless, as BAE is only able to send a replacement part of the same specification.

Nor would a refund provide SpaceKey or its customers with the benefit of their bargain. As BAE itself touted in its marketing materials, there is no alternative to BAE's RH1280B FPGA. CS¶ 1. A refund might conceivably provide an adequate remedy if a buyer is then able to purchase a substitute product with the refunded purchase price. But it is undisputed that such an option was not available here. Moreover, BAE also acknowledged in

---

[6] For the reasons explained, the remedy limitations in the Terms of Sale do not apply by their own terms to SpaceKey's claims. This portion of SpaceKey's brief is expressly premised on a contrary assumption, made for purposes of argument.

its marketing materials that the only alternative to its RH1280Bs were "time-consuming and costly redesigns." *Id.* Even assuming such costly and time-consuming redesigns are even possible (which BAE makes no attempt to show in its papers), they would not provide the benefit of the bargain made in the agreement.

"When the seller is unable to cure the nonconformity of the goods, the limited remedy of repair, replacement, or repair or replacement has failed of its intended and essential purpose. . . .  When the seller is unable to correct the defect within a reasonable time, it is does not matter whether or not the failure is willful." 4B Anderson U.C.C. §2-719:132 (3d. ed. 2010).

For the reasons stated, paragraph 8 does not apply to Space Key's warranty claims. But even if it did, the limited remedies it outlines would not provide SpaceKey with anything like the benefit of its bargain. Finally, SpaceKey notes that "the question of whether a limited remedy of repair and replacement fails its essential purpose is a question of fact which is inappropriate for determination on summary judgment." *Cole Energy Development Co. v. Ingersoll-Rand Co.*  678 F.Supp. 208, 210 (C.D.Ill. 1988). Because that is particularly true in this case, the Court should deny BAE's motion.

## V.    SpaceKey Has a Valid Claim for Warranty Damages.

BAE argues that SpaceKey is not entitled to warranty damages because it resold the products to its own customers at a markup. This argument impermissibly conflates entirely separate and distinct categories of claims and damages. SpaceKey is seeking recovery under Section 2-714(2) for the difference in value between the RH1280B FPGAs as they were promised –with the radiation-hardened characteristics of the original Actel part – and the parts as they were actually delivered. Space Key makes no claim for lost profits or other

consequential damages. BAE's argument is thus a paradigmatic example of apples being compared to oranges.[7]

It has long been the rule, before and after adoption of the UCC, that a buyer's resale of nonconforming goods is separate and distinct from warranty damages, and has no effect on their availability.

> The rule of damages for a breach of warranty on the sale of chattels is well settled and familiar. It is the difference between the actual value of the article sold and the value of the same article if it had been such as the vendor warranted it to be. The application of this rule is not changed or modified by the fact that a purchaser of a warranted article has sold it for the same or even a greater price than that which he paid for it.

*Brown v. Bigelow,* 1865 WL 4715, 2 (Mass. 1865) (internal citations omitted).

 In      *J. I. Case Plow Works v. Niles & Scott Co.*  63 N.W. 1013, 1017 (Wis. 1895), the trial "court refused to allow the plaintiff damages on account of defective wheels which it had sold and disposed of to third parties, and for which it had received an amount equal to the purchase price of the same." In overturning this result, the Wisconsin Supreme Court first stated that "[t]he proper measure of damages" in a breach of warranty claim is "the difference between the actual value of the defective wheels delivered, and their value had they been in accordance with the written warranties." *Id.* at 1017. It then stated that "[t]he price for which the purchaser had sold the goods cannot be shown, in order to modify the rule above stated, nor is it material whether he had sold them at all." *Id.* The plaintiff was therefore entitled to a new trial.

No less a jurist than Justice Cardozo has "give[n] no weight to [a] defendants' argument that a vendee who resells at the price at which he buys must pay damages to the

---

[7] BAE's motion makes no attempt to show (or even to argue) that the RH1280B FPGAs it delivered –with their deficient radiation-hardened specifications – have the same value as the parts it promised. Even if it had, SpaceKey would strenuously dispute such a conclusion. *See* Int. 15 (Spear Decl., Ex. K). This is another reason why these fundamental factual issues are ill-suited for resolution on summary judgment.

subvendee before damages for breach of warranty will be due from the vendor. The law is settled to the contrary, and this though the resale has been effected at a profit. A right of action, measured by the difference between the value of the goods as they are and their value as they ought to be, accrues to the vendee at once when the warranty is broken." *Joannes Bros. Co. v. Lamborn* 237 N.Y. 207, 210 (1923). *See also Davis v. Ferguson Seed Farms,* 255 S.W. 655, 663 (Tex.Civ.App. 1923) ("The rule seems to be well settled that when an article has been sold with a warranty, and the vendee resells the same with a like warranty, the first purchaser may recover for a breach of the warranty, although he has resold the goods and has not refunded any sum to his vendee, and no claim against him has been made."); *Superwood Corp. v. Larson-Stang, Inc.*, 311 F.2d 735, 739 (8th Cir. 1963) ("The rule in its broad terms provides that when a warranted article is sold for the purpose of resale, and it is resold with a similar warranty, the first purchaser may recover for breach of the warranty even though he has resold the article, has not refunded any amount of the purchase price, and has had no claim made against him by the subpurchaser").

These same principles were adopted by, and apply under, the UCC. In *DeGidio v. Ace Engineering Co. Inc.,* 302 Minn. 19 (1974), for example, the plaintiff was an authorized reseller of the defendant's burners and boilers. It sued for warranty damages for a number of burners that failed to conform to the defendant's express performance warranties. The defendant argued that the burners were still in place and still operating, and that "DeGidio has been fully compensated by its ultimate purchasers, both for the cost of the burners and the cost of installation." *Id.* at 26.

Despite the acknowledged risk of a windfall, the court held that "DeGidio is entitled to recover against Ace for breach of warranty and that DeGidio's ultimate disposition of the defective equipment is not relevant to the issues between Ace and DeGidio." *Id.* at 27. The

court reasoned that "[a]part from what appears to be the right to recover under the common law and now under the Uniform Commercial Code, if the burners were valueless, clearly DeGidio had a liability to his vendees to make them whole." *Id.* Accordingly, "DeGidio is entitled to damages for breach of warranty without reference to what profit it may have realized from the sale and installation of the burners or what other arrangements it may have made to correct the problems the burners presented due to their faulty design and construction." *Id. See also, Bartow v. Ford Motor Co.*, 342 Ill.App. 3d 480, 491-2 (Ill. App. 2003). This outcome is particularly apt in this case, because like DeGidio, SpaceKey has given warranties to its own customers that the RH1280B would have the same specifications as the legacy Actel part. Shirley Decl., Ex. F, ¶20.

As this authority demonstrates, BAE is simply wrong to suggest that a resale, even at a profit, bars a claim for warranty damages. The analysis is far more nuanced and complex than BAE's argument allows. This discussion in Anderson's UCC treatise highlights the dynamics at work:

> **Is the buyer's right to recover damages for breach of warranty affected by the fact that the buyer has resold the goods at a profit or at no loss? The technical answer is that it is not**, although, as a practical matter, the buyer may have difficulty in convincing the trier of fact that the goods were not as warranted when they were resold at no loss or at a higher price. Assuming, however, that this aspect of proof is overcome by the buyer, the issue must then be met as to whether a subsequent nonloss resale bars, or affects, the ordinary recovery of damages for breach of warranty.
>
> **If the basic standard of the Code is applied, the resale price is to be ignored. By that standard, the measure of recovery is the difference, at the time and place of acceptance, of the goods between the value of the goods, as accepted, and the value the goods would have had, if they had been as warranted**. A departure from this rule is authorized if "special circumstances show proximate damages of a different amount" and "in a proper case any incidental or consequential damages under may also be recovered."
>
> **The buyer's damages for breach of warranty are not lessened because the buyer has resold the goods at an enhanced price. Had the goods**

> **been as warranted, they might have been resold at a still higher price. It therefore does not matter that the goods were actually worth the price for which they were resold.** Whether the price received on a resale is evidence of the value of the goods at the time of the breach, is another question. Certainly, such evidence is not conclusive.

4A Anderson U.C.C. §2-714:57 (3d. Ed. 2010) (emphasis added) (internal citations omitted).

*Mayberry v. Volkswagen of America, Inc.*, 278 Wis.2d 39 (Wis. 2005) is an instructive case on this issue. There, the plaintiff contended that she suffered warranty damages because her Volkswagen, as delivered, was worth less than it would have been if it had conformed to applicable warranties. Volkswagen argued, as BAE does here, that the plaintiff hadn't suffered any damage because she resold the car for more than market value. This argument succeeded on summary judgment, but was reversed on appeal.

> The fact that Mayberry later resold the vehicle for more than its fair market value does not totally negate the fact that she did not receive the benefit of her bargain. While the amount of profit realized on the resale may be relevant to the issue of mitigation, construing the "special circumstances" clause of § 402.714(2) to completely bar the plaintiff from maintaining a claim would defeat the manifest purpose of the remedies under the Uniform Commercial Code.

*Id.* 43.

The same result should obtain in this case. SpaceKey's ultimate damages, and BAE's argument that no damages exist, cannot be resolved without quantifying the threshold warranty issue – that is to say, the difference in value between the RH1280B FPGAs as warranted by BAE and the value of the parts it actually delivered.

In concurring in the decision to reverse and remand, three justices recommended an approach for calculating the plaintiff's damages in *Mayberry*. "One instance in which courts have recognized that a party has mitigated damages for breach of warranty under the Uniform Commercial Code is where the buyer resells the defective goods for a profit: 'When the buyer sues the seller for warranty damages, the general rule specified by the Code for the

23

measurement of the damages must be modified by deducting the profits made on resale.'" *Id.*
at 71 (*quoting* 4A Anderson on the Uniform Commercial Code § 2–714:223, at 488 (3d ed.
rev. vol. 4A 1997)). "Thus, assuming Mayberry is successful in convincing a jury that
Volkswagen breached its warranties and that she suffered damages, Mayberry's damages
should be reduced to reflect the net profit she obtained as a result of the resale of the
vehicle." *Id.* at 72.

SpaceKey believes that *Mayberry* is distinguishable from this case because the
plaintiff car owner was a consumer who resold her vehicle without a warranty. Here, by
contrast, SpaceKey is in the business of reselling products, and earning a profit on resale is
simply part of its normal operations. More importantly, as was true in *DeGidio*, SpaceKey
has made warranties of its own to its customers, which it may well need to honor.

But even if the Court were to adopt the "special circumstances" approach employed
in *Mayberry*, it would still need to deny BAE's motion for summary judgment. The
*Mayberry* court recognized that warranty damages and resale profits are separate categories,
and that a final damage calculation must take account of both figures. Such a calculation is
impossible to make on the current record, because there is no evidence before the Court –
disputed or otherwise – regarding the value of the non-conforming FPGAs. SpaceKey will
contend at trial that the difference in value is substantial. BAE will no doubt tell a different
story. But until that issue is resolved, the net damages cannot be determined,[8] and BAE's
motion for summary judgment must be denied.

---

[8] A simple example shows how the calculations might work. Assume a total contract price for RH1280B
FPGAs of $6 million dollars, and a net profit on resale of $1.5 million. Although the FPGAs were warranted
to have a TID of 300 KRad, as delivered they have a TID of only 100 KRad. Space Key shows, and the factfinder
concludes, that the nonconforming parts had a value of only 1/3 the purchase price, or $2 million. Thus, direct
warranty damages are $4 million. Under the approach employed in *Mayberry*, these damages must be reduced
by the net profits, leaving a damage amount of $2.5 million. Here, because roughly $1.8 million is still owing
on the original contract price, SpaceKey's net damages would be $700,000.

Neither of the cases BAE cites in its motion is to the contrary. In *Cincinnati Siemens-Lungren Gas Illuminating Co. v. Wester Siemens-Lungren Co.,* 152 U.S. 200 (1894), the Court acknowledged the general rule that "damages in such a case is measured by the difference between the contract price and the actual value of the thing delivered." *Id.* at 210. But, as the language BAE quotes in its memorandum plainly reflects, the buyer of the allegedly nonconforming lamps offered no "testimony showing how much less in value a lamp with the solid burner was than one with the tube burner." *Id.* at 211. Here, SpaceKey intends to show that there is a very significant difference in value between the FPGAs that were promised and warranted and those that were actually delivered. Because BAE failed to provide RH1280Bs that have the promised radiation characteristics, they will have far less longevity, and less ability to withstand both total ionizing doses of radiation, as well as large, single-event doses. Int. 15 (Spear Decl., Ex. K). SpaceKey concedes that if it offers no evidence at trial regarding the difference in value then it will not have proven its damages. But that is merely the general rule. Nothing in the *Cincinnati* decision supports BAE's argument that the mere existence of profit on resale bars a warranty damage claim.

*Ed. S. Michelson, Inc. v. Nebraska Tire & Rubber*, 63 F.2d 597 (8th Cir. 1933) is even less supportive of BAE's position. The Eighth Circuit likewise adopted the general rule of warranty damages, and it acknowledged that "neither the vendee's right of recovery, nor the measure of his damages, is dependent upon a resale by him or upon the price obtained at a resale. At most, the price thus obtained may be some, but not conclusive, evidence of the actual value." *Id.* The court further agreed that the resale price is little "evidence of the value of the article in its inferior condition" "where the resale is with a warranty of quality." *Id.* (*citing Brown v. Bigelow*). These are the very same principles SpaceKey discussed above.

At trial, although there were "opinions of witnesses of the defendant that the tires were of less value than defendant agreed to buy," the buyer's own customer on resale testified "without qualification that the tires purchased by his company in 1927 were equal or superior to those purchased in 1926." *Id.*

In considering this mix of evidence on the buyer's appeal, the Eighth Circuit stated that "[i]t cannot be said that evidence of the price received by purchaser on resale should never be considered in determining the amount of damage, if any, suffered by the purchaser. Such a statement would be too broad." *Id.* at 600. "It does no violence to the [standard rule of warranty damages] to hold that where, as here, the purchaser of the property on resale gives a value to it, and where he has become familiar with all of the circumstances affecting its value, his testimony with reference to the price paid should be given consideration by the jury, as one of the circumstances to be considered by it in connection with other evidence." *Id.* at 601.

Nothing in *Michelson* supports BAE's belief that it should receive summary judgment on SpaceKey's warranty claim. To the contrary, *Michelson* supports denial of the motion, as the Eighth Circuit's analysis underscores the intensely factual nature of the inquiry. BAE's assertion that the existence of a resale for profit bars a claim for warranty damages is supported by *none* of the cases it cites. And the vast weight of authority is to the contrary. The Court should therefore deny BAE's motion.

## VI. The Court Should Deny BAE's Motion for Summary Judgment Against SpaceKey's Misrepresentation Claim.

BAE argues for summary judgment in its favor on SpaceKey's misrepresentation claim, because SpaceKey was merely a middleman. BAE cites no authority to support this extraordinary claim. No such law exists. The law of misrepresentation recognizes that liability arises when false information is supplied "for the guidance of others in their business

26

transactions." Restatement (2d) Torts § 552. Even in the case of negligent misrepresentation, where the scope of liability is the most closely constrained, the Restatement provides that:

> It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it. It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or group. It is sufficient, in other words, insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given. It is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated.

Comment g.

The scope of liability is even broader for intentional misrepresentations. Restatement (2d) Torts §531 ("One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced."); Restatement (2d) Torts §534 ("One who makes a fraudulent misrepresentation intending or with reason to expect that more than one person or class of persons will be induced to rely on it, or that there will be action or inaction in more than one transaction or type of transaction, is subject to liability for pecuniary loss to any one of such persons justifiably relying upon the misrepresentation in any one or more of such transactions").

BAE's contention that it made its representations to others, not to SpaceKey, is baldly inconsistent with this authority. It is also factually mistaken. CS ¶¶ 1-8; Spear Decl., Ex. L. Equally mistaken is BAE's contention that SpaceKey did not rely on its misrepresentations.

It is undisputed that SpaceKey submitted purchase orders for the RH1280B FGPAs, and that these orders incorporated the radiation specifications at issue. CS ¶¶ 1-8. And, since BAE had made the legacy Actel parts, which conformed to those specifications, SpaceKey's reliance was more than reasonable. The fact that others, including SpaceKey's customers on resale, may also have relied on BAE's misrepresentations is of no moment.

### **Conclusion**

For the foregoing reasons, SpaceKey respectfully requests that the Court deny BAE's motion for summary judgment.

Respectf                                                    ully submitted,

Space Key Components, Inc.

By its Attorneys,

ORR & RENO, P.A.
One Eagle Square
P.O. Box 3550
Concord, NH  03302-3550
603-224-2381


Date:   August 2, 2011                    /s/ Jeffrey C. Spear_____
Martha                                              Van Oot (NHB #963)
mvanoot@orr-reno.com
Jeffrey                                             C. Spear (NHB #14938)
jspear@orr-reno.com

CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August 2011, a redacted version of the foregoing Objection has been sent via the Court's ECF system to counsel for BAE Systems, and an unredacted version has been sent via First Class Mail.

/s/ Jeffrey C. Spear_____

28