**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

BAE Systems Information
and Electronics Systems
Integration Inc.

    v.                           Civil No. 10-cv-370-LM

SpaceKey Components, Inc.

**O R D E R**

    BAE Systems Information and Electronics Systems Integration Inc. ("BAE") has sued its former customer and sales consultant, SpaceKey Components, Inc. ("SpaceKey"), in six counts. In its amended complaint, BAE seeks declaratory judgments on two issues (Counts I and II), and asserts the following claims: action for account stated (Count III), breach of contract (Count IV), quantum meruit (Count V), and unjust enrichment (Count VI). In each of Counts III through VI, BAE seeks to recover $1,851,757, the cost of goods it delivered to SpaceKey but SpaceKey has not paid for. SpaceKey, in turn, asserts counterclaims for breach of contract (Counts One and Two), misrepresentation (Count Three), and breach of express warranty (Count Four).[1] Before the court are BAE's motions for: (1) leave to file a second amended complaint and add a new party; (2) summary judgment on Counts

_____

[1] A fifth counterclaim, asserting a violation of New Hampshire's Consumer Protection Act, was dismissed by order dated May 4, 2011, document no. 19.

Three and Four of SpaceKey's counterclaim; and (3) summary judgment on Counts III and IV of its amended complaint.  All three motions are duly opposed.  For the reasons that follow, BAE's motion for leave to file a second amended complaint is denied; its motion for partial summary judgment on SpaceKey's counterclaim is denied; and its motion for partial summary judgment on its amended complaint is granted in part and denied in part.

## Motion to Amend

In its amended complaint ("AC"), BAE alleges that it began doing business with SpaceKey no later than 2004 and continued to do business with SpaceKey through early 2010.  After filing suit, BAE learned that: (1) on June 30, 2006, SpaceKey's existence as a Virginia corporation was automatically terminated for failure to file an annual report and pay the annual registration fee, see Pl.'s Mot. for Leave, Ex. 3 (doc. no. 20-4); and (2) for the entire period of SpaceKey's incorporation, its sole shareholder has been Will Key, see id., Ex. 2 (doc. no. 20-3), at 1.  In light of the foregoing, BAE moves for leave to file a second amended complaint ("SAC").

BAE's SAC adds Will Key as a defendant to the claims stated in Counts III-VI of the AC (which are Counts III, IV, VI, and VII of the SAC), and adds an entirely new Count V, labeled "Alter Ego Doctrine/Pierce the Corporate Veil Against SpaceKey and William C. Key."  Pl.'s Mot. for Leave, Ex. A (doc. no. 20-1), at 11.  SpaceKey objects on grounds of futility, arguing that: (1) its corporate existence has been reinstated such that it is deemed to have been in continuous existence since 2002; (2) Will Key is protected from liability by statute; (3) BAE fails to state a claim under Virginia's law of corporate veil-piercing.  The court begins by briefly sketching the relevant legal principles.  The court next considers BAE's proposed changes to Counts III-VI of the AC, and concludes by examining Count V of the SAC.

A. Legal Principles

    1. Amendment

The Federal Rules of Civil Procedure provide that, under the circumstances of this case, BAE may amend its amended complaint only with leave of the court.  See Fed. R. Civ. P. 15(a)(2).  However, "[t]he court should freely give leave when justice so requires."  Id.  As the United States Supreme Court has explained:

> In the absence of any apparent or declared reason –
> such as undue delay, bad faith or dilatory motive on
> the part of the movant, repeated failure to cure
> deficiencies by amendments previously allowed, undue
> prejudice to the opposing party by virtue of allowance
> of the amendment, futility of amendment, etc. – the
> leave sought should, as the rules require, be "freely
> given."

Foman v. Davis, 371 U.S. 178, 182 (1962).

Regarding futility, "[i]f the proposed amendment would be futile because, as thus amended, the complaint . . . fails to state a claim, the district court acts within its discretion in denying the motion to amend." Abraham v. Woods Hole Ocean. Inst., 553 F.3d 114, 117 (1st Cir. 2009) (quoting Boston & Me. Corp. v. Hampton, 987 F.2d 855, 868 (1st Cir. 1993)). That is, futility "means that the complaint, as amended, would fail to state a claim upon which relief could be granted." Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996) (citing 3 Moore's Federal Practice ¶ 15.08[4], at 15-80 (2d ed. 1983); Vargas v. McNamara, 608 F.2d 15, 17 (1st Cir. 1979)). "In reviewing for 'futility,' the district court applies the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion." Glassman, 90 F.3d at 623.

### 2. Rule 12(b)(6)

A motion to dismiss for "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), requires the court to conduct a limited inquiry, focusing not on "whether

a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). That is, the complaint "must contain 'enough facts to raise a reasonable expectation that discovery will reveal evidence' supporting the claims." Fantini v. Salem State Coll., 557 F.3d 22, 26 (1st Cir. 2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007)). When considering a motion to dismiss under Rule 12(b)(6), a trial court "accept[s] as true all well-pled facts in the complaint and draw[s] all reasonable inferences in favor of plaintiffs." Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 771 (1st Cir. 2011) (quoting SEC v. Tambone, 597 F.3d 436, 441 (1st Cir. 2010)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." United Auto., Aero., Agric., Impl. Workers of Am. Int'l Union v. Fortuño, 633 F.3d 37, 40 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)) (internal quotation marks omitted). On the other hand, a Rule 12(b)(6) motion should be granted if "the facts, evaluated in [a] plaintiff-friendly manner, [do not] contain enough meat to support a reasonable expectation that an actionable claim may exist." Andrew Robinson Int'l, Inc. v.

Hartford Fire Ins. Co., 547 F.3d 48, 51 (1st Cir. 2008)

(citations omitted).  That is, if "the factual allegations in

the complaint are too meager, vague, or conclusory to remove the

possibility of relief from the realm of mere conjecture, the

complaint is open to dismissal."  Plumbers' Union, 632 F.3d at

771 (citation omitted).

B. Counts III-VI of the AC

        BAE seeks to add Will Key as a defendant to Counts III-VI

of the AC.  For example, it seeks to add the following language

to Count III, its action for account stated:

> William Key is personally liable to BAE Systems
> because, as SpaceKey's sole shareholder, he continued
> to operate SpaceKey for purposes other than winding up
> its affairs and to accept new obligations in
> SpaceKey's name even though SpaceKey was terminated as
> a Virginia corporation.  Alternatively, William Key is
> personally liable to BAE Systems because he elected to
> use SpaceKey as a trade name for transactions with BAE
> Systems that he willingly undertook in his personal
> capacity.  In other words, SpaceKey was nothing more
> than a d/b/a of William Key after June 30, 2006.

Pl.'s Mot. for Leave, Ex. A. (doc. no. 20-1) ¶ 45.  To the

breach of contract claim stated in Count IV, BAE proposes to add

this:

> William Key is personally liable to BAE Systems
> because, as SpaceKey's sole shareholder, he continued
> to operate SpaceKey for purposes other than winding up
> its affairs and to accept new obligations in
> SpaceKey's name even though SpaceKey was terminated as
> a Virginia corporation.  Alternatively, William Key is
> personally liable to BAE Systems because he elected to

use SpaceKey as a trade name for transactions with BAE
Systems that he willingly undertook in his personal
capacity.  In other words, SpaceKey was nothing more
than a d/b/a of William Key after June 30, 2006.
Alternatively, William Key assumed the contract
between BAE Systems and SpaceKey.

Id. ¶ 52.

SpaceKey argues that BAE's proposed amendments to Counts
III-VI of the AC would be futile because: (1) those amendments
are premised on SpaceKey's lack of corporate existence; and (2)
its corporate existence has been restored, retroactively, which
means that SpaceKey is now deemed to have legally existed at all
times relevant to this action and that Will Key is protected
from liability for SpaceKey's actions.  BAE contends that
SpaceKey's reliance on Virginia's corporate-reinstatement
statute is misplaced.

In Virginia, when a corporation fails to file an annual
report or pay its annual registration fee, its corporate
existence is automatically terminated on the last day of the
fourth month immediately following the due date of the missed
report or payment.  See Va. Code Ann. § 13.1-752A.  The
corporate-reinstatement statute provides, in pertinent part:

A corporation that has ceased to exist may apply to
the Commission for reinstatement within five years
thereafter . . . .  The Commission shall enter an
order reinstating the corporate existence upon
receiving an annual report together with payment of a
reinstatement fee of $100 plus all registration fees
and penalties that were due before the corporation

7

> ceased to exist and that would have become due
> thereafter if the corporation had not ceased to exist.
> . . .  Upon the entry by the Commission of an order of
> reinstatement, the corporate existence shall be deemed
> to have continued from the date of termination of
> corporate existence, and any liability incurred by the
> corporation or a director, officer, or other agent
> after termination of corporate existence and before
> the reinstatement shall be determined as if the
> termination of corporate existence had never occurred.

Va. Code Ann. § 13.1-754.

The Virginia corporate-reinstatement statute, standing alone, does not insulate Will Key from liability.  While SpaceKey argues that "the statute expressly prohibits the imposition of liability against directors, officers or agents for actions that occurred during the period of termination," Def.'s Obj. (doc. no. 21), at 3, BAE is not attempting to hold Will Key liable as a director, officer, or agent of SpaceKey. The amendments quoted above focus on Will Key's actions as a shareholder,[2] and the reinstatement statute says nothing about shareholder liability.  Rather, it says that liability incurred by the corporation, which, presumably, includes possible shareholder liability imposed through veil-piercing, "shall be

---

[2] The SAC does allege that in 2004, Will Key executed a consulting agreement between SpaceKey and BAE in his capacity as SpaceKey's president, see Pl.'s Mot. for Leave, Ex. A ¶ 21, but makes no allegations concerning his status as a corporate officer during the period of termination.  An inference that Will Key continued in that role during the period of termination would be impermissible, in that such an inference would favor SpaceKey rather than BAE.  See Plumbers' Union, 632 F.3d at 771.

determined as if the termination of corporate existence had never occurred."  Va. Code Ann. § 13.1-754.  Thus, the viability of BAE's proposed amendments to Counts III-VI of the AC rests on the viability of the veil-piercing claim set out in Count V of the SAC, which is how SpaceKey's liability would be imputed to Will Key if SpaceKey's corporate existence had not been terminated.

C. Count V of the SAC

Count V of the SAC is BAE's veil-piercing claim.  SpaceKey objects to the inclusion of a veil-piercing claim on several grounds.  In particular, SpaceKey argues that BAE has failed to state a claim under Virginia's law of corporate veil piercing. BAE disagrees.

SpaceKey begins by asserting that the veil-piercing question should be decided under Virginia law.  For its part, BAE says that the court need not decide whether Virginia or New Hampshire veil-piercing law applies, because it has stated a claim under either.

Both parties agree that New Hampshire choice-of-law principles govern.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941) ("The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts.") (footnote omitted).

The parties further agree that the New Hampshire Supreme Court has not yet had the occasion to resolve a choice-of-law question in the context of corporate veil piercing.  There is a split of authority on whether courts should apply the veil-piercing law of the state of incorporation (i.e., Virginia), or the state of the entity claiming to be harmed by an alleged abuse of the corporate form (i.e., New Hampshire).  See 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 43.72 (2006 rev. vol.).  Because BAE has not stated a claim under the law of either Virginia or New Hampshire, it is unnecessary for this court to predict which approach the New Hampshire Supreme Court would take on the choice-of-law question presented by this case.

In New Hampshire, courts "will pierce the corporate veil and assess individual liability . . . where the corporate identity has been used to promote an injustice or fraud." LaMontagne Builders, Inc. v. Bowman Brook Purchase Grp., 150 N.H. 270, 275 (2003) (citing Terren v. Butler, 134 N.H. 635, 640 (1991)).  More expansively, the New Hampshire Supreme Court has explained:

> "Certainly one of the desirable and legitimate attributes of the corporate form of doing business is the limitation of the liability of the owners to the extent of their investment." Peter R. Previte, Inc. v. McAllister Florist, Inc., 113 N.H. 579, 582 (1973). We will pierce the corporate veil and assess

individual liability, however, where the corporate
identity has been used to promote an injustice or
fraud, <u>Terren v. Butler</u>, 134 N.H. 635, 639 (1991),
where a defendant has suppressed the fact of
incorporation, <u>see</u> <u>Previte</u>, 113 N.H. at 582, and where
an individual expressly agrees to personal liability
for a corporation's debts, <u>see</u> <u>Ashland Lumber Co. v.
Hayes</u>, 119 N.H. 440, 441 (1979).

<u>Gautschi v. Auto Body Disc. Ctr., Inc.</u>, 139 N.H. 457, 462 (1995)

(parallel citations omitted).

In <u>LaMontagne</u>, the New Hampshire Supreme Court affirmed the

trial court's ruling that the defendant, R. Scott Brooks, "used

the corporate entity to promote injustice and fraud and acted in

a fraudulent manner," 150 N.H. at 275, based on the following

findings:

> (1) Brooks breached an express promise to LaMontagne
> and LBI to pay LBI out of the April 30, 1997 loan
> proceeds; (2) Brooks made the promise to pay LBI in
> order to stop LaMontagne from filing a mechanic's lien
> or interfering with the loan; (3) Brooks knew that the
> promise to pay LBI when confirmed and documented by
> Attorney Cleary would cause LaMontagne to not file a
> mechanic's lien or interfere with the bank loan; (4)
> Brooks had no intention of honoring the promise to pay
> LBI; (5) Brooks breached his promise to pay LBI
> without good cause; (6) Brooks' claimed reasons for
> breaching the promise to pay LBI were disingenuous and
> raised in bad faith; and (7) Brooks, his family, or
> his family-controlled business received most or all of
> the loan proceeds.

<u>Id.</u>

For its part, the Virginia Supreme Court has explained its

approach to corporate veil piercing this way:

> Stockholder immunity "is a basic provision of
> statutory and common law and supports a vital economic
> policy underlying the whole corporate concept."
> Cheatle [v. Rudd's Swimming Pool Supply Co.], 360
> S.E.2d [828,] 831 ([Va.] 1987); accord Beale v. Kappa
> Alpha Order, 64 S.E.2d 789, 797 ([Va.] 1951).  "The
> decision to ignore the separate existence of a
> corporate entity and impose personal liability upon
> shareholders for debts of the corporation is an
> extraordinary act to be taken only when necessary to
> promote justice."  C.F. Trust, Inc. v. First Flight
> Limited Partnership, 580 S.E.2d 806, 809 ([Va.] 2003);
> see also O'Hazza [v. Exec. Credit Corp.], 431 S.E.2d
> [318,] 320 [(Va. 1993)]; Cheatle, 360 S.E.2d at 831.

Dana v. 313 Freemason, 587 S.E.2d 548, 553 (Va. 2003) (parallel

citations omitted).  Substantively,

> disregarding the corporate entity is usually warranted
> only under the extraordinary circumstances where
>
>> the shareholder[s] sought to be held personally
>> liable [have] controlled or used the corporation
>> to evade a personal obligation, to perpetrate
>> fraud or a crime, to commit an injustice, or to
>> gain an unfair advantage.  Piercing the corporate
>> veil is justified when the unity of interest and
>> ownership is such that the separate personalities
>> of the corporation and the individual[s] no
>> longer exist and to adhere to that separateness
>> would work an injustice.

Dana, 587 S.E.2d at 554 (quoting O'Hazza, 431 S.E.2d at 320-21).

Count V of the SAC does not state a veil-piercing claim

under either New Hampshire or Virginia law.  The point of veil

piercing is to avoid the injustice that might result from a

shareholder's abuse of the corporate form.  Here, the factual

premise of Count V is that SpaceKey's corporate existence ended

in 2006, and that Will Key continued to operate as if it had

not.  In other words, BAE is not alleging that Will Key spent four years hiding behind a corporate veil; it alleges that, due to the operation of Virginia law, there was no corporate veil for him to hide behind.[3]  It is important to bear in mind that in this legal context, a "corporate veil" is the legal existence of a corporation as an entity separate from its shareholders, not a name, a letterhead, or any other misleading representation that a corporation exists when it does not.  In any event, SpaceKey's corporate veil has been reinstated, retroactively to 2006, and, as a result, SpaceKey's liability "shall be determined as if the termination of corporate existence had never occurred."  Va. Code Ann. § 13.1-754.  Thus, any detriment that BAE may otherwise have suffered as a result of SpaceKey's termination has been cured by the reinstatement.

Because Count V does not state a claim on which relief can be granted and, therefore, would not survive a Rule 12(b)(6) motion to dismiss, BAE's motion for leave to amend is denied as to Count V of the SAC.  Moreover, as veil piercing is the only basis for including Will Key as a defendant in Counts III-VI of the AC, the motion for leave is denied as to those counts, as

---

[3] BAE asserts in its SAC that "it is a misdemeanor in Virginia to transact business as a corporation unless it is properly registered as a corporation in the state."  Pl.'s Mot. for Leave, Ex. A ¶ 67.  That may well be, but Will Key's alleged violation of a criminal statute does not give BAE a cause of action against him.

well.  That, however, is not quite the end of the issue.

Piercing the corporate veil walks the line between being a cause

of action and an equitable remedy.  See Sheppard v. River Valley

Fitness One, L.P., No. CIV.00-111-M, 2002 WL 197976, at *8 & n.7

(D.N.H. Jan. 24, 2002); Brooks v. Becker, 67 Va. Cir. 24, 2005

WL 832211, at *2 (Va. Cir. Ct. Jan. 31, 2005) (recognizing

Virginia authority for treating veil-piercing as either a cause

of action or an equitable remedy).  While BAE has failed to make

adequate factual allegations to support a free-standing veil-

piercing claim, veil piercing remains in play as a potential

equitable remedy, to be granted by the court if BAE is awarded

judgment against SpaceKey and a sufficient factual basis is

demonstrated.

### Motions for Summary Judgment

BAE also moves for summary judgment on two of SpaceKey's

counterclaims and on two of its own claims against SpaceKey.  In

this section, the court begins by setting out the legal

standard, then sketches the factual background, and concludes by

turning to each of the four claims on which BAE seeks summary

judgment.

14

A. Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Dávila v. Corporación de P.R. para la Diffusión Pública, 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)).  "[T]he court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).  When ruling on a party's motion for summary judgment, a trial court "constru[es] the record in the light most favorable to the nonmovant and resolv[es] all reasonable inferences in [that] party's favor."  Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (citing Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002)).

B. Background[4]

Both of BAE's summary judgment motions incorporate short and concise statements of material facts, as required by Local Rule 7.2(b)(1).  SpaceKey does not challenge any of the facts stated by BAE pursuant to Local Rule 7.2(b)(2), but does incorporate its own short and concise statements of material facts that it asserts are undisputed.  BAE does not challenge those facts.  Thus, as to Counts III and IV of the AC and Counts Three and Four of SpaceKey's counterclaim, there appear to be no factual disputes that would preclude summary judgment.  That said, the court turns to the undisputed factual record.

BAE sells specialized goods to buyers in the defense, security, and aerospace industries.  SpaceKey has been a BAE customer, purchasing BAE's products for resale to various end users.  Among BAE's products are semiconductor integrated circuits called field programmable gate arrays ("FPGAs").  For many years, BAE was the original equipment manufacturer of an FPGA sold by Actel called the RH1280.  Actel discontinued the RH1280 in 2006.

---

[4] Much of the factual background of this case requires reference to technical terms, many of which are referred to by acronyms.  For ease of readability, the court will relegate as much of that jargon as possible to footnotes, to help the narrative flow more smoothly.

## 1. BAE's July 2007 Press Release

In July of 2007, BAE announced in a press release that it had entered into a licensing agreement with Actel under which it would begin producing a replacement for Actel's RH1280, which it designated RH1280B.  BAE explained that "[t]he agreement solves a major obsolescence problem for many legacy satellite programs, enabling producers of satellite payloads and instruments to avoid time-consuming and costly redesigns."  Def.'s Obj. to Summ. J., Spear Decl., Ex. A (doc. no. 37-3).  As a result of its agreement with Actel, BAE became the only manufacturer of a RH1280 replacement.  BAE also described the product it planned to produce, stating that "[t]he RH1280B offers a total dose radiation-hardness in excess of 300K rads(Si), the standard for a majority of applications, and guaranteed latch-up immunity." Id.  The press release further stated: "The RH1280B will have the same Standard Microcircuit Drawing ["SMD"] . . . as the original."[5]  Id.

_____

[5] SMD 5962-92156 was issued by the Defense Supply Center Columbus ("DSCC") and lists, under the heading "Radiation features," a "Maximum total dose available" of "300K rads(Si)." Def.'s Obj. to Summ. J., Spear Decl., Ex. C (doc. no. 37-4), at 3.  Table IB of SMD 5962-92156 also lists the following SEP test limits: (1) single event latchup ("SEL") of 177; (2) single event upset ("SEU"), combinatorial, of 17; (3) SEU, sequential, of 4; and (4) single event dielectric (antifuse) rupture ("SEDR") of >60.

On August 1, 2007, BAE produced Revision G of its "top level drawing" ("Drawing") of the RH1280B.  Table IB of the Drawing lists a total dose (or "TID")[6] of 300K rads(Si) along with four additional radiation requirements.[7]

### 2. BAE's TID Disclosure

In May of 2009, Don Francis of BAE informed Will Key that the RH1280s it was manufacturing would not have a TID of 300K rads(Si), _i.e.,_ the TID specified in both Revision G of the Drawing and the SMD.  In response, Will Key consulted with SpaceKey's customers, to see whether they would be willing to accept FPGAs with a TID lower than the 300K rads(Si).  Based on the responses of its customers, SpaceKey proceeded to make the purchases at issue here.  Will Key reports that one of SpaceKey's customers accepted, but "under duress," two fifty-piece shipments of 50K rad(Si) FPGAs.  Even though SpaceKey purchased (and resold) the 50K and 100K rad(Si) FPGAs, Will Key

---

[6] The terms "total dose radiation-hardness," "maximum total dose," "total dose," and "total ionizing dose" appear to be synonyms.  Hereinafter, this characteristic will be referred to as "TID."

[7] Revision G (and Revision K) of BAE's Drawing have been filed under seal, and the numerical values for the four variables referred to here as "additional radiation requirements" were redacted from SpaceKey's objection to BAE's first summary judgment motion.  In the interest of protecting BAE's confidential trade secrets, the court will not disclose the actual additional radiation requirements, but will refer them generically.

repeatedly told Don Francis that SpaceKey considered those FPGAs
to be non-conforming, and that SpaceKey would insist upon
appropriate price adjustments.

### 3. SpaceKey's Purchase Order

In January of 2008, SpaceKey submitted to BAE the first in
a series of purchase orders that culminated in the purchase
order underlying the two largest transactions at issue in this
case.  The January 2008 purchase order lists four items,
including 300 FPGAs.  The purchase order did not specify any
particular TID.  But, it stated: "Performance and quality shall
≥ 5962R9215601."  Pl.'s Mot. Summ. J., Rea Decl., Ex. D (doc.
no. 31-6).  That code appears to correspond to the DSCC's SMD
5962-92156 and the specifications stated therein.

On May 28, 2009, SpaceKey issued the fourth iteration of
its purchase order, SK12508C, which called for the sale of,
among other things, 535 FPGAs with a TID of 100K rads(Si) and
100 FPGAs with a TID of 50K rads(Si).  Will Key maintains that
SpaceKey included the 50K and 100K rad(Si) specifications in its
purchase order not because SpaceKey was ordering FPGAs with
those TIDs, but as a way of documenting BAE's failure to fulfill
its promise to deliver FPGAs with a TID of 300K rads(Si).  See
Pl.'s Mot. Summ. J., Shirley Decl., Ex. A (doc. no. 31-12), at
5; Pl.'s Mot. Summ. J., Key Decl. (doc. no. 44-5) ¶ 5.  The

purchase order also includes the following relevant notes: (1) "BAE SYSTEMS Terms and Conditions apply"; and (2) "Performance and quality shall ≥ 5962R9215603 with TID as stated above."  Id.

On June 15, 2009, BAE issued Revision H of its Drawing. Neither party has produced Revision H.  But, the "Document Change History" section of Revision K (dated March 1, 2010) indicates that: (1) Revision H added information on a 50K rad(Si) FPGA; and (2) Revision J added information on a 100K rad(Si) FPGA.  Revision K also included a new set of additional radiation requirements for the 50K and 100K rad(Si) RH1280Bs. It is unclear from the record whether those new radiation requirements were first added by Revision H, J, or K.

In a letter to Will Key dated September 25, 2009, describing the introduction of the RH1280B, Don Francis stated: "The new FPGA devices are 100% form/fit/function compatible with the legacy design."  Def.'s Obj. to Summ. J., Spear Decl., Ex. L (doc. no. 37-9).  Francis also stated: "The part is offered as a 150 Krad Total Dose Tolerant part which is a change from the original which was a 300 Krad part."  Id.

### 4. BAE's Terms of Sale

BAE's Terms of Sale, referred to in the purchase orders submitted by SpaceKey to BAE, define the term "proposal" as follows: "BAE SYSTEMS' offer letter, quotation or proposal, as

appropriate."  Pl.'s Mot. Summ. J., Rea Decl., Ex. A (doc. no.

31-3), at 2.  That document defines the term "order" to mean

"the agreement between the parties to which these term pertain."

Id.

The Terms of Sale also include the following relevant

provisions:

> **Deliverables:**  BAE SYSTEMS will provide the
> required hardware articles, software, data and/or
> services ("Deliverables") more fully described in the
> Proposal or specifications made part of the Order.
>
> . . . .
>
> **Payment:**  Unless otherwise specified in writing
> by BAE SYSTEMS, terms of payment for Buyer are the
> earlier of net thirty (30) days from the date of
> invoice or upon delivery.  Payment shall be in U.S.
> dollars, net cash, Nashua, New Hampshire.  Payments
> are unconditional and shall be made as specified in
> the Order, without recourse, set off, or discount.

Id. at 2, 3.

In Section 8 of the Terms of Sale, BAE makes warranties

concerning: (1) title to hardware Deliverables; (2) defects in

hardware; (3) defects in software; and (4) patents.  With

respect to defects in hardware, the Terms of Sale provide, in

pertinent part:

> BAE SYSTEMS warrants that, at the time of delivery,
> any hardware Deliverables, shall be free from defects
> in material and workmanship under normal usage for a
> period of one (1) year after delivery, but BAE
> SYSTEMS's sole liability under this warranty shall be
> limited to the repair or replacement of the

Deliverables returned to BAE SYSTEMS or the refund of its price, at BAE SYSTEMS' option.

Id. at 3.  The warranty section concludes with the following paragraph:

>    **EXCLUSIONS/LIMITATIONS: THE FOREGOING CONSTITUTES BAE SYSTEMS' ENTIRE WARRANTY AND BUYER'S SOLE REMEDY WITH RESPECT TO ANY DEFECT OR NONCONFORMANCE IN DELIVERABLES PROVIDED BY BAE SYSTEMS.  THESE WARRANTIES AND REMEDIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OR THOSE ARISING FROM COURSE OF DEALING OR USAGE IN TRADE.**

Id. at 4 (emphasis in the original).

### 5. BAE's Deliveries to SpaceKey

Between June 26 and December 3, 2009, BAE delivered 435 RH1280B FPGAs to SpaceKey.  According to purchase order SKC12508(C), 100 of those FPGAs had a TID of 50K rads(Si), while the other 335 had a TID of 100K rads(Si).  Those TID ratings are generally confirmed by BAE's invoices.  SpaceKey paid BAE the full invoice price for those 435 FPGAs.

On December 16, 2009, BAE delivered and invoiced 100 units of a part described as "1280B RAD Hard FPGA SV, QML, VQ."  Pl.'s Mot. Summ. J., Rea Decl., Ex. C (doc. no. 31-5), at 5.  The invoice price for those FPGAs was $900,000.  On January 12, 2010, BAE delivered and invoiced 100 units of a part described as "1280B RAD Hard FPGA TID > 100KRAD, SDLC."  Id. at 6.  The invoice price for those FPGAs was also $900,000.

22

It appears to be undisputed that the 200 FPGAs BAE delivered on December 16 and January 12 had a TID of 100K rads(Si) rather than 300K rads(Si), along with characteristics that fall short of the additional radiation requirements stated in Revision G of the Drawing but that meet or exceed those stated in Revision K.[8]

### 6. Unpaid Invoices

SpaceKey has never paid BAE the $1,800,000 billed by the December 16 and January 12 invoices.  Two other amounts invoiced by BAE also remain unpaid.  On January 18, 2010, BAE invoiced SpaceKey $5,712 for eight programmable read only memory semiconductor integrated circuits ("PROMs").  Those PROMs were delivered pursuant to purchase order SKC122309, dated December 23, 2009.  Also on January 18, BAE invoiced SpaceKey $46,045 for five static random access memory semiconductor integrated

---

[8] While SpaceKey identifies the radiation requirements of Revision G of the Drawing (dated August 1, 2007) as being part of BAE's warranty, it identifies Revision K of the Drawing (dated March 1, 2010) as documenting the actual performance of the RH1280Bs BAE delivered.  It seems at least somewhat circular to rely on data from Revision K as proof that BAE breached a warranty stated in Revision G.  More importantly, one wonders what SpaceKey would say about the effects wrought on the purported Revision G warranty by: (1) Revision H, which was issued on June 15, 2009, and added a 50K rad(Si) specification; and (2) Revision J, which was issued on October 9, 2009, and added a 100K rad(Si) specification.

circuits ("SRAMs").  Those five SRAMs were delivered pursuant to
purchase order SKC1610, dated January 6, 2010.

By letter dated April 20, 2010, BAE demanded payment on the
four overdue invoices.  SpaceKey responded, through counsel,
indicating its position that "the Deliverables under those
[four] Purchase Orders did not meet customer specifications,
which constitutes a breach for which SpaceKey reserves all
rights and remedies under the Uniform Commercial Code and other
applicable law."  Def.'s Obj. to Summ. J., Spear Decl., Ex. B
(doc. no. 44-3), at 2.  There is no indication anywhere in the
record that the PROMs or the SRAMs failed to meet customer
specifications.

While SpaceKey told BAE that the FPGAs it has not paid for
did not meet customer specifications, it is undisputed that
SpaceKey has sold all 200 of those FPGAs and that its customers
paid the full amount they had agreed to pay for 300K rad(Si)
FPGAs, even though the FPGAs they received had a TID of 100K
rads(Si).

Based on the foregoing, BAE sued SpaceKey in six counts.
Count III is an action for account stated in which BAE claims
SpaceKey owes it $1,851,757 on the four overdue invoices.  In
Count IV, BAE seeks to recover the same amount, as damages for
breach of contract.  SpaceKey, in turn, asserts four

counterclaims.  In Count Three, SpaceKey says that BAE is liable

for misrepresentation, based on statements it made about the

performance characteristics and delivery schedule for the

RH1280B.  In Count Four, SpaceKey claims that BAE "breached [an]

express warranty by delivering a Flight RH1280B FPGA that failed

to meet the [top level drawing] specifications for TID/KRad,

SEL, SEU and Single Event Dielectric Rupture."[9]  Def.'s

Countercl. ¶ 50.

C. Discussion

    The court would ordinarily begin its analysis with the

plaintiff's claims and then turn to the defendant's

counterclaims, but the fact that Count Four of SpaceKey's

counterclaim also serves as a defense to BAE's breach-of-

contract claim counsels in favor of beginning with SpaceKey's

counterclaim.

    1. Count Four of SpaceKey's Counterclaim

    Count Four of SpaceKey's counterclaim is its assertion that

BAE breached its express warranties "that the . . . RH1280B FPGA

would satisfy its own [top level drawing] and other published

_____

        [9] One interesting and potentially significant issue,
seemingly unaddressed by the record as currently developed, is
the relationship between TID and the four additional radiation
requirements.  Given the content of the various representations
at issue, it could be important to know whether those
characteristics can vary independently or, by definition, must
necessarily rise and fall together.

specifications, and would otherwise be a 100% form/fit/function

replacement for the Actel RH1280 part."  Def.'s Countercl. ¶ 49.

The wording of Count Four does not indicate whether the breach-

of-warranty claim stated therein applies to all 635 of the FPGAs

SpaceKey purchased from BAE or only to the 200 FPGAs that are

the subject of BAE's claims.  BAE advances two arguments in

support of its motion for summary judgment on Count Four: (1)

SpaceKey's claim for damages for breach of warranty is barred by

the Terms of Sale to which it agreed; and (2) the breach-of-

warranty claim fails because Space cannot prove damages.

Neither argument is persuasive.

### a. Limitation of Remedies

BAE asserts that SpaceKey's remedies for its breach-of-

warranty claim include only those stated in Section 8(b) of the

Terms of Sale, which pertains to defects in hardware.  Section

8(b), in turn, limits a buyer's remedies to repair, replacement,

or refund, at BAE's option.  Section 8(b) also requires a buyer

seeking one of those remedies to return the defective

merchandise within one year after delivery.  BAE argues that it

is entitled to judgment as a matter of law on SpaceKey's breach-

of-warranty claim because SpaceKey has never returned the

hardware Deliverables on which it bases its claim, and the time

to do so has long passed.  In response, SpaceKey contends that:

(1) BAE made express warranties that it is not permitted to disclaim under New Hampshire's enactment of the Uniform Commercial Code ("UCC"); (2) under the UCC, it was entitled to accept the nonconforming goods delivered by BAE and later seek recovery for the difference in value between the goods delivered and the goods as warranted; (3) the remedy limitation in Section 8(b) of the Terms of Sale is inapplicable to its warranty claim because it is not claiming a defect in the materials or workmanship of the FPGAs BAE delivered; (4) the remedy limitation in Section 8(b) should be disregarded, under the UCC, because it fails of its essential purpose.  SpaceKey's third argument carries the day.

The warranty described in Section 8 of the Terms of Sale has four subparts.  They pertain to title to the hardware Deliverables (Section 8(a)), defects in hardware (Section 8(b)), defects in software (Section 8(c)), and patents (Section 8(d)). SpaceKey is not claiming that BAE breached its warranty to deliver hardware that was free from defects in material and workmanship, which is the warranty described in Section 8(b). Rather, it is claiming that the hardware BAE delivered, while devoid of any defects in materials and workmanship, did not conform to the promised specifications for TID, SEL, SEU, and

SEDR.  Accordingly, the limitation on remedies stated in Section 8(b) does not apply to the warranty claim in this case.

For its part, BAE does not argue that SpaceKey has based its refusal to pay on a defect in materials or workmanship, and all would appear to agree that the deficiencies SpaceKey has identified cannot be remedied the replacement of materials or the application of more or better workmanship to the FPGAs BAE has delivered.  Rather, BAE attempts to counter SpaceKey's argument by pointing out that Section 8(e) of the Terms of Sale provides that Sections 8(a)-(d) constitute SpaceKey's "sole remedy with respect to any defect or nonconformance in deliverables provided by BAE SYSTEMS."  Pl.'s Mot. Summ. J., Rea Decl., Ex. A (doc. no. 31-3), at 4 (emphasis added).  In BAE's view, the effect of Section 8(e) is to extend the applicability of Section 8(b) from defects in materials and workmanship to nonconformance with specifications.  The court does not agree.

As SpaceKey points out, Section 8(e) refers to Sections 8(a)-(d).  Sections 8(b) and (c) warrant the delivery of non-defective hardware and software, while Sections 8(a) and (d) warrant the delivery of hardware and intellectual property free from third-party claims of ownership.  The defects to which Section 8(e) refers are the hardware and software defects described in Sections 8(b) and (c), while the nonconformance to

which Section 8(e) refers is nonconformance with the warranties
of ownership stated in Sections 8(a) and (d).  Because Sections
8(a)-(d) say nothing about nonconformance with specifications,
Section 8(e) does not make Section 8(b) a warranty against
nonconformance with promised specifications that may be remedied
only by repair, replacement, or refund.  Thus, BAE's argument
concerning limitation of remedies provides no basis for summary
judgment in its favor on Count Four of SpaceKey's counterclaim.

> b. Damages

BAE also argues that it is entitled to judgment as a matter
of law on SpaceKey's counterclaim for breach of warranty because
SpaceKey cannot prove any damages, due to its resale of the
parts it purchased from BAE for the price its customers had
previously agreed to pay for FPGAs with a TID of 300K rads(Si).
SpaceKey contends that BAE conflates liability and damages.

SpaceKey's breach-of-warranty claim is based on the UCC,
which provides, in pertinent part:

> (1) Where the buyer has accepted goods and given
> notification . . . he may recover as damages for any
> non-conformity of tender the loss resulting in the
> ordinary course of events from the seller's breach as
> determined in any manner which is reasonable.

> (2) The measure of damages for breach of warranty
> is the difference at the time and place of acceptance
> between the value of the goods accepted and the value
> they would have had if they had been as warranted,

> unless special circumstances show proximate damages of
> a different amount.

N.H. Rev. Stat. Ann. ("RSA") § 382-A:2-714.

For the proposition that SpaceKey's claims are precluded by its receipt of full payment from its customers for the FPGAs it bought from BAE and then resold, BAE relies principally on Cincinnati Siemens-Lungren Gas Illuminating Co. v. Western Siemens-Lungren Co., 152 U.S. 200 (1894) and Ed S. Michelson, Inc. v. Nebraska Tire & Rubber Co., 63 F.2d 597 (8th Cir. 1933). Of those two cases, Michelson is the more analogous factually, but even under the reasoning of that case, BAE is not entitled to judgment as a matter of law.

In Michelson, the plaintiff, Ed S. Michelson, Inc. ("Michelson"), operated a tire factory, and sold much of its output to the defendant, Nebraska Tire & Rubber Co. ("Nebraska Tire"). 63 F.2d at 598. Nebraska Tire, in turn, sold the tires it purchased from Michelson to a single customer: Western Auto Supply Company ("Western Auto"). Id. Under the contract between Michelson and Nebraska Tire, Michelson warranted that its tires would meet certain specifications. Id. The agreement also called for Michelson to deposit tires with Nebraska Tire to insure its performance under the contract. Id.

Michelson sued to recover its deposit, and Nebraska Tire made a counterclaim asserting that the tires Michelson delivered

for resale to Western Auto did not meet the specifications in
the contract between Michelson and Nebraska Tire.  <u>Michelson</u>, 63
F.2d at 598.  Notwithstanding Nebraska Tire's claim that the
tires it bought from Michelson were substandard, it "resold the
tires which it alleges were defective, to the Western Auto
Supply Company at a profit of approximately 10 per cent., and it
received the full agreed contract price for them."  <u>Id.</u>
Moreover, Western Auto's secretary and general manager testified
that the quality of the tires Western Auto purchased from
Nebraska Tire met the standard required by the contract
governing that sale.  <u>Id.</u> at 599.  Based on the foregoing, the
Eighth Circuit affirmed the jury's verdict in favor of Michelson
on Nebraska Tire's counterclaim for breach of warranty.  <u>Id.</u> at
601.  In BAE's view, the Eighth Circuit's holding that Nebraska
Tire failed to prove damages requires judgment as a matter law
in its favor on SpaceKey's counterclaim for breach of warranty.
The court does not agree.

    In <u>Michelson</u>, the jury had before it both evidence that
Nebraska Tire had received the full contract price for the tires
it sold Western Auto <u>and</u> testimony from Western Auto that the
tires it purchased conformed to the requirements of its contract
with Nebraska Tire.  Here, BAE has produced undisputed evidence
that SpaceKey has received the full contract price for the FPGAs

31

it sold its customers.  But, BAE has not produced evidence that
SpaceKey's customers have said they are completely satisfied
with the FPGAs they bought from SpaceKey or have given up any
potential breach-of-warranty claims against SpaceKey.  Absent
such evidence, the reasoning of <u>Michelson</u> does not entitle BAE
to judgment as a matter of law on SpaceKey's claim for breach of
warranty.  That is because, at least theoretically, SpaceKey
remains exposed to claims for breach of warranty from its own
customers which, to some extent, diminishes the value of the
payments it has collected from them.[10]

To summarize, BAE advances two arguments under which it
claims to be entitled to judgment as a matter of law on
SpaceKey's breach-of-warranty claim.  Neither is meritorious.
Thus, BAE is not entitled to summary judgment for the reasons
identified in its motion.  Whether there are other grounds for
judgment in BAE's favor on SpaceKey's breach-of-warranty claim
is a question for another day.

---

[10] To be sure, SpaceKey's legal arguments place it in an odd
position.  Given that SpaceKey has already been paid in full by
its customers, it needs to be liable to one or more of them for
breach of warranty before it can establish damages under its
breach-of-warranty claim against BAE.  Moreover, it would seem
that any recovery SpaceKey might get from BAE would necessarily
be passed through to satisfy SpaceKey's liability to its
customers.

2. Count Three of SpaceKey's Counterclaim

In Count Three of its counterclaim, SpaceKey asserts that BAE is liable for misrepresentation[11] because it knew or should have known that its representations concerning both the specifications for the RH1280B and its delivery schedule were false or misleading at the time it made them.  Regarding its reliance on BAE's alleged misrepresentations, SpaceKey asserts: "SpaceKey and its customers did, in fact, rely on those representations, both in ordering the parts based on their published specifications, in making significant capital investments paired to use of the in-spec RH1280B, and in anticipating a particular delivery schedule."  Def.'s Countercl. ¶ 45.  As for damages resulting from BAE's alleged misrepresentations, SpaceKey asserts:

> First, the Flight RH1280Bs have deficient specifica-
> tions, which will significantly reduce the usable
> lifetime of the spacecraft that employ them.  Second,
> SpaceKey incurred additional travel expenses and time
> in meeting with customers following BAE's disclosure
> of the substandard TID.  Third, because of the
> substandard specifications, SpaceKey lost the
> opportunity to sell approximately 20 RH1280B Flight
> FPGAs.  Finally, SpaceKey and its customers were
> harmed by BAE's delays in delivery.

Def.'s Countercl. ¶ 47.

---

[11] The counterclaim does not indicate whether SpaceKey is pursuing a claim for intentional or negligent misrepresentation.

BAE argues that Count Three fails because SpaceKey is unable to prove either reliance or damages, which are essential elements of a claim for misrepresentation.  The court does not agree.

Under the common law of New Hampshire, "[t]he elements of . . . a claim [for negligent misrepresentation] are a negligent misrepresentation of a material fact by the defendant and justifiable reliance by the plaintiff."  <u>Wyle v. Lees</u>, ___ N.H. ___, ___, No. 2010-624, 2011 WL 4390732, at *5 (N.H. Sept. 20, 2011) (citing <u>Snierson v. Scruton</u>, 145 N.H. 73, 78 (2000)).  Regarding intentional misrepresentation:

> '"[O]ne who fraudulently makes a misrepresenta-
> tion . . . for the purpose of inducing another to act
> or to refrain from action in reliance upon it, is
> subject to liability to the other in deceit for
> pecuniary loss caused to him by his justifiable
> reliance upon the misrepresentation.'" <u>Gray v. First
> NH Banks</u>, 138 N.H. 279, 283 (1994) (quoting
> <u>Restatement (Second) of Torts</u> § 525, at 55 (1977)).
> "The tort of intentional misrepresentation, or fraud,
> must be proved by showing that the representation was
> made with knowledge of its falsity or with conscious
> indifference to its truth and with the intention of
> causing another person to rely on the representation."
> <u>Patch v. Arsenault</u>, 139 N.H. 313, 319 (1995).

<u>Tessier v. Rockefeller</u>, ___ N.H. ___, ___, No. 2010-120, 2011 WL 4133840, at *3 (N.H. Sept. 15, 2011) (parallel citations omitted).  To prevail on a claim for either negligent or intentional misrepresentation, a plaintiff must prove both justifiable reliance, <u>see</u> <u>Wyle</u>, 2011 WL 4390732, at *5; <u>Tessier</u>,

2011 WL at *3, and damages, see Hair Excitement, Inc. v. L'Oreal
U.S.A., Inc., 158 N.H. 363, 369 (2009) (quoting Caledonia, Inc.
v. Trainor, 123 N.H. 116, 124 (1983)); cf. Plourde Sand & Gravel
Co. v. JGI E., Inc., 154 N.H. 791, 799 (2007).  That is, the
plaintiff's reliance on the defendant's false statements must be
both justifiable and detrimental.

    a. Reliance

    BAE's reliance argument is that any of its alleged
misrepresentations about the performance of the RH1280B were
directed toward end users, i.e., SpaceKey's customers, rather
than SpaceKey itself.  Thus, in BAE's view, SpaceKey's customers
are the ones who made decisions about whether to purchase the
device, meaning that they, rather than SpaceKey, relied on BAE's
representations concerning the RH1280B.  In support of that
argument, BAE points out that when it notified SpaceKey of its
inability to produce a FPGA with a TID of 300K rads(Si),
SpaceKey consulted with its customers and submitted its purchase
order for FPGAs with a lower TID only after being told by its
customers that they could make use of the FPGAs BAE was able to
produce.

    BAE offers no legal support for its argument and the court
is skeptical that any such support could be found.  Moreover,
when requesting summary judgment, the burden is on BAE to

demonstrate that the undisputed factual record contains no
evidence of SpaceKey's reliance.  That record, however, contains
evidence of a variety of statements BAE made about the
performance of the FPGAs it intended to produce, evidence that
SpaceKey was aware of those statements, and evidence that
SpaceKey placed purchase orders with BAE and assumed obligations
to pay BAE for the products it delivered.  That SpaceKey
purchased BAE's FPGAs for resale has no legal significance with
respect to the issue of reliance.  The undisputed factual record
does not demonstrate that SpaceKey did not act in response to
BAE's statements about the RH1280B.  That is what BAE would have
to show to prevail on an argument that SpaceKey cannot prove
reliance.

    While BAE's reliance argument does not entitle it to
judgment on Count Three, the court does note that the only
reliance at issue here is SpaceKey's reliance.  Because SpaceKey
is asserting the claim for misrepresentation, its customers'
actions, such as making significant capital investments, have no
place in establishing either reliance or damages.  The court
also reminds SpaceKey that to prevail, it must prove that its
reliance on BAE's alleged misrepresentations was justifiable,
which would seem to require it to prove that it was justified in
relying on the radiation requirements stated in Revision G of

the Drawing even after BAE indicated that it was unable to meet
the 300K rad(Si) TID standard stated therein and issued a
subsequent Drawing with a lower TID standard.

>    b. Damages

BAE also argues that because SpaceKey's customers paid
SpaceKey the full amount they had agreed to pay for FPGAs with a
TID of 300K rads(Si), SpaceKey cannot show that it suffered any
detriment from relying on representations about the performance
characteristics of the RH1280B.  As explained above, evidence
that SpaceKey received the full contract price from its
customers is not necessarily evidence that it has suffered no
detriment.  Moreover, BAE has not produced evidence on any of
the four elements of damages SpaceKey identifies in paragraph
forty-seven of its counterclaim.  That said, the court cautions
SpaceKey that at least two of its four categories of damages
involve damages that are not SpaceKey's to claim.  For example,
because SpaceKey does not own or operate spacecraft, reduced
spacecraft uselife is not a detriment SpaceKey has suffered.
Obviously, SpaceKey is limited to recovering only its own
damages, if any.  The court further cautions SpaceKey that it
will need to be careful to distinguish between damages resulting
from false representations by BAE, which are compensable under a
misrepresentation claim, and damages resulting from the

performance of the RH1280B, which are not.  But, to return to
the issue at hand, it is BAE's burden to show that on the
undisputed factual record, SpaceKey cannot prove damages.  BAE
has not carried that burden.  Thus, its damages argument
provides no basis for judgment in its favor.

As with SpaceKey's breach-of-warranty claim, BAE advances
two non-meritorious arguments for judgment as a matter of law on
the misrepresentation claim.  Thus, BAE is not entitled to
summary judgment for the reasons stated in its motion.  Whether
there are other grounds for judgment in BAE's favor is, as with
Count Four, a question for another day.

### 3. Count IV of BAE's AC

Count IV of BAE's AC is a claim for breach of contract.
Specifically, BAE claims that SpaceKey has breached its
contractual obligations by failing to pay $1,851,757 for goods
shipped pursuant to three purchase orders: (1) SKC12508(C)
($1,800,000 owed for 200 FPGAs); (2) SKC122309 ($5,712 owed for
eight PROMs); and (3) SKC1610 ($46,045 owed for five SRAMs).

BAE moves for summary judgment on Count IV, arguing that on
the undisputed facts, it has established its claim for breach of
contract.  That is, BAE says that because it delivered exactly
the goods described in SpaceKey's three purchase orders,
SpaceKey is obligated to pay for those goods.  It further argues

that under the Terms of Sale, SpaceKey was obligated to pay for the 200 RH1280Bs notwithstanding its current claims that those FPGAs were non-conforming.  SpaceKey disagrees, contending that: (1) its failure to pay for the final 200 FPGAs was based on a valid exercise of its rights under RSA 382-A:2-717; (2) BAE did not deliver the goods it ordered because the FPGAs did not meet the radiation requirements set out in Revision G of BAE's Drawing and the SMD, and because they did not have QML certification; and (3) BAE's argument that the Terms of Sale required payment even if SpaceKey contested the quality of the goods delivered is based on a misreading of the Terms of Sale.

### a. Eight PROMs & Five SRAMs

As a preliminary matter, SpaceKey acknowledges that its UCC defense to BAE's claim for breach of contract does not apply to the $51,757 it owes BAE for the eight PROMs and five SRAMs. Under New Hampshire law, "[a] breach of contract occurs when there is a failure without legal excuse[ ] to perform any promise which forms the whole or part of a contract." Lassonde v. Stanton, 157 N.H. 582, 588 (2008) quoting Poland v. Twomey, 156 N.H. 412, 415 (2007)).  As BAE has produced undisputed evidence that SpaceKey has failed, without legal excuse, to pay for the PROMs and SRAMs, BAE is entitled to judgment as a matter

of law that SpaceKey has breached its agreement to pay $51,757
for those devices.

### b. Deduction of Damages Under the UCC

As to payment for the 200 FPGAs, SpaceKey argues that
because they were non-conforming, it has as a valid legal excuse
under the UCC for not paying the $1,800,000 invoiced by BAE.
New Hampshire's enactment of the UCC provides that a "buyer on
notifying the seller of his intention to do so may deduct all or
any part of the damages resulting from any breach of the
contract from any part of the price still due under the same
contract."  RSA 382-A:2-717.  Here, it is undisputed that: (1)
SpaceKey has not paid the $1,800,000 it has been invoiced for
the last 200 FPGAs that were delivered to it by BAE pursuant to
purchase order SKC 12508(C); (2) those FPGAs have a TID of 100K
rads(Si) rather than 300K rads(Si) and are not in conformance
with the additional radiation requirements stated in Revision G
of BAE's Drawing; and (3) SpaceKey notified BAE of its intent to
deduct from the amount it still owes BAE the damages it has
suffered as a result of BAE's delivery of allegedly non-
conforming goods.  So long as RSA 382-A:2-717 is applicable, it
could provide SpaceKey a defense to BAE's motion for summary
judgment on its breach-of-contract claim.  See, e.g., Tegrant
Alloyd Brands, Inc. v. The Merchant of Tennis, Inc., No. 08 C

40

50041, 2011 WL 249469, at *8 (N.D. Ill. Jan. 26, 2011)
(predicting that the Illinois Supreme Court would hold that a
buyer's invocation of rights under section 2-717 of the UCC
precludes summary judgment on seller's claim for breach of
contract); Kingston Pipe Indus., Inc. v. Champlain Sprinkler,
Inc., 857 A.2d 767, 772 (Vt. 2004) ("because Champlain raised a
genuine issue of material fact pursuant to a valid claim under §
2-717, summary judgment awarding Kingston damages equal to the
full purchase price of the pipe was improper").

BAE argues that RSA 382-A:2-717 is inapplicable because
SpaceKey gave up the protection of that provision by agreeing to
the Terms of Sale, which preclude the UCC remedy of recoupment.
For that proposition, BAE relies on Section 6 of the Terms of
Sale.  BAE's reliance on Section 6 raises an interesting issue
of contract interpretation, i.e., whether SpaceKey's agreement
to make payment to BAE "without recourse, set off, or discount,"
Pl.'s Mot. Summ. J., Rea Decl., Ex. A (doc. no. 31-3), at 6,
constitutes a disclaimer of the remedy otherwise provided by RSA
382-A:2-717.

SpaceKey's defense to full payment for the last 200 FPGAs
consists of both an assertion of its rights under RSA 382-A:2-
717 and a counterclaim for breach of warranty and the damages
described in RSA 382-A:2-714(2).  Because SpaceKey's

41

counterclaim for breach of warranty remains viable, for reasons discussed above, it has an active ongoing defense to BAE's breach-of-contract claim, regardless of whether it gave up the remedy offered by RSA 382-A:2-717.  If the court had granted BAE summary judgment on SpaceKey's breach-of-warranty claim, then it would be necessary to resolve the issue posed by BAE's reading of the Terms of Sale.  But, because the breach-of-warranty claim remains viable, it is not necessary to determine whether BAE has given up its remedy under RSA 382-A:2-717.  Moreover, because a breach of warranty by BAE – a claim SpaceKey has asserted and BAE has not defeated – would be a legal excuse for SpaceKey's failure to perform under its agreement with BAE, BAE is not entitled to judgment as a matter of law on the breach-of-contract claim stated in Count IV of BAE's AC.

### 4. Count III of BAE's AC

Count III of BAE's amended complaint is labeled "action for account stated."  Under that heading, BAE seeks to recover the same $1,851,757 at issue in Count IV.  In moving for summary judgment, BAE argues that SpaceKey never disputed the amounts it invoiced, and that SpaceKey's claim that the FPGAs BAE delivered failed to meet agreed-upon specifications is legally meaningless in light of SpaceKey's sale of those same FPGAs to its

customers.  SpaceKey contends that it never agreed with BAE on
the proper price for the allegedly non-conforming FPGAs.

Both parties agree that "[t]o establish an account stated
there must be an assent, express or implied, to the correctness
of the balance struck."  White v. Schrafft, 94 N.H. 467, 479
(1947) (quoting Connolly v. Manchester Sav. Bank, 92 N.H. 89, 91
(1942)).  With regard to the amount SpaceKey owes for the PROMS
and SRAMs, there is no evidence of any dispute over the amount
BAE invoiced SpaceKey or the quality of the goods BAE tendered.
However, SpaceKey has produced evidence that Will Key informed
BAE that SpaceKey believed that FPGAs with TIDs of 50K and 100K
rads(Si) were non-conforming and that SpaceKey "did not intend
on making full payment unless and until appropriate product
price adjustments were negotiated."  Def.'s Obj. to Summ. J.,
Key Decl. (doc. no. 44-5) ¶ 3.  Accordingly, BAE is entitled to
judgment as a matter of on Count III of BAE's amended complaint,
but only to the extent of the $51,757 SpaceKey owes BAE for the
PROMs and SRAMs.

    5. Recap

Based on the rulings described above, the parties in this
case have spilled a fair amount of ink without moving the ball
very far down the field.  In the interest of promoting an
efficient resolution of what appears to be a relatively simple

dispute between sophisticated business entities represented by able counsel, the court offers the following observations.

Much, it seems, hinges on identifying precisely what warranties BAE made to SpaceKey, given that breach of warranty is both a cause of action for SpaceKey and a defense to BAE's breach-of-contract claim.  All the relevant documents have been produced, with the possible exception of Versions H and J of BAE's Drawing.  What remains to be determined, as a legal matter, is which documents and which parts thereof constitute BAE's express warranty to SpaceKey regarding the radiation-related performance characteristics of its FPGAs.  Beyond that, as a practical matter, SpaceKey would be well advised to consider the question of damages.  As explained above, SpaceKey's receipt of full payment for the FPGAs it sold its customers does not take away its claim for breach of warranty. But its damages would seem to be limited to the cost of its exposure to litigation from its own customers, which would then count as a deduction from the $1,800,000 it still owes BAE. Moreover, any steps SpaceKey might take to establish its damages could well result in its losing to its customers anything it recovers from BAE.  Of course, it is up to SpaceKey to assess the actual value of its breach-of-warranty claim and proceed accordingly.

**Conclusion**

For the reasons explained above, BAE's motion to amend, document no. 20, is denied; its motion for summary judgment on Counts Three and Four of SpaceKey's counterclaim, document no. 31, is denied; and its motion for summary judgment on Counts III and IV of its complaint, document no. 36, is granted, but only to the extent of SpaceKey's obligation to pay BAE $51,757 for eight PROMs and five SRAMs.  Summary judgment is denied as to BAE's claim that SpaceKey has breached its promise to pay $1,800,000 for 200 FPGAs.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge

October 24, 2011

cc:   Jonathan M. Shirley, Esq.
      Jeffrey C. Spear, Esq.
      Martha Van Oot, Esq.
      Daniel E. Will, Esq.
      Joshua M. Wyatt, Esq.