UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| BAE SYSTEMS INFORMATION AND ELECTRONICS SYSTEMS INTEGRATION, INC., | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 10-cv-370-LM |
| vs. | ) |
| | ) |
| SPACEKEY COMPONENTS, INC. | ) |
| | ) |
| Defendant, | ) |
| | ) |
| | ) |

## SPACEKEY'S OBJECTION TO BAE'S THIRD MOTION FOR SUMMARY JUDGMENT

SpaceKey Components, Inc. ("SpaceKey") respectfully submits this objection to

BAE Systems Information and Electronics Systems Integration, Inc.'s ("BAE") Third

Motion for Summary Judgment ("Third MSJ"), stating as follows:

## Introduction

The Court should deny BAE's Third Motion for Summary Judgment.

BAE's primary argument is that SpaceKey's failure to file an annual report with the

Virginia corporation commission operates – retroactively – to terminate the parties'

Domestic Business Development Consultant Agreement (the "Consultant Agreement" or

"Agreement"). This argument fails because compliance with state corporate reporting

requirements is not the type of "unlawful conduct" contemplated by the Consultant

Agreement. As the Agreement itself describes, BAE's business is governed by a host of

stringent government laws and regulations. It is violation of *these* laws by the Consultant

that triggers termination. Moreover, the clause BAE cites to applies only to "services

rendered hereunder." Because payment of annual franchise taxes is not a service described in the Agreement, SpaceKey's failure to do so does not trigger its terms. Finally, BAE fails to distinguish the Virginia law that retroactively reinstated SpaceKey's existence, and none of the cases it cites is applicable.

BAE's second argument is that its December 10, 2009 letter acted to prevent the Agreement from renewing for 2010. The Court should not accept BAE's reading of the Agreement, because it renders Paragraph 2 of the Agreement meaningless. The Agreement – which BAE drafted – carefully distinguishes between two time periods. Paragraph 2(A) sets an initial contract term of two-and-a-half years. This initial term could be earlier terminated "as hereinafter provided" in paragraph 12. Paragraph 2(B) addresses renewal terms. It omits reference to "termination . . . as hereinafter provided," and instead provides that the Agreement renews for yearly terms – shorter than the original term – "unless either Party gives the other notice of its intention not to renew the Agreement, no later than ninety (90) days prior to commencement of the renewal term."

BAE correctly cites the law governing the interpretation of contracts. But it is BAE's reading of the Agreement that violates these principles, not SpaceKey's. BAE's reading would make the distinction between the initial and renewal terms meaningless. It would ignore the inclusion of "termination . . .as hereinafter provided" in paragraph 2(A), and its *exclusion* from paragraph 2(B). And finally, BAE's reading would render the 90-day notice provision for non-renewal superfluous, as there would be no consequences to a failure to comply with this deadline.

SpaceKey's interpretation of the Agreement gives effect to each of these clauses. The Agreement could be terminated on 60 days notice during the initial, two-and-a-half

year term. But once the renewal terms began BAE was required to give notice of intent

not to renew 90 days before February 1 of the next year. Because its December 10, 2009

letter failed to satisfy this requirement, the Agreement renewed for another year on

February 1, 2010.

BAE's final set of arguments is premised on its assertion that a November 2006

revision of the Terms of Sale ("TOS") gave it the power to demand prepayment, suspend

shipments, and terminate SpaceKey orders. The Court should deny BAE's motion on

these grounds because BAE is citing the wrong document. BAE routinely revises its

Terms of Sale, and did so in May 2008. The May 2008 TOS - which governed all

purchase orders entered after that date – contains *none* of the language on which BAE's

arguments rely. BAE removed the language requiring payments to be "unconditional"

and "without recourse, set off, or discount." It eliminated the language allowing BAE to

"defer shipments or deliveries . . . under any other contract with Buyer." And BAE

removed the provisions allowing it to "require payment before delivery if credit

information on Buyer is lacking or unfavorable."

<u>**SpaceKey's Response to BAE's Statement of Facts**</u>

SpaceKey makes the following paragraph-by-paragraph response to BAE's

concise statement of facts.

1.      Undisputed.

2.      Undisputed.

3.      SpaceKey disputes paragraph 3 of the Statement because BAE cites to,

and relies upon, the wrong Terms of Sale. As reflected in paragraph 3 of the Consultant

Agreement, the BAE TOS are "revise[d] from time to time." Rea Decl., Ex. B. The TOS

that Mr. Rea discusses in his declaration is a revision from November 2006. But BAE subsequently revised the TOS on several occasions. The May 2008 Revision substantially revised paragraph 6, removing the language tying payment to delivery, and eliminating the language stating that "[p]ayments are unconditional and shall be made as specified in the Order without recourse, setoff or discount." Declaration of Jeffrey C. Spear in Support of SpaceKey's Objection to BAE's Third Motion for Summary Judgment, Ex. A ("Spear 3rd MSJ Decl.").

4.      SpaceKey disputes paragraph 4 of the Statement because the May 2008 Revision to the TOS no longer contains the language BAE describes.

5.      BAE accurately characterizes paragraph 7 of the TOS.

6.      BAE accurately characterizes paragraph 1 of the TOS.

7.      Undisputed.

8.      The Consultant Agreement speaks for itself.

9.      The Consultant Agreement speaks for itself.

10.     BAE accurately quotes subparagraphs A and B of paragraph 2 of the Consultant Agreement, but omits the title: "Term of Agreement."

11.     Paragraph 12 of the Consultant Agreement speaks for itself.

12.     SpaceKey disputes the claim that it "fell into a practice of delivering purchase orders to BAE Systems in which it identified itself as the 'financially qualified buyer.'" BAE specifically encouraged SpaceKey to seek out international customers for BAE products. It routinely identified SpaceKey as its international partner in marketing materials and presentations. And it regularly referred inquiries from international customers to SpaceKey to handle. In doing so, BAE knew full well that SpaceKey would

be paid its commission under the Consultant Agreement, and that SpaceKey would mark-up the products to cover the costs of doing business, including handling export documentation, maintaining a professional sales team, and to earn a profit. Declaration of Will Key in Opposition to BAE's Third Motion for Summary Judgment ¶ 2 ("Key 3rd MSJ Decl.").

13.     SpaceKey admits that for transactions in which SpaceKey was the qualified buyer, it was paid a commission under the Consultant Agreement by BAE. This was done with BAE's full knowledge, approval, and encouragement. It is not strictly true, as BAE states, that SpaceKey also *acted* as a consultant on such transactions. It acted as a buyer, and was compensated by BAE as a consultant, as per the parties' arrangement.

14.     SpaceKey admits that page 1 and paragraph 10(B) of the Consultant Agreement speak for themselves. Neither contains a representation by SpaceKey that it was a Virginia Corporation in good standing. Moreover, SpaceKey disputes BAE's characterization and legal interpretation of these clauses.

15.     Admitted.

16.     SpaceKey does not believe this is a material fact. In any event, it undisputed for purposes of summary judgment, as SpaceKey has no cause to know what BAE's private motivations or intentions were.

17.     SpaceKey admits that the December 10, 2009 letter attached to Mr. Rea's declaration speaks for itself. It disputes BAE's characterizations of the letter's legal effect.

18.     SpaceKey does not dispute that BAE appeared to be contemplating a change in the way it characterized its consultants.

19.     SpaceKey admits that BAE accepted the listed SpaceKey purchase orders. It also admits that these orders were subject to BAE's TOS. But SpaceKey disputes BAE's contention that the November 2006 TOS Revision applied to these orders. SpaceKey identified its Purchase Orders by date. Key 3rd MSJ Decl. ¶ 3. Thus, SKC12508 was entered on January 25, 2008. SKC1610 was entered on January 6, 2010, SKC11310 on January 13, 2010, SKC12710 on January 27, 2010, and SKC61808 on June 18, 2008. *Id.* None of these orders was subject to the TOS Revision attached to Mr. Rea's Declaration. SKC12508 was subject to the August 2007 TOS Revision, and the remainder of the orders were subject to the May 2008 TOS Revision.

20.     SpaceKey disputes that BAE had delivered products compliant to SKC12508 as of February 8, 2010. Key 3rd MSJ Decl., ¶ 4. It does not dispute that BAE had delivered the products specified in SKC1610 and SKC122309. *Id.*

21.     SpaceKey admits that it submitted the additional purchase orders described in this paragraph. Key 3rd MSJ Decl., ¶ 5. SpaceKey further states that it had received additional purchase orders for BAE products from its own customers that it did not formally submit to BAE, because of BAE's unequivocal refusal to accept any additional orders. *Id.* These orders are set forth on Exhibit A to Mr. Key's declaration.

22.     Paragraph 22 contains legal conclusions, not material facts. In any event, SpaceKey disputes that it owed payment to BAE for SKC12508, for reasons well stated in the prior briefing in this case. SpaceKey disputes BAE's description of the payment due date for SKC1610 and SKC122309, because it relies on a superseded version of the TOS. SpaceKey has already addressed SKC1610 and SKC122309 in prior briefings. It suspended payments on those invoices, as well as on SKC12508, pending resolution of

the RH1280 non compliance issues and concerns about payment of Space Key commissions on these and previously concluded purchase orders. Mr. Key was engaged in ongoing negotiations with Manassas personnel to resolve these issues in early 2010. Key 3rd MSJ Decl, ¶ 4.

23.     SpaceKey disputes paragraph 23 for the reasons stated in paragraph 22.

24.     Paragraph 24 contains legal conclusions and non-material facts. In any event, SpaceKey disputes that it failed to make timely payment for SKC12508, for reasons already stated in prior briefing and in Mr. Key's August 2, 2011 Declaration. And it has already addressed SKC1610 and SKC12230. SpaceKey disputes, as a legal matter, that any of the events described "represented unfavorable credit information." And SpaceKey further disputes BAE's assertion that unfavorable credit information afforded BAE any rights, as BAE removed those provisions from the May 2008 TOS Revision.

25.     BAE's April 20, 2010 letter speaks for itself. This paragraph otherwise contains non-material facts and conclusions of law.

26.     This paragraph comprises a legal conclusion, not a statement of material fact. In any event, the statement is both disputed and wrong. It is wrong as to SKC12508, because SpaceKey's suspension of payment is authorized by UCC 2-717 – a topic explored in prior briefing. As for SKC1610 and SKC122309, they were subject to the May 2008 TOS Revision, which contains *none* of the language or terms on which Mr. Rea bases his assertions.

27.     SpaceKey has already addressed BAE's contentions regarding SKC12508, SKC1610, and SKC122309. It does not dispute, as a factual matter, that it declined to

prepay for SKC61808, SKC12710, and SKC11310 by the deadline BAE imposed. But

SpaceKey does dispute that it had any obligation to do so. As explained above, each of

these orders was subject to the May 2008 TOS Revision, from which BAE removed the

language purporting to allow the imposition of prepayment.

      28.     BAE's May 20, 2010 letter speaks for itself.

      29.     BAE's August 20, 2010 letter speaks for itself. For the reasons stated,

SpaceKey disputes that the applicable TOS imposed any obligation to prepay for orders.

## <u>Argument</u>

**I.**     **SpaceKey Did not Engage in Unlawful Conduct in Rendering Services to BAE Under the Consultant Agreement.**

BAE's primary argument in the Third MSJ is that SpaceKey engaged "in

unlawful conduct" "in rendering services" to BAE under the Consultant Agreement when

it failed to pay franchise taxes to the State of Virginia franchise taxes and was

administratively dissolved. Third MSJ at 11. This argument fails for a number of

independent reasons.

### A.     BAE's Argument Misconstrues the Terms of the Agreement.

First, BAE's argument relies on a misunderstanding of the Consultant Agreement.

As the Agreement states, BAE engages in the production and sale of highly specialized

products, many of which are subject to stringent governmental regulations. Paragraph 7

of the Consultant Agreement specifically notes that "[p]erformance of this Agreement

may require access to information involving National Security up to and including TOP

SECRET." Rea Decl., Ex. B. It requires SpaceKey to "comply with U.S. Government and

BAE SYSTEMS security regulations applicable to the handling of classified

information," and "with all United States export laws and regulations applicable to the

Products, including, without limitation, the International Traffic in Arms Regulations and Expert Administration Regulations." *Id.*

With so many laws and regulations in play, it was entirely conceivable that SpaceKey might violate one of them while rendering service under the Agreement. That is what paragraph 12 refers to. It provides that the Agreement would terminate if "in rendering services hereunder . . .unlawful conduct is engaged in." Given the subject matter of the Agreement, this can only refer to activity that transgresses the many laws and regulations governing the sale of BAE's products.

BAE's reading of the Agreement fails for an even more fundamental reason. Paragraph 12 requires that the unlawful conduct occur while "rendering services hereunder." That is to say, while performing the consulting services described in the Agreement. Paragraph 3 describes those services as follows: "CONSULTANT will advise and assist BAE SYSTEMS in identifying suitable, financially qualified buyers for BAE SYSTEMS' Products . . .and in effecting the sale of such Products." Rea Decl., Ex. B.

Thus, by its plain terms, Paragraph 12 is only triggered if SpaceKey broke the law during its efforts to find qualified buyers or in "effecting the sale" of BAE's products. Failure to file an annual report with the State of Virginia – the only "unlawful conduct" alleged by BAE – is not a service addressed or encompassed by the Agreement. Accordingly, the terms of paragraph 12 on which BAE relies do not apply.

**B.      Even if Paragraph 12 Did Encompass SpaceKey's Filing of Annual Reports, BAE is Raising the Issue After SpaceKey's Corporate Existence Has Been Retroactively Reinstated.**

Even if the Court were to accept BAE's argument that paragraph 12 encompasses and applies to SpaceKey's failure to file annual reports with the State of Virginia, its argument would still fail, because SpaceKey's corporate existence has been reinstated. October 24, 2011 Order at 13.

BAE's argument requires "unlawful conduct" to exist. In essence, they assert that SpaceKey is liable, now, for events that occurred in 2006. But VA Code §13.1-754 provides that upon reinstatement, "the corporate existence shall be deemed to have continued from the date of termination of corporate existence, and *any liability incurred by the corporation or a director, officer, or other agent after termination of corporate existence and before the reinstatement shall be determined as if the termination of corporate existence had never occurred.*" *Id.* (emphasis added.)  Thus Space Key is deemed, as a matter of law, to have been in continuous existence from its formation in 2002 to the present date. BAE's argument fails because it is making its argument for the first time now, after the reinstatement. As the Court stated in its October 24 Order, "any detriment that BAE may otherwise have suffered as a result of SpaceKey's termination has been cured by the reinstatement." *Id.* at 13.

None of the cases BAE cites changes this result. BAE cites no case from Virginia, or which otherwise challenges the plain meaning and operation of VA Code §13.1-754. And the cases it cites to for analogy are plainly distinguishable. *New Hampshire Life Ins. Cov. Frank & Virgil's*, 302 F.2d 780 (8th Cir. 1962) is of no relevance, because the Missouri corporate revival statute involved in that case did not have retroactive effect. As

the court characterized it, "the General Assembly did not intend that restoration of corporate powers, revivor of the right to operate as a corporation, recreation of the corporate legal entity should wipe out the period of suspension and legalize the unlawful acts of the dissolved corporation and of its officers and directors." *Id.* at 784 (internal citations omitted). Needless to say, the Virginia statute has exactly the purpose and intent lacking from the Missouri statute.

*Mack Const. Dev. Corp. v Austin Smith Const.*, 583 N.E.2d 1384 (Ohio App. 1989) is even less supportive of BAE's argument, because that case involved *no* reinstatement statute of any kind, nor any attempt by the plaintiff corporation to revive its existence. The court merely held that, having been dissolved for failure to pay franchise taxes, the plaintiff lacked the capacity to sue.

*Alperstein By and Through Alperstein v. Sherwood Intern., Inc.*, 778 P.2d 279, 280 -281 (Colo.App. 1989) did involve a corporate reinstatement statute, on which Sherwood Intern, Inc. relied in arguing that its claims against the Alperstein estate were timely filed. But BAE neglects to disclose (or discuss) the dispositive element of the court's decision to deny Sherwood's claim – the fact that the probate statute was a "non-claim" statute. As the court explained:

> It is true that a reinstated corporation is regarded as having had a continuous existence, and therefore, reinstatement generally renders valid acts done while it was on suspension.
>
> However, § 15-12-803 is a non-claim statute which provides an absolute bar to claims which are not timely filed.
>
> "A non-claim statute operates to deprive a court of jurisdiction. Personal representatives of an estate can neither waive it nor toll it.... A non-claim statute imposes a condition precedent to the enforcement of a right of action; that is to say, the action must be presented within the time set in the notice to creditors or be *barred.*"

11

> As Sherwood failed to file a claim that could be considered within the
> prescribed period, the trial court was not permitted to consider the claim.
> To interpret the statute otherwise would be inconsistent with its purpose
> which is to provide for a speedy and efficient distribution of the estate.
> That purpose would be defeated if personal representatives were forced to
> delay closing estates for prolonged periods because someone or some
> entity prohibited from making a claim might at some distant date make
> themselves eligible.

*Id.* at 280-81 (internal citations omitted) (emphasis in original).

Thus, *Alperstein* did not turn on the effect or operation of the corporate
reinstatement statute, but rather on the specific probate statute under which Sherwood
filed its claim. Nothing even remotely similar is involved in this case.

*Psychic Research and Dev. Inst. Of Md. v. Gutbrodt*, 415 A.2d 611 (Md. App.
1980), the other case BAE relies upon, is equally inapposite. Like *Alperstein,* it also
involved a claim in probate.

> The Last Will and Testament of Lois G. Hensle, who died on May 30,
> 1978, provided in "item VI" that Psychic Research and Development
> Institute of Maryland, Inc., (Psychic) was the residual legatee of her estate,
> if "in existence at the time of" the testatrix's death. Item VI went on to
> provide that "should . . . (Psychic) not be in existence" the rest and residue
> of Ms. Hensle's estate was to go to her mother, Mabel Gutbrodt, if Mabel
> survived the testatrix

*Id.* at 23-24.

Psychic was dissolved for failure to pay franchise taxes in July 1974, and "was
without de jure corporate status at the time of the testatrix's demise" four years later in
May 1978. *Id.* at 24. But it applied for reinstatement a week after her death and then filed
a claim with the estate. The court rejected Psychic's claims, making a two part analysis.
First, Psychic's claim was contrary to the plain language of Ms. Hensle's will:

> Obviously aware that corporations sometimes wither and die, Ms. Hensle
> provided for that possibility in her will. She named an alternate

> beneficiary in the event of Psychic's non-existence at the time of the testatrix's demise. Indeed, she was even careful to have a second alternate beneficiary. Here and in the trial court Psychic labors to avoid the plain language of the will. The residuary was to pass to Ms. Gutbrodt "(s)hould Psychic . . . not be in existence at my death." Callahan v. Clemens, supra, makes clear that forfeiture brings a halt to corporate existence. Hence, Psychic was not "in existence" at the time Ms. Hensle died.

*Id.* at 25-26.

Just as in did in discussing *Alperstein*, BAE neglects to mention this critical aspect of the court's decision. BAE likewise neglects to mention the second element of the court's analysis; its citation to the specific language of the Colorado reinstatement statute, "which provides that upon revival of the corporate existence '(a)ll the assets and rights of the corporation, except those sold or those of which it was otherwise divested while the charter was void, are restored to the corporation to the same extent that they were held by the corporation before the expiration or forfeiture of the charter.'" *Id.* at 26. The court held that while "[t]he Articles of Revival can spontaneously generate life in a dead corporation . . .  they cannot restore to it rights that passed to others during the period of the corporate abiosis. The subsequent revival of Psychic did not again vest property and rights in the corporation which were divested during the period of forfeiture." *Id.* at 28.

Neither element of the *Psychic* court's holding has any application to this case. Nothing in the Agreement or the parties' relationship is in any way analogous to the specific language in the testatrix's will. Nor does the Virginia statute contain a provision at all similar to the language of the Colorado statute relied upon by the court.

SpaceKey's corporate existence was reinstated by statute, and is deemed, as a matter of law, to have existed continuously from 2002 through the present. Because BAE

cannot rely on SpaceKey's status prior to reinstatement to retroactively terminate the

Agreement, the Court should deny BAE's motion.

## II.     BAE Relies on the Wrong Version of its Terms of Sale.

BAE argues that it is entitled to summary judgment on Count I of its claim for

declaratory relief (and SpaceKey's corresponding counterclaims) because its Terms of

Sale permitted it to defer shipments, require prepayment, and terminate any open order

for various reasons. *See* Third MSJ at 20-21. This argument is premised on the assertion

that an 11/06 Revision to BAE's Terms of Sale governed all of SpaceKey's purchase

orders. *Id.* BAE is mistaken.

The Consultant Agreement states at paragraph 3 that sales to Qualified Buyers

arranged by SpaceKey would be governed by the "Terms and Conditions . . . which BAE

SYSTEMS may revise from time to time." As it happens, BAE did, in fact, revise those

terms, and as of May 2008, a different version of the Terms of Sale was in place. Spear

Third MSJ Decl., Ex. A. BAE's argument fails because it removed from the May 2008

TOS the very provisions in paragraph 6 on which that argument relies.

BAE amended Paragraph 6 in the May 2008 TOS to function solely as a payment

instruction provision, setting forth its ETF and check payment information. The language

requiring payments to be "unconditional" and "without recourse, set off, or discount" was

removed, and does not appear elsewhere in the TOS. *Id.* The language allowing BAE to

"defer shipments or deliveries . . . under any other contract with Buyer" was removed

from paragraph 6, and no longer appears anywhere in the TOS. *Id.* The language

allowing BAE to "require payment before delivery if credit information on Buyer is

lacking or unfavorable" was removed from paragraph 6, and from the TOS entirely. *Id.*

This means that for all of the purchase orders submitted and accepted after May 2008, the arguments that BAE advances are inapplicable as a matter of law.[1] The following orders meet that description: SKC122309 (12/23/09), SKC11310 (1/13/10), SKC12710 (1/27/10) and SKC 61808 (6/18/08), and SKC1610 (1/6/10). None of these Purchase Orders allowed BAE to defer shipments or deliveries, none permitted BAE to require payment before delivery, and none permitted BAE to terminate because of shortcomings with other orders. The Court should deny BAE's motion for summary judgment for this reason.

III.    **BAE's Reading of Paragraph 2 of the Agreement Violates the Rules Governing Contract Interpretation.**

BAE contends that its failure to provide 90-days notice before the Agreement renewed for 2010 was immaterial, because it was entitled to terminate the Agreement on 60-days notice at any time. Third MSJ at 60. BAE's reading of the Agreement fails to recognize the careful distinction made between the initial and renewal terms, and would render important language in the Agreement superfluous. SpaceKey's reading, by contrast, gives proper effect to all of the Agreement's terms.

Paragraph 2 of the Agreement is entitled "Term of Agreement." It contains two clauses. Clause A provides that "[t]he term of this Agreement shall commence as of July 2004 and shall remain in effect through January 31, 2007, or until such earlier termination of the consultant services as hereinafter provided." Thus, the initial term of the Agreement is two-and-a-half years, unless terminated at an earlier time. The reference

---

[1] SpaceKey concedes that SKC12508 – placed on January 25, 2008 – was subject to the older version of the TOS. But BAE's treatment of that order is mistaken for the reasons already addressed in prior briefing, and by the Court's October 24, 2011 Order. Because SpaceKey is claiming recoupment pursuant to UCC S 2-717 under its warranty claims, it is not in breach of its agreement to pay, and the rights BAE claims with respect to other SpaceKey orders do not arise.

to "termination . . . hereinafter provided" is to paragraph 12, which permits termination without cause "on sixty (60) days' written notice to the other Party."

Clause B describes what occurs *after* the initial two-and-a-half year period ends. "If the Agreement has not been terminated prior to its expiration, it shall be renewed for an additional term commencing February 1, 2007, and annually thereafter, unless either Party gives the other notice of its intention not to renew the Agreement, no later than ninety (90) days prior to commencement of the renewal term."

Thus, the Agreement has two separate life phases. The initial phase lasts for 2.5 years. Given its relative length, it made sense from a business perspective for BAE to have coupled that term with a reasonably liberal termination provision. The parties might have found that they didn't work well together, or that the relationship was not as profitable as they might have hoped. Thus, clause A expressly incorporates the 60-day termination provisions "hereinafter provided" in paragraph 12.

The second phase of the Agreement occurs only if the parties have made it through the first 2.5 year phase successfully (i.e., if it "has not been terminated prior to its expiration"). Consequently, it operates differently from the first phase. It involves 1 year annual terms – not 2.5 years – that renew automatically unless 90 days' notice is provided. Again, this makes sense from a business perspective. A 60 day termination provision early in the relationship would protect the terminating party from a mistake, and, because of the incipient nature of the relationship, would limit the harm to the terminated parties' business prospects. But the calculus changes after two-and-a-half years, when the parties have grown comfortable with their business relationship and business prospects. There is simultaneously less risk of a mistake in having entered a

contract, and more risk of damage to prospective business planning and expectations should the relationship end precipitously. Paragraph 2(B) reflects this fact. Thus, by its plain terms, the Agreement automatically renews for another year-long term *unless* notice is given "no later than 90 days" before the anniversary.

There is no dispute in this case that the first phase of the Agreement ran to the end of its term, and was not "earlier terminated." Nor is there any dispute that the Agreement renewed pursuant to Paragraph 2(B) for a one year term on February 1 2007, again on February 1, 2008, and then for a third time on February 1, 2009. Because the Agreement was in the second phase – the term governed by paragraph 2(B) – it automatically renewed for another yearly term on February 1, 2010 unless BAE or SpaceKey gave notice of intent not to renew by November 1, 2009. No such notice was given. BAE's December 10, 2009 letter, which stated that "your current Consultant Agreement will not be renewed in the coming year" was sent forty days too late. Rea Decl., Ex. C. As a result, the Agreement was in effect during 2010, and BAE's refusal to recognize or fulfill its contractual obligations during that time period was a breach.

BAE contends that this reading of the Agreement violates several principles of contract interpretation. Third MSJ at 16-17. SpaceKey has no quarrel with the legal authority BAE cites. It is indeed the law that contracts should be read as a whole, and the Court should take pains to give effect to every clause. *Id.* at 16. SpaceKey also agrees that "one part of a contract should not be interpreted to annul another part." *Id.* at 17.

But it is BAE's interpretation of the Agreement that violates these principles, not SpaceKey's. BAE contends that the Agreement could be terminated on 60 days' notice

either during the first or second phase of the Agreement. But this reading renders the provisions of paragraph 2B superfluous. There are several ways in which this is true.

First and fundamentally, there would be no reason to break the Agreement into two temporal phases, as paragraph 2 does, if the Agreement could be terminated without cause on 60 days' notice during either phase. A Paragraph 2 embodying BAE's view would merely provide that the Agreement would continue until either party terminated on 60 days' notice. Thus, the conceptual division BAE built into the Agreement between the initial and renewal term would be rendered meaningless by its proposed reading.

Second, BAE's reading would render the 90-day renewal deadline meaningless, as failure to meet the deadline would have no consequences. If, as happened here, a party missed the 90-day non-renewal trigger, the Agreement would not, in fact, renew if the party gave a termination notice 60 days before the renewal date. BAE offers no explanation for how the 90-day notice deadline is to operate under its interpretation of the Agreement. It cannot do so, as the 90-day notice provision is rendered superfluous by BAE's approach.

Third, BAE's reading fails to account for the inclusion in paragraph 2(A) of a termination "as hereinafter provided," and the exclusion of any such right to terminate from paragraph 2(B). The plain language of the Agreement allows for termination during the initial term, but does *not* so provide during the renewal terms. Instead, further renewal terms are avoided by giving 90-days notice.

BAE's interpretation likewise runs afoul of the rule that specific provisions govern more general ones. Third MSJ at 17. Paragraph 12 is a general termination right. And, as explained above, it is expressly referred to in paragraph 2(A) as applicable during

the Agreement's initial phase. Paragraph 2(B) is a *specific* renewal and termination

provision for the second phase of the Agreement. It therefore takes precedence over

paragraph 12 during renewal terms (a conclusion reinforced by the omission of the

reference to "termination" "hereinafter provided").

Paragraph 2 of the Agreement creates a distinction between the original and

renewal terms, and it imposes different notice periods and termination provisions for

each. SpaceKey's interpretation recognizes and gives effect to this plain intent. BAE's

reading does not. Accordingly, the Court should deny BAE's motion for summary

judgment.

**IV.     BAE Was Under a Good Faith Obligation to Accept Orders Placed under the
          Consultant Agreement.**

BAE argues that it had no obligation to accept purchase orders from SpaceKey

"after the termination of the Agreement." Third MSJ at 21. SpaceKey has no dispute with

this narrow assertion. If and when the Agreement terminates, SpaceKey agrees that BAE

has no obligation to accept purchase orders submitted by SpaceKey.

For the reasons just explained, it is precisely SpaceKey's argument in this case

that the Agreement did *not* terminate in the way BAE supposes. The Court should reject

this argument on that basis alone. But BAE's argument raises one additional issue. BAE

asserts that the Agreement gave it the right to refuse *any* orders placed by SpaceKey.

Although it does not make this assertion directly, BAE appears to suggest that it had no

obligation to accept orders from SpaceKey even while the Agreement was in place.

The Court should decline to accept any such argument from BAE, as it would

violate the duty of good faith performance implied as a matter of law in the Agreement.

Under New Hampshire law, a "contracting party with expressly conferred discretion to

do nothing at all [is] denied the right to frustrate the other party's expectation of receiving some reasonable level of performance." *Centronics Corp. v. Genicom Corp.* 132 N.H. 133, 141 (1989). Accordingly, BAE did not possess the power to simply reject any and all SpaceKey purchase orders while the Agreement was in force.

**V.      BAE's Terms of Sale Do not Apply to SpaceKey's Claims for Breach of the Consultant Agreement.**

In addition to arguing for judgment in its favor on its claims for declaratory relief, BAE also asks for judgment against SpaceKey's corresponding counterclaims. For the most part, BAE merely incorporates its existing arguments, which SpaceKey has discussed above. But BAE does advance one additional argument that must be addressed.

BAE contends that certain provisions in the Terms of Sale – which apply by their terms only to accepted orders – exclude SpaceKey's damage claim for breach of the Consultant Agreement. Third MSJ at 23. BAE misunderstands SpaceKey's claim.

SpaceKey is not claiming that BAE breached the TOS. It is claiming that BAE breached the Consultant Agreement by refusing to recognize that the Agreement had renewed for 2010. And SpaceKey's damages are the net profits on the sales it actually had in hand during 2010 for BAE products that could not be filled because of the breach. Notably, the Consultant Agreement contains no remedy or damage limitation.

Even if the TOS did apply, the language BAE relies on does not help its arguments. Paragraph 13 of the TOS is expressly limited to damages "alleged to arise from, or relate to the Deliverables and/or this Order." Rea Decl., Ex. A. That is manifestly not the nature of SpaceKey's claims. Moreover, paragraph 13 is plainly addressing the traditional category of consequential damages – where denial of use of the products (because of defects, late delivery or the like) interrupts the buyer's operations,

causing it, in turn, to lose profits and incur expenses. Again, that is not the nature of SpaceKey's claims in this case. It is claiming that BAE breached the Consultant Agreement through early termination, which prevented SpaceKey from filling customer orders it had already obtained.

## Conclusion

For the foregoing reasons, the Court should deny BAE's Third Motion for Summary Judgment.

Respectfully submitted,

Space Key Components, Inc.

By its Attorneys,

ORR & RENO, P.A.
One Eagle Square
P.O. Box 3550
Concord, NH  03302-3550
603-224-2381

Date:   November 21, 2011                    /s/ Jeffrey C. Spear_____
                                             Martha Van Oot (NHB #963)
                                             mvanoot@orr-reno.com
                                             Jeffrey C. Spear (NHB #14938)
                                             jspear@orr-reno.com

CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of November 2011, a copy of this memorandum has been sent via the Court's ECF system to counsel for BAE Systems.

/s/ Jeffrey C. Spear_____