**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

BAE Systems Information
and Electronics Systems
Integration, Inc.

    v.                            Civil No. 10-cv-370-LM

SpaceKey Components, Inc.


**O R D E R**

      BAE Systems Information and Electronics Systems Integration Inc. ("BAE") has sued its former sales consultant and customer, SpaceKey Components, Inc. ("SpaceKey"), in six counts. Among other things, BAE seeks declaratory judgments concerning its rights to terminate or reject seven purchase orders submitted by SpaceKey (Count I) and its right to terminate the agreement under which SpaceKey performed consulting services for it (Count II). SpaceKey, in turn, asserts four counterclaims, including claims that BAE breached the consulting agreement by: (1) refusing to accept five purchase orders it submitted to BAE (Count One); and (2) failing to pay commissions on several dozen sales to qualified buyers it identified for BAE (Count Two). Before the court is BAE's motion for summary judgment on Counts I and II of its amended complaint and Counts One and Two of SpaceKey's counterclaim. SpaceKey objects. For the reasons

that follow, BAE's motion for summary judgment is granted in part and denied in part.

## Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "The object of summary judgment is to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" Dávila v. Corporación de P.R. para la Diffusión Pública, 498 F.3d 9, 12 (1st Cir. 2007) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 7 (1st Cir. 2004)). "[T]he court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009) (citations and internal quotation marks omitted).

"Once the moving party avers an absence of evidence to support the non-moving party's case, the non-moving party must offer 'definite, competent evidence to rebut the motion,'" Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (citing Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)), and "cannot rest on 'conclusory allegations, improbable

inferences, [or] unsupported speculation,'" Meuser, 564 F.3d at 515 (quoting Welch v. Ciampa, 542 F.3d 927, 935 (1st Cir. 2008)).  When ruling on a party's motion for summary judgment, a trial court "constru[es] the record in the light most favorable to the nonmovant and resolv[es] all reasonable inferences in [that] party's favor."  Meuser, 564 F.3d at 515 (citing Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002)).


### Background

Unless otherwise indicated, the following facts are undisputed.

In 2004, BAE and SpaceKey entered into an agreement (hereinafter "Consultant Agreement" or "Agreement") under which SpaceKey promised to "advise and assist BAE SYSTEMS in identifying suitable, financially qualified buyers for BAE SYSTEMS' Products ('Products') and in effecting the sale of such Products to such buyers in the States of Connecticut and Maryland and in the Commonwealth of Virginia ('Territory')." Pl.'s Mot. Summ. J., Rea Decl., Ex. B (doc. no. 57-4), at 1. The Consultant Agreement further provides that "[t]he Products, Prices and Terms and Conditions governing such sales shall be as set forth in Exhibit A, which BAE SYSTEMS may revise from time

to time." Id.  In return for SpaceKey's services, BAE "agree[d]
to pay [SpaceKey], upon completion of each sale by BAE SYSTEMS
of Products to a Qualified Buyer in the Territory a fee equal to
five per cent (5%) of the Net Sales Price of said Products
. . . ." Id. at 2.

The Consultant Agreement also includes the following
relevant provisions:

2. TERM OF AGREEMENT

A. The term of this Agreement shall commence as of
July 8, 2004 and shall remain in effect through
January 31, 2007, or until such earlier termination of
the consultant services as hereinafter provided.  In
no event shall BAE SYSTEMS be liable to [SpaceKey]
hereunder for any services performed by [SpaceKey]
prior to the term of this Agreement or after its
expiration or termination.

B. If the Agreement has not been terminated prior to
its expiration, it shall be renewed for an additional
term commencing February 1, 2007, and annually
thereafter, unless either Party gives the other notice
of its intention not to renew the Agreement, no later
than ninety (90) days prior to commencement of the
renewal term.

. . . .

12. TERMINATION

A. Either Party may terminate this Agreement without
cause by sixty (60) days' written notice to the other
Party.  In the event of termination with or without
cause, BAE SYSTEMS' obligations will be limited to
fees earned by [SpaceKey] to the effective date of
termination.  . . .

> B. This Agreement shall terminate immediately and all payments due shall be forfeited if, in rendering services hereunder, improper payments are made, unlawful conduct is engaged in, or any part of the fee or expenses payable under this Agreement is used for an illegal purpose.

Pl.'s Mot. Summ. J., Rea Decl., Ex. B (doc. no. 57-4), at 1, 5-6.

Appendix A to the Consultant Agreement is a document with a listed revision date of November 2006, and which is captioned "Terms of Sale – Commercial/Domestic" (hereinafter "2006 TOS"). Paragraph 6 of the 2006 TOS, titled "Payment," provides, in pertinent part:

> Unless otherwise specified in writing by BAE SYSTEMS, terms of payment for Buyer are the earlier of net thirty (30) days from the date of invoice or upon delivery.  . . .  Payments are unconditional and shall be made as specified in the Order, without recourse, set off, or discount.  If Buyer shall fail to make any payment in accordance with the terms and conditions hereof, BAE SYSTEMS, in addition to its other rights and remedies, may, at its option, defer shipments or deliveries hereunder, or under any other contract with Buyer.  BAE SYSTEMS reserves the right to require payment before delivery if credit information on Buyer is lacking or unfavorable.

Pl.'s Mot. Summ. J., Rea Decl., Ex. A (doc. no. 57-3), at 3. Paragraph 7 of the 2006 TOS, titled "Buyer's Default: Termination," provides, in pertinent part:

> Without prejudice to any other rights or remedies available to BAE SYSTEMS, BAE SYSTEMS shall have the right and option to immediately terminate this Order upon written notice to Buyer in the event of the

occurrence of one or more of the following: (i) If
Buyer Breaches any of the terms and conditions of this
Order, including but not limited to the failure to
perform any obligation hereunder or make any payment
due hereunder.

Id.

In May of 2008, BAE adopted a revision of its terms of sale
(hereinafter "2008 TOS").  It is not clear whether the 2008 TOS
replaced the 2006 TOS, or a subsequent revision.[1]  Paragraph 6 of
the 2008 TOS, titled "Terms of Payment," provides that
"[p]ayment terms are net thirty (30) days from the date of the
invoice . . . ."  Def.'s Obj., Spear Decl., Ex. A (doc. no. 59-
4), at 2.  Paragraph 6 of the 2008 TOS, however, does not
include any of the language that follows the ellipsis in the
portion of Paragraph 6 from the 2006 TOS that is quoted above.
That is, the 2008 TOS does not include either a provision
allowing BAE to defer shipments to SpaceKey or a provision
allowing BAE to require advance payment from SpaceKey.  On the
other hand, the "Buyer's Default: Termination" section of the
2008 TOS, i.e., Paragraph 7, is identical to Paragraph 7 in the
2006 TOS.

_____

[1] In its objection to summary judgment, SpaceKey refers to
an August 2007, revision of the terms of sale (hereinafter "2007
TOS").  See Def.'s Obj. (doc. no. 59), at 6.  But SpaceKey did
not attach the 2007 TOS to its objection, and it does not appear
that any such document is included anywhere else in the record.

While the Consultant Agreement was in effect, SpaceKey submitted purchase orders to BAE listing itself as the qualified buyer.  It then resold the products it purchased from BAE, earning both a five-percent commission from BAE and whatever mark-up it was able to incorporate into the prices it charged the end users of the products it purchased from BAE.

On June 30, 2006, the Virginia State Corporation Commission automatically terminated SpaceKey's corporate existence because SpaceKey failed to file its annual report and remit the annual registration fee required by Virginia law.  SpaceKey's corporate existence was reinstated on May 26, 2011.

By letter dated December 10, 2009, BAE informed SpaceKey as follows:

> As a result of internal changes and evolving business plans, we have determined that your current Consultant Agreement will not be renewed in the coming year. Accordingly, pursuant to Section 12 of our above-referenced Consultant Agreement, BAE Systems hereby terminates the Agreement effective January 31, 2010.
>
> . . . Please understand that no commissions will be paid for sales arranged after January 31, 2010, unless, and until, a new, U.S. Advisor Agreement is entered, which cannot be predicted with certainty.

Pl.'s Mot. Summ. J., Rea Decl., Ex. C (doc. no. 57-5).  BAE and SpaceKey did not enter into a new U.S. Advisor Agreement.

As of February 8, 2010, BAE had accepted six purchase orders from SpaceKey that had not yet resulted in fully

completed transactions (hereinafter "pending POs").  SpaceKey
contends that the five most recent pending POs were subject to
the 2008 TOS, but "concedes that SKC12508 – placed on January
25, 2008 – was subject to the older version of the TOS."[2]  Def.'s
Obj. (doc. no. 59), at 15 n.1.  After February 8, SpaceKey
submitted five more purchase orders to BAE that BAE did not
accept (hereinafter "rejected POs").

It is undisputed that by February 8, 2010, BAE had
completed delivery under two of the six pending POs, SKC 1610[3]
and SKC 122309[4] (hereinafter "filled POs").  The parties disagree
as to whether the products BAE delivered under purchase order
SKC 12508[5] (hereinafter "disputed PO") were compliant with the
terms of that purchase order.  No deliveries had been made under
any of the other three other pending POs, SKC 61808, SKC 11310,
and SKC 12710 (hereinafter "unfilled POs").

---

[2] It is not clear whether SpaceKey's reference to "the older
version of the TOS" is a reference to the 2006 TOS, which is a
part of the record, or a reference to the purported 2007 TOS,
which is not a part of the record.

[3] This purchase order covered the five SRAMs discussed in
the court's order of October 24, 2011, document no. 58.

[4] This purchase order covered the eight PROMs discussed in
the court's order of October 24, 2011.

[5] This purchase order covered 200 FPGAs that, according to
SpaceKey, did not meet the agreed-upon specifications.

Under the 2008 TOS, SpaceKey had thirty days from the date of the invoice to pay for the products delivered under the filled POs.  SpaceKey has not paid the amounts due under either the filled POs or the disputed PO.  SpaceKey's president, Will Key, says he "suspended payment on [those] invoices . . . pending resolution of the RH1280 non compliance issues and concerns about payment of Space Key commissions on these and previously concluded purchase orders."  Def.'s Obj., Key Decl. (doc. no. 59-1) ¶ 4.

By letter dated April 20, 2010, BAE demanded payment for the goods sold pursuant to both the filled POs and the disputed PO.  See Pl.'s Mot. Summ. J., Rea Decl., Ex. H (doc. no. 57-10), at 1.  BAE also told SpaceKey:

> Based on the above mentioned outstanding invoices, your past payment history with BAE Systems and your credit score, per the stipulations contained in paragraph 6 of the Commercial/Domestic terms of sale, BAE Systems shall now require advance payments for the remaining items to be delivered under [the unfilled POs] prior to delivery.  We also require documentation . . . that the items remaining to be delivered are for a qualified buyer and end user that is located in the "Territory" specified in paragraph 3 entitled Duties of Consultant, of the referenced agreement.

Id.  By letter dated May 20, 2010, BAE notified SpaceKey that it considered SpaceKey to be in default of the 2006 TOS due to its failure to: (1) pay for the products delivered under the two

filled POs and the disputed PO;[6] and (2) provide advance payment
for the products specified in the three unfilled POs.  See id.,
Ex. I (doc. no. 57-11).  By letter dated August 20, 2010, BAE
notified SpaceKey that it was: (1) terminating the three
unfilled POs due to SpaceKey's failure to provide advance
payment; and (2) rejecting any new purchase orders from
SpaceKey.  See id., Ex. J. (doc. no. 57-12).

Based on the foregoing, BAE seeks declaratory judgments
that: (1) it "has rightfully rejected and/or terminated the
purchase orders [from SpaceKey] and that [it] owes no obligation
to SpaceKey to accept any other purchase orders it may submit,"
Am. Compl. ¶ 31 (Count I); and (2) its agreement with SpaceKey
terminated no later than February 8, 2010, and SpaceKey is not
entitled to any fees under that agreement (Count II).  SpaceKey,
in turn, claims that BAE has breached the Consultant Agreement
by: (1) failing to accept the rejected POs (Count One); and (2)
failing to pay commissions on sales of goods it acquired from
BAE pursuant to approximately twenty-eight separate purchase
orders (Count Two).

---

[6] In its order of October 24, 2011, the court granted BAE
summary judgment on its claim that SpaceKey is liable for breach
of contract as a result of its failure to pay for the goods
delivered pursuant to the two filled POs.

**Discussion**

BAE moves for summary judgment on Counts I and II of its complaint and Counts One and Two of SpaceKey's counterclaim. For reasons that will become apparent, the court considers those claims a bit out of order, beginning with BAE's request for a declaratory judgment on its attempted termination of the Consultant Agreement.

A. Count II of the Amended Complaint

In Count II of its amended complaint, BAE asks the court to declare that the Consultant Agreement terminated no later than February 8, 2010, and that SpaceKey is not entitled to any fees under the Agreement.  In support of its motion for summary judgment on Count II, BAE argues that: (1) the Consultant Agreement terminated automatically in 2006, pursuant to Paragraph 12(B), when SpaceKey continued to operate after the termination of its corporate existence, in violation of Virginia law; (2) the Agreement lapsed on February 1, 2007, because SpaceKey lacked the ability to enter into a renewal term, due to its lack of corporate existence; and (3) its letter of December 10, 2009, terminated the Agreement sixty days later, on February 8, pursuant to Paragraph 12(A).  SpaceKey disagrees, categorically.  Because BAE's third argument is correct, and

dispositive, the court need not address BAE's arguments based on the termination of SpaceKey's corporate existence.[7]

BAE argues that under Paragraph 12(A) of the Consulting Agreement, it had the right to terminate the Agreement by giving sixty days' written notice, and that it did so.  SpaceKey argues that the right to terminate described in Paragraph 12(A) lapsed at the end of the Agreement's initial term, and was unavailable when BAE attempted to invoke it in 2009, during a renewal term.

BAE's argument is based upon a construction of the Consulting Agreement under which: (1) Paragraph 2 defines the contract as consisting of an initial two-and-one-half-year term, followed by one-year terms that spring into existence automatically unless either party gives ninety days' notice of its intention not to renew the Agreement; and (2) Paragraph 12(A) allows either party to terminate the Agreement, with sixty days' notice, during either the initial term or any renewal term.  Thus, in BAE's view, once the initial contract term ran, it had two ways out of the Agreement; it could have declined to renew it, by giving notice ninety days before the February 1

_____

[7] In determining that it is unnecessary to reach BAE's corporate-termination arguments, the court notes that Count II does not seek a declaration that the Consultant Agreement terminated in 2006 or 2007.  Had BAE sought such declarations, then the court would have been obligated to consider those arguments.

renewal date, or it could have terminated it at any time, with sixty days' notice.

SpaceKey's argument is based on a construction of the Agreement under which: (1) Paragraph 2 defines the contract as consisting of two separate phases, an initial phase lasting two and one half years, during which either party could have terminated the Agreement with sixty days' notice, and a second phase consisting of one-year renewal terms, during which the Paragraph 12(A) termination right does not apply.  In SpaceKey's view, the Agreement allowed BAE to terminate it with sixty days' notice during the initial phase but, after that, left BAE with only one way out: notice of an intention not to renew, given ninety days before the February 1 renewal date.

Resolution of BAE's motion for summary judgment on Count II requires the court to choose between two competing constructions of the Consulting Agreement.  BAE's construction is the more reasonable of the two.

The Consulting Agreement provides that it "shall be construed in accordance with the laws of the State of New Hampshire."  Pl.'s Mot. Summ. J., Rea Decl., Ex. B (doc. no. 57-4), at 6.  In New Hampshire, "[t]he interpretation of a contract . . . is ultimately a question of law."  Birch Broad., Inc. v. Capitol Broad. Corp., 161 N.H. 192, 196 (2010) (citing Behrens

v. S.P. Constr. Co., 153 N.H. 498, 500 (2006)).  As the New

Hampshire Supreme Court recently explained:

> When interpreting a written agreement, we give the
> language used by the parties its reasonable meaning,
> considering the circumstances and the context in which
> the agreement was negotiated, and reading the document
> as a whole.  [Behrens, 153 N.H.] at 503.  We give an
> agreement the meaning intended by the parties when
> they wrote it.  Id.  "Absent ambiguity, however, the
> parties' intent will be determined from the plain
> meaning of the language used in the contract."  Ryan
> James Realty v. Villages at Chester Condo. Assoc., 153
> N.H. 194, 197 (2006) (quotation omitted).

Birch Broadcasting, 161 N.H. at 196 (parallel citations

omitted).  In addition, "it is a basic principle of contract law

that constructions that render contract terms meaningless should

be avoided."  Summit Packaging Sys., Inc. v. Kenyon & Kenyon,

273 F.3d 9, 12 (1st Cir. 2001) (citing Systemized of N.E., Inc.

v. SCM, Inc., 732 F.2d 1030, 1034 (1st Cir. 1984)).

Interestingly, each party argues that its position is

supported by the principle that a contract should be construed

in a way that gives full effect to all of its parts.  According

to BAE, the court should reject SpaceKey's construction because

it reads the Paragraph 12(A) termination provision out of the

Agreement for all but the initial two and one half years of its

existence.  According to SpaceKey, the court should reject BAE's

construction because it: (1) renders the Paragraph 2(B) renewal

deadline superfluous; and (2) impermissibly allows the general

14

termination right in Paragraph 12(A) to control the specific
renewal and termination provision in Paragraph 2(B), in
violation of the principle of contract interpretation that
specific provisions govern more general ones.

While SpaceKey's construction of the Agreement is not
without a logical basis, it is substantially less reasonable
than BAE's construction.  To begin, while Paragraph 2(A) does
refer to termination, it is not reasonable to characterize
Paragraph 2, as SpaceKey does, as "a specific renewal and
termination provision for the second phase of the Agreement."
Def.'s Obj. (doc. no. 59), at 19.  Paragraph 2 is a provision
describing the term of the Agreement.  Paragraph 12 is a
provision describing the two ways in which it may be terminated.
They are separate provisions, dealing with two different aspects
of the contractual relationship.  The court's obligation to
interpret the Agreement by reading it as a whole, see Birch
Broadcasting, 161 N.H. at 196, does not require the court to
construe Paragraph 2 as some sort hybrid renewal/termination
provision when termination is quite specifically addressed in
Paragraph 12.

SpaceKey devotes several paragraphs to explaining why the
parties may have intended for the Agreement to operate
differently during its two phases, with voluntary termination

15

allowed only during the first one, when the companies were still
getting to know each other.  That theory is all very
interesting, but if the parties had actually intended for the
Paragraph 12(A) termination right to expire at the end of the
initial two-and-one-half-year term of the Agreement, they could
easily have written Paragraph 12(A) to reflect such an
intention.  The plain language of Paragraph 12(A) gives no
indication that the parties intended for the voluntary
termination right to apply only to the initial term of the
Agreement.

Moreover, SpaceKey's theory does not adequately account for
Paragraph 12(B), which provides for immediate automatic
termination under certain circumstances, such as unlawful
conduct by SpaceKey.  Neither Paragraph 12(A) nor Paragraph
12(B) includes an express temporal limitation, giving a strong
indication that the parties intended for those provisions to
apply to the same time period.  SpaceKey, however, identifies no
reason why the parties would want Paragraph 12(B) to expire
after the initial term of the Agreement, as they say Paragraph
12(A) does, and it is difficult to see why unlawful conduct by
SpaceKey would be any more acceptable to BAE during a renewal
term than it would be during the initial term of the Agreement.

In short, SpaceKey's proposed construction either reads Paragraph 12(A) out of the Agreement for all but the initial term, or it reads into Paragraph 12(A) a temporal limitation that is not expressed in the plain language of the Agreement. Neither approach is reasonable.  Rather, on its face, the Agreement unambiguously expresses the intent of the parties that, for the full duration of the Agreement, _i.e._, during both its initial and renewal terms, BAE and SpaceKey each had the right to terminate the Agreement with sixty days' notice to the other party.

Under the circumstances of this dispute, the construction the court adopts does have the result of giving BAE relief from its failure to send SpaceKey a notice of non-renewal ninety days before the February 1, 2010, renewal date.  But, BAE's ability to escape the Agreement in two different ways, _i.e._, by non-renewal or by termination, does not render the renewal provision meaningless any more than the sixty-day termination provision rendered the two-and-one-half-year initial term provision meaningless.

Finally, the court is not persuaded by SpaceKey's reliance on the "as herein provided" language in Paragraph 2(A).  In SpaceKey's view, the Agreement's renewal terms are not subject to termination under Paragraph 2(A) because: (1) Paragraph 2(A)

17

provides that the initial term of the contract ran through
January 31, 2007, "or until such earlier termination of the
consultant services as herein provided"; and (2) Paragraph 2(B)
does not describe the renewal terms as running for one year
each, or until earlier termination "as herein provided."
SpaceKey's argument does not account for one crucial distinction
between Paragraph 2(A) and Paragraph 2(B); the former, but not
the latter, describes a single, specific contract term, and does
so by specifying an end date.  The more generic reference to the
process for renewing the contract in Paragraph 2(B) does not
indicate any specific term and, as a consequence, does not
purport to identify any specific end date.  Thus, as a logical
matter, there was no need to refer to the termination provision
in Paragraph 2(B).  Finally, the court notes that while
Paragraph 2(A) refers to termination, termination itself is
governed by Paragraph 12, not Paragraph 2.

The simple fact is that while Paragraphs 2 and 12 must be
read together, see Birch Broadcasting, 161 N.H. at 196, they
deal with two different subjects, and BAE's construction is the
one that gives the language of those provisions its reasonable
meaning, see id., and best avoids rendering parts of the
agreement meaningless, see Summit Packaging, 273 F.3d at 12.
Accordingly, BAE is entitled to judgment as a matter of law on

18

its request for declaratory judgment that the Consulting

Agreement terminated no later than February 8, 2010, sixty days

after BAE notified SpaceKey of its intention to terminate.  In

Count II of its amended complaint, BAE also asks for a

declaratory judgment that "SpaceKey is not entitled to any fees

under the Agreement," Am. Compl. ¶ 35, but as BAE's motion for

summary judgment does not address that part of Count II, the

court's decision on Count II is limited to a determination that

the Consulting Agreement terminated no later than February 8,

2010.[8]

### B. Count I of the Amended Complaint

In Count I of its amended complaint, BAE asks the court to

declare that it rightfully terminated the three unfilled POs,[9]

and rightfully declined to accept three of the five rejected

---

[8] In any event, while it is not entirely clear, it would appear that SpaceKey's entitlement to fees under the Agreement is also at issue in Count Two of SpaceKey's counterclaim, which is addressed below.

[9] Count I accurately identifies two of the three unfilled POs.  It also refers to SKC 172710.  Am. Compl. ¶ 28.  Because the record includes no purchase order with the number SKC 172710, but does include one with the number SKC 12710, Pl.'s Mot. Summ. J., Rea Decl., Ex. D (doc. no. 57-6), at 6, the court presumes that BAE intended to refer to SKC 12710, which is the purchase order number that appears in its statement of undisputed material facts, see Pl.'s Mem. of Law (doc. no. 57-1), at 7.

POs.[10]   The court begins with the unfilled POs and then turns to
the rejected POs.

### 1. Unfilled POs

In its motion for summary judgment, BAE argues that
SpaceKey's failure to pay for the goods it had received pursuant
to the filled POs and the disputed PO constituted unfavorable
credit information that entitled it, under Paragraph 6 of the
terms of sale, "to defer shipments or to require payment before
delivery under any contract [with SpaceKey]".  Pl.'s Mem. of Law
(doc. no. 57-1), at 20 (emphasis in the original).  It further
argues that SpaceKey's failure to make the payments due under
the filled POs and the disputed PO entitled it to terminate the
unfilled POs, under Paragraph 7 of the terms of sale.  SpaceKey
contends that the language from Paragraph 6 on which BAE relies
appears in the 2006 TOS, which does not apply to five of the six
transactions at issue.  BAE concedes that there is a factual
dispute concerning which version of the terms of sale applies to
the transactions at issue, but argues that the dispute is not
material because Paragraph 13, which appears in both the 2006

---

[10] Without explanation, Count I does not mention the other
two rejected POs, i.e., SKC 32610 and SKC 42210.  It also lists
SKC 127309, which appears to be an erroneous reference to SKC
122309, which is one of the two filled POs.

TOS and the 2008 TOS, bars SpaceKey from recovering consequential damages.

For BAE to be entitled to judgment as a matter of law that it rightfully terminated the unfilled POs, it must, necessarily, identify a legal basis for that action.  Termination of a purchase order is addressed most directly in Paragraph 7 of the terms of sale.  That provision, which is worded the same way in the 2008 TOS as it is in the 2006 TOS, allowed BAE to terminate an order if SpaceKey breached any of the terms or conditions of that order, or under a host of circumstances, such as SpaceKey's bankruptcy, that are not present here.  Notably, Paragraph 7 did not give BAE the right to terminate one order if SpaceKey breached the terms and conditions of some other order.  Consequently, even assuming that SpaceKey did breach its obligations to pay BAE under the filled POs and the disputed PO, those breaches did not give BAE the right, under Paragraph 7, to terminate the unfilled POs.

Paragraph 6 is no more helpful to BAE's position.  For one thing, that paragraph did not give BAE the right to terminate orders, but only the rights to: (1) defer shipments or deliveries under certain circumstances; and (2) require advance payment under other circumstances.  While BAE invokes both of

those aspects of Paragraph 6, neither entitles it to judgment as a matter of law on Count I.

In its letter to SpaceKey, BAE invoked its right to require advance payment.  It did so with respect to the three unfilled POs.  Those POs are dated July 13, 2009; January 9, 2010; and January 13, 2010.  Pl.'s Mot. Summ. J., Rea Decl., Ex. D (doc. no. 57-7), at 5-7.  The 2006 TOS includes the advance-payment provision on which BAE relies.  The 2008 TOS, issued in May of 2008, includes no such provision.  BAE concedes that there is a factual dispute over which TOS applies to the unfilled POs.  Accordingly, BAE has failed to produce undisputed evidence that it was entitled, under the terms of sale, to require advance payment for the goods ordered in the unfilled POs.  Without a legal right to require advance payment, BAE had no basis for terminating the unfilled POs in response to SpaceKey's failure to make pre-delivery payment for the goods subject to those purchase orders.

The deferred-shipment provision gave BAE the right to defer shipments and deliveries under all pending orders in the event that SpaceKey failed to make payments due for any order.  Thus, that provision did give BAE the right to defer shipments and deliveries under the unfilled POs in response to SpaceKey's failure to make payments due under the filled POs and the

disputed PO.  There are, however, two problems with BAE's reliance on the deferred-shipment provision.

First, BAE has not produced evidence that the Paragraph 6 deferred-shipment provision applied to either the two filled POs or the disputed PO.  It is undisputed that the two filled POs post-dated the 2008 TOS.  Because the 2008 TOS does not include the deferred-shipment provision, that provision necessarily does not apply to the two filled POs.  Thus, the only purchase order to which the deferred-shipment provision might apply is the disputed PO, which did pre-date BAE's adoption of the 2008 TOS. But, while BAE has produced evidence that the 2006 TOS did include the deferred-shipment provision, it has not produced evidence that the 2006 TOS applied to the transaction governed by the disputed PO, which, SpaceKey concedes, was submitted in January of 2008.  Second, even if the 2006 TOS had been in force at the time SpaceKey submitted the disputed PO, it is not at all clear that the deferred-shipment provision would have provided BAE with a legal basis for the actions it took.  The deferred-shipment provision allowed BAE to defer shipments or deliveries under certain circumstances, but, by its plain language, it did not authorize BAE to terminate purchase orders.  The parties could have given BAE that right in Paragraph 6, as they did in Paragraph 7, but they did not.

23

To sum up, BAE has identified no authority in its agreements with SpaceKey for its termination of the three unfilled POs.  Accordingly, it is not entitled to judgment as a matter of law that it rightfully terminated those purchase orders.

### 2. Rejected POs

In its motion for summary judgment, BAE argues that because the Consulting Agreement terminated no later than February 8, 2010, it had no obligation to accept the rejected POs.  SpaceKey agrees that "[i]f and when the Agreement terminates . . . BAE has no obligation to accept purchase orders submitted by SpaceKey."  Def.'s Obj. (doc. no. 59), at 19.  Because the court has ruled that the Agreement did terminate no later than February 8, 2010, BAE is entitled to judgment as a matter of law that it was under no legal obligation to accept the three rejected POs identified in Count I, all of which were submitted after February 8, 2010.

### C. Count One of the Counterclaim

In Count One of its counterclaim, SpaceKey asserts that BAE violated the Consulting Agreement by failing to accept the five rejected POs.  In light of the court's determination that the Consulting Agreement terminated no later than February 8, 2010,

and the undisputed fact that the rejected POs were all submitted after that date, BAE is entitled to judgment as a matter of law on Count One of SpaceKey's counterclaim.

### D. Count Two of the Counterclaim

In Count Two of its counterclaim, SpaceKey asserts that BAE breached the Consulting Agreement by failing to pay commissions on: (1) $4,115,000 in sales of goods it acquired from BAE through the disputed PO; and (2) sales of goods it acquired through twenty-seven other purchase orders.  BAE moves for summary judgment on Count Two, arguing that, under Paragraph 12(B) of the Consultant Agreement, SpaceKey forfeited all payments it was due by engaging in unlawful conduct while rendering services under the Agreement, to wit, transacting business as a corporation after the termination of its corporate existence on June 30, 2006.  SpaceKey contends that: (1) operating as a corporation after the termination of its corporate existence does not count as engaging in unlawful conduct in rendering services under the Consulting Agreement; and (2) even if it did engage in unlawful conduct, BAE may not rely on that conduct to withhold its commissions because its corporate existence has been reinstated.  SpaceKey's first argument is persuasive.  Before turning to that argument,

however, the court notes what can only be characterized as an existential problem with BAE's position.

### 1. Who Violated Virginia Law?

BAE argues that it does not owe SpaceKey the commissions SpaceKey claims because SpaceKey engaged in unlawful conduct. Specifically, BAE says that SpaceKey violated a Virginia statute making it "unlawful for any person to transact business in this Commonwealth as a corporation . . . unless the alleged corporation is either a domestic corporation or a foreign corporation authorized to transact business in this Commonwealth."  Va. Code Ann. § 13.1-613.  The question here is just who, exactly, could have violated that statute.

It is well understood that a corporation can be a person for various legal purposes.  See Chesapeake Bay Found., Inc. v. Commonwealth ex rel. Va. State Water Control Bd., 695 S.E.2d 549, 553 n.4 (Va. Ct. App. 2010) ("A 'person' is an 'individual, corporation, partnership, association, government body, municipal corporation, or any other legal entity.' ") (quoting Va. Code Ann. § 62.1-44.3).  Here, BAE argues that SpaceKey's corporate existence was terminated in 2006.  When it lost that legal status, it would seem, as a logical matter, that it also lost its personhood.  So, to the extent there was any violation

26

of Va. Code Ann. § 13.1-613, it is hard to see how SpaceKey could have been a "person" that committed the violation.  Will Key may have transacted business as a corporation, in the name of SpaceKey, without legal authorization to do so, but as a defunct corporation, SpaceKey was simply not a person capable of violating Va. Code Ann. § 13.1-613 at the time of the violations that, according to BAE, relieved it of its obligation to pay SpaceKey.[11]  If SpaceKey did not legally exist, it could not have committed an unlawful act.  If SpaceKey committed no unlawful act, then Paragraph 12(B) does not come into play.

BAE's argument on this point would have substantially more force if Virginia law made it a misdemeanor for a corporation to fail to file an annual report or pay its annual registration fee.  It is undisputed that SpaceKey failed to fulfill at least one of those two legal obligations.  But while that conduct, or lack thereof, had legal consequences, it was not, in and of itself, unlawful conduct.  What was unlawful was the continued

---

[11] There is an additional wrinkle.  If, indeed, a terminated corporation were a person capable of violating Va. Code Ann. § 13.1-613, then reinstatement under Va. Code. Ann. § 13.1-754 would seem to require an automatic misdemeanor charge.  The statute does impose a reinstatement fee and require payment of back registration fees and penalties, but while it plainly contemplates business activity undertaken by defunct corporations, it says nothing about criminal liability under Va. Code Ann. § 13.1-613, which would seem to substantially undermine BAE's position.

operation of SpaceKey as a corporation.  As explained above,
however, the only "person" who could have operated SpaceKey was
Will Key; SpaceKey was no longer a person after its corporate
existence was terminated.

### 2. SpaceKey's First Argument

SpaceKey's first argument against the applicability of the
Paragraph 12(B) forfeiture provision has two parts.  It argues
that: (1) failing to pay franchise taxes to the State of
Virginia is not the kind of unlawful conduct contemplated by
Paragraph 12(B) of the Consulting Agreement; and (2) it did not
engage in that unlawful conduct "in rendering services" under
the Agreement.  BAE contends that: (1) Paragraph 12(B) contains
no limitation on the kinds of unlawful conduct to which it
applies; and (2) SpaceKey's unlawful conduct – transacting
business as a corporation after its corporate existence had been
terminated – necessarily took place while it was rendering the
service of assisting BAE in identifying suitable buyers for
BAE's products.  The court does not agree.

### a. Conduct Contemplated by Paragraph 12(B)

Presuming that SpaceKey could have violated Va. Code Ann. §
13.1-613 in the first place, that unlawful conduct is not the
kind of conduct Paragraph 12(B) was intended to address.  The

Consulting Agreement itself identifies several specific areas in which BAE required SpaceKey's pledge of lawful conduct.  But, maintaining its corporate status falls nowhere close to any of those areas of concern.

In Paragraph 7 of the Consultant Agreement, SpaceKey agreed to comply with: (1) "U.S. Government and BAE SYSTEMS security regulations applicable to the handling of classified information;" and (2) "all United States export laws and regulations applicable to the Products . . . ."  Pl.'s Mot. Summ. J., Rea Decl., Ex. B (doc. no. 57-4), at 3, 4.  In Paragraph 8, SpaceKey agreed not to "solicit, attempt to obtain, or receive any information that is security classified or procurement sensitive, directly or indirectly, from the U.S. Government or any other source, where it is clear that release is unauthorized or in circumstances where there is reason to believe that such information cannot lawfully be in BAE SYSTEMS' possession."  Id. at 4.  In Paragraph 10(B), SpaceKey "[a]greed to comply with applicable laws and regulations and not to make or permit to be made, or knowingly allow a third party to make, any improper payments, or to perform any unlawful act."  Id.  In support of that promise, SpaceKey executed various certifications and agreed to provide supporting information and to execute additional certifications, if necessary.  See id.

Under the rule of construction often referred to as _ejusdem_ _generis_, it is appropriate to construe the reference to "unlawful conduct" in Paragraph 12(B) as embracing only conduct similar in nature to the conduct described in or implied by Paragraphs 7, 8, and 10.  See State v. Beauchemin, 161 N.H. 654, 658 (2011) (quoting State v. Breed, 159 N.H. 61, 65 (2009)). Because the unlawful conduct on which BAE bases its argument, operating as a corporation after the termination of corporate existence, violates none of the kinds of laws or regulations referred to elsewhere in the Consultant Agreement, the court construes the Paragraph 12(B) forfeiture provision as not embracing the unlawful conduct at issue here.  That conclusion is supported in several ways.

First, the second sentence in Paragraph 10(A) begins with the phrase "[i]f CONSULTANT is a corporation, partnership or other form of business organization . . . ."  Pl.'s Mot. Summ. J., Rea Decl., Ex. B (doc. no. 57-4), at 4.  Thus, the Agreement plainly admits of the possibility of consultants that are not corporations, and thus implies, to the point of certainty, that BAE did not require its consultant to be corporations. Moreover, while Paragraph 10(B) required SpaceKey to demonstrate its compliance "with applicable laws and regulations" by executing certain certifications, BAE has produced no evidence

that it ever asked SpaceKey to provide, or that SpaceKey did provide, any certification concerning its corporate existence. The court further notes that unlike the consultant conduct from which BAE sought to protect itself in Paragraphs 7, 8, and 10, SpaceKey's lack of corporate existence does not appear to have exposed BAE to any legal liability <u>vis-à-vis</u> the federal government or any other entity.  Finally, the court is confident that the parties did not intend the expansive construction of Paragraph 12(B) that BAE proposes, under which it could avoid paying SpaceKey commissions it had earned if, for example, it were to learn that SpaceKey had violated local wage-and-hour laws by failing to pay overtime to a clerical worker who had processed the paperwork for the sale that generated the commission.  In short, operating as a corporation after the termination of corporate existence is not the kind of unlawful conduct the parties contemplated when they agreed to the automatic termination provision in Paragraph 12(B).

### b. Unlawful Conduct and Contract Performance

The court also agrees with SpaceKey that conducting business as a corporation after the termination of corporate existence is not a kind of unlawful conduct that could be committed "in rendering services" under the Consultant

31

Agreement.  The plain language of Paragraph 12(B) requires some nexus between unlawful conduct and the performance of services under the Agreement.  Here, however, operating as a corporation after termination is more a state of existence than an affirmative act.  Beyond that, BAE has produced no evidence that SpaceKey's corporate existence had any bearing on the performance of its duties under the Agreement.  So, for that additional reason, the court rejects BAE's construction of the Paragraph 12(B) forfeiture provision as encompassing the unlawful conduct it says SpaceKey committed.

BAE has produced no evidence that SpaceKey has engaged in any unlawful conduct, much less conduct of a kind that would allow BAE the benefit of the Paragraph 12(B) forfeiture provision.  Accordingly, BAE is not entitled to judgment as a matter of law on Count Two of SpaceKey's counterclaim.

## Conclusion

For the reasons described above, BAE's motion for summary judgment, document no. 57, is granted in part and denied in part, as summarized below.  BAE is entitled to summary judgment on Count I of its amended complaint with respect to its rejection of purchase orders submitted after February 8, 2010, but it is not entitled to summary judgment on Count I with

respect to its termination of the unfilled POs.  BAE is entitled

to summary judgment on Count II of its amended complaint with

respect to its request for a declaration that the Consultant

Agreement terminated no later than February 8, 2010.  BAE is

also entitled to summary judgment on Count One of SpaceKey's

counterclaim, but it is not entitled to summary judgment on

Count Two of SpaceKey's counterclaim.

      SO ORDERED.

                           _____

                           Landya McCafferty
                           United States Magistrate Judge

February 1, 2012

cc:  Jonathan M. Shirley, Esq.
     Jeffrey C. Spear, Esq.
     Martha Van Oot, Esq.
     Daniel E. Will, Esq.
     Joshua M. Wyatt, Esq.