UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| BAE SYSTEMS INFORMATION AND ELECTRONICS SYSTEMS INTEGRATION, INC., | ) ) ) ) | |
| Plaintiff, | ) ) | |
| | ) | Case No. 10-cv-370-LM |
| vs. | ) ) | |
| SPACEKEY COMPONENTS, INC. | ) ) | |
| Defendant, | ) ) ) | |
| | ) | |

**TRIAL MEMORANDUM OF SPACEKEY COMPONENTS, INC.**

SpaceKey Components, Inc. respectfully submits this trial memorandum pursuant

to L.R. 16.2(b)(2).[1]

**Introduction**

The issues remaining in dispute in this case are few. The same is true of the

parties' claims and defenses. SpaceKey has claims for breach of warranty and breach of

contract,[2] and BAE has defenses remaining to those claims, as well as its reciprocal

claims for payment.

The facts underlying SpaceKey's warranty claim are straightforward and not

subject to dispute. BAE made repeated representations regarding the RH1280B's

---

[1] This memorandum addresses the case presented by the pleadings, including the judicial admissions by BAE that are discussed in SpaceKey's motion to preclude. Should BAE be permitted to depart from these admissions, then SpaceKey reserves the right to seek additional discovery, reschedule the trial, and to file an amended trial memorandum.

[2] As explained in its pretrial statement, SpaceKey is waiving its claim for misrepresentation, with the proviso that it reserves the right to revive that claim, or to state a new misrepresentation claim, should BAE be allowed to present evidence, from Dr. Reed Lawrence and other sources, that the Actel RH1280B was never, in truth, a 300KRad part, and that the QML qualification process for that part was flawed.

radiation hardness during 2007 and 2008 that became a part of the basis of SpaceKey's January 28, 2008 order for BAE's products. These representations became express warranties as a matter of law, and the Court has already ruled that BAE did not disclaim them.

There is equally little dispute that the RH1280Bs that BAE delivered failed to conform to those warranties. BAE attempts to avoid a clear finding of breach by contending that SpaceKey "accepted" the nonconforming goods. This argument misapprehends the options available to a buyer of goods under the UCC.

The UCC recognizes the commercial reality that sometimes even nonconforming goods are better than no goods at all. It expressly allows a buyer to accept goods, knowing that they don't conform, and then to sue for damages. Acceptance eliminates only some of the UCC's remedies – the right to reject, and the right to revoke acceptance. The buyer specifically retains the right to seek and recover damages for the difference in value between the goods as warranted and as delivered, so long as it provides timely notice to the seller.

That is what occurred in this case. SpaceKey and BAE formed a contract in January 2008 for RH1280B FPGAs that conformed to a long list of warranted performance specifications. Well over a year later, BAE first indicated that it would not be able to satisfy at least one of its warranties (the 300 KRad TID). (The Single Event Effect nonconformities were not known until after delivery.) It is true that SpaceKey accepted the parts even after learning this fact, but because it notified BAE that the nonconformities were an issue, and that a price adjustment would eventually be required, it retained its right to seek and recover warranty damages.

SpaceKey's status as a reseller does not affect its rights to warranty damages. Courts have never required resellers to first be liable to their own buyers before pressing warranty claims against their sellers. It is the long-standing rule that such damages are ripe at the moment the warranty is breached. At most, courts have required some showing that the reseller has made similar warranties to its own buyers, or that those buyers view the products as nonconforming, to limit the risk of a windfall.

Here, SpaceKey *did* make warranties to its customers that the RH1280B would conform to the radiation specifications, and those customers have given notice that the delivered parts do not conform. Moreover, there is no risk of a windfall in this case, because SpaceKey intends to distribute any warranty damages it obtains in this case to its customers on a *pro rata* basis, once its expenses and negotiated markup are covered. It could not take this step unilaterally, or in the absence of a ruling on warranty damages. As the law prescribes, the difference in value between the RH1280B that were promised and those that were delivered must be determined in the first instance.

SpaceKey's claim for breach of contract has two components remaining in the wake of the Court's February 1, 2012 Order: a claim for commissions due, and a claim for BAE's repudiation of, and failure to fulfill, a number of contracts that were in progress as of February 8, 2010. The Court should apply the same reasoning employed in its recent Order to reject BAE's defenses to these claims. There is no dispute that BAE amended its Terms of Sale ("TOS") in May 2008 to *remove* the language it relied on its summary judgment briefing, so its decision to cancel SpaceKey's contracts was without excuse.

The Court can also reject BAE's suggestion that paragraph 13 of the TOS bars SpaceKey's claims (an argument it first raised in its recent summary judgment reply). The first clause in that paragraph applies to, and purports to limit, lost profits only to the extent that they comprise consequential damages. But SpaceKey's damages are direct benefit of the bargain damages, losses that naturally and inexorably flow from the very nature of its consultant relationship with BAE. Paragraph 13's second sentence does mention direct damages, but it applies only to delivered goods (the remedy is a refund of payment received by BAE), and SpaceKey's damages won't exceed the purchase price limit the paragraph imposes in any event. More importantly, paragraph 13 cannot apply to eliminate all remedies for non-delivery and repudiation, as doing so would violate RSA 382-A:2-719(2). SpaceKey is entitled to a remedy that protects the benefit of its bargain with BAE.

The Court should deny BAE's account stated claim for the reasons provided in its October 24, 2011 Order –the parties did *not* agree on a price for the RH1280Bs. Instead, Mr. Key told BAE that the nonconformities were a concern, and that the product price would need to be adjusted.

Finally, the Court should deny BAE's claim for attorneys' fees. It is based on paragraph 7 of the TOS, which applies only in cases of a payment default by SpaceKey. This Court ruled in October that a breach of warranty by BAE *would* constitute a legal excuse to nonpayment by SpaceKey. The facts at trial demonstrate that BAE *did* breach its warranty, and accordingly SpaceKey's failure to pay was not a default. BAE is not entitled to fees.

**<u>Argument</u>**

**I.      BAE Made Express Warranties that the RH1280B Would Satisfy a Long List of Radiation Specifications and Parameters.**

When a seller makes "any affirmation of fact or promise . . . which relates to the goods and becomes part of the basis of the bargain," an express warranty arises that the product will conform to the affirmation or promise. RSA § 382-A:2-313.

The same principles apply when a seller makes a "description" of the goods which becomes part of the basis for the bargain, or provides a "sample or model." In both cases, an express warranty arises that the delivered product will comply to the description or sample. *Id.*

"To create an express warranty, the seller is not required to use formal words, such as 'warranty' or 'guarantee' or have the specific intention to create a warranty." *Kelleher v. Marvin Windows*, 152 N.H. 813, 841 (2007). "In order to become part of the basis of the bargain, the buyer must have been aware of the affirmation of fact or promise at some point in the bargaining process." *Id.* at 844.

> The plain language of section 2-313 requires that the affirmation be *part* of the basis of the bargain, and the corresponding official comments make it clear that "no particular reliance on such statements need be shown [by the buyer]." Thus, the buyer need not show that he or she would not have entered into the agreement absent the seller's statements. Nor is the buyer required to show that the seller's statements were a dominant factor inducing the agreement

*Id.* at 843-44 (internal citations omitted) (emphasis in original).

There can be no question that under this authority BAE made express warranties regarding the radiation performance of the RH1280B. From the very outset of its efforts

to reintroduce the RH1280 FPGA in 2007, it repeatedly warranted that the RH1280B would meet a number of critical performance specifications, including TID, SEU, SEL, and SEDR, which the original Actel part had, and which were set out in the SMD and the TLD, and that the RH1280B would be QML certified to the same specifications as its predecessor.

BAE made these representations repeatedly and continuously throughout 2007 and 2008, during the entire period when SpaceKey was marketing the RH1280B – with BAE's express urging and cooperation – to its customers in India and Russia. SpaceKey was more than just "aware" of these representations, the standard described by the *Kelleher* Court. It was suffused with these representations.

These representations therefore became a "part of the basis of the bargain" that SpaceKey reached with BAE (and with its own customers). SpaceKey made its first sale of the RH1280B in late 2007. It then made its own contract with BAE on January 28, 2008, which it supplemented with additional sales to Indian and Russian customers in November and December of 2008.

As the *Kelleher* court explained, once this threshold showing is made, "[t]he burden then shifts to the seller to prove, by clear affirmative proof, that the resulting bargain did not rest *at all* on the seller's statements." *Id.* at 843 (emphasis in original). Given the scope, breadth, and uniformity of the representations BAE made in this case regarding the radiation performance of the RH1280, that is an impossible task, and BAE cannot make such a showing.

Nor does BAE have any basis to argue that these warranties were disclaimed. The Court has already ruled that paragraph 8 of the TOS does not apply to, and therefore

does not preclude, SpaceKey's breach of warranty claims. DN 58 at 28. But there is another reason to reach the same result. RSA 382-A:2-316(1) provides that disclaimers that are inconsistent with an express warranty must be disregarded. *H.G. Fischer X-Ray Co., Inc. v. Meredith,* 121 N.H. 707, 711 (1981) (language disclaiming implied warranties ineffective to disclaim express "warranty that the machine would be capable of producing up to 300 mili-amps at 125 kilovolts"). That is the case here.

## II.   SpaceKey Was Expressly Permitted by Law to Accept the Nonconforming Goods and Seek Recovery for Breach of Warranty.

One of BAE's primary arguments throughout this case has been that SpaceKey can have no complaint because it accepted the RH1280Bs delivered to it despite knowing that they did not meet the 300KRad specification. BAE's position is at serious odds with the law. The UCC expressly allows a buyer like SpaceKey to accept goods, despite a known lack of conformance.[3] RSA 382-A:2-607(2) states:

> Acceptance of goods by the buyer precludes rejection of the goods accepted and **if made with knowledge of a non-conformity** cannot be revoked because of it unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured **but acceptance does not of itself impair any other remedy provided by this Article for non-conformity.**

(Emphasis added.)

To be sure, by accepting the RH1280Bs with knowledge of the nonconformity, SpaceKey relinquished any right to reject the goods or to revoke acceptance for that reason. But the Code expressly reserves the right to sue for warranty damages under RSA 382-A:2-714, so long as notice is provided. *See also* RSA 382-A:2-606 ("acceptance of goods occurs when the buyer . . .after a reasonable opportunity to inspect the goods

---

[3] It is critical to stress that although BAE did communicate the substandard TID specifications prior to delivery, BAE did not disclose the RH1280B's failures to meet warranted single-event specifications until February 2010, after the parts were delivered.

7

signifies to the seller that the goods are conforming or that he will take or retain them *in spite of their non-conformity*"); 4A Anderson U.C.C. §2-714:13 ("The fact that the buyer does not reject the goods or revoke acceptance does not affect the buyer's counterclaim for damages for the breach of warranty when the seller sues for the purchase price. . . The fact that the buyer cannot reject the goods or revoke acceptance does not bar the buyer from suing for damages, when proper notice has been given").

SpaceKey did provide such notice, repeatedly. From the moment that BAE informed SpaceKey that the RH1280Bs would depart from BAE's warranties, SpaceKey communicated to BAE that it would accept the goods "in spite of their non-conformity," but that adjustments to the price would need to be made to account for those nonconformities.

That is precisely how the UCC is intended to work. BAE made its warranties in 2007 and 2008, and they formed the basis for a bargain reached in January 2008. Contrary to BAE's suggestions, SpaceKey did not relinquish its rights to press a warranty claim by accepting the nonconforming goods in late 2009 and early 2010. The UCC expressly allows SpaceKey to seek the warranty damages described in this case.

### III.    BAE Breached its Express Warranties.

BAE has already admitted in its Answer that it breached the warranty that the RH1280B would have the same 300KRad TID as the original and as specified in the SMD. *See* BAE Answer at ¶ 34 (admitting representations that RH1280B would have 300 KRad TID) and ¶ 42 ("BAE Systems admits the RHl280B Flight FPGA did not meet a 300KRad specification"). As judicial admissions, these facts are established as a matter of law. *Schott Motorcycle Supply, Inc. v. American Honda Motor Co.*, 976 F.2d 58, 61

(1st Cir. 1992) (internal citation omitted) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.").

BAE's admissions are more than amply supported and supplemented by the evidence in the record. The RH1280B, as delivered, had TIDs of 50 and 100Krad, not 300KRad. Def. Exs. FF, NN, KK at 63. The RH1280B, as delivered, was tested only to 1X RHACL, not 2X RHACL. Def. Ex. RR. The delivered RH1280Bs are not marked with SMD 5962F9215603QYC, nor will they meet the specifications of that SMD. The RH1280B, as delivered, has never been QML certified. And even if QML certification is eventually attained, it will not be as a Class V part, or as a Class Q part under 5962F9215603QYC, as was warranted. Def. Ex. QQ. Only a 300KRad part can carry the "F" designation.

The delivered RH1280Bs have an SEL of 80 (not 177 as warranted), an SEU1 of 5.7 (not 17 as warranted), an SEU2 of 1.8 (not 4 as warranted), and an SEDR of 21 (not 60 as warranted). Def. Exs. JJ, RR.

SpaceKey emphasizes that these departures from BAE's warranties are drawn from BAE's own documents. The plain and undisputed facts demonstrate that the RH1280B failed to meet the specifications BAE had warranted, and BAE is therefore in breach of its express warranties.

**IV.      SpaceKey Is Entitled to Warranty Damages Under RSA 382-A:2-714(2) Because the Delivered RH1280Bs Did not Have the Value of the RH1280Bs that Were Promised.**

RSA § 382-A:2-714(2) provides that SpaceKey is entitled to "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted."

Before quantifying this difference in value, it is important to stress that SpaceKey's status as a reseller, and the existence of resales in this case, has no effect on the threshold computation of damages under the UCC. BAE has argued that the mere fact of resale operates as bar to any recovery of warranty damages. The Court rejected BAE's position in its October 24, 2011 Order on summary judgment. DN 58 at 32. It should apply the same approach now at trial.

It has long been the rule, before and after adoption of the UCC, that a buyer's resale of nonconforming goods is separate and distinct from warranty damages, and has no effect on their availability.

> The rule of damages for a breach of warranty on the sale of chattels is well settled and familiar. It is the difference between the actual value of the article sold and the value of the same article if it had been such as the vendor warranted it to be. The application of this rule is not changed or modified by the fact that a purchaser of a warranted article has sold it for the same or even a greater price than that which he paid for it.

*Brown v. Bigelow,* 1865 WL 4715, 2 (Mass. 1865) (internal citations omitted). *See also, J. I. Case Plow Works v. Niles & Scott Co.* 63 N.W. 1013, 1017 (Wis. 1895) ("[t]he proper measure of damages" in a breach of warranty claim is "the difference between the actual value of the defective wheels delivered, and their value had they been in accordance with the written warranties," and "[t]he price for which the purchaser had sold the goods cannot be shown, in order to modify the rule above stated, nor is it material whether he had sold them at all"); 4A Anderson UCC §2-714:56 ("The fact that the buyer is a middleman, who purchases for resale or with the intent of making a

10

reshipment to his or her customer, does not alter the rule as to the measure of damages for breach."); 4A Anderson UCC § 2-714:8 ("The fact that the buyer resells the defective goods does not bar the buyer from recovering damages for a breach of warranty.").

It is equally true that "[a] right of action, measured by the difference between the value of the goods as they are and their value as they ought to be, accrues to the vendee at once when the warranty is broken." *Joannes Bros. Co. v. Lamborn* 237 N.Y. 207, 210 (1923).

And there is no requirement "that a vendee who resells at the price at which he buys must pay damages to the subvendee before damages for breach of warranty will be due from the vendor. The law is settled to the contrary, and this though the resale has been effected at a profit." *Id. See also Davis v. Ferguson Seed Farms,* 255 S.W. 655, 663 (Tex.Civ.App. 1923) ("The rule seems to be well settled that when an article has been sold with a warranty, and the vendee resells the same with a like warranty, the first purchaser may recover for a breach of the warranty, although he has resold the goods and has not refunded any sum to his vendee, and no claim against him has been made."); *Superwood Corp. v. Larson-Stang, Inc.*, 311 F.2d 735, 739 (8th Cir. 1963) ("The rule in its broad terms provides that when a warranted article is sold for the purpose of resale, and it is resold with a similar warranty, the first purchaser may recover for breach of the warranty even though he has resold the article, has not refunded any amount of the purchase price, and has had no claim made against him by the subpurchaser").

The Court stated in *dictum* in the October 24, 2011 Order that SpaceKey "needs to be liable to one or more of [its customers] before it can establish damages under its breach-of-warranty claim." DN58 at 32, n. 10. The Court cited no authority for this

proposition, and SpaceKey respectfully suggests that the Court's position is mistaken. The most that courts have required is that a reseller show some prospect of exposure to its customers, not that the exposure be liquidated first.

*DeGidio v. Ace Engineering Co. Inc.,* 302 Minn. 19 (1974) presents a good example. In that case, the plaintiff was an authorized reseller of the defendant's burners and boilers. It sued for warranty damages for a number of burners that failed to conform to the defendant's express performance warranties. As BAE has in this case, the defendant argued that "DeGidio has been fully compensated by its ultimate purchasers, both for the cost of the burners and the cost of installation." *Id.* at 26.

The Minnesota Supreme Court acknowledged the possibility of windfall, but held that "DeGidio is entitled to recover against Ace for breach of warranty and that DeGidio's ultimate disposition of the defective equipment is not relevant to the issues between Ace and DeGidio." *Id.* at 27. The court reasoned that "[a]part from what appears to be the right to recover under the common law and now under the Uniform Commercial Code, if the burners were valueless, *clearly DeGidio had a liability to his vendees to make them whole*." *Id. (emphasis added).* Accordingly, "DeGidio is entitled to damages for breach of warranty without reference to what profit it may have realized from the sale and installation of the burners or what other arrangements it may have made to correct the problems the burners presented due to their faulty design and construction." *Id. See also, Bartow v. Ford Motor Co.*, 342 Ill. App. 3d 480, 491-2 (Ill. App. 2003).

Had DeGidio *not* made warranties of its own to its customers, the Court would likely have reached a different result. But it did not require that DeGidio first liquidate its claims against its own customers before pressing a claim against Ace Engineering.

Fortunately, these issues are only of theoretical interest in this case, because there is no prospect of a windfall to SpaceKey. As Mr. Key will testify, once a damage figure is determined by the Court, it is SpaceKey's intention to refund that sum *pro rata* to its customers, once its own expenses in defending BAE's suit are deducted (and its negotiated profit margin maintained).

It is important to stress that SpaceKey could not realistically make such an adjustment unilaterally, or in the absence of a definitive ruling on warranty damages. It is SpaceKey's position that BAE breached its warranties, and that the delivered RH1280Bs did not have the value that was promised. BAE disagrees, of course, and it is possible that Court may do so as well. In such a case, SpaceKey, having made a unilateral refund to its own customers, would be left with an enormous financial shortfall.

The only practicable approach was for SpaceKey to attempt to resolve the issue with BAE first, and then to make good on its warranty obligations to its customers. SpaceKey tried to negotiate the value reduction with BAE, but those negotiations were unsuccessful. Instead, BAE sued for the full contract price, and SpaceKey has raised the warranty issues as a defense and a counterclaim. It is only once those issues are resolved that the warranty damages can be quantified, and only then that the parties' warranty obligations can be settled.

This dynamic suggests a strong practical reason why warranty damage calculations are made independently of the existence of a resale, and why the fact of resale does not bar such damages. The difference in value must be established first.

And that difference is real and substantial in this case. The critical feature of the RH1280 (and of the promised RH1280B) is its ability to withstand radiation while

operating in space. The "total ionizing dose" or TID represents the threshold of cumulative radiation a part can withstand while retaining reliable functionality. For any given orbit, there is a predicted rate of radiation exposure to which a part will be subjected. The effects of this exposure on the functionality of a part are steady and cumulative, and when a rated TID threshold is exceeded, failure can be expected. This failure of an FPGA in a spacecraft jeopardizes the entire mission.

Because of the cumulative nature of exposure, the TID thus allows for apples-to-apples comparisons between parts. A 300KRad part will, in any given orbit and assuming an otherwise identical implementation, last three times as long as a 100KRad part, and six times as long as a 50Krad part. Quite simply, it has a greater capacity to withstand and absorb radiation. The TID is the performance specification that allows these comparisons and judgments to be made.

Under the same assumptions, a 300KRad part tested to 2x RHACL (meaning that it can withstand 600 KRads) would last six times longer than a 100KRad part and twelve times longer than a 50KRad part tested to 1X RHACL.

These differences in radiation hardened performance are reflected in market pricing. BAE's own "engineering" RH1280B, for example, has a price of $1500. It is fabricated in precisely the same way as the flight part, in the same foundry, using the same materials. But it is not tested as the flight part is, and carries no guarantee of radiation performance. Radiation-hardened flight parts, which are tested, and do have such guarantees, are priced much higher. BAE's price for the 300KRad RH1280B was $11,500 – just shy of 10 times the price of the engineering part (the $9,000 price charged to SpaceKey reflected a volume discount).

The same relationship obtains between 4M SRAM memory units. Otherwise identical memory varies in price from $80 for a commercial, non-QML part with 10-50KRad TID, to $140 for an industrial, non-QML part with a 40-100KRad TID. Prices for QML certified versions vary from $500 for a 50-100KRad part to $1,130 for a 100-200KRad part and $3,918 for a 200-300 KRad unit. The main difference is the ability of the higher-priced parts to withstand the harmful radiation effects of space.

In this case, the unit prices for the RH1280B were $8,500 (50KRad) and $9,000 (100KRad). These prices were negotiated on the basis of the warranties. Accordingly, they represent the value the RH1280Bs would have had if they had been conforming.

But the 50KRad units, as delivered, had a TID that was 1/12 of the warranted product (given that the RH1280B was promised to be tested as 2X RHACL). Accordingly, its true value was $780 – 1/12 of the price negotiated for a compliant product. Similarly the monetary value of the 100KRad units was $1500 – 1/6 of the price negotiated for a product in conformance with BAE's warranties.

This valuation is underscored by the failures of the delivered RH1280Bs (both the 50 and 100Krad versions) to meet the SEE specifications that BAE had warranted. Although the same type of direct relationship does not exist between SEE performance and survivability in space, the delivered parts are more susceptible to upset, latch-up and dialectric rupture than the warranty promised. This further supports a reduction in value.

Applied to the overall transaction, SpaceKey's warranty damages are $2,984,500. This figure represents several components. First, SpaceKey purchased 100 of the 50KRad parts for $850,000. The value of that purchase was $78,000 (100 x $780). SpaceKey's damages for the 50KRad parts are therefore $772,000 ($850,000 -$78,000).

15

SpaceKey purchased 535 of the 100KRad parts, for which the contract specified a total price of 4,815,000. The actual value of those parts, as delivered, was $802,500 (435 x $1,500). The difference from the contract price is $4,012,500 ($4,815,000 - $802,500). SpaceKey has withheld $1,800,000 of the contract price, so its net damages for the 100KRad parts is $2,212,500. Accounting for the payments already withheld, therefore, SpaceKey's total warranty damages under RSA 382-A:714(2) is $2,984,500 ($2,212,500 + $772,000).

As discussed above, should the Court find and award these damages, SpaceKey will reimburse its own clients *pro rata*. On these assumptions, a total of $4,012,500 would be available. SpaceKey would first deduct its own expenses incurred in this litigation. It will then set aside a figure representing the markup on its own agreements with its customers, and then divide the remaining funds between its own customers on a *pro rata* basis.

The net result of this process will be two fold. First, BAE's plain and undisputed breaches of warranty will be appropriately established and quantified. BAE did breach its warranties in this case, and there are, and must be, real consequences to that failure. Second, SpaceKey will be in the same position it would have been in had BAE performed under its warranties, thus satisfying the goals of RSA 382-A:1-305, and avoiding any concerns about a windfall.

## V.     BAE's Claim for Account Stated Fails for the Same Reasons the Court Identified in its October Order.

An account stated requires "assent, express or implied, to the correctness of the balance struck." *White v. Schrafft*, 94 N.H. 467, 479 (1947) (quoting *Connolly v. Manchester Sav. Bank*, 92 N.H. 89, 91 (1942)). Back in October, the Court denied BAE's

motion for summary judgment because there was no evidence that the parties had assented to the proper price for the RH1280Bs. To the contrary, "SpaceKey ha[d] produced evidence that Will Key informed BAE that SpaceKey believed that FPGAs with TIDs of 50K and 100K rads(Si) were non-conforming and that SpaceKey 'did not intend on making full payment unless and until appropriate product price adjustments were negotiated.'" DN 58 at 43.

These findings are equally true now. Mr. Key timely communicated to BAE his dissatisfaction with the radiation parameters of the RH1280B FPGAs, as well as his intent to negotiate a reduced price with BAE. Accordingly, BAE's account stated claim fails.

**VI.     BAE's Breach of Warranty is a Defense to BAE's Claim for Payment Under the Contract.**

The Court ruled in its October 24, 2011 Order that a breach of warranty by BAE would be a valid legal excuse for nonpayment by SpaceKey. DN 58 at 42. At the time, the possibility of such a breach was a reason to deny BAE's motion for summary judgment. *Id.* BAE's breach of warranty has now moved from possibility to reality. With the merits of that claim resolved, BAE's breach stands as a valid legal excuse for nonpayment by SpaceKey.

**VII.    BAE Is not Entitled to Attorneys' Fees.**

BAE has asserted a right for attorneys' fees pursuant to paragraph 7 of the TOS. The Court should reject this claim, because by its plain terms, paragraph 7 applies only to contractual default by SpaceKey. But because BAE breached its express warranties to SpaceKey, SpaceKey is not in default.

**VIII.   BAE Breached the Consultant Agreement by Failing to Pay Commissions and to Fulfill Orders in Place Prior to February 18, 2010.**

In addition to its breach of warranty claim, SpaceKey also has two breach of contract claims arising out of the parties' Consultant Agreement. The Court's February 1, 2012 Order has clarified the scope of these claims as well as BAE's defenses. It rejected BAE's argument that SpaceKey lost its rights to commission payments because of failure to pay Virginia State franchise tax. The Consultant Agreement requires BAE to pay a 5% commission to SpaceKey on its sales. As Mr. Key will testify, BAE has failed to pay commissions in the amount of $359,835. BAE can offer no excuse for this nonpayment, and SpaceKey is entitled to that amount in damages.

The Court's recent order also decided that the Consultant Agreement terminated as of February 8, 2010, rendering invalid orders placed by SpaceKey after that date. But the Court rejected BAE's arguments that it had been entitled to cancel SpaceKey's existing, pre-termination contracts. As appropriate for a summary judgment proceeding, the Court identified a factual dispute as to whether BAE's May 2008 TOS were applicable to SpaceKey's orders. Trial will reveal that there is no dispute on this issue. BAE exercised its contractual right to amend the TOS in May 2008, and in doing so it removed all of the language on which its arguments relied. Accordingly, the Court can and should apply the same analysis from its February 1, 2012 Order to reject BAE's arguments on the merits, and to conclude that BAE is liable to SpaceKey for cancelling and failing to fulfill its open contracts.

SpaceKey had five orders in progress as of February 8, 2010 that BAE was obligated to fulfill under the Consultant Agreement: SKC61808, SKC12010, SKC11310, SKC12710, and SKC2210. SpaceKey had already negotiated its own sale of the products

covered by SKC61808, and the difference between its contract price with BAE and the

market price negotiated its customer, minus the expenses avoided, is $203,092. SpaceKey

is entitled to damages in that amount, as it represents the benefit of the bargain under the

Consultant Agreement with BAE.

Under the same calculations, SpaceKey is entitled to $148,330 for SKC12010,

$23,395 for SKC11310, $6,668 for SKC12710, and $11,796 for SKC2210.

BAE has made one additional argument that the Court did not resolve in its recent

Order. BAE contends that SpaceKey's claims for breach of the Consultant Agreement are

barred by paragraph 13 of the TOS. That paragraph states (in all versions):

> 13. **Limitation of Liability:** BAE SYSTEMS shall not be liable to Buyer
> for consequential (to include lost profits and business interruption),
> incidental, special, punitive/exemplary damages alleged to arise from, or
> relate to the Deliverables and/or this Order however or whenever caused.
> BAE SYSTEMS' cumulative liability (if any) to Buyer for all claims of
> direct damage of any kind resulting from BAE SYSTEMS' performance
> or breach of this Order or from the Deliverables furnished hereunder shall
> not exceed, to the extent collected by BAE SYSTEMS, the equivalent of a
> refund of the Price of the Deliverable(s) which is(are) the subject of a
> claim.

BAE is wrong to rely on this paragraph for several reasons. First, its first sentence applies

by its terms only to lost profits that are *consequential* damages. But SpaceKey's contract

damages are direct, not consequential, damages. Accordingly, the first portion of

paragraph 13 simply doesn't apply.

The Tenth Circuit addressed a highly analogous set of circumstances in *Penncro

Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1155-56 (10th Cir 2007). In that

case, Sprint also relied on "Section 13" of its agreement with Penncro, which "forbids the

recovery of 'consequential damages,' specifying that they 'include, but are not limited to,

lost profits, lost revenues and lost business opportunities.' In Sprint's parlance, this means

that *any* lost profits are (forbidden) consequential damages." *Id.* (emphasis in original). This is the same position BAE advances in this case.

The Tenth Circuit rejected Sprint's argument for two reasons. First, the "lost profits" language was expressly limited to lost profits that were *consequential* damages. "The more general term informs the subsequently listed examples, not the other way around, and so lost profits here refer only to those that are 'a part or component' of the larger group or class of consequential damages." *Id.* at 1156.

Second, Sprint wrongly assumed that lost profits are necessarily and unvaryingly consequential. The court stated that "[d]irect damages refer to those which the party lost from the contract itself—in other words, the benefit of the bargain—while consequential damages refer to economic harm beyond the immediate scope of the contract. Lost profits, under appropriate circumstances, can be recoverable as a component of either (and both) direct and consequential damages." *Id.*

> Thus, for example, if a services contract is breached and the plaintiff anticipated a profit under the contract, those profits would be recoverable as a component of direct, benefit of the bargain damages. If that same breach had the knock-on effect of causing the plaintiff to close its doors, precluding it from performing other work for which it had contracted and from which it expected to make a profit, those lost profits might be recovered as "consequential" to the breach.

*Id.* at 1156.

In *Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 109 (2d. Cir. 2007), the Second Circuit provided a similar explanation:

> Lost profits are consequential damages when, as a result of the breach, the non-breaching party suffers loss of profits on collateral business arrangements. In the typical case, the ability of the non-breaching party to operate his business, and thereby generate profits on collateral transactions, is contingent on the performance of the primary contract. When the breaching party does not perform, the non-breaching party's

> business is in some way hindered, and the profits from potential collateral exchanges are "lost."

*See also, Atlantic City Assoc., LLC v. Carter & Burgess Consultants, Inc.*, 2011 WL 1683099, *3-4 (3rd Cir. 2011); *Viastar Energy, LLC v. Motorola, Inc.*, 2006 WL 75864, *4-5(S.D. Ind. 2006).

SpaceKey's contract damages are direct, not consequential, under this rubric. SpaceKey is not claiming that BAE's failure to fulfill the five agreements had any "knock-on" or collateral effects on SpaceKey's abilities to do business or to earn profits on other deals or in other arenas. It is claiming the direct benefit of the bargain inherent in every one of its contracts for international sale with BAE.

The Tenth Circuit concluded its analysis in *Penncro* by stating:

> All of this is by way of saying that, under the circumstances we face here, a reading of Section 13 informed by the normal legal meaning of its terms suggests that it bars only the recovery of consequential lost profits, not direct lost profits. Section 13 says that no consequential damages are recoverable, "includ[ing]" lost profits; it simply does not speak to direct damages, or to lost profits recoverable under such a theory.

The Court should adopt the same reasoning here, and rule that the first clause of paragraph 13 has no application to this case.

Moreover, BAE cancelled its sales to SpaceKey, without justification, and did not deliver the products. This is a repudiation or non-delivery in the parlance of the Code. NH RSA 382-A:2-713 provides, in relevant part, that "the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages."

That is another way to characterize what occurred here. For the products at issue, SpaceKey had already negotiated market price contracts with its own customers. Its damages represent the difference between these two prices.

The Court should also rule that the second clause of paragraph 13 is inapplicable. First, this provision applies by its terms only to delivered goods; that is why the remedy is limited to a refund of funds accepted by BAE. SpaceKey's claim, by contrast, is that BAE did not deliver the goods in the first instance. No payment obligations arose under the parties' agreement until after delivery was made. In any event, SpaceKey's damages do not even approach, must less exceed, the contract prices.

Second, even if paragraph 13 could be read as applying to non-delivery and repudiation, doing so would violate RSA 382-A:2-719(2), because it would leave SpaceKey without a remedy. As Comment 1 explains, this subsection applies to "an apparently fair and reasonable clause," which "because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain." Paragraph 13 cannot be read as allowing BAE to avoid any repercussions for cancelling accepted orders.

## Conclusion

For the foregoing reasons, SpaceKey respectfully requests that the Court grant judgment in its favor on Counts One, Two and Four of its Counterclaims, and against BAE on its remaining claims.

Respectfully submitted,

Space Key Components, Inc.

By its Attorneys,

ORR & RENO, P.A.
One Eagle Square
P.O. Box 3550
Concord, NH  03302-3550
603-224-2381


Date:   February 21, 2012              /s/ Jeffrey C. Spear_____
                                       Martha Van Oot (NHB #963)
                                       mvanoot@orr-reno.com
                                       Jeffrey C. Spear (NHB #14938)
                                       jspear@orr-reno.com


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 21st day of February 2012, a copy of this memorandum has been sent via the Court's ECF system to counsel for BAE Systems.


/s/ Jeffrey C. Spear_____