UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

BAE SYSTEMS INFORMATION AND
ELECTRONICS SYSTEMS INTEGRATION
INC.

                Plaintiff,

v.

SPACEKEY COMPONENTS, INC.

                Defendant.

Civil Action No.  10-CV-370-LM

**PLAINTIFF'S TRIAL MEMORANDUM**

Plaintiff BAE Systems Information and Electronics Systems Integration Inc. ("BAE Systems"), by and through its attorneys, Devine Millimet & Branch, Professional Association, respectfully submits the following trial memorandum pursuant to L.R. 16.2(b)(2).

**I.      INTRODUCTION**

The Court entered orders in this action in October 2011 and February 2012 that addressed the merits of summary judgment motions filed by BAE Systems on various of the claims in this action.  As a result of those orders, the issues to be resolved at trial have been narrowed to three.

The first issue is a determination of the parties' rights and obligations under purchase order SKC12508.  BAE Systems seeks damages for breach of contract (Count IV) and account stated (Count III) to recover a balance of $1,802,500 under SKC12508 left unpaid by SpaceKey for 200 flight RH1280B FPGAs and a test report BAE Systems delivered.  SpaceKey asserts counterclaims for breach of warranty (Count Four) and misrepresentation (Count Three) and alleges that the RH1280B FPGAs delivered pursuant to SKC12508 failed to meet promised

1

specifications.  BAE Systems is entitled to judgment on its claims and SpaceKey's counterclaims concerning SKC12508.

SpaceKey cannot pursue a breach of warranty claim because it expressly agreed under BAE Systems' then-effective Terms of Sale that its warranty remedy was limited to the return of the goods for replacement or a credit of the purchase price, at BAE Systems' sole option.  SpaceKey never availed itself of this remedy and instead resold all of the flight RH1280B FPGAs for a profit in excess of $1 million dollars.  Even were it permitted to pursue a breach of warranty claim under the New Hampshire Uniform Commercial Code, however, SpaceKey accepted the goods as a matter of law because it knew of the alleged non-conformance in specifications before it accepted delivery.  SpaceKey is also unable to adduce any competent evidence that the RH1280B FPGAs BAE Systems delivered failed to meet warranted specifications or that the value of the FPGAs as delivered departs from the value of the parts as warranted.  SpaceKey's misrepresentation counterclaim likewise fails because not only has SpaceKey waived recovery of any of the misrepresentation damages alleged in its counterclaim complaint, it cannot demonstrate that BAE Systems made any material misstatements of fact or that SpaceKey justifiably relied on any of the alleged misstatements.  Again, this is because BAE System fully disclosed the specifications of the RH1280B FPGAs prior to delivering them to SpaceKey.

As for BAE Systems' affirmative claims for payment, there is no dispute that BAE Systems delivered the goods identified in SKC12508 along with invoices reflecting the agreed purchase price and that BAE Systems fulfilled all of its obligations under SKC12508 to trigger SpaceKey's payment obligation.  Accordingly, BAE Systems is entitled to judgment on its breach of contract and account stated claims in the amount of $1,802,500, plus all costs of

2

collection including attorneys' fees, as well as to judgment in its favor on SpaceKey's breach of warranty and misrepresentation counterclaims.

The second issue is the resolution of BAE Systems' claim for declaratory judgment concerning the status of three purchase orders that SpaceKey submitted before the parties' Consultant Agreement was terminated on February 8, 2010, and that BAE Systems has refused to fill.  BAE Systems is entitled to a declaratory judgment that it properly exercised its rights under the governing Terms of Sale to terminate the purchase orders after it suspended delivery of the goods and SpaceKey failed to submit prepayment for the orders as required.  Moreover, to the extent SpaceKey is permitted to present evidence of "lost profit" damages for having been refused delivery of the goods – a claim SpaceKey failed to assert in any counterclaim – the Terms of Sale to which the parties agreed expressly preclude direct damages.

The third and final issue is resolution of the parties' competing claims concerning whether commissions are due SpaceKey under the terminated Consultant Agreement.  BAE Systems is entitled to a declaratory judgment that it owes no commission to SpaceKey under SKC12508 because, pursuant to the terms of the Consultant Agreement, BAE Systems is permitted to offset the commission obligation by the costs and attorneys' fees it has incurred in this action to collect the balance of more than $1.8 million dollars owed by SpaceKey (and to defend against SpaceKey's meritless counterclaims).  Those costs and attorneys' fees already exceed the amount of commission claimed by SpaceKey under SKC12508.  As for other commissions claimed due by SpaceKey in Count Two, SpaceKey has failed to adduce evidence that BAE Systems owes such commissions.  In fact, the only competent evidence that bears on the issue is a copy of the check SpaceKey deposited from BAE Systems for more than $67,000 that satisfied many of the commission payments SpaceKey now claims are due.

3

For these reasons, as discussed in more detail below, SpaceKey is entitled to judgment on its claims at Counts I through IV of the Amended Complaint.  BAE Systems is also entitled to judgment on SpaceKey's counterclaims at Counts Two, Three and Four.[1]

## II.    STATEMENT OF FACTS

### A.  The Domestic Business Development Consultant Agreement

BAE Systems and SpaceKey entered into an agreement entitled "Domestic Business Development Consultant Agreement" ("Agreement").  The Agreement was first dated December 21, 2006, but was made effective July 8, 2004.  (Plf. Ex. 1.)

Pursuant to the Agreement, SpaceKey agreed to advise and assist BAE Systems in identifying suitable, financially qualified buyers of BAE Systems' products in the States of Connecticut and Maryland and in the Commonwealth of Virginia.  In exchange, BAE Systems agreed to pay SpaceKey a fee equal to five per cent (5%) of the Net Sales Prices of Products sold to buyers in the Territory identified by SpaceKey.

BAE Systems retained sole discretion under the Agreement to accept the purchase orders submitted by the buyers identified by SpaceKey and SpaceKey's fee only became due once BAE Systems accepted the purchase orders and received payment from the buyers.  (Id. ¶ 4A.) To the extent BAE Systems was required to pursue collection of an outstanding balance from a buyer, the cost of that effort would be deducted from the commissions paid to SpaceKey.  (*Id*.)

In performing the Agreement, SpaceKey delivered purchase orders to BAE Systems in which it identified itself as the "financially qualified buyer" for BAE Systems products. SpaceKey would take delivery of the products from BAE Systems pursuant to BAE Systems' then-effective Terms of Sale and resell the products to end users at a mark-up.  In addition to the

---

[1] BAE Systems also seeks to revisit its earlier efforts to pierce the corporate veil, a theory this Court allowed to remain contingent, based upon SpaceKey's "loan" of nearly $5 million to its sole member, William Key.  That effort is part of a separate pre-trial motion.

profit it realized by acting as a distributor of BAE Systems' products, SpaceKey also charged its fee of 5% of the Net Sales Price of each contract as stipulated in the Agreement.  In this way SpaceKey played two roles in the transaction with BAE Systems: one as BAE Systems' consultant and one as a buyer of BAE Systems' goods.

**B. The RH1280B Field Programmable Gate Array And Purchase Order SKC12508**

Field programmable gate arrays ("FPGAs") are semiconductor integrated circuits that perform certain user-specified logic functions.  Some FPGAs are designed and manufactured to withstand the rigors of space travel, including the increased radiation exposure that occurs beyond the near-earth atmosphere, so that they may be used in satellites and other space equipment.  At one time BAE Systems manufactured two FPGA models under agreement for Actel Corporation ("Actel"), which Actel marketed and sold as the RH1280 and the RH1020. Actel ceased production of the RH1280 and RH1020 and stopped offering them for sale in 2006.

Actel's decision to stop offering the RH1280 and RH1020 left an unfilled demand in the market.  This was because a number of satellite programs, such as those operated by the governments of Russia and India, continued to use legacy satellite designs that incorporated the RH1280 and RH1020 FPGAs.  In order to meet demand, BAE Systems licensed from Actel the right to manufacture and sell its own version of the RH1280 and RH1020 FPGAs.

On July 9, 2007, BAE Systems announced that it would begin manufacturing new FPGAs to replace the Actel RH1280 and RH1020.  BAE Systems designated its new FPGAs as the RH1280<u>B</u> and RH1020<u>B</u>.  BAE Systems added the "B" to indicate that its FPGAs were distinct from those sold by Actel Corporation.  BAE Systems also announced its expectation that the RH1280B would be offered, "as before, in the same 172-pin ceramic quad flat pack or in die form," that the RH1280B would offer "a total dose radiation-hardness in excess of 300K

rads(Si)," and that it would have "the same Standard Microcircuit Drawing Number to Qualified Manufacturers List Q and V levels as the original" RH1280.  (Plf. Ex. 2.)

On July 31, 2007, BAE Systems furnished to SpaceKey a top level drawing ("TLD") for the RH1280B identified as Revision G and dated July 30, 2007.  (Plf. Ex. 3.)  Each page of the document bore the watermark "DRAFT".  While the document identified radiation performance specifications for the RH1280B, including total ionizing dose ("TID"), single event upset ("SEU"), single event latchup ("SEL") and single event dielectric rupture ("SEDR"), BAE Systems notified SpaceKey at the time it furnished the TLD that module characterization for the RH1280B was not complete, meaning data for radiation performance was not final.  (*Id.*)  SpaceKey was therefore made aware that the radiation performance specifications identified in the TLD were not established and that, at best, the TLD represented BAE Systems expectation of radiation performance for the RH1280B.

BAE Systems prepared another TLD Rev. G dated August 1, 2007 that was virtually identical to the DRAFT TLD Rev. G dated July 30, 2007.  The August 1, 2007 version, however, did not have the "DRAFT" watermark on each page.  BAE Systems did not formally release this TLD or make it available for public consumption.  SpaceKey apparently obtained a copy of the August 1, 2007 Rev. G TLD, though it does not know when it obtained the document or from whom.

In September 2007, BAE Systems furnished to SpaceKey a presentation that described the status of production for the RH1280B.  (Plf. Ex. 5.)  The presentation noted that the "goal" of the characterization plan was to ensure the re-generated RH1280B "matches the performance and radiation features of the original product."  The strategy to accomplish this goal was for characterization to "be performed at both wafer level and package module level" and "across

6

specified temperature and voltage range." The presentation also identified "initial design characterization" for the RH1280B to be completed in late September 2007.

In October, BAE Systems furnished to SpaceKey a second presentation that described the status of production for the RH1280B. (Plf. Ex. 6.) While the contents of the October presentation largely mirrored that of the September presentation, it included a "status overview" that described a second wafer lot that had been delivered to test for characterization. The presentation noted that the second lot "demonstrated high tri-state leakage" and that the issue was under investigation. High tri-state leakage directly concerns – and impacts – TID performance.

On January 25, 2008, SpaceKey submitted purchase order SKC12508. (Plf. Exs. 7, 8, 9.) The purchase order contemplated the purchase of 165 engineering versions of the RH1280B to be delivered July 15, 2008 and 300 flight versions of the RH1280B to be delivered November 15, 2008.[2] Among other terms, the purchase order expressly identified BAE Systems' Terms of Sale as applying to the transaction.

The BAE Systems Terms of Sale in place at the time SpaceKey submitted SKC12508 was a version dated August 2007. (Plf. Ex. 4.) The Terms of Sale required buyers, among other things, to pay for goods delivered by BAE Systems the earlier of net thirty (30) days from the date of BAE Systems' invoices or upon delivery of the goods and that "[p]ayments are unconditional and shall be made as specified in the Order without recourse, setoff or discount." (*Id*. ¶ 6.) In the event of a failure to make timely payment, the Terms of Sale entitled BAE Systems to (i) defer shipment of goods under the contract or any other contract with the buyer, (ii) require payment before delivery of the goods, and/or (iii) terminate the order. (*Id*. ¶ 7.) In

---

[2]  Engineering FPGAs allow end users to integrate, verify, and electrically qualify the FPGA for the particular use intended.  The engineering FPGAs do not necessarily withstand radiation effects or meet other performance standards as they are not intended for actual use in a deployed system.

addition, the Terms of Sale established that the buyer was liable for all damages and losses to

BAE Systems resulting from the buyer's payment default, including loss of reasonable profits,

and for costs and expenses, including attorneys' fees sustained by BAE Systems.  (*Id*.)

Paragraph 8 of the Terms of Sale set forth the scope of BAE Systems' warranty.  The

warranty provided in part:

> (b)     Specifications:  BAE Systems warrants that the hardware Deliverables
> will substantially conform to BAE SYSTEMS published descriptions or those
> specification specifically agreed to in the Order, but Buyer's sole remedy under
> this warranty shall be limited to the return within 60 days of delivery of any
> nonconforming Deliverable for credit, repair or replacement, at BAE SYSTEMS'
> sole option.
>
> ******
>
> (f)     EXCLUSION/LIMITATIONS:  THE FOREGOING CONSTITUTES
> BAE SYSTEMS' ENTIRE WARRANTY AND BUYER'S SOLE REMEDY
> WITH RESPECT TO ANY DEFECT OR NONCONFORMANCE IN
> DELIVERABLES PROVIDED BY BAE SYSTEMS.  THESE WARRANTIES
> AND REMEDIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER
> WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING THE IMPLIED
> WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR
> PURPOSE, NON-INFRINGEMENT OR THOSE ARISING FROM COUSE OF
> DEALING OR USAGE IN TRADE.

(*Id*. ¶¶ 8(b), 8(f)).

Paragraph 13 of the Terms of Sale set forth a limitation of BAE Systems' liability, as

follows:

> Limitation of Liability:  BAE SYSTEMS shall not be liable to Buyer for
> consequential (to include lost profits and business interruption), incidental,
> special, punitive/exemplary damages alleged to arise from, or relate to
> Deliverables and/or this Order however or whenever caused.  BAE SYSTEMS'
> cumulative liability (if any) to Buyer for all claims of direct damage of any kind
> resulting from BAE SYSTEMS' performance or breach of this Order or from the
> Deliverables furnished hereunder shall not exceed, to the extent collected by BAE
> Systems, the equivalent of a refund of the Price of the Deliverable(s) which is
> (are) the subject of a claim.

(*Id*. ¶ 13.)

8

Finally, the Terms of Sale included an integration clause, as follows:

This Terms of Sale document, together with the Proposal and Special Conditions, constitute the final, complete, and exclusive statement of all the terms of agreement between BAE Systems and Buyer.  No prior oral or written agreement shall be a part of, or serve to modify, this Order.  Exceptions, confirmations, purchase orders, correspondence, or invoices by Buyer which state additional or different terms shall not alter this Order in any way.  Any such differing or additional terms shall be deemed material alterations within the meaning of the Uniform Commercial Code and notice of objection to any such differing or additional terms is hereby given.  This Order can only be modified by a written instrument referencing this Order, denoted as an "Amendment", and executed by the parties after the effective date hereof.

(*Id*. ¶ 18.)

Beginning in February 2008, BAE Systems hosted program review meetings with certain end-users who intended to purchase the RH1280B.  The purpose of the meetings was to provide a status update on the RH1280B development as well as to discuss certain issues BAE Systems was encountering in re-manufacturing the legacy RH1280 design using new fabrication equipment and techniques.  One such issue concerned BAE Systems' difficulty in achieving a TID rating of 300 KRAD using present test methods.  BAE Systems prepared detailed presentations for these meetings, which reflect the issues discussed.  The status meetings occurred throughout 2008 and into 2009.  (Plf. Exs. 84-86, 88, 89.)

By letter dated July 8, 2008, BAE Systems notified SpaceKey that delivery of the 300 flight RH1280B would be delayed from November 15, 2008 to March 31, 2009 and that SpaceKey would need to submit a revised purchase order in light of the new delivery date.   (Pfl. Ex. 10.)

On July 14, 2008, BAE Systems formally published TLD Rev. G, which disclosed specifications for an engineering version of the RH1280B (part number 197A806-23).  (Plf. Ex. 13.)  TLD Rev. G did not identify specifications for a flight version of the RH1280B were

identified in the document; the product remained under development.  This final, published version of TLD Rev. G was furnished to SpaceKey.

On July 21, 2008, BAE Systems shipped 165 engineering versions of the RH1280B to SpaceKey, as specified on Item 1 of purchase order SKC12508, for which SpaceKey paid BAE Systems.

On July 24, 2008, SpaceKey responded to BAE Systems' letter of July 8, 2008 by submitting a revised purchase order, designated SKC12508(A).  (Plf. Ex. 15.)  The revised purchase order reflected the new delivery date of March 31, 2009 for the flight versions of the RH1280B.

On August 4, SpaceKey shipped 150 of the engineering versions of the RH1280B to the Indian Space Research Organization ("ISRO"), which is an arm of the Indian government's space program.  In exchange, ISRO paid SpaceKey $375,000.  (Plf. Ex. 16.)

On November 25, 2008, SpaceKey submitted a further revised purchase order for the RH1280B, which SpaceKey designated SKC12508(B). (Plf. Exs. 17, 18.)  SpaceKey revised the purchase order to reflect an additional order of 200 flight RH1280Bs that SpaceKey had received from Actel.Ru, which was a contractor for the Russian Federation space program.

Meanwhile, BAE Systems continued to try to achieve a TID rating of 300 KRAD for the RH1280B, again, under present day testing methods.  During this time, BAE Systems made a series of refinements to its manufacturing process, including manufacturing equipment used to fabricate the legacy RH1280 among other things and through other refinements to the manufacturing process.  In December 2008, however, BAE Systems reached a final determination that it would be unable to achieve that TID rating.  SpaceKey was notified of this

development and, thereafter, SpaceKey traveled abroad for the specific purpose of informing the Indian government of the revised TID specification.

BAE Systems notified SpaceKey in January 2009 that it had manufactured a lot of the RH1280B that achieved a TID rating of 50 KRAD.  BAE Systems asked SpaceKey whether it was willing to accept the part at that TID specification – SpaceKey responded that it would need to inquire with its customers, ISRO, SAC and Actel.Ru.

By letter dated May 1, 2012, SpaceKey notified ISRO that "current production [of the RH1280B] meets all specification requirements with the exception of Total Dose ≥ 50KRADs." SpaceKey requested of ISRO that "[i]f FPGA Total Dose (≥ 50 KRAD) for a portion or all of FPGA Flight Units meets ISRO requirements; please notify [SpaceKey] accordingly, so that production allocation can be scheduled."  (Plf. Ex. 21.)

According to SpaceKey, ISRO declined to accept the 50 KRAD parts but indicated it would accept parts with a TID of 100 KRAD.  Actel.Ru, on the other hand, indicated it was willing to accept 100 of the 50 KRAD parts, but that it would require the second 100 parts have a TID of 100 KRAD.  (Plf. Ex. 19; *see also* Def. Summary Judgment admissions.)

The modifications to TID specifications by ISRO and Actel.Ru were memorialized in a revised purchase order SpaceKey submitted to BAE Systems on May 28, 2009, which SpaceKey designated as SKC12508(C).  (Plf. Ex. 22.)  Consistent with ISRO's requirements, Item 2 of the purchase order indicated the purchase of 435 flight RH1280Bs with "TID ≥ 100 KRAD".  The purchases intended for Actel.Ru were reflected in Items 3 and 4.  Item 3 identified two deliveries of 50 KRAD parts.  The first delivery would consist of 50 parts to be delivered in June 2009 and the second delivery would consist of another 50 parts to be delivered in August 2009.  Item 4 identified the second 100 flight RH1280B FPGAs would be delivered by February 2010 and

would have a TID of 100 KRAD.  Finally, the purchase order specified that the parts were to be delivered prior to delivery of the QCI report.[3]

On June 9, 2009, SpaceKey and BAE Systems agreed to one final revision to the purchase order, which was designated SKC12508(D).  (Plf. Ex. 23.)  This version of the purchase order corrected the total balance due by SpaceKey to be $5,917,500 and amended the part number designations to correctly identify the parts that would have a TID of 50 KRAD (197A806-24) and those that would have a TID of 100 KRAD (197A806-34).

On June 15, 2009, BAE Systems published Revision H to the TLD for the RH1280B, a copy of which was furnished to SpaceKey.  (Plf. Ex. 24.)  This revision to the TLD identified in Table IB that the RH1280B with TID of 50 KRAD was designated as part number 197A806-24. All reference to performance for SEL, SEU1, SEU2, and SEDR for the RH1280B was identified as "TBD".  Further, footnote 2 to Table IB read as follows:

> Device electrical characteristics are guaranteed (*The -2X devices are specified at 1X RHACL only, with no margin*) for post-irradiation levels at +25° C and nominal voltage for dose-rate environments ≤ 0.1 rad (Si)/s.  Irradiation performed in according [sic] to MIL-STD-883, Test Method 1019, Condition B at 27 rad(Si)/s.

(Emphasis added.)  TLD Rev. H also identified part number 197A806-24 as "Pre-QML qualified flight."

In turn, SpaceKey prepared a Certificate of Conformance for Radiation Effects, TID, addressed to "Customer:  Actel, ru" and dated June 23, 2009.  (Plf. Ex. 26.)  The certificate described the TID characteristics of the RH1280B and stated in part:

> This is to certify the Total Ionizing Dose (si) performance of the above components in compliance with the BAE SYSTEMS Top Level Drawing (TLD), 197A806-H7-14-2008.  This certification is based upon the parts being

---

[3]  A QCI report is a Quality Conformance Inspection report, which is a compilation of documents and test reports that demonstrate a part has met predetermined specifications, including radiation specifications.

manufactured IAW the approved QML process and tested according to MIL PRF 38535 and Mil-883B.

- All FPGA samples representing all wafers of the first production lot passed > 50 KRADs.

- Measurements were taken at dose steps 10, 30, and 50 KRAD respectively, Dose rate was ~ 27 rd/s.

On June 25, 2009, BAE Systems delivered to SpaceKey the first 50 flight RH1280B FPGAs with TID of 50 KRAD (part no. 197A806-24), which satisfied Item 3(a) of SKC12508(D) and for which SpaceKey paid BAE Systems. (Plf. Ex. 25.)  SpaceKey shipped the parts to Actel.Ru and received payment of at least $50,000 in exchange.

On August 11, 2009, BAE Systems furnished to SpaceKey a departmental report 2009-DBJ-057 dated July 28, 2009.  (Plf. Ex. 27.)  The report was prepared by Reed Lawrence, Ph.D., and titled "Total Ionizing Dose (TID) on RH1280B lot 2080581".  The report detailed the TID performance of the RH1280B with a TID rating of 50 KRAD.

On August 19, 2009, BAE Systems delivered to SpaceKey the second 50 flight RH1280B FPGAs with TID of 50 KRAD (part no. 197A806-24), which satisfied Item 3(b) of SKC12508(D) and for which SpaceKey paid BAE Systems.  (Plf. Ex. 29.)  BAE Systems also delivered to SpaceKey additional test documentation for the RH1280B.  (Plf. Ex. 30.)  The documentation was identified as "TCI Section 4".   In turn, SpaceKey shipped the parts to Actel.Ru in exchange for payment of $706,250.  (Plf. Ex. 32.)  In conjunction with shipping the parts, SpaceKey submitted to Actel.Ru the "Certificate of Conformance for Radiation Effects, TID" dated June 23, 2009.  (Plf. Ex. 31.)

In the Fall of 2009, BAE Systems notified SpaceKey that the RH1280B would not receive QML qualification from the Defense Logistics Agency ("DLA") prior to the delivery deadlines set forth in SKC12508(D).  SpaceKey agreed to accept delivery of the RH1280Bs without QML qualification.

On November 16, 2009, BAE Systems furnished to SpaceKey Revision J to the TLD for the RH1280B. (Plf. Ex. 34) This revision to the TLD identified in Table IB that the RH1280B with TID of 100 KRAD was designated as part number 197A806-34. All reference to performance for SEL, SEU1, SEU2, and SEDR for the RH1280B was identified as "TBD". Further, footnote 2 to Table IB read as follows:

> Device electrical characteristics are guaranteed (*The -2X and -3X devices are specified at 1X RHACL only, with no margin*) for post-irradiation levels at +25° C and nominal voltage for dose-rate environments ≤ 0.1 rad (Si)/s. Irradiation performed in according [sic] to MIL-STD-883, Test Method 1019, Condition B at 26 rad(Si)/s.

(Emphasis added.) TLD Rev. J also identified part number 197A806-34 as "Pre-QML qualified flight."

On December 3, 2009, BAE Systems delivered to SpaceKey 335 flight RH1280B FPGAs with TID of 100 KRAD (part no. 197A806-34), which partially satisfied Item 2(a) on SKC12508(D) and for which SpaceKey paid BAE Systems. (Plf. Ex. 35.) SpaceKey shipped 300 of the parts to ISRO in exchange for payment of $3,255,000 and 35 parts to the Space Application Center ("SAC"), which is another arm of the Indian government's space program, in exchange for payment of $379,750. (Plf. Ex. 36, 37.)

On December 16, 2009, BAE Systems delivered to SpaceKey 100 RH1280B FPGAs with TID of 100 KRAD (part no. 197A806-34), which satisfied the remainder of Item 2 on SKC12508(D). (Plf. Ex. 39.) SpaceKey shipped the 100 parts to SAC in exchange for payment of $1,085,000. (Plf. Ex. 40.) SpaceKey did not pay BAE Systems for that shipment.

On January 12, 2010, BAE Systems delivered to SpaceKey 100 flight RH1280Bs with TID of 100 KRAD, which satisfied Item 4 on SKC12508(D). (Plf. Ex. 42.) SpaceKey did not pay BAE Systems for that shipment.

On March 4, 2010, BAE Systems delivered to SpaceKey the QCI report, which satisfied Item 4 of SKC12508(D) and completed all delivery obligations of BAE Systems under the purchase order.  (Plf. Ex. 47.)  The QCI report provided test data and verification reports explaining the performance of the RH1280B.  (Plf. Ex. 48.)  Among the documents included was Departmental Report 2009-DBJ-065, which detailed the results of single event effects testing BAE Systems had completed on RH1280B and a legacy RH1280 parts, and Departmental Report 2009-DBJ-075, which detailed results of SEDR testing on RH1280B and a legacy RH1280 parts. The data package also included Departmental Report 2009-DBJ-067, which detailed results of TID performance for three production lots of the RH1280B FPGAs with TID of 100 KRAD. (Plf. Exs. 49, 50, 51.)

William Key of SpaceKey contacted Donald Francis of BAE Systems following his receipt of the QCI report to discuss the SEE performance of the RH1280B.  Francis explained to Key that the reports demonstrated that the RH1280B and the legacy RH1280 performed similarly under SEE testing and that no material departure in SEE performance existed between the two FPGA versions.

In April 2010, SpaceKey shipped to Actel.Ru 10 of the flight RH1280B FPGAs (part no. 197A806-34) in exchange for payment of $141,250.  (Plf. Ex. 52.)  In May 2010, SpaceKey shipped to Actel. Ru another 70 of the flight RH1280B FPGAs (part no. 197A806-34) in exchange for payment of $988,750.  (Plf. Ex. 53.)  Almost a year later, in March 2011, SpaceKey shipped the remaining 20 RH1280B FPGAs (part no. 197A806-34) to Actel.Ru in exchange for payment of $282,500.  (Plf. Ex. 54.)

The purchase price for the RH1280B FPGAs and QCI report BAE Systems delivered under SKC12508(D) totals $5,971,500.  (Plf. Ex. 23.)  Of this amount, $1,802,500 is still due to

be paid by SpaceKey for delivery of 100 flight FPGAs on December 16, 2009, delivery of the

100 flight FPGAs on January 12, 2010, and delivery of the QCI report on March 4, 2010.  For its

part, SpaceKey has resold all of the FPGAs purchased under SKC12508 in exchange for

payments by ISRO, SAC, and Actel.Ru totaling $7,263,500.  These payments represent a gross

profit to SpaceKey of $1,292,000.

### C.  The Unfilled Purchase Orders

The Court has determined that the Agreement between BAE Systems and SpaceKey

terminated February 8, 2010 and that BAE Systems owed no obligation to accept purchase

orders SpaceKey submitted after that date.  Accordingly, the only issue that remains in dispute

for trial is whether BAE Systems properly terminated purchase orders it had accepted from

SpaceKey before the Agreement terminated, and whether BAE Systems is liable to SpaceKey for

damages based on the profits SpaceKey anticipated from the orders the rejected purchase orders.

Prior to February 8, 2010, BAE Systems had accepted the following six purchase orders

from SpaceKey:  SKC12508, SKC122309, SKC1610, SKC11310, SKC12710, SKC61808.

(Plfs. Exs. 23, 55-59.)  Of these orders, BAE Systems completed delivery of goods to SpaceKey

under purchase orders SKC12508, SKC1610 and SKC122309.  (Plf. Exs. 25, 29, 35, 39, 42, 47,

60, 61.)  BAE Systems did not fill purchase orders SKC11310 and SKC12710; and it only

partially filled SKC61808 (hereinafter, the "unfilled POs").

Purchase orders SKC12508 and SKC61808 were subject to BAE Systems' Terms of Sale

dated August 2007.  (Plf. Ex. 4.)  Purchase orders SKC1610, SKC122309, SKC11310 and

SKC12710 were subject to BAE Systems' Terms of Sale dated May 2008.  (Plf. Ex. 12.)

Both versions of the Terms of Sale obligated SpaceKey to pay BAE Systems for the

goods delivered under purchase orders SKC12508, SKC1610 and SKC122309 the earlier of

thirty (30) days from the date of invoice or thirty (30) days from the date of delivery.  As BAE Systems completed the delivery of the goods for purchase orders SKC1610 and SKC122309 no later than January 14, 2010 and its invoices for deliveries were dated January 18, 2010, SpaceKey owed payment for the goods was due no later than February 17, 2010.  BAE Systems also delivered goods to SpaceKey under purchase order SKC12508 on December 15, 2009 and January, 12, 2010 along with invoices reflecting the amount.  SpaceKey owed payment for these deliveries under purchase order SKC12508 no later than February 11, 2010.

SpaceKey did not make timely payment for the goods BAE Systems delivered under purchase orders SKC12508, SKC1610 and SKC12230.  SpaceKey's failure to make timely payment on these invoices, which represented unfavorable credit information, prompted BAE Systems to suspend any further delivery of goods to SpaceKey on credit.

By letter dated April 20, 2010, BAE Systems notified SpaceKey that payment was overdue for the goods BAE Systems had shipped SpaceKey under purchase orders SKC12508, SKC1610, and SKC122309.  (Plf. Ex. 62.)  BAE Systems also notified SpaceKey that due to SpaceKey's non-payment of the invoices (which represented unfavorable credit information), BAE Systems would require prepayment for the goods still to be delivered under SKC61808, SKC122710, and SKC1130.  BAE Systems demanded that SpaceKey fulfill its payment obligations no later than May 17, 2010.

SpaceKey failed to make payment on purchase orders SKC12508, SKC1610, and SKC122309 and failed to prepay for the goods identified in purchase orders SKC61808, SKC122710, and SKC1130 by the deadline of May 17, 2010.  By letter dated May 20, 2010, BAE Systems notified SpaceKey that it was in default of its payment obligations for the goods shipped under purchase orders SKC12508, SKC1610 and SKC122309, and in default of its

obligations to prepay for the goods identified in purchase orders SKC61808, SKC122710, and

SKC1130.  (Plf. Ex. 63.)

By letter dated August 20, 2010, BAE Systems notified SpaceKey through counsel that

purchase orders SKC61808, SKC122710, and SKC1130 were terminated due to  SpaceKey's

failure to prepay for the goods.  (Plf. Ex. 61.)

## III.   ARGUMENT

### A.   The Terms Of Sale Preclude SpaceKey's Breach Of Warranty Counterclaim At Count Four

#### 1.   SpaceKey Agreed to Limited Remedies That Do Not Encompass Counterclaim Count Four

BAE Systems is entitled to judgment on Court Four of SpaceKey's counterclaims, for

breach of warranty, because the Terms of Sale provide the exclusive remedies, and SpaceKey

failed to satisfy the conditions under the Terms of Sale that would trigger warranty obligations of

BAE Systems.  The sale of goods in New Hampshire is governed by RSA 382-A:2-101 *et seq.*,

New Hampshire's codification of the Uniform Commercial Code for sales.[4]  Although RSA 382-

A sets forth baseline rights and remedies of sellers and buyers of goods, the statute permits

parties to modify their statutory rights and remedies by agreement.  For example, implied

warranties may be excluded or modified in writing by the parties.  RSA 382-A:2-316; *Eastern*

*Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., Inc.*, 40 F.3d 492, 501 (1st Cir. 1994).

Likewise, the measure of damages and remedies may be limited by agreement, as by limiting a

buyer's remedies to the return of goods and repayment of the price or to repair and replacement

of the non-conforming goods.  RSA 382-A:2-719(1)(a); *Xerox Corp. v. Hawkes*, 124 N.H. 610,

618 (1984).

---

[4]  The Terms of Sale expressly state that disputes will be governed by New Hampshire law.  (Plf. Ex. 4 ¶ 17.)

SpaceKey accepted BAE Systems' Terms of Sale when it purchased the RH1280B

FPGAs and, indeed, SpaceKey expressly incorporated the Terms of Sale by reference into the

original SKC12508 purchase order and all amended purchase orders thereafter.  (Plf. Ex. 7.)

Through the Terms of Sale, SpaceKey agreed that its exclusive remedy for nonconforming parts

was limited to their repair or replacement, or a credit for the purchase price, at BAE Systems'

sole option, upon written notice and return of the goods within sixty (60) days of the date of

delivery.  (Plf. Ex. 4, Terms of Sale ¶ 8(b).)  In addition, also through the Terms of Sale,

SpaceKey waived all "consequential (to include lost profits and business interruption),

incidental, special, punitive/exemplary damages alleged to arise from, or relate to" goods

purchased from BAE Systems, and further agreed that the total amount of its damages, if any,

shall not exceed, "to the extent collected by BAE Systems, the equivalent of a refund of the Price

of the [goods] which is (are) the subject of a claim."  (*Id.* ¶ 13.)

The Terms of Sale foreclose the remedy SpaceKey seeks under its breach of warranty

counterclaim.  New Hampshire's Uniform Commercial Code expressly states that parties may

limit remedies by contract, "as by limiting the buyer's remedies to return of the goods and

payment of the price or to repair and replacement of non-conforming goods or parts . . . ."  RSA

382-A:2-719(a).  The remedies to which BAE Systems and SpaceKey agreed in the terms of sale

are the exact remedies that the statute identifies as legally permissible limitations, namely, return

in exchange for repair or replacement, or refund of the purchase price.

In keeping with the express statutory language, the New Hampshire Supreme Court has

approved similar, if not nearly identical remedy limitations.  *Xerox Corp. v. Hayes*, 124 N.H. 610

(1984).  In *Xerox*, the Court observed that such remedies limitations are commonly upheld,

particularly "when, as here, the transaction was between commercial entities and the disclaimer

was not prima facie unconscionable." *Id*. at 617 (citation omitted).  Similar disclaimer language

extends also to tort claims when the thrust of the complaint is breach of contract and warranty.

*Id*.

SpaceKey's exclusive remedy for the alleged non-conforming flight RH1280B FPGAs

was to provide written notice of the defects and to return the parts to BAE Systems within sixty

(60) days from the date of delivery.  SpaceKey has never returned any of the parts that BAE

Systems delivered in performance of purchase order SKC12508 and the sixty day period for such

returns has now long since passed.  And, it comes as no surprise that SpaceKey never returned

the parts, since SpaceKey sold the parts to ISRO, SAC and Actel.Ru in exchange for payments

well in excess of the prices it paid to BAE Systems.

SpaceKey also cannot argue – as it has attempted in the past – that statements BAE

Systems allegedly made prior to the parties entering purchase order SKC12508 broaden its

"express warranty" for the RH1280B beyond the terms of the parties' contract.  The August 2007

Terms of Sale contains an integration clause at paragraph 18 that provides, among other things,

that "no prior oral or written agreement shall be part of or serve to modify this Order.

Exceptions, confirmations, purchase orders, correspondence or invoices by Buyer which state

additional or different terms shall not alter this Order in any way."  (Plf. Ex. 4, Terms of Sale ¶

18.)

Because the parties settled on a final written agreement for the sale of the FPGAs, as

reflected in SKC12508, SpaceKey may not now introduce prior statements of BAE Systems to

establish that warranty obligations exist beyond those expressed in the writing.  RSA 382-A:2-

202 (West 2011)(setting forth parole evidence and extrinsic evidence rules applicable under NH

UCC); *see Globe Metallurgical, Inc. v. Hewlett-Packard Co.*, 953 F. Supp. 876 (S.D. Ohio

1996), *judgment aff'd*, 99 F.3d 1139 (6th Cir. 1996) (when a contract is completely integrated, extrinsic evidence may not be admitted to contradict or to explain or supplement its terms); *Bushendorf v. Freightliner Corp.*, 13 F.3d 1024 (7th Cir. 1993) (written contract that contained an integration clause excluded an alleged oral warranty that was made before the sale but was not included in the written contract).  As such, BAE Systems only warranted the specifications identified in purchase order SKC12508.  To the extent BAE Systems failed to meet those specifications, SpaceKey's remedy was limited to the return of the parts pursuant to paragraph 8 of the August 2007 Terms of Sale.

Falling in line with New Hampshire's UCC as they do, the Terms of Sale preclude counterclaim Count Four because they bind SpaceKey to a very clear remedy limitation that does not allow for SpaceKey's statutory claims for breach of warranty.

2. The Remedies To Which The Parties Agreed Do Not Fail Their Essential Purpose

SpaceKey has argued before that repair (one of the remedies to which the parties agreed) of the FPGAs was not possible, so the remedy (repair) fails its essential purpose.  Through this argument, SpaceKey seeks to take advantage of remedies the statute provides in the event contractual remedies "fail their essential purpose."  RSA 382-A:2-719(2).  The New Hampshire Supreme Court, however, faced with the virtually identical situation, has rejected SpaceKey's argument and held that a buyer's limited remedies of repair of the goods or return of the purchase price do not fail their essential purpose even if one of the remedies – repair of the goods – is unavailable.  *Xerox*, 124 N.H. 610.  In *Xerox*, a lessee sought to recover consequential damages from the lessor resulting from the malfunction of a leased copy machine.  *Id*. at 614.  The lease agreement, however, limited the lessee's remedies to repair of the copy machine or return of the lease price.  *Id*. at 614-15.  The lessee argued that the exclusive remedies provided

in the lease agreement denied him the benefit of his bargain – and thus failed their essential purpose – because the lessor was unable to repair the machine.  *Id*. at 619.

The New Hampshire Supreme Court rejected the lessee's argument.  The Court, relying on Seventh Circuit authority, reasoned that RSA 381-A:2-719 expressly permits limitation of a buyer's remedies to return of the goods and repayment of the purchase price, and observed "[i]t is obvious that this remedy deprives the buyer of his benefit of the bargain . . . but it is nonetheless deemed permissible."  *Id*. (quoting *Dow Corning Corp. v. Capital Aviation, Inc.*, 411 F.2d 622, 626 (7th Cir. 1969)) (internal quotations omitted).  The Court also reviewed precedent refusing to invalidate remedies limitations because repair of nonconforming goods was not possible, approving the survival of such provisions even if repair was not an option.  *Id*.  at 619-20.  The Court construed New Hampshire's Uniform Commercial Code to permit buyers and sellers to craft exclusive remedies governing the sale of goods even if some of those remedies (like repair of the goods) are unavailable and other remedies (such as return of the purchase price) effectively deprive the buyer of the benefit of the bargain.  *Id*. at 619.

The *Xerox* decision rests on facts highly analogous to this action and forecloses any attempt by SpaceKey to skirt the exclusive remedies under the Terms of Sale.  Irrespective of whether or not the RH1280B FPGAs were "non-conforming," the fact remains that SpaceKey was entitled to the repair of the parts or, if that was not possible, to return them and obtain a return of its purchase price (to the extent collected by BAE Systems).  (Plf. Ex. 4, Terms of Sale ¶¶ 6, 8, 13.)  SpaceKey's contention that BAE Systems cannot not "repair" the parts does not change the outcome:  *Xerox* makes clear that the inability to repair does not constitute a failure of essential purpose pursuant to RSA 382:2-719.

It is undisputed that SpaceKey never elected to pursue either of the remedies to which it agreed to be limited.  Instead, SpaceKey resold the FPGAs to ISRO, SAC and Actel.Ru at a significant profit.  SpaceKey cannot plausibly argue that it was deprived the benefit of its bargain or that the remedies under the Terms of Sale fail their essential purpose, when the undisputed facts demonstrate that it profited (handsomely without discount) on the resale of  the RH1280B FPGAs.  Moreover, SpaceKey has adduced no evidence whatsoever that either ISRO, SAC or Actel.Ru have sought a full return and refund against SpaceKey for the RH1280B FPGAs they purchased.[5]

BAE Systems is entitled to judgment on SpaceKey's breach of warranty counterclaim at Count Four because SpaceKey's remedies for the alleged non-conforming flight RH1280B FPGAs are limited by the Terms of Sale.  Having determined to sell (at profit) rather than return the alleged defective goods as required by the Terms of Sale, SpaceKey failed to trigger any warranty obligation on the part of BAE Systems.

## B. SpaceKey Cannot Prevail On Its Breach of Warranty Counterclaim Under the New Hampshire Uniform Commercial Code

Even assuming SpaceKey were able to proceed outside the Terms of Sale and pursue a breach of warranty counterclaim under the New Hampshire Uniform Commercial Code, BAE Systems would still be entitled to judgment because SpaceKey knew about all of the alleged non-conformities in the flight RH1280Bs at the time it accepted them and because SpaceKey cannot establish that the RH1280B FPGAs BAE Systems delivered were less valuable than the ones BAE Systems promised.

---

[5]  Actel.Ru has sought to exchange a handful of the RH1280B FPGAs following their failure to program correctly. This is not evidence of any liability of SpaceKey because BAE Systems has accepted and processed the exchange of the parts.

1.  <u>SpaceKey Accepted The RH1280B FPGAs As A Matter Of Law</u>

The New Hampshire Uniform Commercial Code sets forth a comprehensive framework
for a buyer's acceptance and subsequent rejection of goods.  The baseline rule is that a buyer is
required to pay at the contract rate for any goods accepted.  RSA 382-A:2-607(1).  A buyer
cannot revoke this acceptance if it is given with knowledge of a non-conformity in the goods.
RSA 382-A:2-607(2). "Revocation is unavailable for a non-conformity known to the buyer at the
time of acceptance, except where the buyer has accepted on the reasonable assumption that the
non-conformity would be seasonally cured."  *Id.* at cmt. 2.  Instead, revocation of acceptance
can only be for a non-conformity the buyer discovers (or reasonably should have discovered)
*after* acceptance is made.  RSA 382-A:2-607(3)(a).  In such cases, the buyer must notify the
seller of the non-conformity within a reasonable time of the discovery.  Importantly, "[t]he
burden is on the *buyer* to establish any breach with respect to the goods accepted."  RSA 382-
A:2-607(4).

SpaceKey contends that BAE Systems was obligated to deliver QML qualified flight
RH1280B FPGAs that met the specifications in a TLD dated August 1, 2007.  The August 1,
2007 TLD purports to show that the RH1280B FPGA would achieve a TID rating of 300 KRAD
based on testing to 2x RHACL and that it would have the following single even effects
performance:  SEL of 177, SEU1 of 17, SEU2 of 4 and SEDR of 60.  It is those specifications,
SpaceKey contends, that it expected but did not receive and which constitute nonconformances.
At the time it accepted the first delivery of the flight parts on June 25, 2009, however, SpaceKey
had already been notified by BAE Systems of the actual specifications for the flight RH1280B.

SpaceKey knew as early as December 2008 – a full six months before the first delivery of
flight parts – that the RH1280B would have a TID specification of 300 KRAD because it

traveled overseas to explain the reduced TID performance to the Indian government.  Shortly thereafter, in January 2009, Donald Francis of BAE Systems notified William Key that the first production lot of the flight RH1280B FPGAs would have a TID specification of 50 KRAD. Following this notice, SpaceKey contacted its customers and inquired whether they would be willing to accept the 50 KRAD parts.  According to SpaceKey, ISRO and SAC would only accept a TID of 100 KRAD whereas Actel.Ru indicated that it would accept 100 parts with a TID of 50 KRAD but that it would require the second installment of 100 parts have a TID of 100 KRAD.  SpaceKey memorialized the acceptance by ISRO, SAC and Actel.Ru in purchase order SKC12508(D), which is dated June 9, 2009.  For parts destined for Actel.Ru, SpaceKey designated that the first installment of 100 parts would be "TID $\geq$ 50 KRAD" and that the second installment would be "TID $\geq$ 100 KRAD".  For the parts destined for ISRO and SAC, SpaceKey designated that they would be "TID $\geq$ 100 KRAD."  (Plf. Ex. 23, SKC12508(D).)

BAE Systems released Revision H to the TLD for the RH1280B on June 15, 2009, two weeks before the first delivery to SpaceKey of the flight RH1280B FPGAs with TID of 50 KRAD.  (Plf. Ex. 24.)  The TLD disclosed that the TID specification for part number 197A806-24 was 50 KRAD based on 1x RHACL testing.  TLD Rev. H at Sheet 16, Table 1B n. 2 ("The - 2X devices are specified at 1X RHACL only, with no margin").  Revision H also withdrew any reported specifications for SEL, SEU1, SEU2 and SEDR, replacing the figures as shown in Revision G with "TBD".  Finally, part number 197A806-24 was specifically identified in the TLD a "Pre-QML qualified flight," meaning the part had not received QML qualification from DLA.

There is no question that SpaceKey obtained and reviewed TLD Rev. H because, following its publication, SpaceKey prepared a "Certificate of Conformance for Radiation

Effects TID" dated June 23, 2009, which it later gave to Actel.Ru.  (Plf. Ex. 26.)  In the document, SpaceKey certified that "the Total Ionizing Dose (si) performance of the above components [197A806-24] in compliance [sic] with the BAE Systems Top Level Drawing (TLD), 197A806-**_H_**7-14-08," which is the number that designates Rev H. (Emphasis added). Without further ado, SpaceKey took delivery of the first installment of 50 flight RH1280B FPGAs with TID of 50 KRAD on June 25, 2009.  SpaceKey took delivery of the second 50 flight RH1280B FPGAs on August 19, 2009.

On November 16, 2009, BAE Systems furnished to SpaceKey Revision J to the TLD for the RH1280B.  (Plf. Ex. 34.)  TLD Rev. J added a new part number, 197A806-34, to denote the flight RH1280B FPGAs with TID of 100 KRAD.  TLD Rev. J indicated that the 100 KRAD TID rating was based on 1X RHACL testing.  TLD Rev. J at Sheet 16, Table 1B n. 2 ("The -2X and -3X devices are specified at 1X RHACL only, with no margin")  TLD Rev. J also disclosed no single event effects specifications for the -3X part, instead noting "TBD" for SEL, SEU1, SEU2, and SEDR.  Finally, part number 197A806-34 was identified in the TLD a "Pre-QML qualified flight," which was a fact that Donald Francis also raised to the specific attention of William Key during a discussion in the Fall of 2009.  Between December 3, 2009 and January 12, 2010, SpaceKey took delivery of 535 flight RH1280B FPGAs with TID of 100 KRAD (part number 197A806-34).

In short, SpaceKey knew long before it accepted delivery of the flight RH1280B FPGAs that they would not have TID specifications of 300 KRADS, but would have specifications of 50 and 100 KRADS based on 1X RHACL testing.  SpaceKey also knew that single event effects performance was not established and that the parts were not QML qualified.  Because SpaceKey knew these alleged "non-conforming" specifications prior to taking delivery of the parts, it

26

cannot now use them as a basis to revoke acceptance and seek damages for breach.  To the contrary, SpaceKey accepted the RH1280B FPGAs as a matter of law and now must pay for them.

> 2.  <u>SpaceKey Has No Competent Evidence That The RH1280B FPGAs Delivered Are Less Valuable Than What BAE Systems' Promised</u>

SpaceKey claims as its breach of warranty damages the alleged difference in value between the parts BAE Systems delivered and the parts BAE Systems warranted.  RSA 382-A:2-714(2).  According to SpaceKey, this difference in value is established by comparing the radiation performance of the RH1280B, as reported in TLD Rev. K, to the radiation performance of the legacy RH1280, as reported in the SMD.  Through its "expert" witnesses, William Key and Donald Soderman, Ph.D., SpaceKey will attempt to show that the "derating" of the RH1280B with regard to TID performance – both in numeric value and change in RHACL testing – has reduced the "time on station availability" of the RH1280B between one-third and one-sixth that of the legacy RH1280.  SpaceKey will also attempt to show that the SEU and SEDR values reported for the RH1280B independently results in a 45% reduction in value as compared to the legacy RH1280.  Based on these "deratings," SpaceKey will claim that the value of the RH1280B FPGAs it purchased were worth $4 million dollars *less* than what it promised to pay BAE Systems under purchase order SKC12508.

Separately, SpaceKey also intends to offer "expert" evidence that, as a general rule, FPGAs with TID ratings between 100 and 200 KRAD sell for $1,500 per part.  SpaceKey apparently intends to argue that, based purely on what other FPGAs sell for in the marketplace (none of which is a substitute for the RH1280B and none of which could have been used by ISRO, SAC, or Actel.Ru for the satellites they intended to launch), the RH1280B FPGAs only have a "value" of $1,500 as compared to the $9,000 price SpaceKey agreed to pay for each

RH1280B FPGA (never mind the price SpaceKey's customers all paid SpaceKey, which well exceeded $9,000 per part).

Even assuming SpaceKey is allowed to present this "expert" evidence, SpaceKey still fails to establish any material difference in the value the RH1280B.  As BAE Systems' engineers will explain, the radiation performance data reported for the legacy RH1280 was gathered more than a decade ago, when radiation testing methods and technology was less advanced as compared to today.  For this reason, it is impossible to draw an "apples to apples" comparison between the radiation performance specifications reported for the RH1280B and those reported for the legacy RH1280, as SpaceKey is attempting to do.  For example, the 300 KRAD TID rating for the legacy RH1280 was established at a time when a charge pump failure mechanism that overtakes the part during irradiation was not known to exist.  This failure mechanism is known today and had it been known when the legacy RH1280 was characterized, it would have rendered the TID rating invalid.

The test methods and technology used to characterize single event effects for the legacy RH1280 was also less stringent than that used today.  SEU testing for the legacy RH1280 stopped data collection when upset detection was below a certain percentage of a key metric known as the saturation level.  This technique does not provide sufficient information for accurate error rate prediction under today's standards.  Instead, testing today is performed to the lowest available ion or until no SEU events are detected for an ion fluence exceeding mission fluence.  The net result of this change in testing method is that the threshold for SEU under today's method is significantly lower than the threshold for SEU under the test method used to characterize the legacy RH1280.

A similar dynamic exists with respect to SEL and SEDR testing.  The technology used to measure the rate of SEDR in the legacy RH1280 employed a catastrophic current monitoring approach (i.e., a very large change in monitored current), which was a function of the limitations of the monitoring equipment, and data was recorded by a human observer using a strip-chart recorder.  By comparison, the rate of SEDR for the RH1280B was measured using computer automated current monitoring equipment with higher resolution and automated data-logging for a more detailed post-exposure evaluation of current changes.  The resolution of this equipment is 1000 times greater than that used to measure SEDR for the legacy RH1280.  For SEL, detection for the legacy RH1280 was based on large current changes in addition to loss of functionality. SEL detection for the RH1280B focused instead on micro-current changes during exposure in addition to loss of functionality.  In short, the methods used to measure SEDR and SEU for the RH1280B are more sensitive to very small changes in current and allow better detection and reporting of events.  This increase in detection sensitivity, however, generates SEL and SEDR test results that give the superficial appearance of lower performance as compared to the legacy RH1280.

SpaceKey opinions about value also overlook two other, critical matters.  First, SpaceKey has entirely ignored side-by-side testing that BAE Systems performed on the RH1280 and the legacy RH1280 which shows the parts perform similarly when tested using the same methods and technology.  For example, the upset cross section data for the RH1280B and legacy RH1280 "overlays," which means the data falls in the same location on a graph when plotted together and confirms that the parts have the same soft error rate.  The RH1280B and legacy RH1280 were also subjected to two side-by-side TID tests in January 2010.  The first irradiated the parts to 300 KRAD using a present-day test method and the second test irradiated the parts with two doses of

300 KRAD using the test method believed to have been used to establish the TID rating of the

legacy RH1280.  The parts performed the same under both tests.  This underscores BAE

Systems' position that while the radiation performance reported for the RH1280B is numerically

lower than that reported for the legacy RH1280, there is no material difference in actual

performance between the two parts.

Second, SpaceKey fails to provide any rational basis for its opinions about the decrease

in value of the RH1280B based on its purported "derating" in radiation performance.  SpaceKey

will argue, for example, that RH1280B has only one-third to one-sixth the "time on station

availability" as the legacy RH1280 because, assuming a satellite experiences 25 KRADS of

radiation per year in orbit, the RH1280B is apt to fail in two to four years once placed in orbit

whereas the legacy RH1280 will last 12 years, which is the typical mission life of a satellite.

What SpaceKey fails to disclose, however, is that satellites experience less than 2 KRADs of

radiation a year in a typical geosynchronous orbit and that SpaceKey's estimate of 25 KRAD per

year is wildly inflated and without any factual support.  Based on the 2 KRAD per year radiation

exposure, both the RH1280B and the legacy RH1280 have "time on station availability" well in

excess of the average 12 to 15 year mission life of a satellite.  Thus, there is no direct,

proportional impact on the "intrinsic value" of the RH1280B based on the alleged TID

"derating" as SpaceKey contends.

SpaceKey also offers only speculation when it comes to computing how single event

effects performance translates into the RH1280B having a lower value than warranted.  For

example, SpaceKey will attempt to show that the RH1280B "C" modules are five times more

sensitive for SEU than the legacy RH1280 and that the SEDR rate is 30 times more than the

expected SEDR rate for the legacy RH1280.  SpaceKey will argue that this combined "derating"

of SEU and SEDR performance amounts to a 45% reduction in the dollar value of the RH1280B. In other words, SpaceKey will argue that a percentage decrease in single event effects performance directly and proportionally decreases the dollar value of the RH1280B.

What SpaceKey ignores is that test results for SEU, SEL and SEDR are the product of sophisticated statistical analysis (none of which SpaceKey has even attempted to perform) and that rates of upset are considered in terms of ranges of years.  For example, the upset rate calculated for the RH1280B "S" mod is 1.54E-6 upset bit-day, which translates to 1,779 years between bit upsets.  The upset rate for the legacy RH1280 "S" mod, by comparison, was 9.6E-7 upset bit-day, which translates to 2,853 years between bit upsets.  These rates of upset are statistically the same because the error in the prediction of the environment is a factor of two, meaning a calculation of 2,853 years between bit upsets for the legacy RH1280 must be understood as a range between 5,708 years (2,853 x 2) and 1,427 years (2,853/2).  This range of years for bit upset includes the upset rate for the RH1280B of 1,779 years.  In short, there is no statistical difference in the upset rate between the RH1280B and the legacy RH1280 because the statistical range of bit upsets for the two parts overlap.  SpaceKey's suggestion that a decrease in single event effects performance translates directly and proportionally to a decrease in the dollar value of the RH1280B has no basis whatsoever.  Accordingly, SpaceKey cannot prove some "intrinsic" value diminution between what it alleges it was promised and what it received.

Nor does SpaceKey offer any competent evidence of a market value diminution, SpaceKey's evidence as to what other FPGAs with similar TID ratings sell for in the marketplace is irrelevant.  The RH1280B is the only drop-in replacement in the market for the legacy RH1280 and its availability avoids the need for satellite programs that incorporate the legacy RH1280 design, such as those operated by the governments of Russia and India, to incur

the extraordinarily high costs associated with qualifying a different FPGA to replace the legacy

design.  This is the true value of the RH1280B – not its TID rating.  Confirming the lack of a

market value differential are the facts that (1) SpaceKey accepted the parts and paid for many of

them with full knowledge of their specifications; (2) SpaceKey sold every single one of the parts

to customers based on pre-existing contracts, at the full contract price.  What the best market

evidence shows, in other words, is that the RH1280B is worth the prices for which SpaceKey

sold it and nothing less.

**C.  BAE Systems Is Entitled to Judgment On SpaceKey's Misrepresentation Counterclaim**

SpaceKey alleges at Count Three of its Counterclaim Complaint that BAE Systems is

liable for misrepresentation because, by promising that the RH1280B would have certain

specifications but then delivering parts that did not meet those specifications, it caused SpaceKey

to fall victim to a "bait and switch" scheme.  BAE Systems is entitled to judgment on

Counterclaim Count Three because SpaceKey can establish no damages for misrepresentation

and because it cannot prove that it justifiably relied on the statements it claims to have been

false.

1.  SpaceKey Waived Its Misrepresentation Damages

On June 6, 2011, SpaceKey's counsel stipulated that the only counterclaim damages by

SpaceKey seeks in this action are for lost profit sales and warranty damages under the UCC:

> SpaceKey is not seeking to recover as damages in this case for loss of
> reputation or monetary impact on its future business prospects.  Its
> damages are limited to the orders it had in place in early 2010, as already
> identified, *and the warranty damages under the UCC*.[6]

---

[6] *See* Plaintiff's Motion In Limine to Limit Defendant's Damages Evidence for Counterclaims Count Three and
Four.

As SpaceKey later elaborated in its summary judgment briefing, it seeks the statutory warranty remedy available under RSA 382-A:2-714(2), which provides damages for the non-conformity in the tender equal to the difference in value between the goods delivered and the value of the goods as warranted.  The misrepresentation damages, in other words, equate to the warranty damages.

By offering this stipulation, which SpaceKey voluntarily gave for its own tactical reasons, SpaceKey has waived all of the damages it could have claimed in Count Three.  Thus, for example, SpaceKey cannot purse damages based on its allegation that the RH1280B FPGAs "will significantly reduce the usable lifetime of the spacecraft that employs them."  It cannot pursue the additional travel expenses in meeting with customers following BAE Systems' disclosure of substandard TID or the harm purportedly caused by delays in delivery of the goods.[7]

Damages for statutory breach of warranty claims, moreover, do not pertain to misrepresentation claims.  The warranty damages SpaceKey seeks are the product of the legislature and not within the family of common law tort damages.  By contrast, misrepresentation damages seek to compensate a party for the harm suffered because of justified reliance on a statement or omission.  Even if SpaceKey relied on a statement or omission, which BAE Systems disputes, SpaceKey suffered no harm:  SpaceKey completed the sales transactions to its customers at the prices they had originally agreed to pay, with no discounts, returns, warranty claims or the like.

---

[7]  The Court has already determined that SpaceKey cannot claim for its own the damages allegedly incurred by its customers in the reduced "usable lifetime" of the spacecraft that employ the flight RH1280B FPGAs.  Order of 10/24/11 at 37.   Moreover, SpaceKey has withdrawn its claim for the lost opportunity to sell 20 flight RH1280B FPGAs.

An essential element of a claim for misrepresentation is the ability to prove that the plaintiff suffered harm as a result of the false statement. *Plourde Sand & Gravel Co. v. JGI Eastern, Inc*., 154 N.H. 791 (2007). Because SpaceKey waived all of the damages it has identified in its allegations for Count Three, it cannot establish an essential element of its counterclaim and BAE Systems is entitled to judgment in its favor.

2. SpaceKey Cannot Establish Justifiable Reliance On A Representation Made With Knowledge Of Its Falsity Or With Conscious Indifference to Its Truth

Beyond damages, BAE Systems is also entitled to judgment on Count Three because SpaceKey cannot establish any of the other elements necessary to prove misrepresentation. To establish negligent misrepresentation, a plaintiff must prove that defendant made a representation with knowledge of its falsity or with conscious indifference to its truth, that the representation was made with the intention to cause plaintiff to rely upon it, that plaintiff justifiably relied upon it, and that the plaintiff suffered harm as a result.[8] *Akwa Vista, LLC v. NRT, Inc.*, 160 N.H. 594, 601 (2010); *Snierson v. Scruton*, 145 N.H. 73, 77 (2000). The essence of SpaceKey's misrepresentation claim is that BAE Systems made false statements regarding the specifications of the RH1280B knowing that SpaceKey would market the product to its customers, thereby apparently diminishing SpaceKey's reputation among its customers when the goods turned out not to have the specifications purportedly promised. This theory is premised entirely on the notion that BAE Systems "promised" the RH1280B would have the specifications identified in a TLD dated August 1, 2007. There are any number of facts that dispell this theory.

---

[8] SpaceKey has not alleged whether Count Three is claim for negligent or fraudulent misrepresentation. It is assumed for purposes of this memorandum that SpaceKey is pursuing a theory of negligent misrepresentation because the burden of proof – more probable than not – is easier to satisfy. To the extent SpaceKey seeks a claim for fraudulent misrepresentation, it must prove by *clear and convincing evidence* that BAE Systems misrepresented a material fact with fraudulent intent. *Hair Excitement, Inc. v. L'Oreal U.S.A., Inc.*, 158 N.H. 363 (2009). The facts support neither theory, so the question is academic.

For example, on July 31, 2007 – one day before the August 1, 2007 TLD was created – BAE Systems furnished SpaceKey a TLD Rev. G stamped with a watermark on all pages that read "DRAFT".  (Plf. Ex. 3.)  This TLD was virtually identical to the August 1, 2007 version. At the time the DRAFT TLD was furnished to SpaceKey, BAE Systems told SpaceKey that module characterization for the RH1280B was not yet complete.  By this statement, SpaceKey was notified that the specifications represented in the DRAFT TLD were not yet established.  In September and October of 2007, moreover, BAE Systems furnished to SpaceKey presentations regarding the RH1280B that identified module characterization was still not complete.  (Plf. Exs. 5, 6.)  Again, such information necessarily notified SpaceKey that final results for TID and SEE performance were not available.  The October 2007 presentation even mentioned the fact that a second lot of the RH1280B "demonstrated high tri-state leakage," which directly impacts TID performance.

Later, SpaceKey was furnished the officially released version of TLD Rev. G, dated July 14, 2008, which only identified specifications for the engineering versions of the RH1280B FPGAs (part number 197A806-23) and which identified no specifications whatsoever for flight versions of the RH1280B.  (Plf. Ex. 13.)  Moreover, as discussed in detail already, SpaceKey was also given revised TLDs prior to the delivery of the 50 KRAD and 100 KRAD parts, which notified SpaceKey of the TID ratings of the respective parts, the change test methodology to 1X RHACL from 2X RHACL, the identification of all single event effects specifications as "TBD", and the status of the flight RH1280B FPGAs as "Pre-QML qualified flight."

SpaceKey responded to this situation by issuing a series of revisions to SKC12508, all of which reflected the reality of the situation rather than misrepresented something to SpaceKey.

BAE Systems informed SpaceKey at each step of the way and SpaceKey acknowledged and accepted the parts as their specifications became known.

Given the disclosures BAE Systems made to SpaceKey both before and after August 1, 2007 which SpaceKey acknowledged and accepted in revised purchase orders, SpaceKey cannot show a misrepresentation of fact by BAE Systems or, more importantly, that it was reasonable for SpaceKey to continue to rely on the specifications identified in the August 1, 2007 TLD when it accepted the deliveries of FPGAs from BAE Systems in 2009 and 2010.  SpaceKey's misrepresentation claim soundly fails on the merits.

### D.  BAE Systems Is Entitled to Judgment On Counts III and IV Of Its Amended Complaint

Counts Three and Four of BAE Systems' Amended Complaint state claims for account stated and breach of contract.  As set forth below, BAE Systems is entitled to judgment on both claims.

1.   <u>BAE Systems Is Entitled To Judgment On Its Claim For Breach Of Contract</u>

SpaceKey breached its contract with BAE Systems to pay for the goods it purchased pursuant to purchase orders SKC12508.  A breach of contract occurs when a party fails, without legal excuse, to perform any promise that forms the whole or part of a contract.  *Fogle v. Wilmington Finance*, 2011 WL 320572, at *9 (D.N.H. Jan. 31, 2011) (citing *Lassonde v. Stanton*, 157 N.H. 582, 588 (2008)); *West Gate Village Assoc. v. Dubois*, 145 N.H. 293, 298 (2000).

SpaceKey purchased from BAE Systems the goods identified in purchase orders SKC12508 pursuant to BAE Systems' August 2007 Terms of Sale.  The Terms of Sale obligated SpaceKey to pay for the goods no later than thirty days after delivery of the goods or the date of the BAE Systems invoice.  BAE Systems delivered all of the goods to SpaceKey along with

36

Case 1:10-cv-00370-LM   Document 86   Filed 02/21/12   Page 37 of 45

invoices from December 2009 and January 2010 totaling $1,800,000 that were due to be paid not later than February 2010 and an invoice in March totaling $2,500 that was due to be paid no later than April 2010.  SpaceKey's deadlines to pay these invoices has long since passed and yet SpaceKey has failed and refused to pay BAE Systems the balance due.  SpaceKey cannot dispute that it ordered the goods pursuant to the Terms of Sale, received, resold and was paid for the goods, but that it has not paid BAE Systems for the goods.  SpaceKey has failed to perform pursuant to the Terms of Sale and has breached its contractual obligations to BAE Systems.

While SpaceKey has thrown up a series of counterclaims that allege deficiencies in the goods, those counterclaims do not represent legal excuse for the nonpayment.  SpaceKey expressly agreed in the Terms of Sale that its payment obligation is "unconditional and shall be made a specified in the Order without recourse, setoff or discount."  (Plf. Ex. 4, August 2007 Terms of Sale ¶ 6.)  SpaceKey also agreed to very specific and limited remedies in the event of defects, namely returns to BAE Systems for repair or refund at BAE Systems' option.  (*Id*. ¶¶ 8, 13.)  Whatever the outcome of SpaceKey's counterclaims alleging non-conforming parts, those counterclaims do not forestall SpaceKey's payment obligation to BAE Systems.  SpaceKey agreed to pay for the goods or return them; it has done neither.

As to the merits of its counterclaims arising from purchase order SKC12508, SpaceKey cannot prevail.  The facts already discussed in detail above establish that SpaceKey understood and accepted flight RH1280B FPGA's with TID of less than 300 KRAD and resold the FPGAs to its customers, all of whom also understood and accepted the FPGAs with the revised TID specifications.  Moreover, SpaceKey cannot return the goods because it sold all of them for full payment and a handsome profit.

It is undisputed that SpaceKey never paid BAE Systems for the goods delivered under purchase order SKC12508, and SpaceKey has no legal excuse for its failure to honor is payment obligations under the August 2007 Terms of Sale.  Accordingly, BAE Systems is entitled to judgment on its claim for breach of contract at Count IV.

    2.   <u>BAE Systems Is Entitled To Summary Judgment On Its Claim For Account Stated At Count III</u>

SpaceKey is also liable to BAE Systems for an account stated.  An action for account stated is an action based upon a promise, express or implied, to pay the balance agreed upon between the parties.  1 Am.Jur. 2d *Accounts and Accounting* § 43 (Westlaw 2011).  When the account has been stated, the balance, rather than the constituent items, constitutes the cause of action on the account.  *Id*.  An account stated requires assent, express or implied, to the correctness of the balance struck between the creditor and debtor.  *White v. Schraft*, 94 N.H. 467, 469-70 (1948).  It is not essential that the account shall be stated in any particular form, and the mere statement of the balance due, if accepted as correct, may constitute an account stated.  *Id*. Moreover, when the statement is rendered to a debtor and the debtor does not make a reply or objection to the statement within a reasonable amount of time, the law implies an agreement that the account is correct as rendered.  *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1011 (7th Cir. 1985); *Newberry Corp. v. Firemen's Fund Ins. Co.*, 95 F 3d 1392, 1403 (9th Cir. 1998).

The decision in *Coleman Co., Inc. v. Cargil Intern. Corp.*, 731 So. 2d 2 (Fla. Dist. Ct. App. 3d 1998), analyzed account stated on highly analogous facts.  In *Coleman*, the appellate court permitted the manufacturer to recover on its claim against the distributor for account stated because the distributor never disputed the invoices upon which the claim was based and, in fact, sold the goods it had purchased from the manufacturer.  *Id*. at 3.

38

Similar to *Coleman*, SpaceKey in this action submitted to BAE Systems purchase orders SKC12508, which not only identified the goods to be purchased from BAE Systems, but also the price SpaceKey promised to pay for the goods.  In turn, BAE Systems delivered all of the goods identified in the purchase orders along with invoices reflecting the payments due.  The amounts identified in BAE Systems' invoices dated December 16, 2009, January 12, 2010 and March 4, 2010, which collectively total $1,802,500, match identically the amounts identified in purchase order SKC12508 for those deliveries.  When SpaceKey failed to timely pay the invoices, BAE Systems sent a letter to SpaceKey dated April 20, 2010 requesting an update from SpaceKey as to the status of payment.

For its part, SpaceKey has never contended that BAE Systems' invoices reflect an incorrect balance.  Rather, SpaceKey's only contention is that the RH1280B FPGAs delivered under SKC12508 did not meet certain specifications.  Relevant to the claim for account stated, this contention has no merit because SpaceKey resold all of the FPGAs for a significant profit to its own customers.  *Coleman*, 731 So. 2d at 3.  It is in this way that SpaceKey stands in the same shoes as the defendant in *Coleman*:  it has never disputed the accuracy of the account stated to it by BAE Systems and it has resold all of the FPGAs despite its claims that such goods were non-conforming.  *Id*.

In short, the undisputed facts confirm fact that SpaceKey agreed to pay BAE Systems $1,802,500 as stated in its own purchase order SKC12508 and as stated in BAE Systems' invoices.  Accordingly BAE Systems is entitled to judgment on its claim for account stated at Count III.

**E.   In The Alternative, BAE Systems Is Entitled to Judgment On Its Equitable Claims At Counts V and VI**

Alternatively, were the Court to find that there was no contract between the parties for the sale of the RH1280B FPGAs, BAE Systems would nonetheless be entitled to recover under its equitable claims for unjust enrichment and quantum meruit, as alleged in Counts V and VI of its Amended Complaint.

A claim for unjust enrichment is proper where "the defendant received a benefit [from the plaintiff] and it would be unconscionable for the defendant to retain that benefit." *General Insulation Co. v. Eckman Const.*, 159 N.H. 601, 611 (2010).  A claim for quantum meruit, in turn, requires that "(1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment." *Id.* at 612.

It is evident under the circumstances of this case that SpaceKey accepted the flight RH1280B FPGAs from BAE Systems and resold them all for significant profit.  Despite having done so, SpaceKey failed to pay BAE Systems.  BAE Systems reasonably expected payment for the RH1280B FPGAs it delivered and SpaceKey understood this expectation when it accepted the delivery.  Thus, permitting SpaceKey to retain the benefit resulting from its resale of the parts would be unconscionable and a windfall benefit.  These facts establish BAE Systems entitlement to judgment on its equitable claims for unjust enrichment and quantum meruit as an alternative to judgment on its claims for breach of contract and account stated.

**F.   BAE Systems Is Entitled To A Declaratory Judgment That It Rightfully Terminated The Unfilled Purchase Orders**

BAE Systems requests at Count I of its Amended Complaint the entry of a declaratory judgment "that BAE Systems has rightfully rejected and/or terminated the purchase orders [of SpaceKey] and that BAE Systems owes no obligation to SpaceKey to accept any other purchase

orders it may submit" after the termination of the parties' Consultant Agreement.  Amend. Comp. ¶ 34.  By its order of February 1, 2012, the Court held that the parties' Consultant Agreement terminated February 8, 2010 and that BAE Systems was not obligated to accept purchase orders SpaceKey submitted after the date of termination and, as result, it entered judgment for BAE Systems on SpaceKey's counterclaim Count One.  The Court further determined that the only issue remaining for trial under BAE Systems' Count I is whether three unfilled purchase orders BAE Systems accepted from SpaceKey prior to February 8, 2012 (SKC61808, SKC11310, and SKC12710) were properly terminated.

> 1.  BAE Systems Properly Exercised Its Right Under The Terms Of Sale
>     To Terminate The Unfilled POs

BAE Systems properly terminated the unfilled POs by exercising its rights under the August 2007 Terms of Sale governing purchase order SKC12508 and SKC61808.  Under those terms of sale, payment by SpaceKey for delivery of the goods under SKC12508 was unconditional and without any right of recourse, setoff or discount.  (Plf. Ex. 4, August 2007 Terms of Sale ¶ 6.)  Furthermore, because SpaceKey failed to meet in its payment obligations for SKC12508, BAE Systems was entitled to defer shipments to SpaceKey "under any other contract with Buyer" and, in addition, to demand payment before delivery if credit information on SpaceKey was lacking or unfavorable.  *Id*.

By letter dated April 20, 2010, BAE Systems notified SpaceKey that it was deferring shipment of the goods for the unfilled POs and invoking its right to demand prepayment.  When SpaceKey failed to honor the request for prepayment, BAE Systems notified SpaceKey by letter dated May 20, 2010, that SpaceKey was in default of its payment obligations.  BAE Systems later notified SpaceKey through counsel by letter dated August 20, 2010 that the unfilled POs were terminated.

BAE Systems' termination of the unfilled POs was pursuant to paragraph 7 of the Terms of Sale, which provides that "BAE Systems shall have the right and option to immediately terminate this order . . . [i]f Buyer breaches any of the terms and conditions of this order, including but not limited to the failure to perform any obligation hereunder or make any payment due hereunder."  In other words, because SpaceKey failed to satisfy BAE Systems' demand for prepayment (a condition BAE Systems could impose by virtue of the August 2007 terms of sale for SKC12508), SpaceKey failed to make a "payment due hereunder" for each of the unfilled purchase orders.  SpaceKey's payment failure vested BAE Systems with the right and option to immediately terminate the unfilled POs, which it did.

Accordingly, BAE Systems is entitled to a declaratory judgment that it properly terminated the unfilled POs pursuant to its rights under the August 2007 terms of sale (governing SKC12508 and SKC61808) and the May 2008 terms of sale (governing SKC11310 and SKC12710).

    2.   <u>SpaceKey Is Precluded From Seeking Lost Profit Damages For The Unfilled POs</u>

SpaceKey has not pleaded a claim for lost profit damages arising from BAE Systems' termination of the unfilled POs and, indeed, it specifically waived any such damage claims in answering BAE Systems' declaratory judgment allegations in Count I of the Amended Complaint.[9]

Even were SpaceKey permitted to introduce evidence of alleged lost profit damages concerning the unfilled POs, BAE Systems' Terms of Sale expressly preclude such damages. Paragraph 13 of the August 2007 and May 2008 Terms of Sale provides that BAE Systems is not liable to SpaceKey as a buyer of goods for "consequential (to include lost profits and business

---

[9] *See* Plaintiff's Motion *In Limine* to Preclude and/or Limit Defendant's Lost Profit Damages.

interruption), incidental, special, punitive/exemplary damages alleged to arise from, or relate to the Deliverables and/or this Order however or wherever caused."  Instead, BAE Systems cumulative liability under the Terms of Sale for all claims of direct damages, if any, is not to exceed – to the extent collected by BAE Systems – "the equivalent of a refund of the Price of the Deliverable(s) which is(are) the subject of a claim."

Because BAE Systems never collected the purchase price from SpaceKey for the goods to be delivered under the unfilled POs, SpaceKey is not entitled to any award of damages for alleged lost profits.

### G. BAE Is Entitled to A Declaratory Judgment That SpaceKey Is Owed No Further Commissions Under The Agreement

BAE Systems requests at Count II of its Amended Complaint the entry of a declaratory judgment "(i) that the Agreement terminated not later than February 8, 2010 and (ii) that SpaceKey is not entitled to any fees under the Agreement."  Amend. Compl. ¶ 35.  As noted already, the Court has held that the Agreement terminated February 8, 2010, thereby granting to BAE Systems the first element of relief requested under Count II.  The only question remaining, therefore, is whether BAE Systems owes commissions to SpaceKey under the Agreement.

BAE Systems filed Count II because SpaceKey had taken the position prior to litigation that it was owed commissions under the Agreement and, in particular, it was owed a commission of approximately $200,000 in connection with purchase order SKC12508.  While it is true BAE Systems received partial payments from SpaceKey in connection with SKC12508, those payments do not entitle SpaceKey to a commission.

Under the Agreement, BAE Systems' obligation to pay a commission to SpaceKey is reduced by any costs and attorneys' fees BAE Systems incurs in connection with a sale transaction:

> It is understood that if a sales contract should be rescinded, revoked or repudiated by a buyer for reasons beyond BAE SYSTEMS' control or by BAE SYSTEMS for a buyer's breach of contract or by either party for force majeure causes, CONSULTANT shall not be entitled to a fee with respect to such sales, except *pro rata*, to the extent of any amount BAE SYSTEMS may have previously received and to which the buyer asserts no claim for refund or any recovery that BAE SYSTEMS obtains based on buyer's breach, after deduction of BAE SYSTEMS' costs, including attorneys' fees.

(Plf. Ex. 1, Agreement ¶ 4.A.)

SpaceKey has asserted misrepresentation and breach of warranty counterclaims in connection with the goods delivered under SKC12508 and is claiming upwards of $4 million dollars in damages. All of the payments received by BAE Systems for SKC12508 are therefore subject to a claim for refund. Moreover, BAE Systems has incurred costs and attorneys' fees in excess of $200,000 to pursue collection of the more than $1.8 million dollars still due under SKC12508. As such, whatever commissions SpaceKey was possibly due under SKC12508 as a consultant have been consumed by the action BAE Systems is pursuing against SpaceKey to collect the remaining payments due under the purchase order. Accordingly, BAE Systems owes no commission to SpaceKey for purchase order SKC12508.

### H. BAE Systems Is Entitled To Judgment On SpaceKey's Counterclaim Count Two For Alleged Outstanding Commissions

Finally, SpaceKey asserts at Counterclaim Count Two that it is entitled to commissions under SKC12508 as well as commissions arising from 27 other sale transactions SpaceKey contends it facilitated as a consultant. As discussed above, BAE Systems owes no commission to SpaceKey for SKC12508 because it has been fully absorbed by the legal fees BAE Systems has incurred to collect the remaining balance due.

As for the remaining commissions alleged in Count Two, SpaceKey has failed to produce any evidence that BAE Systems owes any such commissions. For its part, BAE Systems has produced a copy of a canceled check establishing that SpaceKey was paid commissions of

$67,562.80 in October 2008, which represented full payment for at least 10 of the 27 sale transactions claimed by SpaceKey.

Given SpaceKey's lack of evidence and BAE Systems' proof of payment, BAE Systems is entitled to judgment on Counterclaim Count Two.

## IV.     CONCLUSION

For the foregoing reasons, BAE Systems is entitled to judgment on its claims at Counts I through IV of its Amended Complaint.  BAE Systems is also entitled to judgment on SpaceKey's counterclaims at Counts Two, Three and Four.

Respectfully submitted,

**BAE SYSTEMS INFORMATION AND ELECTRONICS SYSTEMS INTEGRATION INC.**

By its attorneys,

**DEVINE, MILLIMET & BRANCH, P.A.**

Dated: February 21, 2012

/s/ Jonathan M. Shirley
Daniel E. Will, Esq. (Bar No. 12176)
Jonathan M. Shirley, Esq. (Bar No. 16494)
Joshua M. Wyatt, Esq. (Bar No. 18603)
111 Amherst Street
Manchester, NH 03101
(603) 669-1000
dwill@devinemillimet.com
jshirley@devinemillimet.com
jwyatt@devinemillimet.com

## CERTIFICATE OF SERVICE

I, Jonathan M. Shirley, hereby certify that a copy of the foregoing Plaintiff's Trial Memorandum was this day served via the Court's Electronic Filing System on counsel for the defendant.

/s/ Jonathan M. Shirley
Jonathan M. Shirley