# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

BAE Systems Information
and Electronics Systems
Integration, Inc.

     v.                         Civil No. 10-cv-370-LM

SpaceKey Components, Inc.

## O R D E R

After reviewing the parties' pretrial statements and trial memoranda, it has become apparent that there is less to this case than meets the eye.  Specifically, based upon BAE's belated submission of the 2007 version of its Terms of Sale, it would appear that several purely legal issues are now ripe for resolution and that resolution of those issues would greatly simplify the trial of this case.  Therefore, the court orders the parties to show cause why it should not adopt the legal analyses detailed below and dispose of several pending issues before trial.

### Issue One

In their assented-to statement of the case, the parties identify three issues.  They describe the first one this way:

> The first [issue] is a dispute over purchase
> order SKC12508 and BAE Systems' delivery of flight
> RH1280B field programmable gate arrays ("FPGAs") to

> SpaceKey in 2009 and 2010.  BAE Systems seeks to
> recover the balance under purchase order SKC12508 that
> remains unpaid by SpaceKey as well as the costs and
> attorneys' fees it has incurred to pursue collection
> of this amount.  (Amended Complaint Counts III, IV, V,
> IV.)  SpaceKey contends it is entitled to damages
> because the flight RH1280B FPGAs BAE Systems delivered
> did not conform to BAE's express warranties.
> (Counterclaim Count Four.)

Def.'s Pretrial S'ment (doc. no. 115), at 1; Pl.'s Pretrial

S'ment (doc. no. 119), at 1-2.

SpaceKey's claim for damages is based upon factual

allegations that: (1) none of the 635 flight FPGAs it received

from BAE conformed to BAE's express warranties; (2) the 535

FPGAs with a TID of 100K rad(Si) were worth no more than one

third of the amount it paid for them, and perhaps as little as

one sixth of that amount;[1] and (3) the 100 FPGAs with a TID of

50K rad(Si) were worth no more than one sixth of what it paid,

and perhaps as little as one twelfth.[2]  The legal basis for

SpaceKey's claim is the Uniform Commercial Code ("UCC"), which

provides, in pertinent part:

---

[1] Specifically, SpaceKey argues that a FPGA with a TID of
100K rad(Si) is worth one third as much as a FPGA with a TID of
300K rad(Si), and that a FPGA with a TID of 100K rad(Si) that
has been tested to 1x RHACL is worth one sixth as much as a FPGA
with a TID of 300K rad(Si) that has been tested to 2x RHACL.

[2] SpaceKey argues that a FPGA with a TID of 50K rad(Si) is
worth one sixth as much as a FPGA with a TID of 300K rad(Si),
and that a FPGA with a TID of 50K rad(Si) that has been tested
to 1x RHACL is worth one twelfth as much as a FPGA with a TID of
300K rad(Si) that has been tested to 2x RHACL

(1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2-607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

N.H. Rev. Stat. Ann. ("RSA") § 382-A:2-714.  The UCC also provides, however, that parties to a sales contract may agree to "limit[ ] the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts."  RSA 382-A:2-719(1)(a).  But, "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter."  RSA 382-A:2-719(2).

Here, all agree that 2007 Terms of Sale ("TOS") govern the purchase and sale of the 200 FPGAs for which BAE seeks payment and the 435 FPGAs for which SpaceKey claims that it overpaid.  Section 8 of the 2007 TOS includes the following warranty provision:

(b)  Specifications: BAE SYSTEMS warrants that the hardware Deliverables will substantially conform to BAE SYSTEMS['] published descriptions or those specifications specifically agreed to in the Order, but Buyer's sole remedy under this warranty shall be limited to the return within 60 days of delivery of

3

any nonconforming Deliverables for credit, repair or
replacement, at BAE SYSTEMS' sole option.

Pl.'s Mot. for Leave, Rea Decl., Ex. G (doc. no. 112-3), at 27.
In BAE's view, Section 8(b) of the 2007 TOS bars SpaceKey from
seeking damages under RSA 382-A:2-714.  SpaceKey disagrees,
arguing that the Section 8(b) remedy fails of its essential
purpose, thus allowing it to recover for non-conformance under
RSA 382-A:2-714.  BAE's argument is the more persuasive.

Obviously, the key question is whether the Section 8(b)
remedy fails of its essential purpose.  Whether a limited remedy
fails of its essential purpose had been deemed by at least one
court to be "a question of fact for a jury to decide." Enidine
Inc. v. Dayton-Phoenix Grp., Inc., No. 02-CV-0230E(F), 2003 WL
22383571, at *3 (W.D.N.Y. Sept. 30, 2003) (citing Laidlaw
Transp., Inc. v. Helena Chem. Co., 680 N.Y.S.2d 365, 367 (N.Y.
App. Div. 1998); Roneker v. Kenworth Truck Co., 944 F. Supp.
179, 184 (W.D.N.Y. 1996)).  But where, as here, the buyer has
not attempted to use a limited remedy to which it has agreed,
there is no issue of fact for a jury to resolve, and the
question of whether that remedy fails of its essential purpose
may be decided as a matter of law.  See Nat'l Rural Telecomms.
Coop. v. DIRECTV, Inc., 319 F. Supp. 2d 1040, 1055 (C.D. Cal.
2003).

4

In support of its argument that the limited remedies to which SpaceKey agreed do not fail of their essential purpose, BAE relies heavily upon Xerox Corp. v. Hawkes, 124 N.H. 610 (1984).  But, as SpaceKey correctly points out, the issues decided in Xerox are so different from the issues in this case that Xerox offers little useful guidance for resolving the question before this court.  Because there is no opinion from the New Hampshire Supreme Court that is any more helpful than Xerox, it is necessary to turn to opinions from other jurisdictions.  Happily, there is no shortage of persuasive authority on this issue.

As Judge Fogel recently explained, "[a] limited remedy fails of its essential purpose when the circumstances existing at the time of the agreement have changed so that enforcement of the limited remedy would essentially leave plaintiff with no remedy at all."  Stearns v. Select Comfort Retail Corp., No. 08-2746 JF, 2009 WL 1635931, at *5 (N.D. Cal. June 5, 2009) (quoting Computerized Radiological Servs., Inc. v. Syntex Corp., 595 F. Supp. 1495, 1510 (E.D.N.Y. 1984)) (emphasis supplied by Stearns).  Stated slightly differently, "[a]n exclusive remedy fails of its essential purpose 'if circumstances arise to deprive the limiting clause of its meaning or one party of the substantial value of its bargain.'"  Taylor Inv. Corp. v. Weil, 169 F. Supp. 2d 1046, 1059 (D. Minn. 2001) (quoting Valley

Paving, Inc. v. Dexter & Chaney, Inc., No. C2-00-361, 2000 WL
1182800, at *4 (Minn. Ct. App. Aug. 22, 2000)).  Finally,

> U.C.C. § 2-719, per comment 1, requires only a
> "minimum adequate remed[y]."  Section 2-719(2) is
> concerned with the essential purpose of the remedy
> chosen by the parties, not with the essential purpose
> of the code or of contract law, or of justice and/or
> equity.  1 White and Summers, Uniform Commercial Code
> § 12-10 (3d ed. 1988).  U.C.C. § 2-719(2) is concerned
> only with novel circumstances not contemplated by the
> parties and does not contemplate agreements arguably
> oppressive at their inception.  Id.

Shepherd v. Weather Shield Mfg., Inc., No. W1999-00508-COA-
R3-CV, 2000 WL 34411064, at *6 (Tenn. Ct. App. Aug. 21, 2000)
(quoting Arcata Graphics Co. v. Heidelberg Harris, Inc., 874
S.W.2d 15, 29 (Tenn. Ct. App. 1993)) (emphasis added).

Turning from general principles to the mechanics of
evaluating whether a specific remedy fails of its essential
purpose, Judge Mihm has explained:

> An exclusive or limited remedy consisting of
> replacement, repair or refund for the purchase price
> of goods can fail of its essential purpose in two
> separate ways when those goods are found to be
> defective.  First, when a contract limits [a buyer's]
> remedy to repair or replacement of defective goods,
> the limited remedy fails of its essential purpose when
> either the goods are unable to be repaired or the
> seller is unwilling to make repairs or replace the
> goods within a reasonable amount of time.  See, e.g.,
> Cooley v. Big Horn Harvestore Systems, Inc., 813 P.2d
> 736 (Colo. 1991) (where the Court found that
> limitation of remedy to repair or replacement failed
> of its essential purpose when the seller was unable to
> repair and did not replace a grain distribution system
> within a reasonable time period).  Second, when a
> contract limits [a buyer's] remedy to return of the
> purchase price, the limited remedy fails of its

essential purpose "when goods have latent defects which are not discoverable upon receipt and reasonable inspection."  Leprino v. Intermountain Brick Co., 759 P.2d 835, 836 (Colo. App. 1988) (where a limited remedy to refund of purchase price was found to have failed of its essential purpose when the defect was latent or not discoverable until after use and significant damages had occurred).

PDC Labs., Inc. v. Hach Co., No. 09-1110, 2009 WL 2605270, at *4 (C.D. Ill. Aug. 25, 2009); see also Advanced Tubular Prods., Inc. v. Solar Atms., Inc., 149 F. App'x 81, 85 (3d Cir. 2005) ("courts have held that a remedy fails in its essential purpose when the remedy is limited to the purchase price for a defect that was not discoverable within a reasonable period after receipt of shipment") (citing Neville Chem. Co. v. Union Carbide Corp., 422 F.2d 1205 (3d Cir. 1970); Fiberglass Component Prod., Inc. v. Reichhold Chems., Inc., 983 F. Supp. 948 (D. Colo. 1997); Earl M. Jorgensen Co. v. Mark Constr., Inc., 540 P.2d 978 (Haw. 1975)).

In Leprino, the court explained that a provision limiting the plaintiffs' remedy to the cost of the defective bricks they purchased from the defendant failed of its essential purpose when the seller's breach of warranty was discoverable only after the bricks had been installed.  See 759 P.2d at 837.  In that case, the harm to the buyers consisted of both the price they paid for the defective bricks and the cost of taking down and replacing the structure they had built with those bricks.  As

the court elaborated: "When the parties agreed to limit the buyers' remedy to refund of the purchase price, they contemplated a situation in which the defective bricks would be returned to [the seller] prior to installation and the purchase price would be returned to the plaintiffs." Id. Under the circumstances of Leprino, the failure of the bricks to perform properly after they were installed was the post-agreement change in circumstances, see Stearns, 2009 WL 1635931, at *5; Taylor, 169 F. Supp. 2d at 1059; Shepherd, 2000 WL 34411064, at *6, that caused the refund remedy to fail of its essential purpose.

In Viking Yacht Co. v. Composites One LLC, the court held that a remedy limited to refund or replacement failed of its essential purpose when the defendant sold the plaintiff defective gel coat that it subsequently applied to boats it built. See Civ. Action No. 05-538(JEI), 2007 WL 2746713, at *6 (D.N.J. Sept. 18, 2007)); see also Cox v. Lewiston Grain Growers, Inc., 936 P.2d 1191, 1198 (Wash. Ct. App. 1997) (holding that refund remedy failed of its essential purpose when seeds for winter wheat had latent defect that buyer "could not have discovered . . . until he planted the seed and it did not produce an adequate crop").

Outside the circumstances present in Leprino, Viking Yacht, and Cox, i.e., latent defects that were only discovered after the defective product was either integrated into something else

8

or was otherwise put to use in a way that rendered it non-returnable, courts have generally determined that return/refund remedies do not fail of their essential purpose.  For example, in White v. Microsoft Corp., which involved a latent defect in an Xbox 360, Judge Steele ruled that a "limited remedy provid[ing] for repair or replacement . . . or [a] refund of the purchase price . . . would actually ensure that White received the substantive value of his bargain, not deprive him of it," 454 F. Supp. 2d 1118, 1128 (S.D. Ala. 2006).  Similarly, in Stearns, which presumably also involved a latent defect, Judge Fogel held that "a full refund of the purchase price provide[d] substantially the same value as the non-defective bed for which the parties initially bargained," Stearns, 2009 WL 1635931, at *6.

While White and Stearns involved latent defects, the defective goods in those cases, unlike the goods in Leprino, Viking Yacht, and Cox, were free-standing objects readily amenable to being returned to the seller before being used in a way that either consumed them or involved their irreversible integration into something else.  White and Stearns also stand for the proposition that a buyer who returns a defective product for a refund does receive the substantial value of his or her bargain.

9

Finally, a refund remedy is even less likely to fail of its essential purpose when the product at issue has a patent defect as opposed to a latent one.  See, e.g., Marr Enters., Inc. v. Lewis Refrig. Co., 556 F.2d 951, 955 (9th Cir. 1977); Garden State Food Distribs., Inc. v. Sperry Rand Corp., Sperry Univac Div., 512 F. Supp. 975, 978 (D.N.J. 1981).  Where a buyer can identify a defect upon delivery, and has recourse to a return and refund remedy, such a remedy allows the buyer to take immediate action to protect the value of his or her bargain, which means that such a remedy does not fail of its essential purpose.

With the foregoing legal principles in mind, the court turns to the undisputed facts of this case.  All agree that: (1) in May of 2009, BAE informed SpaceKey that its RH1280Bs would not have a TID of 300K rad(Si) but, rather, would have a TID of either 50K rad(Si) or 100K rad(Si); (2) SpaceKey informed its customers of those new specifications; (3) after it learned of the alleged TID shortfall, SpaceKey submitted purchase order ("PO") SKC12508(C) to BAE, in which it offered to buy 535 FPGAs with a TID of 100K rad(Si) and 100 more FPGAs with a TID of 50K rad(Si); (4) BAE delivered all 635 FPGAs; and (5) SpaceKey paid the full invoice price for the first 435 FPGAs, but refused to pay anything for the last 200.  Based upon those facts and the controlling legal principles, the UCC remedy SpaceKey seeks,

10

i.e., the one described in RSA 382-A:2-714(2), is not available because SpaceKey cannot get past the limitation of remedies in the TOS.

As a preliminary matter, this is not a case in which a buyer paid money to a seller only to discover, later, a patent or latent defect in the product he or she purchased.  Nor is this a case involving an after-arising circumstance that was not contemplated by a buyer when it entered into its agreement with a seller.  See Stearns, 2009 WL 1635931, at *5; Taylor, 169 F. Supp. 2d at 1059; Shepherd, 2000 WL 34411064, at *6.  To the contrary, when SpaceKey submitted PO SKC12508(C) to BAE, it fully contemplated that it would receive FPGAs with a TID of either 50K or 100K rad(Si).  Thus, this is a case in which the buyer knew about the alleged defect before ordering the product, took delivery of the product with full knowledge of the defect, and was not obligated to pay for the product until thirty days after delivery.  SpaceKey had the opportunity to protect the value of its bargain, i.e., the amount of money it promised to pay BAE, by declining to order the allegedly defective FPGAs. Had it done so, it would have retained the substantial value of its bargain, albeit in the form of cash rather than in the form of FPGAs with a TID of 300K rad(Si).

Leaving aside SpaceKey's ability to protect the value of its bargain by declining to enter into it in the first place, if

SpaceKey had paid for the FPGAs at the time of delivery, the TOS provided for the return of those parts, for credit with BAE. That remedy would also have provided SpaceKey with the value of its bargain.  Accordingly, the remedies available to SpaceKey do not fail of their essential purpose, which is the hurdle SpaceKey must clear before it is entitled to seek the remedy described in RSA 382-A:2-714(2).[3]

SpaceKey's principal objection to the Section 8(b) remedy is that credit with BAE, or even a refund, would leave it deprived of the benefit of its bargain with BAE.  That argument, of course, flows from the premise that the purpose of a remedy for a seller's breach of warranty is to provide the buyer with the benefit of his or her bargain.  But, the cases all stand for a somewhat narrower proposition, i.e., that a remedy fails of its essential purpose when it deprives the buyer of the value of his or her bargain, not the benefit of that bargain.  See White, 454 F. Supp. 2d at 1128; Taylor, 169 F. Supp. 2d at 1059; Stearns, 2009 WL 1635931, at *6.  As White, Taylor, and Stearns all recognize, in a cash transaction, the amount paid is a valid

_____

[3] SpaceKey makes much of its allegation that Will Key told BAE's Don Francis that he considered BAE's FPGAs to be non-conforming, and that SpaceKey would insist on price adjustments. While that notification may have been sufficient to satisfy RSA 382-A:2-714(1) (and RSA 382-A:2-607), the sufficiency of SpaceKey's notification is of no moment because SpaceKey relinquished, by contract, any right to the remedies described in RSA 382-A:2-714(2).

measure of the value of the bargain.  While SpaceKey is correct in its observation that that it could not use a credit or even a refund to purchase a substitute for BAE's RH1280B due to BAE's status as the sole manufacturer of a replacement for Actel's RH1280, that fact was known to SpaceKey at the time it agreed to the limited remedy in the TOS and, in any event, the availability of a substitute for BAE's RH1280B goes to the benefit of SpaceKey's bargain, not its value.

In light of the analysis outlined above, SpaceKey shall show cause why BAE should not be granted judgment as a matter of law on: (1) the claim for breach of contract stated in Count IV of BAE's amended complaint; and (2) the claim for breach of warranty stated in Count Four of SpaceKey's counterclaim.

**Issue Two**

In their assented-to statement of the case, the parties frame the second issue this way:

> The second issue concerns the parties' rights and obligations with respect to purchase orders BAE Systems accepted from SpaceKey prior to the termination of the Consultant Agreement on February 8, 2010.  BAE Systems refused to fill these accepted purchase orders and eventually terminated them.  BAE Systems seeks a declaratory judgment that it properly terminated three unfilled purchase orders pursuant to its rights under the applicable terms of sale. (Amended Complaint Count I.)  SpaceKey contends that BAE Systems accepted five purchase orders prior to February 8, 2010 (not three), that BAE Systems improperly refused to fill these purchase orders, and

13

that it is entitled to the benefit of the bargain
damages it suffered as a result.

Def.'s Pretrial S'ment (doc. no. 115), at 2; Pl.'s Pretrial

S'ment (doc. no. 119), at 2.

Apart from the number of purchase orders that were pending

when the parties' Consultant Agreement expired, the facts

involved in the parties' second issue are undisputed.  Either

three or five purchase orders were pending on February 8, 2010.

On April 20, BAE demanded advance payment for the parts

referenced in three pending purchase orders (SKC61808,

SKC122710, and SKC11310), and based its demand on Section 6 of

the TOS.  On May 20, BAE informed SpaceKey that it intended to

terminate those purchase orders, and cited Section 7 of the TOS

as its authority for doing so.  On August 20, BAE terminated the

three purchase orders.

The parties disagree as to whether BAE rightfully

terminated SpaceKey's pending purchase orders.  BAE asks for a

declaratory judgment that its actions were justified by the

Terms of Sale.  SpaceKey contends that BAE breached the parties'

Consultant Agreement by failing to process the pending purchase

orders.  Neither argument appears to be meritorious.

Turning first to BAE's termination of the pending purchase

orders, it appears that all three of them were subject to the

2008 TOS.  That iteration of the TOS includes the following
relevant language:

> 7.  **Buyer's Default: Termination:**  Without prejudice
> to any other rights or remedies available to BAE
> SYSTEMS, BAE SYSTEMS shall have the right and option
> to immediately terminate this Order upon written
> notice to Buyer in the event of the occurrence of one
> or more of the following: (i) if Buyer breaches any of
> the terms and conditions of this Order, including but
> not limited to the failure to perform any obligation
> hereunder or make any payment due hereunder; or (ii)
> if Buyer shall make an assignment for the benefit of
> creditors, or file a petition in bankruptcy, or be
> adjudged bankrupt or become insolvent, or be placed in
> the hands of a receiver, or otherwise be involuntarily
> placed into bankruptcy, or otherwise have its charter
> of incorporation relinquished or canceled.  The
> equivalent of any of the proceedings or acts referred
> to in this paragraph, though known and/or designated
> by some other name or term, shall likewise constitute
> a ground for termination of this Order.

Def.'s Obj. to Summ. J., Spear Decl., Ex. A (doc. no. 59-4), at

2 (emphasis added).  According to BAE, SpaceKey's failure to

make the advance payments it demanded was a breach of the terms

and conditions of the three purchase orders, thus triggering its

right to terminate them, under Section 7(i) of the TOS.  The

problem with BAE's position is that while Section 6 of the 2006

and 2007 iterations of the Terms of Sale included a provision

allowing BAE to require advance payment under certain

circumstances, that provision does not appear in the 2008 TOS,

which governed the pending purchase orders.  Without a

contractual right to demand advance payment, BAE had no right to

terminate the pending purchase orders on grounds of SpaceKey's failure to pay in advance.

But, SpaceKey's claim that BAE breached the parties' agreement by failing to process the pending purchase orders is equally infirm.  The 2007 TOS, which governed BAE's sale of FPGAs to SpaceKey, includes the following payment provision: "If Buyer shall fail to make any payment in accordance with the terms and conditions hereof, BAE SYSTEMS, in addition to its other rights and remedies, may, at its option, defer shipments or deliveries hereunder, or under any other contract with Buyer."  Pl.'s Mot. for Leave, Rea Decl., Ex. G (doc. no. 112-3), at 27 (emphasis added).  Given the court's proposed resolution of issue one, SpaceKey had no right not to pay for the last 200 FPGAs that BAE delivered,[4] which gave BAE the right to defer shipments of the goods referenced in the pending purchase orders.  Because SpaceKey has never paid for the last 200 FPGAs it accepted from BAE, it never had a right to delivery of the goods referenced in the pending purchase orders, and BAE never became obligated to fill or otherwise process them.  That is, under the 2007 TOS, BAE was, and still is, entitled to defer shipment of the goods referenced in the pending purchase orders,

---

[4] For what it is worth, the UCC provides that "[t]he buyer must pay at the contract rate for any goods accepted."  RSA 382-A:2-607(1).

whether there are three of them or five of them, until SpaceKey

pays for the last 200 FPGAs that BAE delivered pursuant to

SKC12508(C).

In view of the analysis outlined above, BAE shall show

cause why SpaceKey should not be granted judgment as a matter of

law on what remains of the request for declaratory judgment

stated in Count I of BAE's amended complaint,[5] and SpaceKey shall

show cause why BAE should not be granted judgment as a matter of

law on the portion of Count One of SpaceKey's counterclaim in

which it asserts that BAE breached the Consultant Agreement by

failing to process the pending purchase orders.

### Issue Three

In their assented-to statement of the case, the parties

frame the third issue this way:

> The third and final issue concerns the amount, if
> any, SpaceKey is due for commissions under the
> Consultant Agreement.  BAE Systems seeks a declaratory
> judgment that it owes no commissions and, in
> particular, that whatever commissions may have once
> been owed under purchase order SKC12508 have been
> offset by the costs and attorneys' fees BAE Systems
> has already incurred in this litigation to collect the
> outstanding balance owed for SKC12508.  (Amended
> Complaint Count II.)  BAE Systems contends this offset
> is expressly authorized under the Consultant
> Agreement.  SpaceKey seeks a damage award for the
> commissions allegedly due under SKC12508 as well as

---

[5] The court has already granted summary judgment to BAE on
the portion of Count I pertaining to its rejection of purchase
orders submitted after the expiration of the Consultant
Agreement.  See Doc. No. 68, at 24, 32.

> for commissions on an assortment of other sale
> transactions that were completed – or should have been
> completed – between 2008 and 2010.  (Counterclaim
> Count Two.)

Def.'s Pretrial S'ment (doc. no. 115), at 2; Pl.'s Pretrial

S'ment (doc. no. 119), at 2.

In a nutshell, SpaceKey asserts that it is owed $359,835 in

commissions, an amount equal to five percent of the revenue

generated by twenty-eight separate transactions, including its

purchase of the first 435 FPGAs referenced in SKC12508.  In

addition to arguing that SpaceKey has not produced adequate

evidence to support its claim, an issue that is not amenable to

resolution as a matter of law on the record before the court,

BAE also argues that it is entitled to a declaratory judgment

that, under the Consultant Agreement, it is excused from paying

SpaceKey a commission on the sales of the 435 FPGAs for which it

has received payment in full.  The court is not inclined to

agree.

The second paragraph of Section 4.A of the Consultant

Agreement states:

> It is understood that if a sales contract should be
> rescinded, revoked or repudiated by a buyer for
> reasons beyond BAE SYSTEMS' control or by BAE SYSTEMS
> for a buyer's breach of contract or by either party
> for force majeure causes, [SpaceKey] shall not be
> entitled to a fee with respect to such sales, except
> pro rata, to the extent of any amount BAE SYSTEMS may
> have previously received and to which the buyer
> asserts no claim for refund or any recovery that BAE
> SYSTEMS obtains based on buyer's breach, after

deduction of BAE SYSTEMS' costs, including attorney's
fees.

Pl.'s Mot. Summ. J., Rea Decl., Ex. B (doc. no. 57-4), at 2-3.
According to BAE, it does not owe SpaceKey any commission on the
sales of the 435 FPGAs for which it received payment in full
because: (1) SpaceKey's counterclaim for breach of warranty is a
claim for a refund of some of what SpaceKey paid for those
FPGAs; and (2) the amount of the attorneys' fees it has incurred
in defending against SpaceKey's claim is greater than the amount
of the commissions SpaceKey earned on those sales.  In BAE's
view, "[u]nder the [Consultant] Agreement, [its] obligation to
pay a commission to SpaceKey is reduced by any costs and
attorneys' fees BAE Systems incurs in connection with a sale
transaction."  Pl.'s Trial Mem. (doc. no. 121), at 28.  In
reaching that conclusion, BAE appears to erroneously treat the
second paragraph of Section 4.A as a general fee-shifting
provision when, in actuality, it has a more narrow scope and
purpose.

The subject matter of Section 4.A is SpaceKey's right to a
commission in the event that a sales contract is rescinded,
revoked, or repudiated.  Here, there is no allegation that
either BAE or SpaceKey ever rescinded, revoked or repudiated
their agreement for the purchase and sale of FPGAs.  Thus, the
provision on which BAE relies has no applicability to the

undisputed facts of this case, and does not entitle it to withhold commissions on the completed and paid-for sales of 435 FPGAs to SpaceKey.  The bottom line is this: BAE might be entitled to attorneys' fees under Section 7 of the Terms of Sale, but Section 4.A of the Consultant Agreement does not entitle it to withhold commissions that SpaceKey has earned.

Based on the foregoing, BAE shall show cause why SpaceKey should not be granted judgment as a matter of law on: (1) what remains of the request for declaratory judgment stated in Count II of BAE's amended complaint;[6] and (2) the claim for commissions on the sales of the 435 FPGAs for which BAE has received payment in full, stated in Count Two of SpaceKey's counterclaim.

## Conclusion

The parties shall have twenty-one (21) days from the date of this order to make the showings ordered herein, and each party shall have ten (10) days to respond to its opponent's filing.  With the benefit of those filings, the court will issue an order specifying the issues that remain for trial.  As a result of this briefing schedule, the bench trial scheduled for February 5, 2013, is continued, and the parties shall file,

---

[6] The court has already granted summary judgment to BAE on the portion of Count II pertaining to the termination of the Consultant Agreement.  See Doc. No. 68, at 11-19, 33.

within ten (10) days of the date of this order, a joint
stipulation proposing a new trial date.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge

January 11, 2013

cc:    Jonathan A. Shirley, Esq.
       Jeffrey C. Spear, Esq.
       Daniel E. Will, Esq.
       Joshua M. Wyatt, Esq.