**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

BAE Systems Information
and Electronics Systems
Integration, Inc.

     v.                              Civil No. 10-cv-370-LM
                                         Opinion No. 2013 DNH 064 P

SpaceKey Components, Inc.


**O R D E R**

In an order dated January 11, 2013, the court directed the parties to show cause why three legal issues in this case should not be decided in the manner described in that order. The parties' show-cause briefing is now before the court. Based upon that briefing, and for the reasons that follow, this order resolves the issues described in the show-cause order largely along the lines proposed in that order.

**Issue One**

In their assented-to statement of the case, the parties frame the first issue this way:

> The first [issue] is a dispute over purchase order SKC12508 and BAE Systems' delivery of flight RH1280B field programmable gate arrays ("FPGAs") to SpaceKey in 2009 and 2010. BAE Systems seeks to recover the balance under purchase order SKC12508 that remains unpaid by SpaceKey as well as the costs and attorneys' fees it has incurred to pursue collection of this amount. (Amended Complaint Counts III, IV, V,

> IV.)  SpaceKey contends it is entitled to damages because the flight RH1280B FPGAs BAE Systems delivered did not conform to BAE's express warranties. (Counterclaim Count Four.)

Def.'s Pretrial S'ment (doc. no. 115) 1; Pl.'s Pretrial S'ment (doc. no. 119) 1-2.  In its previous order, the court directed

> SpaceKey [to] show cause why BAE should not be granted judgment as a matter of law on: (1) the claim for breach of contract stated in Count IV of BAE's amended complaint; and (2) the claim for breach of warranty stated in Count Four of SpaceKey's counterclaim.

Order (doc. no. 122) 13.

The court's proposed resolution of Issue One is based upon a three-part rationale.  First, the Uniform Commercial Code ("U.C.C.") permits a buyer and seller to limit the buyer's remedies for breach of warranty by agreement, so long as the agreed-upon remedy does not fail of its essential purpose.  See N.H. Rev. Stat. Ann. ("RSA") §§ 382-A:2-719(1)(a) & (2).  Second, Section 8(b) of the 2007 Terms of Sale ("TOS")[1] provides that if the hardware BAE delivered thereunder did not substantially conform to BAE's specifications, then SpaceKey's sole remedy was "return within 60 days of delivery of any nonconforming Deliverables for credit, repair or replacement, at BAE SYSTEMS' sole option."  Pl.'s Mot. for Leave, Rea Decl., Ex.

---

[1] The transactions at issue in this case were governed by two different iterations of BAE's Terms of Sale.  When used in this order, the abbreviation "TOS" refers exclusively to the 2007 version, which governed the largest transaction.  The other relevant version will be referred to as "2008 TOS."

G (doc. no. 112-3), at 27.  Third, the remedy provided by the
TOS did not fail of its essential purpose, which precludes
SpaceKey from receiving any remedy for BAE's asserted breach of
warranty other than the one described in the TOS.

SpaceKey raises a host of objections to the reasoning
outlined above.  Specifically, it argues that: (1) the cases the
court cited in its previous order are irrelevant because they
involve contracts with purchase-price damage ceilings and claims
for consequential damages; (2) the cases the court cited do not
state a general rule that a refund never fails of its essential
purpose, and there is no difference between the "value" and the
"benefit" of a bargain; (3) while the return-for-credit remedy
described in Section 8(b) of the TOS is apparently fair and
reasonable, it failed in its purpose because of circumstances;
(4) the cases the court cited are distinguishable because they
do not address the sufficiency of a credit remedy, and the
failure of BAE's RH1280s to conform to BAE's warranties was
latent; and (5) there is no procedural basis for the court to
grant judgment as a matter of law as it proposed to do in its
previous order.  The court considers each of those five
arguments, beginning with the last one.

A. SpaceKey's Fifth Argument

SpaceKey argues that the court's show-cause order lacks a procedural foundation, and contends that the court should not: (1) treat proposed findings of fact as if they are facts found at trial; (2) grant summary judgment sua sponte without identifying evidence appropriate to that procedural posture; or (3) find facts and draw inferences unfavorable to it.

In particular, SpaceKey objects to the following portion of the court's previous order:

> [T]he court turns to the undisputed facts of this case.  All agree that . . . after it learned of the alleged TID shortfall, SpaceKey submitted purchase order ("PO") SKC12508(C) to BAE, in which it offered to buy 535 FPGAs with a TID of 100K rad(Si) and 100 more FPGAs with a TID of 50K rad(Si).

Order (doc. no. 122) 10.  In support of its objection to that statement, SpaceKey points to evidence that it mentioned TIDs of 50K and 100K rad(Si) in its purchase order not because it was ordering FPGAs with those specifications but, rather, to create contemporaneous documentation of BAE's inability to produce FPGAs with a TID of 300K rad(Si).

Based upon the parties' pretrial statements, it became evident that the trial in this case could involve several complex factual issues.  For example, BAE proposes to prove that the FPGAs it delivered to SpaceKey actually conformed to its warranty, and plans to do so by showing that the standards for

4

measuring TID have changed over time such that an FPGA that would have been rated at 300K rad(Si) at some point in the past would only test out at 100K rad(Si) today.  For its part, SpaceKey proposes to prove the value of the allegedly nonconforming FPGAs that BAE delivered, based upon the diminished use life of a 50K or 100K rad(Si) FPGA as opposed to one rated at 300K rad(Si).  The point of the court's previous order was to determine whether the complicated and no doubt costly trial the parties envision is actually necessary, based upon the undisputed facts and the relevant law.

In the discussion that follows, the court: (1) assumes that the FPGAs BAE sold SpaceKey did not meet the warranted specifications; (2) accepts as true, for purposes of this order, SpaceKey's explanation for the inclusion of TIDs of 50K and 100K rad(Si) in PO SKC12508(C); and (3) relies only upon facts that were undisputed on summary judgment, plus those contained in the 2007 TOS, which has made a belated appearance in this case.  In sum, the order that follows engages in no factfinding, only a legal analysis of the undisputed facts, undertaken in an effort to conserve judicial resources and those of the parties by avoiding a costly trial of factual matters that are immaterial to resolving the claims in this case.

B. SpaceKey's First Argument

In its first argument, SpaceKey devotes considerable attention to four of the opinions to which the court turned for guidance on the question of when and how a contractual remedy fails of its essential purpose.  Those opinions are PDC Laboratories, Inc. v. Hach Co., No. 09-1110, 2009 WL 2605270 (C.D. Ill. Aug. 25, 2009); Cox v. Lewiston Grain Growers, Inc., 936 P.2d 1191 (Wash. Ct. App. 1997); Leprino v. Intermountain Brick Co., 759 P.2d 835 (Colo. App. 1988); and Viking Yacht Co. v. Composites One LLC, Civ. Action No. 05-538(JEI), 2007 WL 2746713 (D.N.J. Sept. 18, 2007).  SpaceKey's point is that the cases that resulted in PDC Labs, Cox, Leprino, and Viking Yacht are distinguishable from this case, making those opinions irrelevant, because unlike this case, those cases all involved claims for consequential damages asserted in the face of contractual clauses limiting damages to the contract price. SpaceKey also contends that the court erred by relying upon those four cases because the courts that decided them all did so in ways that run counter to New Hampshire law as stated in Xerox Corp. v. Hawkes, 124 N.H. 610 (1984).

Starting with SpaceKey's second argument, the court cannot agree that PDC Labs, Cox, Leprino, and Viking Yacht are contrary to New Hampshire law.  In Xerox, the New Hampshire Supreme Court

explained that a seller can limit the remedies available for a
breach of warranty to repair or replacement, under RSA 382-A:2-
719(1)(a), and may limit or exclude consequential damages as an
available remedy, under RSA 382-A:2-719(3).  See 124 N.H. at
617.  A limited remedy is permissible under RSA 382-A:2-
719(a)(1) so long as it does not fail of its essential purpose,
see RSA 382-A:2-719(2), and a limitation or exclusion of
consequential damages is permissible so long as the limitation
or exclusion is not unconscionable, see RSA 382-A:2-719(3).
Substantively, the Xerox court determined that in the case
before it, "the allegations [did] not provide the basis for a
ruling that a material issue may exist regarding possible
unconscionability of the clauses in dispute."  124 N.H. at 618.

Regarding the interplay between RSA 382-A:2-719(2) and (3),
the court in Xerox explained:

> [O]ther courts, interpreting the effect of the
> "failure of essential purpose" Code provision in cases
> where there is proof of an inability to repair non-
> conforming goods, have not invalidated contractual
> limitations on incidental or consequential damages.
> Those portions of a contract disallowing incidental
> and consequential damages are considered separate and
> distinct from the language dealing with repair and
> replacement.  Such damage limitations survive even if
> the contractual provision limiting the buyer's
> remedies to repair or replacement is judicially
> stricken.  See Polycon Industries, Inc. v. Hercules,
> Inc., 471 F. Supp. 1316, 1324-25 (E.D. Wis. 1979);
> County Asphalt, Inc. v. Lewis Welding & Engineering
> Corp., 323 F. Supp. 1300, 1309 (S.D.N.Y. 1970); S.M.
> Wilson & Company v. Smith Intern., Inc., 587 F.2d

> [1363,] 1375 [(9th Cir. 1978)].  In <u>County Asphalt,
> Inc. v. Lewis Welding & Engineering Corp.</u>[,] <u>supra</u>,
> the federal district court held that a consequential
> damage limitation would not be affected by a finding
> of failure of essential purpose due to inability to
> repair or replace.  <u>Supra</u> at 1309.

<u>Xerox</u>, 124 N.H. at 619-20.  To paraphrase, the rule of <u>Xerox</u> is

that if an agreement between a buyer and seller includes an

exclusion of consequential damages that is not unconscionable,

that exclusion is not rendered inoperative when an agreed-upon

limited remedy fails of its essential purpose.  Under such

circumstances, the buyer may seek remedies as provided elsewhere

in Article 2 of the U.C.C.  <u>See</u> <u>Colonial Life Ins. Co. of Am. v.

Elec. Data Sys. Corp.</u>, 817 F. Supp. 235, 240-41 (D.N.H. 1993).

There is nothing in <u>PDC Labs</u>, <u>Cox</u>, <u>Leprino</u>, or <u>Viking Yacht</u> that

runs counter to the rule stated in <u>Xerox</u>.

In <u>PDC Labs</u>, the agreement between the buyer and the seller

included a limitation on remedies, <u>see</u> 2009 WL 2605270, at *2,

subject to analysis under section 2-719(2) of the U.C.C., but

does not appear to have included an exclusion of consequential

damages.  As a result, there was no call for the court in <u>PDC

Labs</u> to choose between the <u>Xerox</u> rule, or the alternative rule,

situated on the other side of the "deep division of opinion,"

<u>Colonial Life</u>, 817 F. Supp. at 240 (quoting <u>McKernan v. United

Techs. Corp., Sikorsky Aircraft Div.</u>, 717 F. Supp. 60, 71 (D.

Conn. 1989)) (internal quotation marks omitted), on the issue of

the relationship between sections 2-719(2) and (3) of the U.C.C.
So, too, with Leprino.  Like the court in PDC Labs, the court in
Leprino was faced with a contract that included a limitation of
remedies but not an express exclusion of consequential damages.
See 759 P.2d at 836.  Like the PDC Labs court, the Leprino court
assessed the conscionability of the limitation of remedies
provision under section 2-302 of the U.C.C., see PDC Labs, 2009
WL 2605270, at *2; Leprino, 759 P.2d at 836-37, but did not
assess the conscionability of an exclusion of consequential
damages because neither agreement included such a provision.
Thus, as in PDC Labs, the court in Leprino never had the
opportunity to consider the application of the Xerox rule, much
less make a decision that ran contrary to it.

In Cox, when the buyer picked up a load of winter wheat
seed from the seller, the seller "issued a delivery ticket to
the truck driver . . . [that] limited [the seller]'s liability
to the purchase price of the seed."  936 P.2d at 1194.  Judge
Thompson referred to the provision set forth in the delivery
ticket in a manner that evokes both sections 2-719(2) and (3),
as "the limitation of remedies clause (exclusionary clause)."
Cox, 936 P.2d at 1195.  There is no indication, however, that
the delivery ticket in Cox included an express exclusion of
consequential damages of the sort addressed by section 2-719(3).

9

Absent an exclusion of consequential damages other than the
exclusion that might be implied by the limitation of remedies to
the purchase price of the seed, the facts of Cox are similar to
those of PDC Labs and Leprino.  But, in any event, whatever the
legal status of the language in the delivery ticket, Judge
Thompson ruled that "the [trial] court did not err in finding
the exclusionary clause unconscionable."  Id. at 1198.  Because
the decision in Cox did not involve an award of consequential
damages in the face of a conscionable exclusion of consequential
damages, nothing in that opinion contravenes the Xerox rule.

     Finally, there is Viking Yacht.  Of the four opinions
SpaceKey identifies as making rulings that run contrary to New
Hampshire law, this is the only one that unambiguously involved
both a limitation of remedies and an exclusion of consequential
damages.  See 2007 WL 2746713, at *4.  The problem with
SpaceKey's analysis of Viking Yacht is that Judge Irenas
followed the Xerox rule.  First, he determined that if the
limitation of remedies to replacement or refund applied, that
remedy would fail of its essential purpose.  See Viking Yacht,
2007 WL 2746713, at *6.  Having made that determination, Judge
Irenas continued:

        This leaves the question of the validity of the
     exclusion of consequential and incidental damages
     clause.  As noted in Chatlos Sys., Inc. v. Nat'l Cash
     Register Corp. (NCR Corp.), 635 F.2d 1081, 1086 (3d

10

Cir. 1980), "[s]everal cases have held that when a
limited remedy fails of its purpose, an exclusion of
consequential damages also falls, but approximately
the same number of decisions have treated that
preclusion as a separate matter." In <u>Chatlos</u>, the
Third Circuit adopted the latter approach. <u>Chatlos</u>
involved an exclusive repair remedy, which the Court
held was unenforceable due to the untimeliness of the
repair of the faulty installation of a computer
system. <u>Id.</u> at 1086. The Court held that the
exclusion of consequential damages should be reviewed
independently, and should stand if not unconscionable.
<u>Id.</u>; <u>see also</u> N.J. Stat. § 12A:2-719(3). However, it
also stated that unconscionability is to be decided
under the circumstances, and it is relevant to
consider the failure of the essential purpose of a
contractual remedy when making this determination.
<u>Id.</u>

2007 WL 2746713, at *7. In other words, the law of the Third

Circuit as expressed in <u>Chatlos</u>, which Judge Irenas applied in

<u>Viking Yacht</u>, is identical to New Hampshire law, as announced in

<u>Xerox</u>. And, indeed, after determining that the limited remedy

in <u>Viking Yacht</u> failed of its essential purpose, Judge Irenas

conducted a separate analysis of unconscionability. <u>See</u> <u>Viking</u>

<u>Yacht</u>, 2007 WL 2746713, at *7. Accordingly, there is no basis

for arguing that <u>Viking Yacht</u> runs counter to New Hampshire law.

Not only is there nothing in <u>PDC Labs</u>, <u>Cox</u>, <u>Leprino</u>, or

<u>Viking Yacht</u> that runs counter to New Hampshire law, but,

perhaps more importantly, even if any of those opinions had

taken the approach to the relationship between sections 2-719(2)

and (3) that the <u>Xerox</u> court rejected, this court relied on

those opinions for what they had to say on an issue unrelated to

11

the interplay between sections 2-719(2) and (3) of the U.C.C. In its show-cause order, the court agreed with SpaceKey that Xerox offers little guidance on the question of how to determine whether a limited remedy fails of its essential purpose, and then turned to opinions in cases from outside New Hampshire. But, the court drew no rules of law from those opinions other than their discussions of the principles and mechanics for determining whether a limited remedy fails of its essential purpose.

Beyond that, the factual distinction SpaceKey uses to argue the irrelevance of those out-of-state cases, i.e., the fact that they involved buyers who sought consequential damages, played no part in the court's discussion or analysis. Thus, the possibility of an award of consequential damages in those cases does nothing to undermine the validity of the court's reliance on them. Moreover, the fact that the plaintiffs in PDC Labs, Cox, Leprino, and Viking Yacht sought consequential damages is a distinction without a difference. In those cases, the plaintiffs argued that they were entitled to seek consequential damages because a contractual limitation of remedies to a refund of the purchase price failed of its essential purpose. Here, SpaceKey argues that it is entitled to seek a partial refund of its purchase price because a contractual limitation of remedies

to return for credit failed of its purpose.  The remedies sought and the contractual limitations in the out-of-state cases are different from those in this case.  However, the legal principle is the same: in order to be entitled to seek a remedy for breach of warranty other than one specified by a contract between a buyer and a seller, the buyer must establish that the agreed-upon remedy, whatever it may be, fails of its essential purpose. In sum, SpaceKey's first argument is without merit.

### C. SpaceKey's Second Argument

SpaceKey's second argument is that: (1) the cases the court cited do not establish a general rule that a refund never fails of its essential purpose; and (2) there is no meaningful difference between the "value" and the "benefit" of a bargain.

The court begins by noting that, notwithstanding the argument that SpaceKey appears to be making in Section II of its memorandum, the resolution of Issue One proposed in the show-cause order does not rely on a general rule that a refund remedy can never fail of its essential purpose.  Such a remedy can fail.  Cox, Leprino, Viking Yacht, and PDC Labs describe circumstances under which that might happen.  That said, the court turns to the argument SpaceKey makes in the body of Section II.

SpaceKey develops the main part of its second argument by contending that: (1) the purpose of a remedy for breach of warranty is to receive conforming goods; (2) nothing in <u>White v. Microsoft Corp.</u>, 454 F. Supp. 2d 1118 (S.D. Ala. 2006); <u>Stearns v. Select Comfort Retail Corp.</u>, No. 08-2746 JF, 2009 WL 1635931 (N.D. Cal. June 5, 2009); or <u>Taylor Investment Corp. v. Weil</u>, 169 F. Supp. 2d 1046 (D. Minn. 2001), stands for the proposition that "the mere availability of a refund – without regard to whether conforming goods can be obtained with that sum – is enough to prevent a remedy from failing of its essential purpose," Def.'s Mem. (doc. no. 124) 14; and (3) both <u>Stearns</u> and <u>White</u> "involved remedies that did, in fact, provide the plaintiffs with what they wanted – conforming goods," <u>id.</u> at 15. SpaceKey summarizes the main part of that argument this way:

> Neither <u>Stearns</u> [<u>v. Select Comfort Retail Corp.</u>, No. 08-2746 JF, 2009 WL 1635931 (N.D. Cal. June 5, 2009)] nor <u>White</u> [<u>v. Microsoft Corp.</u>, 454 F. Supp. 2d 1118 (S.D. Ala. 2006)] stands for "the proposition that a buyer who returns a defective product for a refund does receive the substantial value of his or her bargain," irrespective of whether a conforming product can be obtained.  Nor do any of the other authorities the Court cites.  With respect, SpaceKey suggests that the law is to the contrary – a refund cannot serve its essential purpose unless it permits the acquisition of a conforming substitute.

<u>Id.</u> at 20 (quoting Order (doc. no. 122) 9) (citation to the record omitted).

SpaceKey gets off on the wrong foot by contending that the purpose of any remedy is to provide the buyer with conforming goods.  The purpose of a remedy is not a one-size-fits-all proposition.  Rather,

> both the statutory language [of the U.C.C.] and the comment [to section 2-719(2)] refer to "its [i.e., the remedy's] essential purpose * * * " (emphasis added). That is, 2-719(2) should be triggered when the remedy fails of its essential purpose, not the essential purpose of the Code, contract law, or equity.

James J. White & Robert S. Summers, Uniform Commercial Code § 13-10(a), at 603 (6th ed. 2010); see also 4B Lary Lawrence, Lawrence's Anderson on the Uniform Commercial Code § 2-719:128, at 110 (3d ed. 2010) ("The determination that a limited remedy has failed of its essential purpose is a two-step process. First, the essential purpose of the limited remedy must be determined.") (citing Cooley v. Big Horn Harvestore Sys., Inc., 813 P.2d 736, 744 (Colo. 1991)); id., § 2-719:129, at 111 ("Whether a remedy has failed of its essential purpose is limited to an examination of the essential purpose of the limitation . . . .") (citing Waukesha Foundry, Inc. v. Indus. Eng'g, Inc., 91 F.3d 1002, 1010 (7th Cir. 1996)) (emphasis added).

Plainly, the essential purpose of a repair or replacement remedy is to put conforming goods in the hands of the buyer.  A repair remedy fails of its essential purpose, which is "to cure

the defect," when "the seller is unwilling or unable to repair the defective goods within a reasonable period of time," White & Summers, supra, § 13-10(a), at 603, or "when the seller is willing and able to repair, but the repairs cannot be done," id. Indeed, all of the opinions SpaceKey cites for the proposition that the purpose of a remedy is to provide the buyer with conforming goods were issued in cases involving repair and/or replacement remedies.  See Def.'s Mem. (doc. no. 124) 12-14.

SpaceKey, however, has cited no opinion in which a court has determined that the purpose of a refund remedy is to provide the buyer with conforming goods, and the court's own research has uncovered no authority for that proposition.  A refund remedy fails of its essential purpose under the circumstances described in PDC Labs, Leprino, Cox, and Viking Yacht, and may also fail if the seller: (1) is "unable or unwilling to provide a refund . . . within a reasonable time" Arias/Root Eng'g v. Cinn. Milacron Mktg. Co., 945 F.2d 408 (table decision), 1991 WL 190114, at *6 (9th Cir. Sept. 25, 1991); or (2) "conceal[s] facts regarding the breach of warranty until such time that recision by the buyer could not be pursued . . . because it would cause sever[e] financial strain," Evans Indus., Inc. v. Int'l Bus. Machs. Co., No. Civ.A. 01-0051, 2004 WL 241701, at *9 (E.D. La. Feb. 6, 2004) (quoting Ritchie Enters., Inc. v.

Honeywell Bull, Inc., 730 F. Supp. 1041, 1049 (D. Kan. 1990)).
That a refund remedy does not fail in the same way as a repair
or replacement remedy would fail tends to suggest that the
essential purposes of those two kinds of remedies are also
different as well.

The lack of authority for the proposition that the purpose
of a refund remedy is to provide the buyer with conforming goods
is entirely understandable.  With a repair or replacement
remedy, the power to put a conforming product in the hands of
the buyer rests with the seller.  If the seller repairs or
replaces a defective product, the result is that the buyer will
end up with the product it bargained for, provided by the
seller.

A refund remedy is different.  Rather than placing the
buyer in the position it bargained for, such a remedy puts the
buyer back in the position it occupied before it struck a
bargain the seller could not fulfill and could not correct
through repair or replacement.  Instead of putting a conforming
product into the hands of the buyer, the seller puts the buyer's
money back into his or her hands.  The purpose of such a remedy
is to make the buyer whole financially, not to provide it with a
conforming product.  See White & Summers, supra, § 13-10(b), at
607 (describing purchase-price refund as "an alternate, or

'backup,' remedy for cases where the primary repair-or-replace remedy fails of its essential purpose").

A buyer might use a refund to purchase a conforming product from another vender, if available, but that is the buyer's choice, not the purpose of the refund remedy.  Thus, SpaceKey overstates the essential purpose of a refund remedy when it argues that "[t]he plaintiff in White was assured of receipt of a functional Xbox 360 either directly from Microsoft [as a result of a repair-or-replacement remedy], or by buying a new unit himself with his refund."  Def.'s Mem. (doc. no. 124) 18. Repair or replacement would have provided the plaintiff in White with a functional Xbox 360; a refund would have provided him with the ability to purchase a new Xbox, or anything else that cost as much as a new Xbox.

The distinction between putting the buyer where it hoped to end up and putting the buyer back on the starting line is the source of the court's distinction between giving the buyer the benefit of its bargain, i.e., a conforming product, and giving the buyer the value of its bargain.  In this context, a bargain's value is measured relatively broadly, and encompasses more than just its benefit.  As Judge Irenas explained in Viking Yacht: "the Court recognizes that a remedy need not put a party in precisely the same position as the party would have been had

the breach not occurred, [but] a party is nonetheless entitled to the substantial value of his bargain." 2007 WL 2746713, at *6 (citing U.C.C. § 2-719).  Indeed, the commentary to section 2-719 provides that a contractual remedy must give way if it deprives "either party of the substantial value of the bargain," not the benefit of the bargain.  RSA 382-A:2-719 cmt. 1 (emphasis added).

That principal was the basis for decisions such as those in Marr Enterprises, Inc. v. Lewis Refrigeration Co., 556 F.2d 951, 955 (9th Cir. 1977) (affirming district court's enforcement of refund remedy for defective brine refrigeration unit); Garden State Food Distributors, Inc. v. Sperry Rand Corp., Sperry Univac Division, 512 F. Supp. 975, 978 (D.N.J. 1981) (ruling that where buyer purchased computer system with patent defects, refund remedy was neither inadequate nor failed of its essential purpose); White, 454 F. Supp. 2d at 1128 (holding that three different remedies, including purchase-price refund "would actually ensure that [the buyer] received the substantive value of his bargain"); and Stearns, 2009 WL 1635931, at *6 (holding that "full refund of the purchase price provide[d] substantially the same value as the non-defective bed for which the parties initially bargained").  Those four opinions all stand for the proposition that when a buyer cannot be provided with the

benefit of its bargain through repair or replacement, it is remedy enough for the seller to take back the nonconforming goods and give the buyer a refund, thus making it financially whole.

Moreover, none of the four opinions cited in the preceding paragraph says anything that ties the ability of a refund remedy to achieve its essential purpose to the availability of a conforming product.  Thus, as SpaceKey states, White, Stearns, and Taylor do not stand for the proposition that "the mere availability of a refund – without regard to whether conforming goods can be obtained with that sum – is enough to prevent a remedy from failing of its essential purpose."  Def.'s Mem. (doc. no. 124) 14.  While literally accurate, that statement does not advance the ball because none of the buyers in those cases argued that the unavailability of a conforming product in the marketplace caused an available refund remedy to fail of its essential purpose.

SpaceKey correctly observes that in Viking Yacht, Judge Irenas recognized "cases in which parties purchase defective items, and can be made whole with a refund remedy which allows them to purchase the items from a different vendor."  2007 WL 2746713, at *6 n.10 (citing Garden State Food, 512 F. Supp. 975; Ritchie, 730 F. Supp. 1041; Arcata Graphics Co. v. Heidelberg

Harris, Inc., 874 S.W.2d 15, 29 (Tenn. Ct. App. 1993)).  And, the court appreciates both a buyer's interest in being able to use a refund to purchase a non-defective replacement for a defective product and the fact that no such replacement product is available in this case.  But, SpaceKey has cited no case that stands for the proposition that "a refund cannot serve its essential purpose unless it permits the acquisition of a conforming substitute."  Def.'s Mem. (doc. no. 124) 20.  The lack of any such authority, in turn, is not difficult to explain, given that the U.C.C. "requires only a 'minimum adequate remed[y],'" RSA 382-A:2-719 cmt. 1, not a perfect remedy.

A refund remedy does not fail of its essential purpose so long as it makes the buyer whole; such a remedy fails when a refund alone would leave the buyer in a hole.  That is the teaching of opinions such as PDC Labs, Cox, Leprino, and Viking Yacht.  In those cases, buyers purchased and used non-conforming products and then suffered significant financial losses as a result of using them.  It is because of cases such as those that this court readily agrees with SpaceKey's observation that there is no general rule that a refund never fails of its essential purpose.  A refund remedy can fail of its essential purpose in several ways, as the court has already pointed out.  But, this

is not a case in which a seller has refused to make good on such a remedy, nor is it a case in which a refund would have been insufficient to make whole a buyer that accepted nonconforming goods and put them to use, to its financial detriment.

To summarize the foregoing, and in response to SpaceKey's second argument, the court reaches the following legal conclusions: (1) the purpose of a refund remedy is to make the buyer financially whole, not to provide it with conforming goods; (2) in <u>Stearns</u> and <u>White</u>, the available refund remedy would have made the buyers financially whole, but, standing alone, would not have provided them with conforming goods; and (3) a refund remedy does not fail of its essential purpose if a buyer is unable to use its refund to purchase a conforming substitute for a nonconforming product.

### D. SpaceKey's Third Argument

SpaceKey's third argument is that Section 8(b) of TOS includes an "apparently fair and reasonable clause" that "because of circumstances" has failed in its purpose. In addition, SpaceKey notes the lack of evidence that the limited remedy was the subject of separate negotiation. The court considers each part of SpaceKey's argument in turn.

SpaceKey frames its "because of circumstances" argument in the following way:

> [T]he particular circumstances of this transaction
> made this general term [i.e., the limitation of
> remedies to return for credit, repair, or replacement]
> fail of its essential purpose.  BAE cannot repair the
> RH1280B to make it conform to its express warranties.
> Replacement would simply substitute one nonconforming
> product for another.  And there is no dispute that a
> refund – even if one were provided for in the TOS –
> would accomplish nothing, because no substitute
> products exist.

Def.'s Mem. (doc. no. 124) 24.  The problem with that argument is that SpaceKey does not identify any legally sufficient circumstance that would cause a refund (or credit) remedy to fail of its essential purpose.

The U.C.C. provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter."  RSA 382-A:2-719(2).  The commentary to the Code elaborates: "[U]nder subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article." Id. cmt. 1.  As a leading treatise explains, "this provision 'is not concerned with arrangements which were oppressive at their inception, but rather with the application of an agreement to novel circumstances not contemplated by the parties.'"  White & Summers, supra, § 13-10(a), at 603 (quoting 1 N.Y. State Law

Revision Comm'n, 1955 Report 584 (1955)) (emphasis added).

Another treatise explains the concept this way:

> Whether an exclusive remedy has failed of its
> essential purpose is controlled by whether there has
> been such a change of circumstances subsequent to the
> making of the contract as to cause such a failure.
> That is, "the word 'circumstances' in U.C.C. § 719(2)
> would seem to refer to circumstances not within the
> contemplation of the parties at the time of
> contracting and circumstances not within the control
> of the complaining party."

4B Lawrence, supra, § 2-719:125, at 108 (quoting Envirex, Inc.
v. Eco. Recovery Assocs., Inc., 454 F. Supp. 1329, 1336 (M.D.
Pa. 1978)) (citation omitted).

In SpaceKey's view, a refund remedy would have failed of
its essential purpose because there was no other vendor from
which it could have obtained an FPGA that conforms to the 300K
rad(Si) TID that BAE allegedly warranted for its RH1280B.  The
unavailability of a 300K rad(Si) FPGA, however, is not a novel
circumstance not contemplated by the parties.  If there had been
another vendor selling 300K rad(Si) FPGAs at the time SpaceKey
made its agreement with BAE, and that vendor later went out of
business, that, perhaps, would have been a novel circumstance
not contemplated by the parties.  In this case, however,
SpaceKey knew from the outset that BAE was the one and only
source for Actel legacy FPGAs.  Thus, if the remedy provided by
the TOS is oppressive, it has been so since the inception of the

agreement, which places it beyond the reach of RSA 382-A:2-719(2).  In that regard, this case has much in common with Proto Construction & Development Corp. v. Super. Precast, Inc., 52 U.C.C. Rep. Serv. 2d (CBC) 921, No. 99-CV-2851(NG), 2002 WL 1159593 (E.D.N.Y. May 28, 2002).  Professor Lawrence had this to say about Proto:

> Given that both parties were aware that there was a substantial risk of delay when they entered into the contract, and that the parties, both of which are sophisticated companies, allocated the risk of that delay to the buyer, the buyer was not deprived of the substantial value of the bargain by enforcing the limitation of liability clause.

4B Lawrence, supra, § 2-719:138, at 130.  Here, both parties are sophisticated companies, both knew that BAE was the sole source of Actel legacy FPGAs, and they allocated any risks associated with BAE's status as the sole source of those FPGAs to SpaceKey.

In its third argument, SpaceKey also makes the following contention:

> There is another flaw to the Court's reasoning here.  BAE's TOS is a preprinted form.  There is no evidence in this case that it was separately negotiated by BAE and SpaceKey.  Cox, 936 P.2d at 1196 (requiring that "exclusion of remedies be explicitly negotiated and set forth with particularity").

Def.'s Mem. (doc. no. 124) 17.  There are at least two problems with that argument.  First, Cox is based on the law of Washington, and with regard to the particular rule on which SpaceKey relies, the states are not in agreement.  As the Cox

court explained in the context of resolving a conflict-of-law
question:

> Idaho courts also strictly construe limitation of
> remedy clauses.  Clark v. International Harvester Co.,
> 581 P.2d 784, 796-97 ([Idaho] 1978).  Washington
> disfavors disclaimers and finds them to be ineffectual
> unless they are explicitly negotiated and set forth
> with particularity.  Berg v. Stromme, 484 P.2d 380
> ([Wash.] 1971) (Berg rule).  See also Schroeder v.
> Fageol Motors, Inc., 544 P.2d 20 ([Wash.] 1975).
> Washington also requires that any exclusion of
> remedies be explicitly negotiated and set forth with
> particularity.  Baker v. City of Seattle, 484 P.2d 405
> ([Wash.] 1971).  Thus, Washington's requirements for
> disclaimers and limitations on remedies differs from
> Idaho's rules, and an actual conflict exists between
> the laws of the two states.

936 P.2d at 1196 (parallel citations omitted).  Absent any

argument that New Hampshire would come down on Washington's side

on the issue over which Washington disagrees with Idaho, this

court declines to apply the Cox rule to this case.  And, perhaps

more importantly, unlike SpaceKey, which is a sophisticated

business entity, the buyer in Cox was a consumer, see id. at

1194, and it is well understood that the U.C.C. provides greater

protection to consumers than to business people, see White &

Summers, supra, § 13-10(a), at 605.

   In sum, there is no merit to SpaceKey's argument that the

limited remedy set out in the TOS qualifies as a remedy that was

fair and reasonable at the outset but ended up depriving

SpaceKey of the substantial value of its bargain as a result of circumstances arising after the inception of the agreement.

E. SpaceKey's Fourth Argument

SpaceKey's fourth argument has two parts.  First, it argues that the opinions on which the court relied in its analysis are distinguishable, and therefore irrelevant, because they do not address the impact or meaning of a credit remedy as opposed to a refund remedy.  Second, SpaceKey argues that the failure of BAE's FPGAs to conform with its warranty was, in fact, a latent defect.  The court considers each argument in turn.

In the first part of its argument, SpaceKey contends that: (1) a credit is different from a refund; and (2) without any evidence before it concerning the volume of SpaceKey's business with BAE, the court has no basis for concluding that the credit remedy available to SpaceKey would have given SpaceKey the benefit of its bargain with BAE.  SpaceKey's point is that a customer who did $5 million worth of business with BAE every week might find a $5 million credit nearly equivalent to cash, while a customer that did $2 million worth of business with BAE in a year might find a credit to be much less valuable.  In SpaceKey's view, this case needs to be rescheduled for a trial at which it could introduce evidence concerning the magnitude of its demand for BAE products which, in turn, would establish

whether a credit with BAE would have provided it with the value
of its bargain with BAE.

Broadly speaking, SpaceKey is correct to focus on the lack
of evidence in this case.  But, the problem is not the lack of
record evidence concerning SpaceKey's demand for BAE products.
The problem is the lack of any evidence that SpaceKey ever
attempted to use the remedy it now says failed of its essential
purpose.

"Ordinarily, the buyer must provide the seller a reasonable
opportunity to carry out the exclusive or limited remedy before
the buyer can successfully argue failure of essential purpose."
White & Summers, supra, § 13-10(a), at 603 (citations omitted);
see also 4B Lawrence, supra, § 2-719:140, at 134 ("Although the
software purchased could not be repaired, the exclusive remedy
of repair or replacement or return of the price paid did not
fail of its purpose where the buyer did not ask for price
back.") (citing Valley Paving, Inc. v. Dexter & Chaney, Inc., 42
U.C.C. Rep. Serv. 2d (CBC) 433, 2000 WL 1182800 (Minn. Ct. App.
Aug. 22, 2000)).  When a buyer has given the seller the
opportunity to carry out a limited remedy, then there is a
question for the jury concerning whether the remedy achieved its
essential purpose, or failed to do so.

But where, as here, the buyer did not give the seller the opportunity to carry out the remedy, there are no facts for the jury to find.  See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 319 F. Supp. 2d 1040, 1055 (C.D. Cal. 2003) (holding that where "NRTC never requested a refund of its Committed Member Payments . . . NRTC [had] not raised a genuine issue of material fact that Section 11.01 of the Agreement [i.e., the refund provision] fails of its essential purpose").  Because SpaceKey never attempted to return the nonconforming FPGAs for credit with BAE, a fact that is undisputed, there would no basis for a jury to determine that the credit remedy failed of its essential purpose, which means that there is no triable issue concerning the failure of that remedy.

In its reply, SpaceKey makes two attempts to evade the consequences of eschewing the return-for-credit remedy.  It begins with this:

> BAE argues that SpaceKey's claims should be disposed of without trial because it did not make a formal attempt to invoke the limited remedies in the TOS.  The court should disregard this argument.  First, it is not an argument that the Court proposed in the Order.  Nor is it an argument that BAE had previously made.

Def.'s Reply (doc. no. 132) 3-4.  SpaceKey is mistaken.  The show-cause order includes the following relevant passage:

> [W]here, as here, the buyer has not attempted to use a limited remedy to which it has agreed, there is no

> issue of fact for a jury to resolve, and the question
> of whether that remedy fails of its essential purpose
> may be decided as a matter of law.

Order (doc. no. 122) 4 (citing <u>Nat'l Rural Telecomms.</u>, 319 F.

Supp. 2d at 1055).  SpaceKey next points out the undisputed

facts that BAE could not repair the FPGAs and that there were no

conforming FPGAs available in the marketplace, and recites the

well established rule "that the law does not require a useless

act."  Def.'s Reply (doc. no. 132) 4 (quoting <u>McGranahan v. Std.</u>

<u>Constr. Co.</u>, 101 N.H. 46, 47 (1957)).  Plainly, seeking to use

the repair or replacement remedies provided by Section 8(b)

would have been useless acts.  But, Section 8(b) also gave

SpaceKey a third remedy, return for credit, and because there

was nothing about that remedy, on the facts of this case, that

would have caused it to fail of its essential purpose,

attempting to return the allegedly nonconforming FPGAs for a

credit would not have been a useless act, notwithstanding the

lack of conforming FPGAs in the marketplace.  In short, there is

no excuse for SpaceKey's decision to bypass the return-for-

credit remedy.

The second part of SpaceKey's fourth argument is that the

failure of BAE's FPGAs to conform to its warranty was, in fact,

a latent defect.  According to SpaceKey: (1) BAE disclosed its

inability to produce FPGAs with a TID of 300K rad(Si) in the

spring of 2009, after SpaceKey's customers had spent up to two years incorporating the anticipated 300K rad(Si) FPGA into their satellite systems; (2) that late disclosure made the TID shortfall "functionally identical to a 'latent' defect of the type described in the Court's authorities," Def.'s Mem. (doc. no. 124) 28, thus bringing SpaceKey's claims "comfortably within the latent defect paradigm," id.; and (3) under the latent-defect paradigm, a refund (or credit) remedy fails of its essential purpose.  Accepting, for the sake of argument, the somewhat counterintuitive proposition that a product characteristic listed by a buyer in its purchase order could ever qualify as a latent defect,[2] there is fundamental problem with SpaceKey's attempt to bring its claims within the latent-defect paradigm: the use to which SpaceKey put the allegedly defective FPGAs.

      In Cox, the buyer purchased seed, planted it, and then discovered that it had a low germination rate.  See 936 P.2d at 1195.  In Leprino, the buyer purchased bricks, installed them, and then discovered that they were susceptible to staining.  See 759 P.2d at 836.  In Viking Yacht, the buyer purchased gel coat,

---

      [2] As noted above, the court does not construe PO SKC12508(C) as an order for FPGAs with TIDs of 50K or 100K rad(Si), but only as evidence that, when the purchase order was issued, SpaceKey knew that BAE was not going to delivering FPGAs with a TID of 300K rad(Si).

applied it to several boats, and then discovered that the gel coat was subject to cracking when it hardened.  See 2007 WL 2746713, at *6.  In each of those three cases, the buyer was a consumer, and each of those consumers suffered damages as a result of using the defective product.  The farmer in Cox planted the defective seed on 865 acres, and that seeding yielded no harvest, resulting in damages substantially in excess of the cost of the defective seed.  See 936 P.2d at 1195.  The builder in Leprino incurred the cost of removing the defective bricks from a structure he had built and rebuilding with conforming bricks, which "far exceeded the costs of merely purchasing new bricks."  759 P.2d at 837.  The boat builder in Viking Yacht was faced with the costs of replacing the defective gel coat it used, which far exceeded the cost of the gel coat. See 2007 WL 2746713, at *6.

Here, by contrast, while SpaceKey was a buyer, it was not a consumer of BAE's FPGAs.  SpaceKey did not design or launch any satellites.  Its customers did.  What SpaceKey did was resell the FPGAs it purchased from BAE to its own customers.  And, it is undisputed that SpaceKey was able to use the FPGAs it purchased from BAE exactly as it had intended to use them, with the intended results.  It resold the 50K and 100K rad(Si) FPGAs for the same price its customers had agreed to pay for 300K

rad(Si) FPGAs.  Because SpaceKey was a reseller rather than a
consumer, and because its use of the defective FPGAs was just as
remunerative as its use of non-defective FPGAs would have been,
SpaceKey is situated entirely differently from the buyers in
Cox, Leprino, and Viking Yacht, and its claims fall well outside
the latent-defect paradigm.

The familiar flaw in SpaceKey's argument is that it
conflates itself with its customers.  See Order (doc. no. 58) 37
("[T]he court cautions SpaceKey that at least two of its four
categories of damages involve damages that are not SpaceKey's to
claim.  For example, because SpaceKey does not own or operate
spacecraft, reduced spacecraft uselife is not a detriment
SpaceKey has suffered.").  SpaceKey used BAE's FPGAs for resale,
and it is undisputed that the 50K and 100K rad(Si) FPGAs
performed exactly as well for SpaceKey as 300K rad(Si) FPGAs
would have performed.  Moreover, not that the end use of the
FPGAs is even an issue in this case given that SpaceKey is
making the breach of warranty claim, the court further notes
that SpaceKey's customers installed the 50K or 100K rad(Si)
FPGAs in their satellites knowing that that they had TIDs of 50K
or 100K rad(Si).  Thus, SpaceKey's customers are distinguishable
from: (1) the farmer in Cox who bought seed that was certified
to have a germination rate of at least eighty-five percent but

ultimately performed at a rate of between twenty-two and forty-two percent, see 936 P.2d at 1194-95; (2) the builder in Leprino who used stainable bricks that he expected to be stain-resistant; and (3) the boat builder in Viking Yacht that applied crack-prone gel coat that it expected to be crack proof.

### F. Summary

Before examining the two legal claims at the heart of Issue One, it will be useful for the court to summarize the legal conclusions it has reached to this point.  First, the purpose of a refund or credit remedy for breach of warranty is not to provide the buyer with conforming goods; it is to make the buyer whole financially.  Second, the availability of a conforming product in the marketplace has no bearing on the sufficiency of a refund or credit remedy.  Third, where the seller is, at the outset of the agreement, the sole source for a particular product, the lack of a conforming substitute is not a circumstance that causes a refund or credit remedy to fail of its essential purpose.  Fourth, a buyer must attempt to use a limited remedy before it may be heard to argue that any such remedy has failed of its essential purpose.  Finally, the latent-defect exception to RSA 382-A:2-719(1)(a), as established in the decisional law, extends only to buyers who used the products they purchased for their intended purposes and suffered

damages in excess of the amount they could recover from a refund remedy.

Having established the foregoing legal principles, the court turns to the two questions posed in its show-cause order: (1) whether BAE is entitled to judgment as a matter of law on the claim for breach of contract stated in Count IV of its amended complaint; and (2) whether BAE is entitled to judgment as a matter of law on the claim for breach of warranty stated in Count Four of SpaceKey's counterclaim.  The court begins with SpaceKey's claim and then turns to BAE's claim.

### 1. SpaceKey's Claim for Breach of Warranty

For purposes of the following analysis, the court assumes, without deciding, that BAE warranted, among other things, that the FPGAs it delivered to SpaceKey would have a TID of 300K rad(Si) and that BAE breached its warranty by, among other things, delivering FPGAs with TIDs of 50K or 100K rad(Si).  It is undisputed that the TOS provided a limited, exclusive remedy for that particular kind of warranty breach: return within sixty days of delivery for credit, repair, or replacement.  It is undisputed that SpaceKey did not attempt to avail itself of any of those three remedies.  Rather than attempting to return the nonconforming FPGAs, it bypassed the contractual remedies, sold

35

the FPGAs to its customers, and withheld payment for the final 200 of them.

Because SpaceKey never attempted to use any of its contractual remedies, it is precluded from arguing that the return-for-credit remedy failed of its essential purpose. <u>See</u> White & Summers, <u>supra</u>, § 13-10(a), at 603. Because SpaceKey cannot prove that the contractual remedy failed of its essential purpose, it is bound by the limitation of remedies in the TOS. <u>See</u> RSA 382-A:2-719(2). And, because SpaceKey has no remedy available to it other than the contractual remedies it declined to seek, there is no reason to try the question of the actual value of the FPGAs BAE delivered to SpaceKey. In other words, even if SpaceKey could prove that the FPGAs BAE delivered were worth less than the contract price under the theory it advances, BAE is entitled to judgment as a matter of law that SpaceKey is entitled to no further remedy for BAE's purported breach of warranty.

### 2. BAE's Claim for Breach of Contract

Under the common law of New Hampshire, "[a] breach of contract occurs when there is a failure without legal excuse to perform any promise which forms the whole or part of a contract." <u>Axenics, Inc. v. Turner Constr. Co.</u>, ___ N.H. ___, ___, No. 2011-219, 2013 WL 960175, at *6 (Mar. 13, 2013)

(quoting <u>Lassonde v. Stanton</u>, 157 N.H. 582, 588 (2008)).  As a defense to BAE's claim for breach of contract, SpaceKey has contended that BAE's breach of warranty, coupled with its own statutory right to deduct damages from the amount it owed BAE, <u>see</u> RSA 382-A:2-717, gave it a legal excuse for failing to perform its promise to pay BAE $1.8 million for the last 200 FPGAs BAE delivered.  It is difficult to see how that defense survives the limitation on remedies stated in Section 8(b) of the TOS.

Even if Section 8(b) did permit SpaceKey to interpose section 2-717 as a legal excuse for not paying full price for the last 200 FPGAs, the TOS includes another line of defense in the form of a provision in Section 6 requiring SpaceKey's payments to BAE to "be made . . . without recourse, setoff, or discount."  Pl.'s Mot. for Leave, Rea Decl., Ex. G (doc. no. 112-3), at 27.  In its first summary-judgment order in this case, the court denied BAE summary judgment on SpaceKey's counterclaim for breach of warranty and, for that reason, denied BAE summary judgment on its claim for breach of contract.  In so doing, the court left for another day a determination of whether Section 6 of the TOS precludes SpaceKey from relying on RSA 382-A:2-717.  The day to answer that question has arrived.

Under the heading "Deduction of Damages From the Price," New Hampshire's enactment of the U.C.C. provides that "[t]he buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract."  RSA 382-A:2-717.  Under the heading "Payment," Section 6 of the TOS provides, in pertinent part:

> Unless otherwise specified in writing by BAE SYSTEMS, terms of payment for Buyer are the earlier of net thirty (30) days from the date of invoice or upon delivery.  Payment shall be in U.S. dollars, net cash, Nashua, New Hampshire.  Payments are unconditional and shall be made as specified in the Order, without recourse, set off, or discount.

Pl.'s Mot. for Leave, Rea Decl., Ex. G (doc. no. 112-3), at 27. BAE contends that the third sentence of Section 6 leaves SpaceKey without a legal excuse for failing to pay for the last 200 FPGAs.  SpaceKey responds by arguing that Section 6 addresses the question of how it was obligated to make payments and "speaks the language of negotiable instruments," Def.'s Obj. to Summ. J. (doc. no. 44) 14, thus making it irrelevant to determining whether it had a legal right to withhold payment for the last 200 FPGAs.  BAE has the better argument.

According to SpaceKey, when BAE drafted Section 6, it: (1) used the term "unconditional" to override RSA 382-A:2-511(3), which provides that payment by check is conditional; (2) used

the term "without recourse" to "eliminate or reduce its
liability as an endorser upon receipt and endorsement of a
customer's check," Def.'s Obj. to Summ. J. (doc. no. 44) 15
(citing RSA 382-A:3-415); and (3) used the term "set off" to
"eliminate a particular defense to payment of the instrument,"
id. (citing Community Bank v. Ell, 564 P.2d 685, 687 (Or.
1977)).  SpaceKey also argues that "[a]lthough not defined, the
term 'discount' doubtless refers to the common commercial
practice of granting discounts for prompt or early payment,"
id., and that the reference to discount in Section 6 was
"intended to negate any . . . infiltration of trade usage
regarding discounts," id., into the agreement between itself and
BAE.  After acknowledging that the concept of "setoff" does have
applications beyond the law of negotiable instruments, SpaceKey
points out that setoff and recoupment are distinct legal
concepts, and argues that it is relying upon RSA 382-A:2-717 to
invoke its right to recoupment, not setoff.

There are distinctions to be drawn between setoff and
recoupment.  The definition of "setoff" includes the following:

> **1.** A defendant's counterdemand against the plaintiff,
> arising out of a transaction independent of the
> plaintiff's claim.  . . .  **2.** A debtor's right to
> reduce the amount of a debt by any sum the creditor
> owes the debtor; the counterbalancing sum owed by the
> creditor.

Black's Law Dictionary 1496 (9th ed. 2009).  The definition of

"recoupment" includes these components:

> **2.** The withholding, for equitable reasons, of all or
> part of something that is due.  . . .  **3.** Reduction of
> a plaintiff's damages because of a demand by the
> defendant arising out of the same transaction.  . . .
> **4.** The right of a defendant to have the plaintiff's
> claim reduced or eliminated because of the plaintiff's
> breach of contract or duty in the same transaction.

Id. at 1388.

According to SpaceKey, Section 6 of the TOS does not help

BAE because it withheld payment to BAE not as a setoff but,

rather, as "a recoupment counterclaim under Section 2-717."

Def.'s Obj. to Summ. J. (doc. no. 44) 16.  There are several

problems with that argument.  First, it is not at all clear that

section 2-717 grants a buyer a right to recoupment.  As one

treatise explains:

> Lawyers, from force of habit, are inclined to
> call this remedy of deduction by the name
> "recoupment."  Actually, however, there is a
> theoretical difference between deduction and
> recoupment.  Recoupment does not proceed on the
> assumption that the buyer owes the price upon the
> acceptance of defective goods.  . . .  Deduction, on
> the other hand, is based on the assumption that a
> buyer who has accepted the goods owes the contract
> price from which he is entitled to deduct damages
> resulting from nonconformities in the goods.  In many
> cases the dollar amounts under recoupment and
> deduction will be the same, but in some cases they
> will differ due to the fact that quasi-contractual
> principles are employed to determine the amount due
> where recoupment is the theory, whereas contractual
> principles are used where deduction is asserted.

Deduction is similar to counterclaim in that both proceed on the assumption that the buyer is liable for the price of the accepted goods.  Deduction, however, may be used as a self-help remedy until the seller sues for the price, at which point deduction may be asserted as an affirmative defense.  . . .

Deduction is often used as a self-help remedy. Commonly, the buyer will notify the seller that the goods did not conform to the contract, that the dollar value of the nonconformity comes to a certain amount, and that a check is enclosed for the price of the goods as diminished by this amount.[3]

2 William D. Hawkland, Uniform Commercial Code Series § 2-717:1 (2012) (footnotes omitted).  At the very least, SpaceKey may not be entirely accurate in its characterization of section 2-717 as a recoupment provision.

More importantly, however, whatever the true nature of the right granted by section 2-717 may be, that right is commonly described as a setoff.  As Professors White and Summers have explained:

If there is a minor defect in a product sold and if the buyer chooses to retain the product, he has the right under sections 2-711, 2-714, and 2-717 to set off his damages against the seller.  Whether he can set off all of these damages in the first installment or whether he must prorate them is not clear under 2-

---

[3] Here, SpaceKey made no contemporaneous effort to establish the dollar value of the alleged nonconformity of the last 200 FPGAs and diminish its payment accordingly.  Under SpaceKey's theory of damages, those FPGAs were worth something (between one third and one twelfth of the contract price), yet it has paid BAE nothing for them.  Thus, SpaceKey's current reliance on section 2-717 is substantially undermined by its conduct, which evinces a form of self help other than the one described in section 2-717.

717.  It is clear that he cannot stop paying entirely.
Rather, he simply reduces the total amount of his
payments by the amount of his damages.  Assume for
example that a windshield cracked two months after the
buyer purchased a car.  Assume further that it would
cost $300 to replace the windshield and that the buyer
chose to keep the car.  In those circumstances buyer's
damages under 2-714 would not normally exceed $300 and
the buyer would typically be permitted to set off that
amount – if indeed it could be proven that the
windshield broke because it was defective and not
because it was subjected to improper use.

2 James J. White & Robert S. Summers, Uniform Commercial Code §

17-9(d), at 218 (5th ed. 2008) (footnote omitted, emphasis

added).

Professors White and Summers are not alone in referring to

the right granted by section 2-717 as a right of setoff.  See,

e.g., Twin Disc, Inc. v. Big Bud Tractor, Inc., 772 F.2d 1329,

1336 (7th Cir. 1985) ("Section 2-717 . . . allows a buyer to

offset breach of contract damages"); Carlisle Corp. v. Uresco

Constr. Mats., Inc., 823 F. Supp. 271, 274 (M.D. Pa. 1993)

("Section 2-717 of the [U.C.C.] allows set-off"); Samuel, Son &

Co. v. Sierra Stainless, Inc., No. 3:09-cv-00291-RAM, 2010 WL

4237993, at *6 (D. Nev. Oct. 19, 2010) (describing section 2-717

as permitting offsets); Chainworks, Inc. v. Webco Indus., Inc.,

No. 1:05-CV-135, 2006 WL 461251, at *11 (W.D. Mich. Feb. 24,

2006) ("Section 2-717 grants a buyer a right of setoff"); Ning

Shing (U.S.A.), Inc. v. Howard Berger Co., No. CIV. 97-604(WGB),

1998 WL 684244, at *4 (D.N.J. Mar. 16, 1998) (stating that

section 2-717 "recognizes a buyer's right to setoff"); <u>Midwest</u>
<u>Grain Prods., Inc. v. Envirofuels Mktg., Inc.</u>, Civ. A. No. 95-
2355-EEO, 1996 WL 445070, at *7 (D. Kan. July 12, 1996)
(characterizing section 2-717 as granting buyer "remedy of
setoff"); <u>Sencom Sys., Inc. v. W.R. Bonsal Co.</u>, No. 85 C 8250,
1986 WL 10989, at *3 (N.D. Ill. Sept. 29, 1986) (discussing
"plaintiff's right of setoff under U.C.C. § 2-717"); <u>Berdex</u>
<u>Int'l, Inc. v. Milfico Prepared Foods, Inc.</u>, 630 N.E.2d 998,
1001 (Ill. App. Ct. 1994) (explaining that section 2-717 allows
buyer "to file a counterclaim in the nature of a setoff"); <u>Lee</u>
<u>v. Coastal AgroBus., Inc.</u>, No. 09 CVS 1719, 2012 WL 2356522, at
*3 (N.C. Super. Ct. June 21, 2012) (describing section 2-717 as
permitting offsets).  While acknowledging Judge Boudin's
observation that "the two terms [i.e., 'recoupment' and
'setoff'] are not always used with precision," <u>ITV Direct, Inc.</u>
<u>v. Healthy Solutions, LLC</u>, 445 F.3d 66, 71 n.3 (1st Cir. 2006),
this court has no difficulty construing the "without offset"
language in Section 6 as precluding SpaceKey from invoking the
right provided by RSA 382-A:2-717.

Finally, however, even if SpaceKey were not precluded from
engaging in self-help pursuant to RSA 382-A:2-717, whatever that
form of self-help may be called, the section 2-717 jurisprudence
establishes that under the circumstances of this case, SpaceKey

43

had no damages to recoup by means of a deduction from the amount it owed BAE.  It is undisputed that SpaceKey has sold all of the 200 allegedly nonconforming FPGAs to its customers for the same amounts those customers had agreed to pay for conforming FPGAs. Under those circumstances, a section 2-717 deduction would give SpaceKey a windfall, which is impermissible.  See 4A Lawrence, supra, § 2-717:11, at 976 ("It is generally inappropriate to allow a party a windfall due to the breach by the other party.") (citing Lindstrom v. Patriot Homes, Inc., 709 N.W.2d 112 (Wis. Ct. App. 2005)).

In Carbontek Trading Co. v. Phibro Energy, Inc., Carbontek contracted to sell Phibro a load of coal, and Phibro contracted to sell that same coal to Elkraft Power Co.  See 910 F.2d 302, 303 (5th Cir. 1990).  Both contracts included specifications regarding the quality of the coal.  See id.  The coal Carbontek provided did not comply with the specifications because was mixed with a substance called "pet coke," which was considered a contaminate.  See id.  Phibro told Elkraft that "[a]s full compensation for the contamination . . . we will from the invoice value deduct a lump sum of USD 192,000."  Id. at 306. Elkraft then "paid Phibro the original contract price less $192,000."  Id. at 304.  Phibro, in turn, deducted $192,000 from its payment to Carbontek.  See id.

44

Carbontek sued Phibro for the full amount due under the parties' contract.  After a bench trial, the judge made the following relevant findings and rulings:

> Phibro's acceptance [of the contaminated coal] was subject to its right to claim damages for the inclusion of approximately 10% pet coke, under UCC section 2-714.  The damages would be the difference between the value of the goods delivered and their value had the cargo not been controverted, and under UCC section 2-717, Phibro could deduct such damages from the price due under the contract.

Carbontek, 910 F.2d at 305.  The trial court, however, did not allow Phibro to deduct from its payment to Carbontek the full $192,000 it deducted from its invoice to Elkraft.  The court of appeals modified the judgment to incorporate the full deduction. It began its analysis this way:

> Phibro argues that $192,000 is a reasonable calculation of the difference in fair market value between the conforming and nonconforming coal, because that is the reduction in Elkraft's price that Elkraft required in return for accepting the nonconforming coal.  Under New York law, "when a seller delivers nonconforming goods to ultimate buyers, the intermediate buyer may claim as damages the amount it had to pay the ultimate buyers to compensate them for the delivery of the defective goods."  Happy Dack Trading Co. v. Agro-Industries, Inc., 602 F. Supp. 986, 994 (S.D.N.Y. 1984) (citing Rite Fabrics, Inc. v. Stafford-Higgins Co., 366 F. Supp. 1 (S.D.N.Y. 1973)). In Happy Dack, the court accepted as a reasonable measure of damages a specified amount of compensation that an intermediate buyer of resin agreed to pay the ultimate buyer in exchange for the ultimate buyer's agreement to keep the defective resin.  Because the parties fixed the amount of compensation pursuant to arm's length bargaining, the court concluded that that amount could be considered the difference in fair

> market value between conforming and nonconforming
> resin.  Happy Dack, 602 F. Supp. at 994.  Phibro
> argues that the district court should have applied the
> same principle in this case.

Carbontek, 910 F.2d at 305-06.  The court of appeals agreed with

Phibro: "In accordance with Happy Dack . . . we think $192,000

is a reasonable measure of Phibro's damages."  Id. at 306.  In

accordance with Carbontek, it would seem that zero would be a

reasonable measure of SpaceKey's damages, given the undisputed

fact that in its role as an intermediate buyer, SpaceKey, unlike

Phibro, received full payment from the ultimate buyers for the

allegedly nonconforming goods it sold them.

Adam Metal Supply, Inc. v. Electrodex, Inc., 386 So. 2d

1316 (Fla. Dist. Ct. App. 1980), also involved an intermediate

buyer that was situated similarly to Phibro and SpaceKey.  In

that case, the seller delivered 200 sheets of nonconforming

aluminum.  See id. at 1317.  The intermediate buyer refused to

pay for any of it.  See id.  The seller "sued for the purchase

price [and] [t]he court denied [the seller] any relief because

it found that the shipment was nonconforming [which] thereby

entitled [the intermediate buyer] to a set-off [equaling the

full contract price] of $3,069."  Id. at 1318.  On appeal, that

setoff was reduced because the intermediate buyer was able to

use forty percent of the nonconforming aluminum to make fixtures

it sold to the ultimate buyer that had originally contracted to purchase fixtures made from conforming aluminum.  See id. (applying U.C.C. §§ 607(3)(a), 714, and 717).  The application of Adam Metal to the undisputed facts of this case is self-evident; SpaceKey's resale of all the nonconforming FPGAs for full price eliminates its right to any setoff under section 2-717.

To similar effect is the decision in Society National Bank v. Pemberton, 409 N.E.2d 1073 (Akron Mun. Ct. 1979).  In that case, a lender sued on a promissory note given in exchange for a loan that one of the defendants had used to purchase a truck.  See id. at 1075.  After "[t]he plaintiff acknowledged at trial that any defenses available against [the dealership that sold the truck] would also be available against the plaintiff," id., the court was faced with determining the amount the defendant was entitled to deduct from the amount he owed on the note, as a result of the dealer's breach of warranty.  The court first stated the rule that "[t]he measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted."  Id. at 1077 (citing U.C.C. § 2-714(2)).  Then it calculated damages:

> The court finds the purchase price of the
> contract ($4,489.20) to be a reasonable indication of
> the market value of the truck if it had been as
> warranted.  The price at which the truck was resold
> ($2,425) after being repossessed from the defendant is
> a valid indication of its actual market value absent
> the seller's glowing representations.  The defendant
> is entitled to the difference between these two values
> as damages for breach of express warranty.

Id. Applying that reasoning to this case yields the same result

as applying the reasoning from Carbontek and Adam Metal:

SpaceKey's resale of the allegedly nonconforming FPGAs to its

customers for the same amount they would have paid for

conforming FPGAs establishes that the market value of the

nonconforming FPGAs was the same as the market value of

conforming FPGAs, which left SpaceKey without any damages

resulting from BAE's alleged breach of warranty.

Based on the foregoing, the court concludes that, as with

SpaceKey's counterclaim for breach of warranty, BAE's claim for

breach of contract involves no triable issue of fact.  As a

matter of law, SpaceKey had no legal excuse not to pay for the

last 200 FPGAs but, even if it had such an excuse, the

undisputed facts of the case show that SpaceKey suffered no

damages that could have been lawfully deducted from the amount

it owed BAE.[4]  Accordingly, BAE is entitled to judgment in the
amount of $1.8 million against SpaceKey on its claim for breach
of contract.

### 3. The Remainder of Issue One

The court's show-cause order, and the parties' subsequent
briefing, do not reach the full extent of Issue One.  While it
would appear that the court's disposition of BAE's Count IV and
SpaceKey's Count Four would render BAE's Counts III, V, and VI
moot, that is not for the court to decide at this juncture, as
the court did not include those counts in its show-cause order.
In addition, Issue One appears to involve a claim for costs and
attorney's fees stated in Count IV of BAE's amended complaint.
That claim also remains to be resolved.

**Issue Two**

In their assented-to statement of the case, the parties
frame the second issue this way:

---

[4] In a previous order, the court noted the possibility that
an intermediate buyer such as SpaceKey, that had been paid in
full, could be at risk of injury as a result of buying and
reselling defective merchandise, see Order (doc. no. 58) 30-32.
But SpaceKey has made no requests for factual findings that, if
granted, would preclude the court from employing the reasoning
of Ed S. Michelson, Inc. v. Nebraska Tire & Rubber Co., 63 F.2d
597 (8th Cir. 1933), and ruling that SpaceKey has not adequately
demonstrated damages.

The second issue concerns the parties' rights and obligations with respect to purchase orders BAE Systems accepted from SpaceKey prior to the termination of the Consultant Agreement on February 8, 2010.  BAE Systems refused to fill these accepted purchase orders and eventually terminated them.  BAE Systems seeks a declaratory judgment that it properly terminated three unfilled purchase orders pursuant to its rights under the applicable terms of sale. (Amended Complaint Count I.)  SpaceKey contends that BAE Systems accepted five purchase orders prior to February 8, 2010 (not three), that BAE Systems improperly refused to fill these purchase orders, and that it is entitled to the benefit of the bargain damages it suffered as a result.

Def.'s Pretrial S'ment (doc. no. 115) 2; Pl.'s Pretrial S'ment

(doc. no. 119) 2.  In its previous order, the court directed

BAE [to] show cause why SpaceKey should not be granted judgment as a matter of law on what remains of the request for declaratory judgment stated in Count I of BAE's amended complaint, and [directed] SpaceKey [to] show cause why BAE should not be granted judgment as a matter of law on the portion of Count One of SpaceKey's counterclaim in which it asserts that BAE breached the Consultant Agreement by failing to process the pending purchase orders.

Order (doc. no. 112) 17 (footnote omitted).

Notwithstanding the court's directive that SpaceKey show

cause why BAE should not be granted judgment as a matter of law

on a portion of Count One of SpaceKey's counterclaim, SpaceKey's

memorandum in response to the show-cause order is directed

exclusively to Issue One, and its response to BAE's memorandum

is directed exclusively to refuting BAE's arguments concerning

Count I of its amended complaint.  Because SpaceKey's failure to

pay for the last 200 FPGAs gave BAE the right to defer shipments or deliveries on all of SpaceKey's pending purchase orders, SpaceKey had no legal right to have its pending purchase orders filled by BAE, as discussed more fully in the court's previous order.  See doc. no. 122, at 16-17.  Accordingly, BAE is entitled to judgment as a matter of law on the portion of Count One of SpaceKey's counterclaim in which it asserts that BAE breached the Consultant Agreement by failing to process five pending purchase orders.

The parties do, however, engage on the first part of Issue Two, the court's directive to BAE to show cause why SpaceKey should not be granted judgment as a matter of law on the remainder of Count I of BAE's amended complaint.  BAE argues that: (1) the court should abstain from ruling on the extent of its obligation to perform under the unfilled purchase orders; (2) the 2007 TOS gave it the right to require payment before delivery on the unfilled purchase orders and later terminate them; and (3) the court may resolve Issue Two even if a trial is necessary to resolve the breach-of-warranty counterclaim addressed in Issue One.  BAE's third argument is moot, as no trial is necessary to resolve SpaceKey's counterclaim for breach of warranty.  BAE's first argument is beside the point, as the court proposed in its earlier order to do nothing more than rule

on BAE's request for a declaratory judgment.  In its amended
complaint, BAE asks the court to declare that it properly
terminated SpaceKey's pending purchase orders.  BAE does not ask
the court to determine what its obligations might be if the
court rules that BAE did not have the right to terminate those
purchase orders.  Thus, all that remains is BAE's second
argument, which is not persuasive, largely for the reasons
articulated in SpaceKey's responsive memorandum.

        In Count I of its amended complaint, BAE seeks a
declaratory judgment that it rightfully terminated some number
of pending purchase orders submitted to it by SpaceKey due to
SpaceKey's failure to pay in advance for the items it sought to
purchase.  In its previous order, the court proposed to grant
SpaceKey judgment as a matter of law on that issue, on grounds
that: (1) the purchase orders BAE terminated were all subject to
the 2008 TOS; (2) the 2008 TOS did not grant BAE the right to
demand advance payment; and (3) without a right to advance
payment, BAE had no right to terminate SpaceKey's pending
purchase orders when SpaceKey declined to make payment in
advance.  BAE now argues that: (1) the 2007 TOS, which governed
the purchase and sale of FPGAs, gave it the right to require
advance payment for all future purchases, not just those
governed by the 2007 TOS; and (2) SpaceKey's failure to pay in

advance, on demand, for items subject to the purchase orders
pending on February 8, 2010, gave BAE the right, pursuant to RSA
382-A:2-309, to terminate those purchase orders.  BAE's argument
is based upon an erroneous construction of Section 6 of the 2007
TOS.

All agree that the 2008 TOS, which governed the
transactions in which BAE terminated SpaceKey's purchase orders,
did not grant BAE a right to demand prepayment.  The 2007 TOS
did grant BAE such a right, in the following two sentences drawn
from Section 6 of that document:

> If Buyer shall fail to make any payment in accordance
> with the terms and conditions hereof, BAE SYSTEMS, in
> addition to its other rights and remedies, may, at its
> option, defer shipments or deliveries hereunder, or
> under any other contract with Buyer.  BAE SYSTEMS
> reserves the right to require payment before delivery
> if credit information on Buyer is lacking or
> unfavorable.

Pl.'s Mot. for Leave, Rea Decl., Ex. G (doc. no. 112-3), at 27.
Here is the crux of BAE's argument that the Section 6 of the
2007 TOS gave it the right to demand prepayment in connection
with purchase orders that were subject to the 2008 TOS:

> When this passage [i.e., the language quoted above] is
> read as a whole, the phrase "hereunder, or any other
> contract with Buyer" establishes not only the scope of
> the right to defer deliveries, but also the scope of
> the right to demand payment before delivery.  Thus,
> upon a buyer's payment default, [Section] 6 allows BAE
> Systems to defer delivery and demand payment before
> delivery on all contracts pending with the buyer.  . .
> .  With respect to [Section] 6, the term "delivery" in

the sentence establishing the right to demand payment
before delivery is informed by - and builds upon – the
phrase in the prior sentence "deliveries hereunder, or
under any other contract with Buyer."  By comparison,
had the right to demand payment before delivery been
intended only to apply to the order "hereunder" . . .
then the sentence would have employed either the term
"Order" or "Deliverables."  . . .  The absence of
those defined terms [from Section 6] is meaningful
because it demonstrates an intention for the right to
demand payment before delivery to apply to all pending
orders with the buyer, not just the specific order to
which the terms of sale [is] attached.

Pl.'s Resp. (doc. no. 125) 5-6 (emphasis added).

There are at least three problems with BAE's construction

of Section 6.  First, according to its plain language, the

sentence describing BAE's right to defer shipments or deliveries

applies to shipments or deliveries required by both the contract

under which the Buyer has failed to make payments, and "under

any other contract with Buyer," but the next sentence describes

BAE's right to "require payment before <u>delivery</u>" (emphasis

added), while saying nothing about any deliveries under other

contracts with the Buyer.  In other words, BAE's proposed

construction reads something into the second sentence that its

drafter could have written into it, but did not.  Relatedly, use

of the term "delivery" rather than "deliveries" in the sentence

granting BAE the right to require prepayment further suggests

that the right to require prepayment was restricted to delivery

under the contract at issue while the right to defer extended to deliveries under all of the contracts between BAE and SpaceKey.

The second problem with SpaceKey's construction is that it ignores the fact that in addition to specifying different consequences, i.e., deferral and prepayment, the two sentences quoted above have different triggering events.  The first sentence gave BAE the right to defer shipments if SpaceKey failed to make payments.  The second sentence gave BAE the right to demand prepayment "if credit information on Buyer [was] lacking or unfavorable."  BAE's construction of Section 6, and its attempt to rely on the right to demand prepayment stated therein, fails to acknowledge the proviso that its right to demand prepayment was triggered by something not at issue in this case: the availability and/or content of credit information on SpaceKey.

Finally, BAE's construction of Section 6 of the 2007 TOS, and its extrapolation from that construction, has the inevitable effect of adding something to the 2008 TOS that was not placed there by its drafter.  The 2008 TOS, which applied to the purchase orders BAE terminated, gave BAE the right to terminate purchase orders under a variety of circumstances, but did not give BAE the right to terminate a purchase order if SpaceKey breached the terms and conditions of some other contract.

In New Hampshire, it is well established that "[w]hen interpreting a written agreement, [a court should] give the language used by the parties its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole." In re Taber-McCarthy, 160 N.H. 112, 115 (2010) (citing Czumak v. N.H. Div. of Devt'l Servs., 155 N.H. 368, 373 (2007)).  Here, Section 6 of the 2007 TOS gave BAE a right to: (1) defer shipments or deliveries under all contracts with SpaceKey, if SpaceKey failed to make any payment required under any contract subject to the 2007 TOS; and (2) demand payment in advance for shipments under any particular contract subject to the 2007 TOS, if credit information on SpaceKey was lacking or unfavorable.

The right upon which BAE relies to establish the validity of its termination of SpaceKey's pending purchase orders, i.e., a right to demand prepayment under all agreements with SpaceKey once SpaceKey defaulted on its payment obligations under any agreement, appears nowhere in any iteration of the TOS.  While the court can appreciate why BAE might now wish that the 2007 TOS included such a term, it does not have the power to effect such a radical rewriting of that document.  See Centorr-Vacuum Indus., Inc., v. Lavoie, 135 N.H. 651, 654 (1992).  For the foregoing reasons, SpaceKey is entitled to judgment as a matter

of law on BAE's request for a declaratory judgment that it rightfully terminated SpaceKey's pending purchase orders.

In summary, BAE has said nothing to sway the court from the analysis of Issue Two described in its previous order.  BAE is not entitled to the declaratory judgment it seeks in Count I, but is entitled to judgment as a matter of law on the counterclaim SpaceKey asserts in Count One based upon BAE's failure to fill its pending purchase orders.  In view of that stalemate, it would appear that nothing remains of those claims for further resolution.  BAE did not properly terminate the three purchase orders it says are at issue, but it did properly defer filling them, and nothing has happened to remedy the situation that allowed BAE to take that action.  Thus, those purchase orders remain in limbo, and it is up to the parties, in the first instance, to determine how they wish to deal with them.

### Issue Three

In their assented-to statement of the case, the parties frame the third issue this way:

> The third and final issue concerns the amount, if any, SpaceKey is due for commissions under the Consultant Agreement.  BAE Systems seeks a declaratory judgment that it owes no commissions and, in particular, that whatever commissions may have once been owed under purchase order SKC12508 have been offset by the costs and attorneys' fees BAE Systems has already incurred in this litigation to collect the

57

> outstanding balance owed for SKC12508.  (Amended
> Complaint Count II.)  BAE Systems contends this offset
> is expressly authorized under the Consultant
> Agreement.  SpaceKey seeks a damage award for the
> commissions allegedly due under SKC12508 as well as
> for commissions on an assortment of other sale
> transactions that were completed – or should have been
> completed – between 2008 and 2010.  (Counterclaim
> Count Two.)

Def.'s Pretrial S'ment (doc. no. 115) 2; Pl.'s Pretrial S'ment

(doc. no. 119) 2.  In its previous order, the court directed

> BAE [to] show cause why SpaceKey should not be granted
> judgment as a matter of law on: (1) what remains of
> the request for declaratory judgment stated in Count
> II of BAE's amended complaint; and (2) the claim for
> commissions on the sales of the 435 FPGAs for which
> BAE has received payment in full, stated in Count Two
> of SpaceKey's counterclaim.

Order (doc. no. 112) 20 (footnote omitted).

In Count II of its amended complaint, BAE seeks, among

other things, a declaration that SpaceKey is not entitled to any

commissions under the parties' Consultant Agreement.  In Count

Two of its counterclaim, SpaceKey seeks, among other things,

commissions it says it earned on the sale of the 435 FPGAs for

which it paid SpaceKey in full.  In its previous order, the

court proposed to grant SpaceKey summary judgment on those

issues, based on the inapplicability of the provision in the

Consultant Agreement on which BAE based its failure to pay

commissions on the consummated sales of 435 FPGAs.  Nothing in

BAE's response to the court's show-cause order persuades the

court to move away from the rationale set out therein.

Under the heading "Compensation for Services," Section 4A

of the Consultant Agreement provides, in pertinent part:

> As full compensation for services performed by
> CONSULTANT [i.e., SpaceKey] hereunder, BAE SYSTEMS
> agrees to pay CONSULTANT, upon completion of each sale
> by BAE SYSTEMS of Products to a Qualified Buyer in the
> Territory a fee equal to five per cent (5%) of the Net
> Sales Price of said Products . . . .  The fee shall be
> earned on a proportional basis upon receipt by BAE
> SYSTEMS of each installment of the Net Sales Price.
>
> It is understood that if a sales contract should be
> rescinded, revoked or repudiated by a buyer for
> reasons beyond BAE SYSTEMS' control or by BAE SYSTEMS
> for a buyer's breach of contract or by either party
> for force majeure causes, CONSULTANT shall not be
> entitled to a fee with respect to such sales, except
> pro rata, to the extent of any amount BAE SYSTEMS may
> have previously received and to which the buyer
> asserts no claim for refund or any recovery that BAE
> SYSTEMS obtains based on buyer's breach, after
> deduction of BAE SYSTEMS' costs, including attorneys'
> fees.

Pl.'s Mot. Summ. J., Rea Decl., Ex. B (doc. no. 57-4), at 2-3.

In BAE's view, SpaceKey the buyer, which had been brought to BAE

by SpaceKey the consultant, repudiated its agreement with BAE to

purchase FPGAs by "refus[ing] to acknowledge the terms of the

contract for the sale of the FPGAs and to pay what the contract

obligate[d] [it] to pay."  Pl.'s Resp. (doc. no. 125) 9.  BAE

also notes SpaceKey's claim for a substantial refund of the

amount it has already paid for the first 435 FPGAs.

Given the court's determination, with respect to Issue One, that SpaceKey has suffered no compensable injury as a result of the alleged nonconformance of the first 435 FPGAs that BAE delivered, there is nothing in the Consultant Agreement to protect BAE from its obligation to pay commissions on the sales of those FPGAs.  As for BAE's argument that SpaceKey repudiated its agreement with BAE by failing to pay for the final 200 FPGAs,[5] the court concludes that under even the most generous plain-meaning analysis, the action BAE wants to call "repudiation" is nothing other than a breach of SpaceKey's agreement to pay for the FPGAs BAE delivered.  Moreover, even if SpaceKey's failure to pay for those FPGAs could somehow be understood as a repudiation of the contract, BAE does not even attempt to address the contractual requirement that for it to escape liability for paying SpaceKey a commission, SpaceKey's repudiation must have been "for reasons beyond BAE SYSTEMS' control."  Pl.'s Mot. Summ. J., Rea Decl., Ex. B (doc. no. 57-4), at 2.

So, here is where things stand with respect to Issue Three. BAE has failed to show cause why SpaceKey should not be granted judgment on the portion of Count II of BAE's amended complaint

---

[5] Plainly, there is no basis for BAE to argue that SpaceKey repudiated its agreement to purchase the first 435 FPGAs; SpaceKey took delivery of those parts and paid for them in full.

in which BAE asks the court to determine that it owes SpaceKey
no further commissions.  BAE has also failed to show cause why
SpaceKey is not entitled to a five percent commission on the
sales of the first 435 FPGAs.  What remains to be resolved,
however, is the amount of commissions that SpaceKey may be owed
on other transactions, including the sale of the final 200
FPGAs, for which SpaceKey now owes BAE $1.8 million.  Resolution
of that issue will also entail determining whether BAE is
entitled to deduct from any commissions it may owe the costs it
has incurred in recovering payment from SpaceKey for the last
200 FPGAs.[6]

### Conclusion

With regard to the claims involved in Issue One, even if
the court were to make all the factual findings requested by
SpaceKey, BAE would be entitled to a judgment of $1.8 million,
which is the amount that SpaceKey has not paid BAE for the last
200 FPGAs.  Two matters remain to be determined: (1) whether BAE
is entitled to the costs and attorneys' fees it has incurred to
secure its judgment against SpaceKey; and (2) the final
disposition of Counts III, V, and VI of BAE's amended complaint.

---

[6] Given the way the parties have phrased Issue Three, it
seems as if BAE may be arguing that it is entitled to deduct
from the commissions it owes in the first 435 FPGAs the costs it
has incurred in securing payment for the last 200 of them.

The claims involved in Issue Two are a wash; as a matter of law, BAE had no right to terminate SpaceKey's purchase orders, but because BAE did have a right to defer deliveries under those purchase orders, SpaceKey has no claim against BAE for failing to fill them.  With regard to the claims involved in Issue Three, BAE had no right to withhold the commissions SpaceKey earned for selling the first 435 FPGAs.  Two aspects of Issue Three remain: (1) the amount of commissions, if any, that SpaceKey is due on sales other than its sales of the first 435 FPGAs; and (2) whether, and to what extent, BAE is entitled to use its litigation expenses to offset whatever commissions it may owe SpaceKey.

In light of the foregoing, the parties shall confer and determine how they wish to go about resolving the relatively few issues that remain in this case.  Within thirty days from the date of this order, they shall notify the court, in writing, how they wish to proceed.  The court expects that the parties will be able to come to an agreement on this matter.

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge

April 22, 2013

cc:    Jonathan M. Shirley, Esq.
       Jeffrey C. Spear, Esq.
       Daniel E. Will, Esq.
       Joshua M. Wyatt, Esq.